PAN:AB
F.#2003R01783

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

VINCENT BASCIANO,

          Petitioner,

   - against -                   12 CV 280(NGG)
                                 (Related to 03 CR 929(NGG))
UNITED STATES OF AMERICA,

          Respondent.

- - - - - - - - - - - - - - - -X


GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER
VINCENT BASCIANO'S PETITION PURSUANT TO 28 U.S.C. § 2255 AND HIS
MOTION TO RECUSE THE DISTRICT COURT


                                       LORETTA E. LYNCH
                                       United States Attorney
                                       Eastern District of New York
                                       271 Cadman Plaza East
                                       Brooklyn, New York  11201


Amy Busa
Assistant United States Attorney
    (Of Counsel)

TABLE OF CONTENTS

Page

STATEMENT OF FACTS . . . . . . . . . . . . . . . . 4

I.    Overview . . . . . . . . . . . . . . . . . . 4

II.   The 2006 Trial . . . . . . . . . . . . . . . 5

      A.   The Bonanno Family and Basciano's Membership . . . . 6

      B.   The Racketeering Acts . . . . . . . . . . . 8

           1.   The Conspiracy to Murder, and
                Attempted Murder of, David Nunez . . . . . . . . 8

           2.   Illegal Gambling Operations . . . . . . . . 13

III.  The 2007 Trial . . . . . . . . . . . . . . . 14

      A.   The Santoro Murder/Murder Conspiracy . . . . . . . 15

      B.   The Martino Murder Solicitation . . . . . . . . 20

      C.   The Vitale Murder Solicitation . . . . . . . . 23

      D.   Marijuana Conspiracy . . . . . . . . . . . 24

      E.   Gambling . . . . . . . . . . . . . . . . 24

      F.   The Defense's Impeachment of Cicale . . . . . . . 25

V.    Admission of Pizzolo Homicide Evidence . . . . . . . . 26

VI.   Government's Jury Addresses Referencing
      Pizzolo Homicide . . . . . . . . . . . . . . 30

VII.  The Government's *Brady* Disclosures . . . . . . . . 32

VIII. The False Murder Plot Allegation . . . . . . . . . . 34

IX.   Basciano's Rule 33 Motion Relevant to
      His First Appeal . . . . . . . . . . . . . . 35

X.    Basciano's Direct Appeal . . . . . . . . . . . . 37

XI.   The 2010 New Trial Motion . . . . . . . . . . . 39

XII. Basciano's Capital Trial . . . . . . . . . . . . . . . . 43

XIII. Basciano's History Of Recusal Motions . . . . . . . . 44

XIV. Basciano's Habeas Petition . . . . . . . . . . . . . . 50

      A.    Gambina's Proffer Statements
           Regarding The Pizzolo Murder . . . . . . . . . 52

           1.   Gambina's Proffer Statements . . . . . . . . 52

           2.   Cicale's 2007 Trial Testimony Relating
               To Gambina's Role In The Pizzolo Homicide . . 54

      B.    Cicale's Awareness Of Whether He
           Would Be Charged With The Santoro Murder . . . . . 59

      C.    Sixth Recusal Motion . . . . . . . . . . . . . 65

           1.   Cicale's Sentencing . . . . . . . . . . . 66

           2.   History of Rulings Concerning
               The "Hit List" . . . . . . . . . . . . . . 69

           3.   Alleged Interference With
               Attorney-Client Relationship . . . . . . . 72

           4.   Denial of Basciano's Motion For A Stay . . . 76

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . 82

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 83

I.    MANY OF BASCIANO'S CLAIMS ARE PRECLUDED . . . . . . . 83

      A.   Legal Standards Applicable to
          § 2255 Petitions . . . . . . . . . . . . . . . 85

II.   Grounds One and Two: Counsel Was Not
     Ineffective In Failing To Object To
     Instructions On The Use Of Other Crimes
     Evidence Or In Failing To Argue That The
     Undisclosed Pizzolo Evidence Was Brady
     Material Because It Was Part Of The Charged Crime . . . 88

III.  GROUND THREE: BASCIANO CANNOT ESTABLISH A BRADY
     VIOLATION FROM THE FAILURE TO DISCLOSE THE GAMBINA
     PROFFER AND THE CICALE/SANTORO INFORMATION . . . . . . 98

      A.   Legal Standard . . . . . . . . . . . . . . . . 99

B.   The New Information Does Not
     Establish a Brady/Giglio Violation . . . . . . . .  99

IV.  GROUNDS FOUR AND FIVE: THE GOVERNMENT DID
     NOT KNOWINGLY PERMIT THE INTRODUCTION OF FALSE
     TESTIMONY AT EITHER TRIAL, NOR DID IT ENGAGE IN
     PROSECUTORIAL MISCONDUCT BY SUPPRESSING THE
     GAMBINA INFORMATION OR THE CICALE/SANTORO
     INFORMATION . . . . . . . . . . . . . . . . . . . . 109

     A.   Legal Standard . . . . . . . . . . . . . . . . 110

     B.   The Government Did Not Engage In
          Prosecutorial Misconduct By Either
          Suppressing Evidence Or Introducing
          False Testimony . . . . . . . . . . . . . . . 115

V.   GROUND SIX: BASCIANO'S CLAIM THAT THE SUPPRESSION
     OF PIZZOLO-RELATED INFORMATION "DESPOILED" THE
     DISTRICT COURT'S CALCULUS UNDER RULE 403 ABOUT
     WHETHER TO ADMIT EVIDENCE OF THE PIZZOLO
     HOMICIDE LACKS MERIT . . . . . . . . . . . . . . . 125

VI.  GROUND SEVEN: USE OF NON-RACKETEERING ACTIVITY TO
     PROVE A PATTERN OF RACKETEERING ACTIVITY IS NOT
     CONTRARY TO THE RICO STATUTE AND DID NOT RENDER
     THE RICO STATUTE OVERBROAD, VAGUE OR OTHERWISE
     VIOLATE BASCIANO'S DUE PROCESS RIGHTS . . . . . . . 126

     A.   Legal Standards . . . . . . . . . . . . . . . 126

     B.   Use Of Other Crimes Evidence To Establish
          The Pattern Element Does Not Render RICO
          Overbroad Or Void For Vagueness . . . . . . . 127

VII. GROUND EIGHT: COUNSEL WAS NOT INEFFECTIVE IN
     FAILING TO ARGUE THAT THE PERMITTED USE OF
     OTHER CRIMES EVIDENCE TO ESTABLISH A PATTERN
     OF RACKETEERING AMOUNTED TO A CONSTRUCTIVE
     AMENDMENT OF THE INDICTMENT . . . . . . . . . . . . 130

     A.   Legal Standards . . . . . . . . . . . . . . . 130

     B.   Basciano's Counsel Was Not Ineffective In
          Failing To Raise A Constructive Amendment
          Claim . . . . . . . . . . . . . . . . . . . . 131

VIII.     GROUND NINE: COUNSEL WAS NOT INEFFECTIVE
IN FAILING TO OBJECT TO HEARSAY TESTIMONY
REGARDING THE PIZZOLO MURDER OR IN FAILING
TO CHALLENGE THE ADMISSION OF SUCH TESTIMONY
ON APPEAL . . . . . . . . . . . . . . . . . . . . . 133

IX.    GROUND TEN: TRIAL COUNSEL WAS NOT INEFFECTIVE
BY CONCEDING ELEMENTS OF THE CHARGED CRIME . . . . . . . 135

X.     GROUND ELEVEN: AUSAS ANDRES AND BURETTA
DID NOT SHOW ACTUAL PROSECUTORIAL BIAS . . . . . . . . . 138

    A.   Legal Standards . . . . . . . . . . . . . . . 140

    B.   Basciano Has Not Established Actual Bias
Or Prosecutorial Misconduct By AUSAs Andres
and Buretta . . . . . . . . . . . . . . . . . 141

XI.   BASCIANO'S MOTION FOR RECUSAL LACKS MERIT . . . . . . . 147

    A.   Legal Standards . . . . . . . . . . . . . . . 150

    B.   Basciano Has Not Demonstrated
That The Court Must Recuse Itself . . . . . . . . . 152

        1.   Cicale's Sentencing . . . . . . . . . 152

        2.   The Court's Rulings On The Purported
Hit List And The Request For A Stay . . . . . 157

        3.   The Court's Alleged Interference With
Basciano's Attorney-Client Relationships . . . 159

            a.   Alleged Conflict Regarding Barone . . . . 159

            b.   The Court's Relieving of Jane Simkin
Smith . . . . . . . . . . . . . . . 163

XII.  AN EVIDENTIARY HEARING REGARDING
BARONE'S INFORMATION IS NOT NECESSARY . . . . . . . . . 168

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 170

Vincent Basciano has filed a petition, pursuant to 28 U.S.C. § 2255, asserting eleven grounds of error in his trials in connection with United States v. Basciano, 03-CR-929. Basciano was convicted, after two jury trials, of racketeering conspiracy (18 U.S.C. § 1962), racketeering (18 U.S.C. § 1962), three counts of conducting an illegal gambling business (18 U.S.C. § 1955) and conspiring to distribute marijuana (21 U.S.C. § 846). He was sentenced to life imprisonment, with five years of supervised release, and forfeiture in the amount of $5,400,000. Following his direct appeal, his conviction was affirmed by summary order. United States v. Basciano, 384 Fed. Appx. 28 (2d Cir. Jul. 16, 2010). Following his trial and while his direct appeal was pending, Basciano filed his third motion for a new trial pursuant to Fed. R. Crim. P. 33, which was denied. United States v. Basciano, 2010 WL 3325409 (E.D.N.Y. 2010). The denial of Basciano's third new trial motion was affirmed by summary order. United States v. Basciano, 465 Fed. Appx. 9 (2d Cir. 2012).

Basciano's habeas petition raises several claims that have previously been raised in this Court and in the Second Circuit, including claims relating to the government's alleged failure to disclose information relating to the murder of Randolph Pizzolo, an uncharged crime, and relating to further impeachment of one of the government's cooperating witnesses, Dominick Cicale. Basciano also claims ineffective assistance of his various trial

3

and appellate counsel primarily relating to their alleged failure to challenge the use of the Pizzolo homicide evidence at trial, their failure to make certain arguments Basciano believes were meritorious and their failure in conceding certain elements at trial.  For the reasons provided below, Basciano's arguments lack merit.[1]

Along with his habeas petition, Basciano has filed his sixth recusal motion, seeking the Court's recusal on the grounds of actual bias or the appearance of bias, primarily based on the Court's sentencing of Dominick Cicale, the cooperating witness who testified against Basciano in both trials, and based on instances in which Basciano claims the Court interfered with his attorney-client relationships during the course of Basciano's capital trial. Basciano's recusal claims lack merit.

Finally, Basciano seeks the unsealing of the transcript of the sentencing of Dominick Cicale.  Because Cicale's sentencing was in open court and the transcript has never been under seal, this motion is moot.  In addition, because Basciano quotes from the sentencing transcript in his supplemental recusal motion (Supp. Recual Mot. 42-44), it is apparent he now possesses it.

---

[1]     Pursuant to <u>Sparman v. Edwards</u>, 154 F.3d 51 (2d Cir. 1998), the government has provided Basciano's various trial and appellate counsel with a copy of his petition.

STATEMENT OF FACTS

I.   <u>Overview</u>

From November 2005 to January 2006, a grand jury sitting in the Eastern District of New York returned a series of indictments and superseding indictments against Basciano and others, principally charging racketeering conspiracy, murder, gambling and extortion offenses.  The racketeering counts named the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family") as the charged enterprise and Basciano as an associate, then soldier, and finally captain in that enterprise.  The charged conduct spanned the period from January 1979 to January 2005. Before his arrest in November 2004, Basciano became the acting boss of the Bonanno family.

Basciano, together with codefendant Patrick DeFilippo, was tried before this Court on the fifth superseding indictment. The trial commenced with jury selection in January 2006.  On May 9, 2006, the jury returned a partial verdict convicting Basciano of racketeering conspiracy based upon predicate acts of murder conspiracy, attempted murder and gambling.

Basciano was retried on the charges upon which the first jury could not reach a verdict as well as on additional charges in superseding indictment S-8.  On July 31, 2007, a jury rendered a

verdict convicting Basciano of all counts in 03 CR 929 (S-8),[2] including racketeering -- with predicate acts of murdering and conspiring to murder Frank Santoro, soliciting the murder of Salvatore Vitale, soliciting the murder of Dominick Martino, conspiring to distribute marijuana and two forms of illegal gambling (sports betting and an illegal lottery) -- and other substantive counts including marijuana distribution conspiracy and three forms of illegal gambling (sports betting, an illegal lottery and joker poker machines).

II.  The 2006 Trial

The superseding indictment on which Basciano was tried in 2006 and the verdicts are summarized below:

| Count | Charge | Verdict |
|-------|--------|---------|
| 1 | RICO Conspiracy | Guilty |
| 2 | Illegal Gambling – Joker-Poker Machines | No Verdict |
| 11 | Extortionate Collection of Credit Conspiracy - Peter Calabrese | Not Guilty |

As part of the Count One racketeering conspiracy, Basciano was charged in the following predicate racketeering acts that the jury

---

[2]   As indicated above, Basciano was also tried on additional murder in-aid-of racketeering charges in a separate indictment (referred to as the "'05 case") in a capital trial, United States v. Vincent Basciano, 05-CR-060 (NGG) (E.D.N.Y.), where he was convicted in 2011.  Basciano's 2006 and 2007 trials were in connection with an indictment initially returned as to other defendants in 2003 (referred to as the "'03 case").

resolved as follows:

| RA# | Charge | Finding |
|-----|--------|---------|
| 1 | Illegal Gambling - Policy Operation | Proved |
| 2 | Illegal Gambling - Joker Poker Machines | Proved |
| 3A | Conspiracy to Murder David Nunez | Proved |
| 3B | Attempted Murder of David Nunez | Proved |
| 5 | Extortionate Extension of Credit - Generoso Barbieri | Not Proved |
| 6 | Extortionate Extension of Credit - John Palazzolo | Not Proved |
| 11 | Murder of Frank Santoro | No Verdict |
| 12 | Solicitation to Murder - Dominick "Donnie" Martino | No Verdict |
| 13 | Extortionate Collection of Credit Conspiracy - Peter Calabrese | Not Proved |

A.    The Bonanno Family and Basciano's Membership

Basciano originally became associated with the Bonanno family by serving as the driver of Bonanno captain Dominick Trinchera; following Trinchera's death in 1981, Basciano became associated with DeFilippo's crew. (TI 5435, 4722, 8118-26, 7301-02).[2]  The evidence showed his subsequent rise through the ranks of

---

[2]    "TI" refers to pages in the 2006 trial transcript; "TII" refers to pages in the 2007 trial transcript; "GX" refers to the government's exhibits at trial.  References to the government's exhibits in the '05 trial are to "05-cr-060 GX _" "DE" refers to the relevant docket entry in the docket of United States v. Basciano, 03-cr-929(NGG)(E.D.N.Y.) or United States v. Basciano, 05-cr-060(NGG)(E.D.N.Y.).  "Habeas Pet." refers to Basciano's habeas petition and "Recusal Br." and "Supp. Recusal Br." refer to Basciano's sixth recusal motion, filed on February 17, 2012, and his supplemental motion, filed on June 14, 2013.  Any page references in the habeas petition or the recusal brief is to the

the Bonanno family.  For example, in a consensual recording from December 2003, then-Bonanno family acting boss and acting consigliere Anthony Urso formally introduced Basciano, consistent with La Cosa Nostra protocol, as a captain in the Bonanno family to then-Bonanno family captain James Tartaglione.  (TI 4779; (GX 205b (12/21/03 Tr.) 5; GA 14).  Later in that recording, Basciano seeks to introduce Urso in his new role as Acting Consigliere to Tartaglione consistent with mafia protocol.  (12/21/03 Tr. 24; GA 18).  Basciano also discusses his crew members and acknowledges that he is a captain in the Bonanno family who has his own hit team.  (See, e.g., 12/21/03 Tr. 28-30, 54-55, 58-59, 60; GA 19-21, 23-24, 25-26, 27).

Further, Thomas Lee, an attorney who passed messages between Basciano and then-official boss Joseph Massino, who was incarcerated, testified that the "[f]irst illegal message I remember passing was the one where Joseph Massino indicated to me in the Metropolitan Detention Center Vinny should take the reins of the Bonanno Crime Family," which he understood to mean "[a]ssume the acting role as the boss of the Bonanno Crime Family." (TI 6797).  Basciano did not dispute either the existence of the family or his membership in it; indeed, his counsel conceded that

---

page referenced in the ECF heading on each page.  "GA" refers to the government's appendix accompanying this response.  The government presumes the Court and Basciano possess copies of the trial transcripts for all of Basciano's trials and has not included them in the appendix in light of their significant length but, upon request, will provide copies of the trial transcripts.

he was a member (TI 2011, 2457, 2461), and the district court noted these concessions in its instructions in the '06 trial (TI 10114, 10186).

    B.    <u>The Racketeering Acts</u>[3]

        1.    The Conspiracy to Murder, and
               <u>Attempted Murder of, David Nunez</u>

On November 14, 1985, Basciano, together with then-Bonanno family soldier Patrick DeFilippo and then-Bonanno associate Anthony Donato, was involved in the shooting of David Nunez as Nunez exited a cab on White Plains Road in the Bronx, New York in front of a "numbers spot." Nunez was shot in connection with a gambling dispute; he survived after treatment at a local hospital. Proof of this racketeering act was established through the testimony of Bonanno family members Salvatore Vitale, Generoso Barbieri, James Tartaglione and Dominick Cicale. The government also presented the testimony of (1) Ann Caruncho and Anthony Colangelo, Jr., the common-law wife and son, respectively, of Bonanno associate Anthony Colangelo, Sr., (2) Anthony Bottone, a long-time acquaintance of Basciano, and (3) Thomas Lee, the former attorney who represented participants in Basciano's policy and joker poker operations.

Basciano became involved, as early as the 1980s, in an illegal policy gambling (or "numbers") business with Donato that

---

[3]    The proof as to the Santoro and Martino charges is discussed in the section addressing the 2007 trial since Basciano was convicted of those acts in that trial.

operated in the Bronx, Brooklyn and Queens. (TI 4732, 5768-69, 7923-49, 7930-55, 7946, 8118-22, 8126-28). At first, Basciano worked in the numbers business of Anthony Colangelo, Sr., first as a controller and then as the operator of the business after Colangelo went to jail in approximately 1982. (TI 7923-29, 7930-55, 8024, 8118-22). Colangelo, Sr. was also associated with the Bonanno family and was friends with Trinchera, DeFilippo, Basciano and Bonanno associate Emanuel Guaragna, all of whom had some role in the numbers operation.

DeFilippo at times received payments from Colangelo's numbers business from Colangelo, Jr. (TI 5768-69, 7930-55, 8125-26). Following Colangelo, Sr.'s imprisonment, Basciano and Donato continued to pay to Caruncho her husband's share of the proceeds of that illegal gambling business. (TI 8090-93). Tartaglione also had learned that Basciano and DeFilippo were partners in a numbers business. (TI 4732).

Bottone met Basciano, Trinchera and Guaragna as a young man. Bottone's father, Alfred Bottone, who had contacts in the Gambino organized crime family, was involved in the numbers business with Trinchera and told Bottone that Basciano was a controller in a numbers business. Bottone eventually began working with Basciano in the business. In doing so, Bottone learned that Basciano's partner in the numbers business was Donato, another Bonanno associate. (TI 7934-36, 7942-43, 7946, 7949).

While working in the numbers business, Bottone met Stefano Larerio ("Stevie the Blind"), who had highly profitable numbers stores on Gun Hill Road, among other locations, in the Bronx.  After Nunez's shooting on November 14, 1985, Bottone learned from his father that "Stevie the Blind's son-in-law" (Nunez)[4] had had "some kind of beef" and that Bottone's father had set up Nunez for Basciano and two other men, alerting them that a car service automobile was dispatched daily to pick up Nunez; so alerted, the three "shot him up" but were apprehended when their car was pulled over.  (TI 7953-57).

Police Officer Keith Garley testified that, shortly after hearing a radio call about the shooting, he observed the getaway car with three men inside, including Basciano, who was gesturing with his hand in the shape of a gun.  Following a car chase during which one gun was thrown from the car occupied by Basciano, DeFilippo and Donato, and then a foot chase after Basciano, during which Basciano discarded another firearm, Garley and his partner arrested Basciano, DeFilippo and Donato and recovered the two firearms.  (TI 8279-8306).

The government introduced a portion of Basciano's, DeFilippo's and Donato's guilty plea allocutions to criminal

---

[4]    Larerio was the brother of Nunez's father-in-law. (TI 6984, 8536).

possession of a weapon in the third degree, which concerned this incident.  (GX 515; TI 8391-95).

According to Steven Dunne, a cabdriver who witnessed the shooting, following his attendance at a line-up, Alfred Bottone questioned him about what Dunne had told the police.  Bottone directed Dunne to show Bottone where the other eyewitnesses to the shooting lived, which Dunne did.  (TI 8262-63).  Anthony Bottone testified that his father paid Dunne a "few dollars" to make sure that he did not identify anyone.  (TI 7957-58).

Twenty years after the shooting, Basciano told Cicale that, in 1985, Basciano, DeFilippo and Donato were involved in an attempted murder and after which they were pursued by the police. Basciano also told Cicale that "the guy lived and he [Basciano] wound up pleading out on the case to a gun charge" and that "the victim couldn't identify him."  Basciano complained about the getaway car (driven by DeFilippo) and warned Cicale, in substance, never to let DeFilippo set up "a piece of work" because "he doesn't know what he's doing."  (TI 5681, 5719-23).

Bonanno family underboss Salvatore Vitale testified that, soon after Massino came home from prison in 1992, Massino told Vitale that, before promoting DeFilippo to the position of captain, he wanted to verify the events surrounding a shooting in the Bronx in which Basciano and DeFilippo were involved and in which "Patty" got away.  (TI 2687-88).

The testimony concerning Nunez's involvement in an illegal numbers operation on White Plains Road and Gun Hill Road -- where the attempted murder took place -- was corroborated by Police Officers Garley and Ponce, both of whom arrested Nunez at that location in 1985 on gambling charges. (TI 8297-99, 8386, 8389-90).

Several witnesses testified about the rules in organized crime concerning the location of gambling spots, the disputes over competition for the spots that can ensue and the violence that often follows a violation of those rules. (TI 2713, 2714-17, 5750, 5775, 8009). Vitale attended a "sit-down" with the Luchese organized crime family on behalf of Basciano concerning Basciano's dispute with that family about a numbers spot that Basciano believed belonged to him. (TI 2714-17). Bottone testified that, if an individual not affiliated with organized crime opened a numbers store too close to an existing location, the organized crime members would force it to close. (TI 8009).

Cicale testified that, because of a dispute involving Basciano's joker poker machines, Cicale, Bonanno family soldier Anthony Aiello and Bonanno family associate Giuseppe Gambina threatened a person who claimed Basciano's spot and forcibly replaced that person's machine with one of Basciano's. (TI 5750). Cicale also learned from Anthony "Tony Hands" Congello that Basciano had ordered Congello beaten when Congello opened up a new numbers spot two blocks away from a spot Basciano had acquired.

(TI 5775).

Additional evidence established that coconspirators of Basciano tampered with eyewitnesses to the Nunez attempted murder. Bottone learned that the charges relating to the Nunez shooting against Basciano were dropped because there "was a sit-down and everything was squashed." (TI 7956-57). Lee testified that, in January 2005 (shortly after Basciano's arrest on the Nunez charges and other charges), he met with Michael Larerio (Nunez's brother-in-law), who told him that Nunez had reached out to either Larerio's father or his uncle regarding the shooting and that Larerio had concerns because "someone in his family that taken care of Mr. Nunez back in 1985" by "pay[ing] [Nunez] not to cooperate with the authorities." (TI 6854, 6878-79). Lee conveyed this information to Basciano. (TI 6879).

### 2. Illegal Gambling Operations

In addition to the testimony summarized above concerning Basciano's involvement in an illegal policy gambling operation, the government offered evidence to establish his participation in a joker-poker operation. Lee testified that, as part of his role as house counsel for Basciano's illegal gambling business (which involved both numbers spots and joker poker machines), he represented the individuals associated with the business who were arrested in the Bronx, Brooklyn and Queens up until Lee's arrest in January 2005. (TI 6770, 6772, 6787). Several law enforcement

witnesses testified to observing illegal policy betting and joker poker machines in spots controlled by Basciano's operation and to arresting participants in that operation, including Joseph DiMarco, Clarence Hopkins and Soraida Rodriguez, for possession of illegal electronic gambling devices or possession of gambling records. (TI 7125-31, 7215-19, 7224-30).

Bottone testified that Basciano was involved in policy gambling from the 1980s until at least 1994, at which time Basciano assumed Bottone's numbers locations (which also had joker poker machines). Bottone also testified that, in the 1980s, these numbers locations could earn between $5,000 and $30,000 a week in profit. (TI 7938, 7954-55). Vitale, Tartaglione and Barbieri also testified about Basciano's involvement with joker poker machines in the 1990s. (TI 2679, 4734-36, 7314). Vitale testified that he attended a sit-down to represent Basciano's interest in a dispute with another organized crime family regarding Basciano's joker poker machines and numbers store. (TI 2713-17). Cicale testified that Basciano told him that he (Basciano) earned between $300,000 and $500,000 a year from his joker poker business and that Basciano "kicked up" 10 percent of those earnings to Massino. (TI 5734-36).

III. <u>The 2007 Trial</u>

On July 31, 2007, a jury convicted Basciano of all counts in the superseding indictment (S-8) on which Basciano was tried in 2007. The verdicts are summarized below:

| Count | Charge | Verdict |
|---|---|---|
| 1 | Racketeering | Guilty |
| 2 | Illegal Gambling – Joker Poker | Guilty |
| 3 | Marijuana Distribution Conspiracy | Guilty |
| 4 | Illegal Gambling - Lottery | Guilty |
| 5 | Illegal Gambling - Sports Betting | Guilty |

As part of the Count One racketeering charge, Basciano was charged in the following predicate racketeering acts that the jury resolved as follows:

| RA# | Charge | Finding |
|---|---|---|
| 1A | Conspiracy to murder – Frank Santoro | Proved |
| 1B | Murder of Frank Santoro | Proved |
| 2 | Solicitation of murder – Salvatore Vitale | Proved |
| 3 | Solicitation of Murder – Dominick "Donnie" Martino | Proved |
| 4 | Conspiracy to Distribute Marijuana | Proved |
| 5 | Illegal Gambling - Lottery | Proved |
| 6 | Illegal Gambling - Sports Betting | Proved |

Eight cooperating witnesses testified at the 2007 trial, including two who had not testified in Basciano's 2006 trial: Nicholas Pisciotti and Mitchell Casper.

A.    The Santoro Murder/Murder Conspiracy

During the evening of February 15, 2001, a drug addict named Frank Santoro was killed by multiple shotgun blasts while walking his dog on the Throgs Neck Expressway Extension in the

Bronx.  The evidence showed that Basciano was the shooter and that the murder was committed because Basciano believed that Santoro was planning to kidnap one of Basciano's sons.  The other participants in the murder included Cicale, Donato, Anthony "Bruno" Indelicato, and John Tancredi.  The government proved Basciano's guilt of this murder through a variety of evidence, including Basciano's own recorded admissions.  In addition, five cooperating witnesses implicated Basciano in the Santoro murder: Vitale, Pisciotti, Cantarella, Tartaglione and Cicale.

Vitale testified that Massino told him that, in early 2001, Basciano used a shotgun to kill a man who was planning to kidnap one of Basciano's sons while that man was walking his dog and that Indelicato and a corrections officer or an ex-corrections officer was with Basciano when Basciano murdered Santoro. (TII 307-09).[5]

Bonanno family acting captain Pisciotti testified that Indelicato told him that Indelicato was charged with the murder of "a junkie" in the Bronx and that Basciano and Cicale had participated with Indelicato in that murder.  (TII 3429-32). Indelicato described his own, Basciano's and Cicale's involvement in that murder, explaining that because Cicale shot at Santoro five times and missed, Basciano "had to get out and do it." (TII 3429-32).  Indelicato also referred to the murder as being a "test" for

_____

[5]  Cicale had been married to a corrections officer. (GX 355(b)).

Cicale prior to Cicale's being proposed for membership in the Bonanno family. (TII 3429-32).

Bonanno family captain Cantarella testified that in 2001 he learned from Massino that Massino was angry with Basciano for committing an unsanctioned murder (TII 1974-75), testimony that was consistent with other witnesses' testimony about the unsanctioned Santoro murder committed on February 15, 2001.

The government also offered consensual recordings of Basciano made by Bonanno family captain Tartaglione concerning the Santoro murder. On December 21, 2003, Tartaglione brought to Basciano a police report and two FBI "302" reports (GX 200d and 200e) relating to the murder of a "junkie." However, Basciano correctly explained that the reports in fact concerned two separate incidents (the murder of Santoro and the solicitation to murder Dominick Martino, with which Basciano was also charged), correctly identified the source of the information in each report,[6] and provided further information about each crime not contained in any of the reports.

Regarding the Santoro murder, Basciano stated:

> They're gonna be tough to pinch me on this.
> You wanna know why? They got no forensics.
> They have no guns. They have no nothing.

---

[6]    Special Agent Joseph Bonavolonta testified that the source of the information contained in GX 200d was Cantarella and the source of the information contained in GX 200e was Vitale and that there was nothing apparent from the face of the 302s to identify the source of the information. (TII 2140-41, 2143-44, 2145-47).

>           Forget about the fact that I didn't do it
>           anyway.  Okay?  I had nothing to do with it.
>           But if I did, there's no guns, there's no
>           cars, there's no eyewitnesses, there's no
>           rats.  How are they going to pinch me on that?

(12/21/03 Tr. 10; GA 17).  Notably, the police and FBI reports did

not describe the presence of multiple guns, cars, eyewitnesses or

cooperators (i.e., other murder participants).  (See TII 2259;

GX 200e).

         In addition, Basciano explained that the police report

regarding the Santoro homicide matched the statements on the FBI-

302 about that murder.

>           VB:  In other words basically, this over here
>           corroborates the statement that he makes
>           . . . .  This is a police report for this.
>
>           CW:  This is the police report.
>
>           VB:  To report what actually happened.

(12/21/03 Tr. 7; GA 15).

         In addition to the testimony of the five cooperating

witnesses and Basciano's own admissions, the government introduced

a variety of other evidence that corroborated the witnesses'

testimony.  These included:

         1. Testimony of Kenneth Champlin, a civilian eyewitness,

who corroborated Cicale's testimony that two different types of

weapons were fired and that there were two cars speeding from the

scene following the murder.  (TII 1628, 1629).

2.   Testimony of Carmine Naddeo, a civilian witness who corroborated Cicale's testimony that the hit team waited while Santoro spoke with someone in a car.   Naddeo testified that, shortly before Santoro was murdered, Naddeo observed Santoro, who was walking his dog, talking with someone in a car close to where Santoro's body was later found.  (TII 1709-10, 1711-12).

3.   Indelicato's prison calls immediately after he learned of Basciano's arrest during which Indelicato inquired whether Cicale had been arrested and expressed astonishment that Basciano was the only person arrested for the murder.  (GX 650a at 3-4; GX 650d at 4).

4.   Donato and Cicale's telephone records which confirmed Cicale's testimony that Cicale had attempted to reach Donato, another participant in the Santoro murder conspiracy and the only other murder participant still on the street, as soon as he learned Basciano was arrested.

5.   Testimony of FBI Special Agent Michael Breslin that, after he advised Basciano that Basciano had been charged with Santoro's murder and that Donato had been arrested on the same day, Basciano asked whether Donato was charged with the same things. (TII 4056).

6.   Testimony of Detective Luis Fontanez, a ballistics expert, that the four shotgun shells recovered from the Santoro murder scene were fired from one shotgun.  (TII 846).

7.   Testimony of Dr. James Gill, the medical examiner, that Santoro was shot from a distance of four to ten feet and was shot while he was lying on the ground (TII 819-20, 820-22), testimony which corroborated Cicale's account of the murder.

8.   Testimony of Special Agent Rita Fitzpatrick that on the afternoon of the murder, February 15, 2001, she observed Indelicato's sister-in-law's car outside Basciano's residence (TII 706-08), which corroborated the testimony of Piscotti and Cicale.

B.   The Martino Murder Solicitation

In 2002, Basciano sought permission from Massino to murder Dominick Martino, another drug addict, after Martino had an altercation with Donato.   Basciano also solicited Cicale's participation in the plot, which involved Martino's being shot by a gunman on the back of a motorcycle.   Massino denied permission for the murder because Martino's brother was a Genovese crime family soldier.   However, Basciano nonetheless planned with Cicale to kill Martino "on the sneak" if Martino did not apologize and the opportunity presented itself.   The government proved the Martino murder solicitation through, inter alia, the testimony of cooperating witnesses Cantarella and Cicale and Basciano's admissions on the first Tartaglione recording.

Basciano admitted this crime on the December 21, 2003 recording, where, in reference to one of the FBI-302 reports

Tartaglione provided, Basciano explained not only the background of his dispute with Martino but also that he had asked Massino for permission to kill Martino:

> In other words, they're saying, supposedly, I shot a guy over here. Okay, he's a junkie. And over here, he's saying that Massino denied Basciano (UI) the junkie's brother was a friend. Oh! You know who that was? I know who that was. That was um, how the fuck did it get back to Sal? You know who that is, it's Joe Martino. He's a friend with the West Side.[7] His brother hit Anthony, a kid around me. Okay, they had a fight in the club, and he hit Anthony. And I wanted to clip him, I wanted to clip him, but he wouldn't let me clip him. It was two different incidents.

(12/21/03 Tr. 9-10; GA 16-17). Later in this conversation, Basciano correctly identified the source of the two separate 302s regarding the Martino solicitation and the Santoro murder as, respectively, Cantarella and Vitale. (12/21/03 Tr. 90; GA 28). By doing so, Basciano corroborated Cantarella's testimony that Basciano told him directly about the Martino murder solicitation.

Cantarella learned of Basciano's solicitation to murder Martino from both Massino and Basciano himself. Cantarella explained that, after Basciano was introduced to him as a captain, he had a conversation with Basciano in which Basciano explained that Massino "had just nixed" Basciano's plot to kill someone, involving a shooter on the back of a motorcycle. (TII 1924). Prior to his conversation, Cantarella had learned from Massino

---

[7]     The "West Side" was another name for the Genovese family. (See, e.g., TII 1926).

that, because the intended victim's brother was a member of the Genovese family, Massino had denied Basciano permission to kill a drug addict. (TII 1925-26).

Cicale provided additional testimony regarding the initial altercation between Martino and Donato that prompted Basciano's decision to kill Martino, Basciano's plan to kill Martino using a shooter on a motorcycle, Basciano's request to Massino for permission to kill Martino, and Massino's ultimate denial of permission to kill Martino. (TII 1135-43). Basciano told Cicale that Dominick Martino had asked Anthony Donato, "[W]hat's the matter, your friend, meaning Vinny Basciano, can't say thank you." (TII 1135-36). Basciano explained that Martino was "looking for thanks because Donny was the one who tipped off Joe Monk, that Joe Monk was the one who informed Vinny Basciano about Frank Santoro looking to kidnap his son." (TII 1136). Cicale's testimony was corroborated by the testimony of Special Agent Timothy Buckley, who testified about his investigation into Genovese soldier James Martino during 2001, including the use of wiretap interceptions, which established that (1) immediately prior to the Santoro murder, Michael Mancuso, a Bonanno soldier in the same crew as Basciano, was attempting to meet James Martino and (2) after a resulting meeting between Mancuso and Martino, Martino was urgently attempting to find his brother Dominick Martino by calling James Pulcino. (TII 4177-78, 4181; GX 240, 241(a), 241(b),

23

241(d)).

C. <u>The Vitale Murder Solicitation</u>

In late 2002, Basciano asked Massino for permission to kill Vitale, Massino's brother-in-law and the underboss of the Bonanno family, who was suspected of cooperating with the government. The evidence that proved Basciano's guilt regarding this predicate included Basciano's recorded admission and Cicale's testimony. On the first Tartaglione recording, Basciano stated that he had spoken with Massino regarding Vitale's purported cooperation and solicited permission to murder Vitale but that Massino could not act on Basciano's suggestion to kill him:

> VB: He [Massino] braved this one out. He braved it out. He braved it out and you wanna know something, he thought with his heart and not with his head, with his head with this one. And in this life over here, he'll tell ya himself. You know what, unfortunately, we learn by our mistakes. But some mistakes are too gruesome to learn from. You gotta just act on 'em.
>
> AU: A lot of people getting hurt here.[8]
>
> VB: You just gotta act on 'em. Okay, here's one thing over here that he was thinking about his wife and everything and he probably in the back of his mind, he didn't wanna actually believe it. Okay, but he knows because I went to him and I went to him (UI) about three weeks before. This is the way, this is the way the tone was going. And he says listen to me. He says . . .

---

[8] "AU" refers to Anthony Urso, a member of the Bonanno family administration who was also present at the December 21, 2003 meeting.

> AU:  He had a bad feeling about it then.
>
> VB:  They're by his house, they're by his house.  He couldn't do it.

(12/21/03 Tr. 50; GA 22).

Cicale also testified that Basciano had asked Cicale to kill Vitale for the Bonanno family but that when Basciano solicited Massino, Massino had denied permission.  (TII 1160, 1162-63).

D.   <u>Marijuana Conspiracy</u>

Pisciotti, Bottone and Cicale implicated Basciano in the marijuana distribution conspiracy.  Pisciotti purchased ten to twenty pounds of marijuana on several occasions from members of Basciano's marijuana trafficking operation in 2000 and 2001, including once from Basciano directly.  (TII 3303-16).  Bottone testified that, in 1999 or 2000, Basciano attempted to recruit him to transport marijuana.  (TII 2890-92).

E.   <u>Gambling</u>

Mitchell Casper, Pisciotti, Vitale and Cicale implicated Basciano in illegal sports betting.  Casper, in particular, extensively described the sports betting operation, its high-level participants including Basciano, its office in Costa Rica, the website used, and the total profits and losses per season.  (TII 3655-60, 3563-64, 3569).  Casper's testimony paralleled that of Cicale regarding the participants in the sports betting operation, the business's operation, and its profits and losses per season.  (TII 3593-94, 3635-41, 3649-69).

Vitale, Cantarella, Thomas Lee, Pisciotti, Bottone and Cicale also implicated Basciano in running a joker poker business that operated from the early 1980s through Basciano's arrest in November 2004.  Anthony Colangelo, Jr. testified about Basciano's running of the joker poker locations in the early 1980s. (TII 3000).  Several police officers testified about arresting members of Basciano's joker poker operation, such as Joseph DiMarco, Clarence Hopkins and Giuseppe Mondelli, for possession of illegal electronic gambling devices.

As to the illegal lottery, Cicale testified that Basciano, as acting boss, approved the Bonanno family lottery run by Louis DeCicco.  (TII 1250-51).  Additional testimony established that one of DeCicco's associates was Anthony DeFilippo, from whom the FBI recovered gambling records consistent with the illegal lottery Cicale described.

F.    The Defense's Impeachment of Cicale

Both the government and the defense comprehensively elicited Cicale's past crimes and frauds, including his conviction for manslaughter for his role in the murder of George Kehoe, his commission of and guilty plea to the murders of Santoro and Randolph "Randy" Pizzolo, his involvement in drug dealing, assaults, shootings, armed robbery while on bail, arson, frequent violations of prison rules and supervised release, his attempts to cash fraudulent checks, and accusations of domestic violence.

(<u>See</u>, <u>e.g.</u>, TII 965, 968-69, 972, 974-76, 978-84, 991-92, 1007-09, 1010-11, 1276-77, 1298-99, 1331, 1332, 1354, 1376-77, 1380, 1383-85, 1387-89, 1392-93, 1425-26, 1512-15).   Cicale also admitted defrauding his grandmother. (TII 1299-1300, 1326).  The government also elicited that Cicale had lied during his first proffer session by not disclosing that he had given his cousin a bag of firearms. (TII 1298).   The defense extensively impeached Cicale on his allegedly prior inconsistent statements that were made either during debriefings or at the 2006 trial on a variety of topics, including Cicale's recollection of the Santoro murder, the facts surrounding Basciano's solicitation of the murder of Martino, and Basciano's and Cicale's involvement in illegal gambling.  (<u>See</u>, <u>e.g.</u>, TII 1348, 1360, 1363-64, 1367-70, 1410-11, 1413-14, 1439-44, 1454, 1458, 1472-74, 1478-80, 1521-22, 1523-25, 1563-66, 1578-79, 1604).  In addition, the defense cross-examined Cicale regarding his motive to cooperate, including the fact that he had been indicted for a death-eligible crime prior to his decision to cooperate (<u>see</u>, <u>e.g.</u>, TI 6084; TII 1390-92, 1400), and that he had access to discovery about some of the charged crimes (<u>see</u>, <u>e.g.</u>, TI 6084-86, 6330-32; TII 1394, 1397; <u>see also</u> TII 1269-70).

V.   <u>Admission of Pizzolo Homicide Evidence</u>

Before trial, the government sought the admission of several uncharged crimes by Basciano, including the Pizzolo murder, as evidence showing, <u>inter alia</u>, the existence of the charged

enterprise, that Basciano committed crimes of violence to individuals that he perceived threatened the Bonanno family, and the relationship of trust between Basciano and Cicale, or, alternatively, as Rule 404(b) evidence necessary to complete the story of the charged crimes and show the relationship of trust between Basciano and Cicale, Basciano's intent and absence of mistake or accident and Basciano's <u>modus operandi</u>. (<u>See</u> <u>Basciano</u>, 03-cr-929, DE# 446). In addition to the government's proffer (<u>id.</u> at 21-22), the court also had before it evidence of Basciano's own statements regarding Basciano's and Cicale's involvement in Pizzolo's murder, captured in a conversation Massino consensually recorded with Basciano on January 3, 2005, a recording that was the subject of extensive pre-trial and trial litigation when both Basciano and his codefendant DeFillipo at times suggested that they would seek to offer the Massino recordings in the 2006 trial or call Massino themselves.[9] (<u>See</u>, <u>e.g.</u>, <u>Basciano</u>, 03-cr-929, DE# 306 (filed Sept. 16, 2005)). In the January 3, 2005 conversation, Basciano admitted to Massino that he had ordered the Pizzolo murder, explained why Pizzolo needed to be murdered (and the background to Joseph Bonelli's disrespect to the Bonanno family) and indicated that Cicale and Bonanno family soldier Anthony Aiello

---

[9]    These recordings were not played at either the 2006 or 2007 trial.

were involved in the murder.[10] Cicale's testimony about the Pizzolo murder was largely consistent with Basciano's statements on the Massino recording.

The district court admitted evidence of the Pizzolo murder at both trials, ruling that it showed the development of the relationship of trust between Basciano and the cooperating witnesses, provided background evidence of the charged enterprise, corroborated the testimony of the cooperating witnesses and, for the 2007 trial, was also admissible for the jury to evaluate Basciano's claim that he was incapable or unwilling to violate the rules of organized crime (2010 WL 3325409, at *1 n.1), here, by committing a murder not sanctioned by the official boss of the crime family. The court instructed the jury in accordance with its rulings. (<u>Id.</u>).

There was other evidence presented as to the Pizzolo homicide and the DeFilippo conspiracy, another uncharged crime that Basciano references in his petition. For example, in the 2006 trial, Barbieri testified that he had conversations with Basciano about Pizzolo's murder while they were housed together at the Metropolitan Detention Center. (TI 7360-61, 7363). Basciano showed Barbieri a newspaper article containing a picture of

---

[10] At one point during the discussion, Basciano claimed that Michael Mancuso had ordered Pizzolo's murder. However, Cicale explained that, once Basciano was arrested, Cicale tried to avoid committing the murder but then spoke with Mancuso, the acting boss on the street, who re-affirmed Basciano's order to kill Pizzolo. (TII 1227-28).

Pizzolo's dead body and stated, "[Y]ou owe me one," which Barbieri understood to mean that Basciano knew Barbieri had had a dispute with Pizzolo and that Basciano had taken "care of" Pizzolo, although not because of Barbieri.  (TI 7363).  In the 2006 trial, Lee testified that Basciano told Lee to tell Massino that DeFilippo had the potential to cooperate with the government.  (TI 6825-26). Lee also passed a message from Massino to Basciano that DeFilippo did not like Basciano and that Basciano had to watch out for DeFilippo.  (TI 6826).  In response, Basciano stated that he "shouldn't have to worry about him, he could handle Patty DeFilippo."  (TI 6826).  Basciano stated that if DeFilippo were ever released from prison, DeFilippo "would have to go back through Saint Raymond [a cemetery] to get back to the Bronx."  (TI 6827). In the 2007 trial, Lee testified consistently with his testimony at the 2006 trial.  (TII 3077-79).  Lee pleaded guilty to the conspiracy to murder DeFilippo for his role in passing messages that could have led to DeFilippo's death.  (TI 6958-59).

       The government also disclosed that others, besides Basciano, had a motive to kill Pizzolo, facts that were elicited at both of Basciano's trials.  For example, during the 2006 trial, Barbieri testified about his own disputes with Pizzolo and stated that he had hoped to meet Pizzolo in a dark alley someday. (TI 7357).  During the 2006 trial, Tartaglione also testified about Barbieri's disputes with Pizzolo.  (TI 5039, 5116-19, 5125-27,

5128-29).  It is clear from the discussion at sidebar that defense counsel possessed a transcript of a conversation recorded by Tartaglione on November 14, 2003, in which Barbieri stated that he wanted to meet Pizzolo in a dark alley.  (TI 5036-38, 5054).

During the 2007 trial, Tartaglione testified that a soldier in his crew, John Palazzolo, informed him that Pizzolo, who was previously associated with Palazzolo, had shot a man at Café on the Green.  (TII 2310, 2551).  This indicated that the victim had a motive to kill Pizzolo.  Notably, Basciano's attorney cross-examined Cicale at the 2006 trial about Pizzolo's shooting of Darren D'Amico at Café on the Green in 2002.  (TI 6133-34).

Basciano was also aware of evidence that could have supported the defense that Cicale alone had committed the Pizzolo murder.  In the 2007 trial, Pisciotti testified that Cicale had told Pisciotti that Cicale "took care of" the Pizzolo murder but did not say that Basciano had ordered the murder.  (TII 3363-64).  In addition, the defense possessed the Massino consensual recordings in which Basciano himself stated that "Michael," referring to then street boss Michael Mancuso, gave the order to murder Pizzolo.  (TI 5108).

VI.  <u>Government's Jury Addresses Referencing Pizzolo Homicide</u>

During the 2006 trial, the government referenced Pizzolo four times in its jury addresses.  In summation, the government noted that Basciano and Cicale "were very much partners in crime.

After all, the only two murders that Cicale committed while a part of the Bonanno family, he did it [sic] under the orders of Vincent Basciano.  Frank Santoro, who was killed on February 15th, '01 and Randolph Pizzolo, who was killed at the end of 2004." (TI 9440). The government's three references to Pizzolo in its rebuttal either did not address Basciano's involvement in that murder (TI 9980), referenced the murder only in passing to note that Aiello, another person involved in the Pizzolo murder, was sponsored by Basciano for induction to the crime family too early in connection with an argument that Basciano broke the rules of organized crime (TI 9994-95) or noted that Cicale had been facing the death penalty for the murder of Pizzolo (TI 10038).  Basciano did not object to any of these references.

During the 2007 trial, the government again referenced Pizzolo four times in its jury addresses.  During the course of a nearly six-hour summation, the government noted that Michael Mancuso had reordered the murder of Pizzolo.  (TII 4408-09).  In addition, to rebut Basciano's argument that he was merely a gambler too afraid to risk the wrath of Massino to commit an unsanctioned murder and to provide an example of Basciano's ordering a murder to punish a perceived disrespect to himself or the crime family, the government quoted Cicale's testimony that Basciano, as acting boss, ordered the murder of Pizzolo to "show the crime family that Vinny Basciano doesn't play around."  (TII 4410).  To establish that

Basciano trusted Cicale, the government also noted that Cicale had killed for Basciano twice, referring to the murders of Santoro and Pizzolo. (TII 4465). In rebuttal, the government stated that Cicale had been charged with the Pizzolo murder prior to his cooperation. (TII 4688). Basciano did not object to the government's references to the Pizzolo murder.

VII. The Government's *Brady* Disclosures

Prior to and during the trials in the '03 case, the government made numerous Brady disclosures to the defense of information that could have been exculpatory of Basciano for the crimes and predicate acts with which he had been charged, including the Nunez attempted murder and the Santoro murder. (See, e.g., United States v. Basciano, 03 CR 929 (NGG) (Docket Entries 287, 482, 530, 540, 550, 551, 586)). Several of those disclosures pertained to Cicale. Those disclosures included information from another cooperating witness that contradicted Cicale's account of the events leading to the Santoro murder. The other cooperating witness had stated that the witness sold Cicale the shotgun used in the Santoro murder and that Cicale had told his father about the Santoro murder. Because this cooperating witness was prosecuted by an office other than the United States Attorney's Office for the Eastern District of New York, the government requested that the Court order that entity to permit the disclosure.[11] The Court

---

[11] This occurred during a sealed sidebar. (TII 1143 (referring to court's order)).

conducted an _in camera_ review of additional materials submitted _ex parte_ by the government relating to this witness and concluded that the government had already provided the defense with "all of the appropriate materials." (TII 1150).

In addition, the government disclosed voluminous impeachment material for Cicale. That material included, among other items, (1) Cicale's numerous prior violent acts, (2) Cicale's lack of truthfulness in certain regards in his initial proffer session with the government (TII 1298), and (3) Cicale's commission of prison infractions after cooperating, stemming from Cicale's assault of another inmate (TII 1275-76). As to this last topic, the government produced an exhibit regarding Cicale's prison infraction. (GX 3500-DXC-57). Included in that exhibit were the following documents: (1) the Putnam County Correctional Facility Disciplinary Board Findings and Final Decision documenting the disciplinary charges to which Cicale pleaded guilty and his corresponding punishment; (2) an attached synopsis by a prison guard detailing the prison fight between Cicale and another inmate; and (3) a Putnam County Correctional Facility Statement of Confinement documenting the disciplinary infraction with which Cicale was being charged.

Following Basciano's 2007 conviction, the government disclosed additional material that primarily related to the Pizzolo murder, a crime charged in Basciano's pending trial in the '05

case. (Basciano, 03-cr-929, DE# 1126-30, Exs. A, C, E-K). As part of this material, the government disclosed notes from a proffer session with Frank Vasaturo, who stated in relevant part that prior to Pizzolo's murder, Pizzolo indicated that he expected to be inducted into the mob and that Nicholas Cirillo, the son of "Quiet Dom" Cirillo, would never be found. (United States v. Basciano, 10-3548, Appendix A 219 (2d Cir. 2011)). When Vasaturo asked Pizzolo how he knew, Pizzolo smiled and pointed to himself and gestured with his chin at Cicale, who was sitting across the table from him. (Id.). The notes do not indicate whether Cicale was aware of Pizzolo's statements to Vasaturo.

During Basciano's 2006 trial, the defense sought to cross-examine Cicale regarding Cirillo's disappearance. One of the prosecutors (who had attended Vasaturo's 2005 proffer) challenged the defense's good-faith basis for inquiring into this matter and indicated that Cicale and Nicholas Cirillo had had an altercation four to six weeks prior to Cirillo's disappearance but that, prior to Cirillo's disappearance, Cicale met with Cirillo and Basciano and they "made up." (TI 5644-45). The court refused to permit the defense to cross-examine Cicale regarding Cirillo's murder. (TI 5661).

VIII. The False Murder Plot Allegation

On August 17, 2007, several weeks after the verdict in Basciano's second trial, a cooperating witness, Carlos Medina, in

another matter unrelated to organized crime made an allegation to an Assistant United States Attorney ("AUSA") that Cicale had propositioned Medina falsely to claim that Marco Santomaggio, a prison guard at the Metropolitan Correctional Center ("MCC"), had asked Medina to kill Cicale on Basciano's behalf.

IX.  Basciano's Rule 33 Motion Relevant to His First Appeal

Following his conviction, Basciano moved for a new trial pursuant to Fed. R. Crim. P. 33 based upon, among other claims, the Cicale false murder plot allegations.  The Court denied that motion on March 24, 2008, ruling that it was unnecessary to resolve whether the government had knowledge of the false murder plot allegations during the trial because the allegations were not material.  United States v. Basciano, 2008 WL 794945, *3-*4 (E.D.N.Y. Mar. 24, 2008).  The Court then addressed the materiality of the Cicale allegations at length, including Basciano's contention "that the impeachment evidence at issue here is 'of a wholly different order' from the other impeachment evidence offered against Cicale because it occurred after he supposedly 'saw the light' and began cooperating with the Government." Id. at *4.  The Court ruled,

> Although evidence of the Cicale allegation arguably might have been helpful to the defense, there is not a "reasonable probability" of a different result at trial had the evidence been available.  First, Defendant mischaracterizes the centrality of Cicale's testimony in establishing the elements of the charges for which Basciano was

> convicted and gives short shrift to the
> multitude of other evidence offered against
> him.

Id. at *4.  The Court first summarized the evidence that supported

Basciano's guilt of the charged offenses and concluded that

"significant independent evidence and evidence that corroborated

Cicale's testimony implicated Basciano in the crimes for which he

was convicted."   Id. at *4.   The Court then reviewed the

impeachment evidence concerning Cicale that the jury heard:

> [D]uring direct examination and a thorough and
> aggressive cross-examination lasting nearly
> nine hours, the jury heard significant
> impeachment evidence against Cicale.  The jury
> learned of Cicale's extensive violent and
> criminal past, including a conviction for
> manslaughter, involvement in two other
> murders, drug dealing, assaults, shootings,
> armed robbery while on bail, arson, fraudulent
> check cashing, violations of prison
> regulations, violations of supervised release,
> and defrauding his own grandmother.
> Significantly, the jury also learned that
> Cicale had lied during his first proffer
> session with the Government, and defense
> counsel sought to show that he made
> inconsistent statements during debriefings
> with the Government and at Basciano's earlier
> trial.  Thus, Defendant's argument that the
> Cicale allegations are of a "wholly different
> order" than the other impeachment evidence
> offered against him rings hollow: the jury
> already knew Cicale was capable of deception
> subsequent to his decision to become a
> cooperator.  Knowledge of the bogus murder
> plot would not have substantially aided the
> jury in assessing Cicale's credibility, given
> the already plentiful impeachment evidence
> offered against him.

Id. at *5 (citations omitted).

Following this ruling, Basciano moved for reconsideration. On March 31, 2008, the Court denied that motion, ruling again that "[t]he significant independent and corroborating evidence offered against Basciano and the significant impeachment evidence offered against Cicale support the conclusion that the Cicale allegations do not warrant a new trial." United States v. Basciano, 2008 WL 905867, *1–*2 (E.D.N.Y. Mar. 31, 2008) (internal citations omitted). Basciano appealed. On March 24, 2010, while Basciano's appeal was pending, Basciano filed another Rule 33 motion in district court, discussed below, arguing that previously undisclosed material impeached Cicale's testimony and contradicted Cicale's testimony regarding the Pizzolo murder (the "2010 New Trial Motion"). Basciano's appeal was resolved before the district court ruled on this Rule 33 motion.

X.   Basciano's Direct Appeal

On appeal, Basciano argued, inter alia, that he was denied a fair trial by the alleged suppression of Brady material. Specifically, he relied on the Cicale false murder plot allegations and also contended that the government had suppressed information that exculpated him of the Pizzolo murder, some of which Basciano continues to rely upon in this petition, including (1) evidence of Vasaturo's statement that Pizzolo indicated Cicale was involved in Nicholas Cirillo's disappearance, which Basciano asserts could have provided a motive for Cicale to kill Pizzolo, (2) Pizzolo's life

insurance application, (3) evidence suggesting that others, besides Basciano, had a motive to kill Pizzolo, and (4) Al Perna's grand jury testimony, which Basciano asserted was inconsistent with Cicale's testimony regarding some of the background to the conspiracy to murder Pizzolo.  See United States v. Basciano, 08-1699-cr, Brief of Defendant-Appellant at 170-73.

On July 16, 2010, the Second Circuit affirmed Basciano's conviction by summary order.  See United States v. Basciano, 384 Fed. Appx. 28 (2d Cir. 2010).  The Circuit agreed that the allegedly suppressed information relating to the false murder plot allegation was cumulative and immaterial:

> In this case, Cicale's life-long and murderous criminal history, coupled with his record of deceit and violence while cooperating with federal authorities and inconsistent statements in his own testimony, provided such fertile ground for impeachment as to occupy nearly 300 pages of transcript spanning two days.  This record supports the district court's determination - made with the advantage of having presided over both Basciano's conspiratorial and substantive racketeering trials - that "knowledge of the bogus murder plot would not have substantially aided the jury in assessing Cicale's credibility, given the already plentiful impeachment evidence offered against him."

Id. at 31 (citation and brackets omitted).  The Circuit also found that there was substantial evidence corroborating Cicale's testimony and independently implicating Basciano in the crimes for which he was convicted.  Id.

The Circuit also rejected Basciano's <u>Brady</u> claims with respect to the Pizzolo murder, ruling as follows:

> Even assuming that Basciano could have used this information – or other allegedly suppressed information regarding Pizzolo – to impeach Cicale's testimony that Basciano ordered the Pizzolo murder, because that murder was not a charged predicate in either the 2006 or 2007 trial, the impeachment is properly deemed cumulative of the many other attacks that were mounted against Cicale's credibility and, thus, immaterial.

<u>Id</u>.

Basciano sought a writ of certiorari, which was denied on January 18, 2011.  <u>Basciano v. United States</u>, 131 S. Ct. 1025 (Jan. 18, 2011).

XI.  <u>The 2010 New Trial Motion</u>

In connection with the 2010 New Trial Motion, Basciano filed a 149-page memorandum of law that raised many of the same claims that the Second Circuit had rejected on the prior appeal. Basciano also contended that the allegedly suppressed evidence relating to the Pizzolo murder, the solicitation to murder AUSA Greg Andres (which was not charged in, and of which no evidence was presented at, either the 2006 or the 2007 trial), and additional information about a meeting between the government and Cicale in November 2005 warranted a new trial because the court and the jury were not presented with the full evidence to evaluate the claim that Basciano was responsible for Pizzolo's murder and the defense

lacked sufficient information to impeach Cicale.  (<u>Basciano</u>, 03-cr-929, DE# 1125).

With respect to the Pizzolo murder, Basciano claimed that the government violated <u>Brady/Giglio</u> principles by failing to disclose the following information that was disclosed in connection with the '05 case:  (1) the Vasaturo proffer report that Pizzolo had indicated that he and Cicale had been involved in the murder of Nicholas Cirillo; (2) Pizzolo's application for a life insurance policy after Basciano's November 2004 arrest and the fact that a deceased person named Richard Adler was aware of Pizzolo's life insurance policy; (3) claims that certain additional people had motives to kill Pizzolo; (4) Perna's grand jury testimony that was allegedly inconsistent with Cicale's testimony; (5) Natale Terzo's grand jury testimony that was allegedly inconsistent with Cicale's testimony; and (6) the grand jury testimony of Dora Roman, Pizzolo's girlfriend, that Pizzolo did not have a problem with Basciano and had confided to her that he had killed a man on October 23, 2004, a man Basciano inferred was Nicholas Cirillo.

On August 19, 2010, the district court denied Basciano's Rule 33 motion, ruling that, as to the 2006 trial, it was untimely, and on the merits, as to both trials:

> None of Basciano's new claims, by themselves, show[s] a reasonable probability that the result of his trial would have been different had the allegedly suppressed information been disclosed to the defense.  Basciano's claims also do not rise to the level of a

> constitutional violation when considered in
> combination with all his <u>Brady</u> claims,
> including those previously litigated on appeal
> . . . . As this court previously noted, the
> Government presented significant evidence of
> Basciano's guilt for the crimes which he is
> convicted of – independent from and
> corroborative of Cicale's testimony.

<u>Basciano</u>, 2010 WL 3325409, *11.

The district court concluded that the "mandate rule" permitted it to consider only Basciano's Pizzolo-related claims that had not been addressed by the Circuit. (<u>Id.</u> at *6, 19) (declining to reconsider the false murder plot allegation claim). The Court further found that none of the new evidence proffered by Basciano was material.

Basciano appealed. In his appeal, he raised new arguments relating to the Pizzolo evidence. Specifically, he claimed that the government's failure to disclose certain information relating to the Pizzolo murder corrupted the district court's weighing of the probative and the prejudicial evidentiary value of admitting evidence of the Pizzolo murder. <u>United States v. Basciano</u>, 465 Fed. Appx. 9, 11 (2d Cir. 2012)(summary order).

On February 16, 2012, the Second Circuit affirmed the denial of Basciano's new trial motion by summary order. The Circuit concluded that the district court did not err in determining that the Second Circuit had already resolved Basciano's arguments concerning the non-disclosure of certain Pizzolo-related evidence (Vasaturo proffer, Pizzolo's purchase of a life insurance

policy, evidence that Pizzolo shot Darren D'Amico and statements by

Al Perna).   Regarding the decision to admit the Pizzolo evidence,

the Circuit explained,

> Evidence of the Pizzolo murder and Basciano's involvement in it was admitted by the district court for the purpose of telling the complete story behind the charged crimes – namely the murder of Frank Santoro – to show the evolution of relationships of trust, to shed light on the background of the enterprise, to corroborate the testimony of cooperating witnesses, and to rebut Basciano's claim that he was incapable or unwilling to violate the rules of organized crime.  Admission of 404(b) evidence is entirely appropriate to explain, as it did here, the development of criminal relationships and to illustrate that mutual trust existed between conspirators . . . .

> The evidence identified in Basciano's brief on appeal suggests only that it would have been helpful to the defense to argue that others had a motive to murder Pizzolo and that Cicale's testimony was not credible.  The record reveals, however, that both arguments *were* put before the district court and the jury.  Indeed, the jury and the district court heard testimony that Pizzolo had shot but not killed D'Amico and that Cicale had told others, without referencing Basciano, that he, Cicale, was responsible for killing Pizzolo, and that another person, Michael Mancuso, had been involved in ordering the hit on Pizzolo.  Additionally, as we noted in our prior decision, "Cicale's life-long and murderous criminal history, coupled with his record of deceit and violence while cooperating with federal authorities and inconsistent statements in his own testimony, provided such fertile grounds for impeachment as to occupy nearly 300 pages of transcript spanning two days." Basciano, 384 Fed. Appx. at 31.  We cannot hold, therefore, that the disclosure of evidence further impeaching Cicale's credibility would have persuaded the district

court to exclude evidence of the Pizzolo murder.

Furthermore, even if we were to decide that the non-disclosed evidence should have been disclosed to the district court and that the district court thereafter would have excluded evidence of the Pizzolo murder, Basciano would still not be entitled to a new trial . . . . There was a multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale, through whom the evidence of the Pizzolo murder was admitted. . . .

Having considered all of Basciano's <u>Brady</u> claims concerning the Pizzolo murder both individually and in conjunction with each of his previously appealed <u>Brady</u> claims, . . . we hold that Basciano has failed to make a threshold showing that not only would the district court's evidentiary ruling have been different but, more pointedly, that there exists a "reasonable probability" of a different result at trial had the government disclosed the identified evidence. We have considered all of Basciano's arguments on appeal, not simply those identified in this order, and conclude that the district court acted within its discretion in refusing to order a new trial based on the government's failure to disclose information concerning the murder of Randolph Pizzolo.

<u>Basciano</u>, 465 Fed. Appx. at 14-15 (footnote omitted).

XII. <u>Basciano's Capital Trial</u>

On May 16, 2011, Basciano was convicted at the trial of the '05 indictment of, among other crimes, the murder in-aid-of racketeering of Pizzolo.  During the trial, Cicale testified for the government.  The government also called Giuseppe Gambina to

44

testify.  Basciano called Medina to testify about the false murder plot allegation.

XIII. <u>Basciano's History Of Recusal Motions</u>

During the course of Basciano's prosecutions, Basciano previously moved to recuse the Court on five occasions and has also sought to disqualify one of his prosecutors and then subsequently the entire United States Attorney's Office for the Eastern District of New York.  Each of Basciano's motions has been denied and the denial of two of his recusal motions has been affirmed on appeal.

Basciano first moved to recuse this Court in October 2006, following the government's disclosure that Basciano had authored a purported "hit list" that included Judge Garaufis, AUSA Andres and three cooperating witnesses who had testified against him.  Basciano renewed this motion in June 2007, in connection with his petition pursuant to 28 U.S.C. § 2241 to be released from Special Administrative Measures ("SAMs") while incarcerated, and in February 2008 in the '05 case, following the government's indication that it would seek to introduce the purported "hit list" as evidence during the guilt phase of Basciano's capital trial.  <u>In re Basciano</u>, 542 F.3d 950, 955 (2d Cir. 2008).[12]

By order dated November 30, 2006, this Court denied Basciano's motion for recusal, finding that in light of Basciano's

_____

[12]   The Second Circuit also affirmed this Court's denial of Basciano's habeas petition regarding the conditions of his confinement.  <u>See</u> <u>Basciano v. Martinez</u>, 316 Fed. Appx. 50 (2d Cir. Mar. 20, 2009).

statement to his wife about seeking a different judge, Basciano's history of replacing his counsel and his status as a "sophisticated party," Basciano had sought to "engineer" the Court's recusal. United States v. Basciano, 2006 WL 3483924, at *2 (E.D.N.Y. 2006). The Court also noted that Basciano did not allege any instances of actual bias by the Court and that the only action the Court had taken since the threat had been disclosed was favorable to Basciano. Id.

On March 24, 2008, the Court, in denying Basciano's motion for a new trial, reaffirmed its decision not to recuse itself. In doing so, the Court explained that neither that decision denying the motion to recuse nor the Court's denial of Basciano's habeas petition and accompanying request for a hearing on the alleged hit list created "an appearance of partiality sufficient to call into question the fairness of Basciano's retrial." United States v. Basciano, 03-cr-929, 2008 WL 794945, at *10 (E.D.N.Y. 2008). The Court explained that although Basciano had pointed to some decisions adverse to him, he had failed to identify any pattern of actions by the Court that would contribute to an appearance of an absence of impartiality. Id. at *11. On April 3, 2008, in the '05 case, the Court reaffirmed this decision for substantially the same reasons. Basciano then sought a writ of mandamus from the Second Circuit.

On September 17, 2008, the Second Circuit denied Basciano's petition for a writ of mandamus seeking this Court's recusal from his capital trial. In re Basciano, 542 F.3d 950 (2d Cir. 2008). The Circuit concluded that requiring recusal through the creation of a purported hit list would provide any defendant who wanted a new judge "with an effective, if in some cases, dreadful, method to achieve that end." Id. at 957. The Circuit also found that this Court came to each of its recusal decisions "meticulously." Id. Finally, the Circuit noted that Basciano's purported evidence of bias by this Court amounted to no more than proof that the Court had occasionally ruled against Basciano and that it did not reveal partiality. Id.

On direct appeal of Basciano's 2007 conviction, the Second Circuit again rejected his challenge to this Court's decision not to recuse itself under 28 U.S.C. § 455(a) following the revelation of the purported "hit list" created by Basciano. Referencing its earlier decision denying a writ of mandamus, the Circuit held that Basciano was not entitled to use a plot to change judges or a threat to kill the judge "as a judge-shopping device," a "rationale [that] applies with equal force in this case, where the district court expressly found that 'one of Basciano's objectives appeared to be to manipulate the judicial process, regardless of whether the list was in fact intended as a hit list.'" Basciano, 384 Fed. Appx. at 33 (citations omitted). The

Circuit emphasized, "Judge Garaufis's careful eliding of the latter question, coupled with his exemplary attention to Basciano's rights throughout the trial, would not permit any objective, disinterested observer to entertain significant doubt as to whether justice was done in this case without recusal." Id.   The Circuit also rejected Basciano's argument, the subject of a separate recusal motion in the district court on July 16, 2009, that the Supreme Court's ruling in Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), required recusal. Basciano, 384 Fed. Appx. at 33.

Basciano again unsuccessfully sought the recusal of the Court in his capital case in 2010, arguing that the Court's belated disclosure of a letter from Joseph Barone, who had alleged that he had saved Judge Garaufis's life, somehow gave the appearance of partiality.  In his motion, Basciano also asserted that he sought to introduce as evidence a letter the Court wrote to the Attorney General following Basciano's sentencing to life imprisonment inquiring whether the government would continue to pursue the death penalty, thereby transforming the trial judge into a witness.  This Court denied Basciano's motion, finding the motion on the basis of Barone's letter to be meritless and deciding that the letter to the Attorney General was inadmissible. See United States v. Basciano, 05-cr-060, 2010 WL 4484366, at *3-4 (E.D.N.Y. 2010).

In addition to his recusal motions, Basciano has also sought the disqualification of AUSA Andres on multiple occasions

and the disqualification of the entire United States Attorney's Office for the Eastern District of New York. Shortly after Basciano's 2006 trial began in the '03 case, he moved to disqualify AUSA Andres, arguing that Andres's status as a victim of Basciano's murder solicitation (which was then charged in the '05 case) gave Andres an improper personal interest in convicting Basciano and asserting that Andres would be an unsworn witness at trial. In rejecting Basciano's motion, the Court noted that AUSA Andres was prosecuting Basciano for crimes that preceded and were unrelated to any possible attempt to solicit Andres's murder. 2006 WL 385325, at *9. By precluding the government from offering evidence of the Andres murder solicitation at his trial, the Court denied Basciano's motion to recuse AUSA Andres as moot. Basciano, 2006 WL 385325, at *11.

Following the revelation of the "hit list," Basciano again sought AUSA Andres's disqualification, a motion that was denied. In denying the motion, the Court noted that the ABA Standards for Criminal Justice reject an appearance-based conflict-of-interest standard in favor of a determination of actual bias or partiality and that "there is nothing in the record to suggest that Andres bears any actual bias toward Basciano. The alleged threats were not made until well after Andres presented the '03 charges to the grand jury. Therefore, there is no indication that the prosecution initiated by Andres was predicated upon any semblance

of 'improper motivation.'" <u>United States v. Basciano</u>, 2006 WL 3486774, at *2 (E.D.N.Y. Dec. 1, 2006).  Finally, the Court noted that Basciano's motion to disqualify Andres appeared to be "yet another attempt by him to manipulate the judicial process which this court will not sanction" and highlighted the fact that Basciano had sought disqualification shortly following his 2006 conviction.  <u>Id.</u> at *3.

Finally, prior to his trial in the '05 case, Basciano moved to disqualify the entire United States Attorney's Office for the Eastern District of New York from prosecuting his capital case since, he alleged, the Office had "an axe to grind" with Basciano relating to Basciano's alleged solicitation of the murder of AUSA Andres.  <u>United States v. Basciano</u>, 763 F. Supp. 2d 303, 312 (E.D.N.Y. 2011).  As support, Basciano claimed a host of improprieties by prosecutors in "their overly zealous pursuit of the death penalty against" him.  <u>Id.</u>  In rejecting Basciano's motion, this Court noted that it had "considered Basciano's recusal request in the context of Defendant's extensive history of attempting to change the players involved in his criminal proceedings," observed that AUSA Andres had not participated in the capital case and found that the disqualification of the entire Office "would compromise the efficient administration of justice." <u>Id.</u> at 313 & n.6.  Having reviewed Basciano's allegations of purported government misconduct "carefully," the Court found "that

none of them assert any particular act of bad faith or unethical conduct.  They fail to rise to the level of creating the special circumstances required for recusal." Id. at 314.

XIV. <u>Basciano's Habeas Petition</u>

On January 17, 2012, Basciano, acting pro se, filed his habeas petition, asserting eleven different grounds he believes warrant a new trial: (1) ineffective assistance of trial counsel in failing to object to the Court's instructions of how the jury could use other crimes evidence and in failing to object to the use of the Pizzolo homicide (along with the conspiracies to murder Joseph Bonelli and Patrick DeFilippo) as evidence to prove a pattern of racketeering; (2) ineffective assistance of his post-trial and appellate counsel for failing to argue properly that the Pizzolo evidence was material under <u>Brady</u> because it was part of the charged crime; (3) a violation of <u>Brady</u> based on the government's failure to disclose Giuseppe Gambina's information that Basciano alleges contradicts Cicale's trial testimony regarding the Pizzolo murder; (4) a violation of Basciano's due process rights through the government's introduction of false testimony by Cicale about (a) whether he knew prior to his cooperation that he was going to be charged with the Santoro murder and (b) aspects of his account of the Pizzolo murder that differed from Gambina's; (5) prosecutorial misconduct for failing to disclose whether Cicale was told he was going to be charged with the Santoro murder and

Giuseppe Gambina's account of the Pizzolo murder conspiracy; (6) the failure to disclose information relating to the Pizzolo murder "despoiled" the district court's calculus in determining its admissibility; (7) the use of non-racketeering activity to prove a pattern of racketeering was contrary to RICO, violated due process or rendered RICO overbroad or void for vagueness; (8) the introduction of Rule 404(b) evidence and the jury instruction allowing the use of this evidence to prove a pattern amounted to a constructive amendment of the indictment; (9) ineffective assistance of trial and appellate counsel for failing to object to the admission of hearsay evidence; (10) ineffective assistance of trial counsel for conceding elements of the charged crime; and (11) prosecutorial bias of AUSAs Andres and Buretta.

Several of these grounds (Grounds Three, Four, Five, Six and Eleven) rely on two new pieces of undisclosed information, specifically, a perceived contradiction between Giuseppe Gambina's account of the timing and substance of the initial conversations between Cicale and Gambina when Cicale attempted to recruit Gambina to participate in the conspiracy to murder Pizzolo and, second, a handwritten note indicating that Cicale's attorney had had prior discussions with AUSA Andres prior to Cicale's statement to Basciano at a co-defendant meeting that Cicale "was going to be supposedly charged [with] Santoro." (GX 3500-DC-75, 05-cr-060).

A.   Gambina's Proffer Statements
     <u>Regarding The Pizzolo Murder</u>[13]

1.   <u>Gambina's Proffer Statements</u>

During an August 31, 2005 proffer session, Gambina advised the government that in November 2004, he and Anthony Aiello met with Cicale, who advised Gambina that "he had to do something and that Aiello would explain it to him."  Aiello later explained that they had been ordered to take part in two hits, one in which Pizzolo would kill a person (Joseph Bonelli) and the second where Aiello would kill Pizzolo.  Gambina did not reference what was to be done with the bodies of the murder victims but described the plan as committing two murders in different locations in quick succession.  Gambina told Aiello he would not participate.  At the time of these meetings, Basciano had recently been arrested.  Gambina explained that he then attempted to contact Cicale, who was out of town.  Shortly before Thanksgiving, Gambina met with Cicale and told Cicale he had refused to participate in killing Pizzolo.  Cicale was furious with Gambina.  (05-CR-060, GX 3500-GG-9 at 1-2; GA 45-46).

At a subsequent proffer on September 9, 2005, Gambina clarified that the first meeting with Cicale occurred less than a week before Thanksgiving and that on the way to the meeting with

_____

[13]   In his appeal of the denial of the 2010 New Trial Motion, Basciano referenced Gambina's statements in his cataloging of alleged prosecutorial misconduct, although he did not argue at length about Gambina's statements.  <u>United States v. Basciano</u>, 10-3548, Appellant's Br. 7 n.2.

53

Cicale, Aiello told Gambina that the purpose of the meeting was to discuss a murder they were going to carry out.  At the meeting, Cicale told Gambina that Aiello was in charge of the plan, Gambina's role was to drive Pizzolo to a location and that Aiello would explain the rest.  Cicale and Aiello then discussed the murder plot privately but Gambina overheard some details including a discussion of whether the body should be burned along with the car after the murder.  On their return from the meeting with Cicale, Aiello told Gambina the details of the plan to kill Pizzolo and a second person (Bonelli), at which point Gambina told Aiello he would not help kill Pizzolo.[14]  Gambina also cautioned Aiello that it was possible that Cicale or Basciano might be trying to set up Aiello and Gambina so they could use the murder against them if either later tried to cooperate with the government, thereby confirming that the Pizzolo murder conspiracy included Basciano. (05-CR-060, GX 3500-GG-9 at 3-4; GA 47-48).  Neither report reflects that Cicale ever told Gambina that the planned hit on Pizzolo had been called off.

---

[14]     The report does not reflect whether Aiello told Gambina what they were to do with Pizzolo's body, but it does reflect that Pizzolo would kill the second victim (Bonelli) and that once Pizzolo returned to the car, Gambina would drive Pizzolo to a second location for Aiello to kill Pizzolo.

2.   Cicale's 2007 Trial Testimony Relating
     To Gambina's Role In The Pizzolo Homicide

During Basciano's 2007 trial, Cicale testified as follows
regarding Gambina's role in the conspiracy and the timing of the
development of the conspiracy,

Q   Who did the defendant tell you to kill?

A   Joe Bonelli and Randy Pizzolo.

Q   Did you discuss with the defendant in what
order those two people should die?

A   Yes, sir, I did.

Q   What was discussed?

A   I had suggested, we were thinking of a way
to kill both of them; that, I would have
Anthony Aiello, Joey Gambini, and Randy
Pizzolo go look for Joe Bonelli.   Randy
Pizzolo knew Joe Bonelli.   Randy Pizzolo
killed Joe Bonelli.   Randy Pizzolo went back
to the vehicle.   Joe Gambini said[15] Anthony

---

[15]   The word "said" appears to be a typographical error
substituting for the word "and," since Cicale is responding to the
question about discussions Cicale had with Basciano, rather than
discussions with Aiello and Gambina.   In addition, there is no
reference in Cicale's direct testimony in the 2006 trial about any
conversation with Gambina about leaving the bodies in the street.
(TI  5815-20, 5827-29).   Gambina's proffer statements make clear
that Gambina was not privy to all of the discussions about the plot
and that Cicale and Aiello discussed separately what should be done
with the bodies.   However, even assuming that the transcript is
correct and Cicale was referencing a conversation with Gambina, the
fact that Gambina did not recall or relate this conversation in
either his proffer or trial testimony does not, without more, prove
that Cicale committed perjury.   See United States v. Monteleone,
257 F.3d 210, 219 (2d Cir. 2001)(perjury requires a showing that
the witness gave "false testimony concerning a material matter with
the willful intent to provide false testimony, . . . [s]imple
inaccuracies or inconsistencies in testimony do not rise to the
level of perjury"); United States v. Gambino, 59 F.3d 353, 365 (2d
Cir. 1995)("even a direct conflict in testimony does not in itself

Aiello would kill Randy Pizzolo and they would leave both bodies in the street.

* * * * *

Q    Did you talk to Joey Gambini about carrying out the murder?

A    Yes, sir, I did.

Q    Did you talk to Anthony Aiello about carrying out the murders?

A    Yes, sir, I did.

Q    Did Joey Gambini ultimately agree to carry out the murders or not?

A    Yes, sir, he agreed.

Q    Did he ever change that position?

A    Yes, sir, he did.

Q    What did he do?

A    After Vinny Basciano was arrested, Joey Gambini did not want to kill Randy Pizzolo anymore.

Q    How did you react to that?

A    I was upset.

Q    Why?

A    Because Joey Gambini was aware that we were looking to kill somebody.

Q    Why did that concern you?

A    Because Joey Gambini had committed us to kill Randy Pizzolo and by Joey Gambini stepping out, God forbid if law enforcement ever arrested him, Joey Gambini would be aware

constitute perjury").

56

that myself and Anthony Aiello were given the permission to kill Randy Pizzolo.

*    *    *    *    *

Q    Did the murders happen?

A    One murder happened.

Q    Which one?

A    The murder of Randy Pizzolo.

Q    When?

A    November 30th of 2004.

Q    What was the final plan?

A    The final plan was that Anthony Aiello would meet with Randy Pizzolo and take him to a location and shoot him.

Q    When did Vinny Basciano first give you the order to kill Randy Pizzolo before or after the defendant was arrested?

A    Before he was arrested.

Q    After the defendant was arrested, did you plan to kill Randy Pizzolo?

A    Yes, sir, I did.

Q    Why?

A    I was ordered from Michael Mancuso.

Q    Explain that?

A    After Vinny Basciano was arrested, I informed Anthony Aiello and Joey Gambini that the murder was off for Randy Pizzolo.

Q    Why?

A    Because I didn't want to kill Randy Pizzolo and I figured Vinny Basciano Basciano

wasn't around so I could slip him by without killing him.

Q    What happened?

A    During one of my meetings with Michael Mancuso, initially he had asked me, he told me he wants to be aware of anybody who's -- he doesn't want anybody to get hurt or killed and he asked me, Is there anything I should tell him.  I said there's nothing to tell and we left it off at that.

    The next time I ran into Michael Mancuso, he brought to my attention that he was aware that Randy Pizzolo was to be killed and Michael Mancuso informed me to go ahead and proceed with that killing, that nothing skips a beat.  Here he was using Vinny Basciano's terminology and Michael Mancuso also informed me that if anything was said that he gave me the order, meaning, Michael Mancuso to make sure that Randy got killed and to follow Vinny Basciano's original order.

(TII 1225-28).[16]

    Gambina's information is not materially inconsistent with Cicale's trial testimony.  Gambina confirms there was a conspiracy to murder Pizzolo involving Basciano, Cicale and Aiello and that although Cicale recruited him to participate in the conspiracy, Gambina eventually refused to participate, angering Cicale.  Both men differ slightly on the timing of when Cicale approached Gambina to participate in the murder plot, with Gambina's account placing that meeting shortly after Basciano was arrested, but even under Gambina's account it is clear that the conspiracy to murder Pizzolo

---

[16]    Cicale testified similarly in the 2006 trial.  (TI 5815-20, 5827-29).

already existed, that it involved Basciano, and that the plot was well developed before Gambina was approached to participate.

Notably, in his testimony at Basciano's capital trial, Gambina explained that at the initial meeting with Cicale, when Cicale asked Gambina to participate in the murder plot, Gambina did not refuse to participate even though he did not want to be a part of the plot:

> Q    At the restaurant that night, did you agree to participate in the murder?
>
> A    I didn't say yes and I didn't say no.
>
> Q    Did you tell Cicale that you would not participate?
>
> A    No, I didn't say that, no.
>
> Q    Had you ever previously refused to do something that Dominick Cicale had asked you to do?
>
> A    No.

(United States v. Basciano, 05-CR-060, T 6583-84).    Gambina reiterated this answer on cross-examination, stating, "But I left. In his knowledge, I was going to go ahead with the plan, but I never said yes, and I never said no." (Id. T 6651).

Cicale's testimony in the capital trial also clarified that he had told Aiello, but not Gambina, that the hit was called off after Basciano's arrest and asked Aiello to relay that information to Gambina, (05-CR-060, T 7187),[17] thereby explaining

---

[17]    In Basciano's capital trial, Gambina testified that Cicale had not told him that the plot to kill Pizzolo had been

the discrepancy between Cicale's and Gambina's accounts on whether Cicale told Gambina the hit was off.

B.   Cicale's Awareness Of Whether He
     Would Be Charged With The Santoro Murder

During the 2007 trial, the defense attempted to cross-examine Cicale about whether the government had threatened to charge him with a second death-eligible crime, the murder of Frank Santoro, prior to Cicale's cooperation:[18]

> Q   So the fact that you were not charged in the Santoro murder in January of 2006, by no means meant you were safe from the  government not charging you with that crime, correct?
>
> A   No, sir.
>
> Q   You weren't safe?
>
> A   I can't answer for the government.
>
> Q   Well, they had other cooperators, correct?
>
> A   Yes, sir; they did.
>
>            *    *    *    *    *
>
> Q   And so you knew that you weren't safe from the government charging you with it, right?
>
> A    I felt confident I wouldn't be charged with it.
>
> Q    Well, sir, isn't it a fact that in November of 2005, you were informed that the government did have intentions of bringing you into this Santoro case?

---

called off after Basciano was arrested.  (05-CR-060, T 6651).
     [18]   Prior to meeting with the government, Cicale had been charged with the murder of Randolph Pizzolo, a death-eligible murder.

A    I don't recall.

Q    November of 2005 is three months before you decided to cooperate, correct?

A    Yes, sir; that's correct.

Q    And in November of 2005, you had a co-defendant with you, correct?

A    I don't recall the date, sir.

Q    But you had a bunch of co-defendant meetings you decided to cooperate, correct?

A    Yes, sir.    There has was a bunch of co-defendant meetings.

*    *    *    *    *

Q    And during the November co-defendant meeting, you were informed that the government was considering putting you into the Santoro murders, correct?

        MR. BURETTA:  Objection.
        THE COURT:  You may answer.

Q    Right?

A    I don't recall, sir.

Q    When did you find out that the government had intentions of putting you into the Santoro murder?

A    I'm not sure if the government was ever going to put me into the Santoro murder case.

(TII 1397-1400).

During summation, defense counsel attempted to show that Cicale had falsely implicated Basciano in a variety of crimes, including the Santoro murder, in order to escape the death penalty:

Dominick Cicale was arrested in 2005, and he was charged with the murder of Randolf Pizzola, and he was facing the death penalty. He was facing execution.  He had spent some twelve years of his life in jail, just on two cases.   He knew one of his cohorts had previously cooperated against him and landed him in jail.  He knew that he did not want to go back to jail, and he certainly was not interested in being executed as he had executed others in his life.

So, he stayed in jail for a year.   He gathered the discovery and he read it carefully, and he made his move.

And when I'm finished, ladies and gentlemen, if you have not realized it yet, you're going to see just how sinister and calculated, but how transparent, his move was.

And when did he make this move?  Well, he made this move, I submit to you, as the other doors were closing in, as the other walls were closing in, around him.

You know the government asked a lot of its cooperators:  Did the government know about this murder?, Did the government know about that?, Did the government know about this murder?, Were you investigating for you for this?, Were you investigating you for this?, to give you the illusion that if it weren't for the truthful revelations of these fine men presented to you, the government would never have known about it, that they were not scared that these murders would come down upon them.

Well, Dominick Cicale, I asked him: Isn't it a fact that on November  --no, in November of 2005, two months before you decided to cooperate, isn't a fact at a codefendant meeting, you found out, you were told the government was closing in on you on the Santoro murder?

What did he say?  I don't recall.  I
don't know.  If you didn't, you would say no.
I asked him again, and what did he say?  I
don't recall.

As the walls were closing in around this man,
already facing the death penalty for one of
his executions, he was told that the walls
were closing in around him on another one, and
so in January of 2006, he made his move.

What he did is, he went and he delivered
what you know, what you know now, the
government needed:  Cooperation against
Vincent Basciano.  Something that you know,
from sitting here for the last four weeks, the
government went to great lengths, at least for
some of these witnesses, to get.

(TII 4580-82).

In response to this argument, the government stated in

rebuttal,

Cicale is charged with the Pizzolo
murder.  Let's be clear here.  He's charged
with the Pizzolo murder when he gets arrested,
not the Santoro murder.  Mr. Kousouros stands
here and says, Well, Mr. Cicale was about to
be charged with the Santoro murder.  Is that
true?  Was there any evidence of that at all?
What evidence, according to what you  saw in
this trial, implicated Dominick Cicale in the
Santoro murder before he told the government
about his participation?  The tapes
Tartaglione made?  No.  Doesn't mention his
involvement.  Salvatore Vitale's statements?
All Salvatore Vitale knows about this third
person is, he's a correction officer or
ex-correction officer.

There's no evidence implicating Dominick
Cicale before he walks in the door charged
with a different murder and says, You know
what?  I got to tell you everything, so I'm
going to, and I was in this murder, and it was
not just Basciano and Indelicato and myself.

> There were actually other people.  Salvatore
> Vitale didn't hear everything.  There were
> more of us.

(TII 4688-89).

In support of his habeas petition, Basciano cites a
handwritten note of a 2010 telephonic interview with Cicale, which
states in relevant part,

> • During first 2 mtgs, gov't did not tell
> CW about things he would be charged with.
> CW + his lawyer had discussions though
> after Andres had discussion [with]
> attorneys.  CW mentioned to VB @ a
> subsequent co-def mtg that he was going
> to be supposedly charged [with] Santoro
> murder.

(05-CR-060,   GX   3500-DC-75;   GA   40)(the   "Cicale/Santoro
information").  This note, however, does not materially contradict
Cicale's testimony that he did not recall at that time whether he
had learned, and from whom he had learned, that the government
intended to charge him with the Santoro murder.  Indeed a
handwritten note reflecting a debriefing immediately prior to the
one Basciano cites states, "First two meetings.  Does not recall
ever being told that [more charges would be coming if he did not
cooperate].  Will think more on it." (05-CR-060, GX 3500-DC-74; GA
39).  Cicale was not asked at trial what he told Basciano in the
co-defendant meeting and his statement documented in the 2010
handwritten note that he "was going to be supposedly charged" with
the murder reflects a degree of skepticism corresponding with his

64

testimony that he was "not sure if the government was ever going to put me into the Santoro murder case." (TII 1400).

In the 2010 New Trial Motion, Basciano raised a Jencks Act claim with respect to this portion of Cicale's testimony on cross-examination and the government's rebuttal and noted that any evidence that the government failed to disclose Cicale's November 2005 meetings with the government where the government allegedly threatened him with being charged with the Santoro murder as a "highly prejudicial Giglio violation." (United States v. Basciano, 03-CR-929, DE# 1125 at 72, 75 (E.D.N.Y. Mar. 24, 2010)).  In the reply to his 2010 New Trial Motion, Basciano's attorneys attached a handwritten letter by Basciano in which Basciano wrote that he had discussions with Cicale prior to a December 27, 2005 co-defendant meeting during which time Cicale "expressed concerns regarding information his lawyers supposedly received from the government that they, (the prosecutors), had 'intentions' to indict Cicale for the murder of Frank Santoro and that they intended to seek the death penalty on Cicale for that murder." (03-CR-929, DE# 1151-1, Reply Mem., Ex. AA at 2).  Thus, Basciano has been aware since December 27, 2005 of the information he claims the government suppressed.  In this letter, Basciano also proceeds to explain what he believes the significance of the "secret" meeting between Cicale and the government on November 21, 2005.  Basciano's habeas

petition advances the same argument and information as Basciano's earlier letter.

In rejecting Basciano's motion for a new trial, this Court concluded, "[E]ven if the Government had threatened Cicale with a death-penalty prosecution to obtain his cooperation, Cicale testified at trial that he believed that if he violated his cooperation agreement by testifying falsely, the Government could pursue the death penalty against him." United States v. Basciano, 03-cr-929, DE# 1157 at 19 (E.D.N.Y. Aug. 19, 2010).

C.   Sixth Recusal Motion

In connection with his habeas petition, Basciano has raised his sixth motion to recuse the Court from matters relating to him. In this motion, brought pursuant to 28 U.S.C. §§ 144, 455(a) and 455(b)(1), Basciano asserts that this Court has shown actual bias, or that an objective person would find an appearance of bias, in the Court's purported declaration that Dominick Cicale, one of the many witnesses against him, did not commit perjury regarding the Pizzolo murder.[19] In so doing, Basciano believes, this Court now has a vested interest in denying his habeas petition so as not to reflect negatively on its credibility in finding that Cicale did not perjure himself. (Recusal Mot. 6-7; Supp. Recusal Mot. 15 (asserting that this provides the "appearance of bias")).

---

[19]   Basciano asserts that the evidence that Cicale committed perjury is the "Gambina 302" of Gambina's proffer statements. (Recusal Mot. 5).

Basciano also cites a purported contradiction between this Court's rulings that the alleged hit list was a tool to engineer the Court's recusal and its ruling in the capital case that evidence regarding the hit list was sufficiently credible to be admitted in the penalty phase.  (Recusal Mot. 8-9).

Basciano further claims that this Court improperly interfered with his attorney-client relationships by telling certain of Basciano's several court-appointed attorneys not to advise him on matters not within the scope of their appointment and also refused to let Basciano seek advice from an unconflicted counsel once he learned that one of his attorneys in the capital case might have a possible conflict although the attorney claimed not to have a conflict.  (Recusal Mot. 9-10).

1.   Cicale's Sentencing

On January 30, 2012, this Court sentenced Dominick Cicale principally to 120 months' imprisonment.  (Cicale Sent. Tr. 27). In providing its reasoning, the Court noted that it considered, along with the other relevant factors, Cicale's crimes of conviction, his criminal history, the extensive assistance Cicale provided to the government and the risk to Cicale and his family through his cooperation.  (Cicale Sent. Tr. 19-20).  Calling Cicale "a true career criminal," the Court then explained the impact of Cicale's cooperation, as follows:

> Dominick Cicale has cooperated with the
> government, meeting with the agents, providing

information and testifying at several high
profile trials since 2006.  In its 5K letter,
the government describes Cicale's cooperation
as, quote "substantial and significant," end
quote.  And notes the timing of his
cooperation made it particularly useful.

Cicale's cooperation came at a moment of
transition within the Bonanno family.  A
moment when the enterprise had been weakened
by years of large scale arrests and successful
prosecutions.

After the conviction of long time boss
Joseph Massino and acting boss Anthony "Tony
Green" Urso, new leadership emerged within the
family.  Cicale was among the first
cooperators to provide intelligence about this
wave of Bonanno leaders.  With information he
provided, the government was able to
incapacitate four different Bonanno family
administration and bosses who stepped up to
fill the void that Massino left behind.

The government attests that Cicale has
been, quote, "an important and effective
government witness," end quote.  Cicale was a
crucial witness in multiple successful
prosecutions of his one-time friend and then
acting boss of the Bonanno crime family,
Vincent Basciano.  Cicale has testified in
Basciano's three trials before this Court.
Having presided over these trials, I've had
the ability to observe Cicale's testimony and
the impact that it has had firsthand.

Cicale has also testified or been prepared to
testify in connection with other prosecutions
including the trial of Gambino family boss
John A. Gotti.  He provided the government
with information about dozens of members and
associates of La Cosa Nostra including many
new made members.

He has provided information that led to
the conviction of at least nine defendants who
were charged with acts involving murder.  And
intelligence Cicale provided aided the government in obtaining

lengthy sentences for other members of the Mafia who committed serious crimes.

Due in no small part to Cicale's cooperation, Vincent Basciano is now serving two consecutive life sentences, and other Bonanno leaders and associate[s] are serving sentences as much as 40 years.

The Court must balance my views of Cicale's cooperation against a lifetime of violence and utter disregard for the law and human life. It is regrettable that our criminal justice system must rely on the cooperation of criminals like Cicale in the prosecution of other criminals. But in order to penetrate the secretive world of organized crime, to solve and prevent other crimes, and hopefully give the victims and families of these crimes some measure of such peace. Such methods are an unfortunate necessity within our system.

Nothing about Cicale's cooperation justifies or excuses the loathsome life he has led. And the Court is under no illusion that his cooperation is nothing more than self-interested. Cicale had committed two capital eligible murders and saw the Bonanno organization crumbling around him. Any remorse he feels is belated and must be read in the context of that reality.

It is the same reality, the reality of a family in transition, weakened and trying to rebuild, that has made Cicale's cooperation so useful to the government. This cooperat[ion] comes at a great cost to society, to the government[,] to Cicale himself.

In determining whether Cicale's case is proper for downward departure, this Court has considered his serious and extensive criminal history, his invaluable and protracted cooperation and his willingness to place himself at personal risk.

*     *     *     *     *

It has always been my preference to
sentence a defendant thinking and hoping that
what he says to the Court will result in
action on his part, that he or she, in this
case he, will actually take advantage of any
mercy that the Court shows: I will find a way
to lead a law abiding life even under the
extraordinarily difficult circumstances of
witness protection.

Sentencing is the most difficult job that
a judge [has].  And sentencing a cooperator
who has admitted to three murders, two of them
in connection with his activities in organized
crime, makes that job all the more difficult.

The Court has sentenced, by this point,
approximately 100 members and associates of
the Bonanno crime family.  It doesn't get
easier when you turn to those who have
cooperated with the government.  It actually
becomes more difficult.

The sentence that I will impose on Mr.
Cicale shows great mercy, I hope, but also
provides opportunities for Mr. Cicale to turn
to a life that is productive and helps others.
I am under no illusion that that will be an
easy road to travel.  I don't know how he will
do it because his history would tell us, would
argue that he will not be able to do it.  In
view of the extraordinary assistance that he
has given to the government, I believe that he
should have the opportunity to attempt to do
it.

(Cicale Sent. Tr. 23-27).

2.   History of Rulings Concerning The "Hit List"

Basciano also cites what he believes is the Court's

inconsistent rulings about the meaning of the purported hit list

(the "List") in the recusal and SAMs habeas litigation, which did

not address whether the List was a hit list but merely determined

that one of Basciano's possible motives in authoring the List was to engineer the Court's recusal, see Basciano, 2006 WL 3483924, at *2; Lindsay, 2008 WL 141860, at *10-11, and the Court's decision in Basciano's capital case permitting the government to introduce evidence concerning the List during the penalty phase. Basciano believes that these "meticulous elidings by the Court were orchestrated specifically to align the Court's actions with judicial bias caselaw just so it could justify staying on the case until the time came in the death penalty trial to flip the switch." (Supp. Recusal Mot. 11). Basciano further believes that the Court's ruling that the List was admissible shows that "this Court believed all along that the threat upon its life by Basciano was real and credible." (Supp. Recusal Mot. 12).

During the SAMs habeas litigation, the government argued that one of the grounds supporting the imposition of the SAMs was Basciano's authoring of the purported hit list. Following an ex parte discussion with the government, Magistrate Levy concluded that the government's evidence "strongly indicates" that the list was a hit list. (Basciano v. Martinez, 07-CV-421 (NGG)(RML), May 25, 2007 Report & Recommendation). Basciano objected to the Report and Recommendation. In adopting the Report and Recommendation, this Court clarified,

> As for the alleged "hit list," I find
> that there is sufficient evidence of
> Basciano's dangerousness to justify the
> Government's safety concerns quite apart from

a specific finding that the list is a hit list
. . . .

   Finally, I address Defendant's contention
that this court's decision not to recuse
itself after discovery of the list is in
conflict with Judge Levy's finding that the
Government's evidence "strongly indicates" the
list is a hit list.  The court's November 30,
2006 opinion found that "it appears that *one
of Basciano's objectives* in writing the May
2006 list and filing this motion is to
'engineer' this court's recusal."  Earlier in
the opinion, the court wrote that "if the
court concludes that recusal is one of the
objectives underlying the threat, irrespective
of whether or not the threat is taken
seriously," then recusal is not mandated.
Nowhere in the opinion did the court find that
the list was not a hit list and indeed, the
decision to deny the recusal motion was based
solely on the court's finding that recusal was
one of Basciano's objectives.   I make no
finding here, as I made no finding before, on
whether or not the list is a hit list in
addition to functioning as a recusal tool.  I
note simply that the court's recusal decision
and Judge Levy's conclusion about the list are
not mutually exclusive.  I also caution that
the court's decision to decline to make a
definitive finding on the list should not be
construed as a pronouncement by implication in
either direction.

Basciano v. Lindsay, 2008 WL 141860, at *10-11 (E.D.N.Y.

2008)(internal citation omitted).

   Prior to Basciano's capital trial, Basciano moved for an

evidentiary hearing regarding the reliability of the purported hit

list before the government would be permitted to introduce it in

the penalty phase.   See Basciano, 763 F. Supp. 2d at 356.   In

denying Basciano's motion for a hearing, this Court ruled,

>With respect to the List, the court is persuaded that sufficient reliability has been shown to offer this evidence. Judge Levy previously determined that sufficient indicia of reliability suggested it was a hit list aimed at a judge, federal prosecutor, and cooperating witnesses. See Martinez, 2007 WL 2119908, at *7. The penalty phase is an adversarial proceeding and Basciano will have sufficient opportunity to rebut and counter the Government's evidence. As addressed above, Basciano even sought permission to admit evidence of the list at the guilt phase.

763 F. Supp. 2d at 356.

3.   Alleged Interference With
     Attorney-Client Relationship

Basciano cites three instances, primarily in relation to the '05 case, in which he claims the Court has interfered with his attorney-client relationships.

First, Basciano cites a sealed ex parte meeting between the Court and his defense counsel in the '05 case in which the Court expressed curiosity about why attorneys appointed to represent Basciano in the '03 case, which was then on appeal, were seeming to perform work in relation to Basciano's capital case, where he was already represented by three court-appointed attorneys (George Goltzer, Esq., Ying Stafford, Esq. and Richard Jasper, Esq., who was appointed as learned counsel). (Recusal Mot., Tab A at 3, 5). Even within that conversation, however, the Court was clear that there was no "gag order" between the counsel teams but merely expressed its concern that the appropriate court (the district court or the Second Circuit) was being billed for the work

being performed by Basciano's various counsel.  (Id. at 3, 5, 10-11).   Indeed, the Court noted that it was focused on "the bookkeeping aspect of this in a case where we've already expended a large amount of tax dollars for this case, which I have never objected to, obviously, or criticized or questioned." (Id. at 5). The Court also expressed concern that Basciano's appellate counsel on the '03 case may not understand all of the developments in the '05 case and did not want them to inject confusion into the proceeding when Basciano had three attorneys appointed to represent him in his capital case.  (Id. at 9, 11).[20]

Basciano also includes a transcript from his capital trial, in which the Court noted that two of Basciano's '03 appellate attorneys had attended "virtually the entire trial" and asked whether they were being paid for their assistance in the '05

_____

[20]   Within this discussion, the Court referenced a December 3, 2010 letter by Basciano in which Basciano expressed concern about whether Goltzer was burdened with a conflict of interest on the basis of his interview of a witness (Id. at 7), who the government surmises is Joseph Barone based on the timing of the interview two months earlier and the similarity in language of how Basciano described Barone and this witness in his letters to the Court (Compare Recusal Mot. Tab A with 05-cr-060, DE# 949, 952, 955).  In his December 3rd letter, Basciano noted that Goltzer did not believe a conflict existed but one of Basciano's '03 appellate attorneys asserted there was a conflict.  (Id.).  The government can find no further discussion in the public docket regarding Goltzer's alleged conflict referenced in the December 3, 2010 letter.   Because these communications were ex parte between the defense and the Court, the government is unaware of information about whether a conflict exists or the nature of that conflict or, if a conflict existed, what steps were taken to advise Basciano pursuant to United States v. Curcio, 694 F.2d 14 (2d Cir. 1982). In his recusal motion, Basciano does not explain the nature of the conflict but asserts only that Goltzer possessed one.

case and, if so, by whom they were being paid.  (Recusal Mot., Tab B at T 5385).  During its colloquy with the '05 counsel, the Court also noted that one of Basciano's appellate attorneys, Jane Simkin Smith, Esq., had been disruptive during the capital trial and warned that Ms. Smith had "an obligation to be proper and decorous" in the courtroom or she would be ordered to watch the trial from another room.  (Id. at T 5386-87)(noting "this week was an outrageous situation in a number of respects").

Finally, Basciano cites a July 8, 2009 letter to the Court by Mr. Goltzer in response to the Court's June 26, 2009 order relieving Ms. Smith of her obligations on the '05 case since she had completed her role in researching and preparing post-trial motions in the '03 case and pre-trial motions in the '05 case and directing the government to advise the Bureau of Prisons, which implements the Special Administrative Measures to which Basciano was subject, that Ms. Smith is "no longer assigned to the case." (Recusal Mot., Tab C at 1, 3).  On July 9, 2009, the Court denied Basciano's request to modify the Court's order regarding Ms. Smith and directed Mr. Goltzer and Mr. Jasper to file appearances in the Second Circuit.  (05-CR-060, DE# 725).

By way of background, during a June 26, 2009 oral argument on motions pertaining to the '05 case, Basciano's counsel raised the need to continue Ms. Smith's representation of Basciano, despite his having three additional attorneys (Goltzer, Jasper and

Stafford) represent him on the '05 case.   In relevant part, the

Court stated,

> The  Court  has  approved  every  single
> voucher that has been submitted to it in this
> case  in  full  without  question  understanding
> the importance of leaving to professionals who
> the Court has appointed the responsibility of
> making the choices and dealing with the issues
> that  are  necessary  to  be  dealt  with.    So
> that's the first item.  So money, while money
> is to be guarded carefully in the public fisc,
> is  not  an  issue  in  this  decision.    So  take
> money off the table.
>
> I understand that you're relatively new
> to  this  case,  but  I  also  understand  that  Mr.
> Stern's  appointment  was  the  result  of  the  fact
> that  the  defendant  and  his  appointed  counsel,
> Mr. Savitt, were not getting along.
>
> Now, let me go over the lawyers who have
> represented this defendant in this litigation
> just  so  that  we  have  a  fulsome  understanding
> of what's been going on here and the fact that
> this isn't about Mr. Stern at all.
>
> On March 22nd, 2005, Barry Levin, who was
> handling  the  other  case,  was  retained  in  this
> case,  and  Mr.  Savitt  was  appointed  learned
> counsel.  On December 5th, 2006, the defendant
> terminated  Mr.  Levin  and  hired  James
> Kousouros.    On  October  17th,  2007,  the
> defendant  terminated  Mr.  Koursouros  and
> requested the Court to appoint counsel, which
> the  Court  did  making  Mr.  Savitt  primary
> counsel and appointing Mr. Jasper as learned
> counsel.  On August 6th, 2008, Mr. Savitt was
> relieved,  and  Mr.  Stern  was  appointed.    On
> February 25th, 2009, Mr. Stern was relieved,
> and Mr. Goltzer was appointed.
>
> Now, the Court is very mindful of the
> fact that the defendant is sitting in the SHU
> under  a  SAMs  Order,  and  it's  the  Court's
> desire  to  move  this  case  as  quickly  as
> possible.  But the fact of the matter is that

the purpose for which Ms. Smith was appointed
has been completed, and this defendant is
entitled to two lawyers and still has three,
and the Court believes that that is adequate
for his representation.

If you need more time to prepare the
defense after the decision on the double
jeopardy appeal, then you'll let me know and
I'll consider it.  I've already told you to
keep January, February and March open in the
possibility that the case will have to be
tried after the first of the year. I'm open to
that.

As far as arguing the double jeopardy
motion, I'm sorry, I have two outstanding
federal criminal defense lawyers in this case,
and I dare say either one of you could argue
this motion blindfolded.  So it is absolutely
unacceptable to the Court to hear that only
Ms. Smith, the implication that Ms. Smith must
argue that motion.  You are counsel, it's your
job, and I expect you to do your job.  That's
what you were appointed to do, not part of the
job, not the part that she doesn't do, but the
whole job, and I believe that you are the
professionals to do it.  Your presentation
here today demonstrates your capabilities, and
I'm very pleased with what you have presented
here today, and I think your client should be
too.

(United States v. Basciano, 05-CR-060, Transcript of Oral Argument

at 166-68 (E.D.N.Y. June 26, 2009); GA 30).

    4.    Denial of Basciano's Motion For A Stay

        Finally, in Basciano's supplemental recusal motion, filed

on June 14, 2013, Basciano asserts that this Court's denial of his

motion for a stay in the habeas proceeding until Basciano could

seek a writ of mandamus in the Second Circuit, its sentencing of

other cooperating witnesses and its handling "of certain other

peculiar affairs throughout its dealings with" Basciano are all relevant to the bias inquiry. (Supp. Recusal Mot. 6).

On March 19, 2013, this Court denied Basciano's motion for a stay, noting that it would first address the motion for recusal and, if granted, not comment on the merits of Basciano's § 2255 claim and request for counsel but that it would consider both on the merits if it denied the recusal motion. <u>Basciano v. United States</u>, 12-cv-280(NGG), DE# 9 (filed Mar. 21, 2013). Basciano asserts that this denial is a sinister ploy by the Court in "very possibly contaminating future decision-makers with the interjection of its potentially prejudicial views just to ensure that [its] opinion ultimately has some effect in preserving" Basciano's conviction. (Supp. Recusal Mot. at 7). Basciano also asserts that the fact that this is a new matter, rather than part of his criminal case, eliminates possible checks, such as a jury's finding, on the court's recusal decision. (<u>Id.</u> 8).

In addition to amplifying his arguments regarding the Court's alleged bias in sentencing Cicale, Basciano also raises an overarching conspiracy by the Court after the revelation of the purported hit list to conceal its bias through a variety of rulings that appear consistent with recusal caselaw (such as authoring a letter to the Attorney General inquiring whether the Attorney General still sought the death penalty after Basciano's conviction and life sentence were affirmed (Supp. Recusal Mot. 67 n.19)) or

through other judicial actions that Basciano believes amount to proof that the Court was willing to ignore evidence of perjury by cooperating witnesses who testified against Basciano and purportedly had conflicting accounts on matters collateral to Basciano's charges or, in the case of the conflicting accounts on the false murder plot allegation, to become complicit in the government's use of perjury.

Finally, Basciano reprises his argument that the Court's withholding of Joseph Barone's letter until after the time for Basciano's Rule 33 motions had passed was proof of bias. (Supp. Recusal Mot. 60-61). Basciano asserts that by withholding the Barone letter, the Court violated judicial canons by not advising the parties promptly of a communication concerning a pending proceeding. (Supp. Recusal Mot. 64 n.17). Basciano claims that it is obvious on the face of Barone's letter how valuable Barone's testimony would be. (Supp. Recusal Mot. 60). However, as this Court previously concluded, the "section of the Barone letter at issue in this case consists solely of the bald and unsubstantiated assertion that Barone somehow saved this judge's life, without providing any additional facts. Defendant has failed to show this letter is at all relevant." Basciano, 2010 WL 4484366, at *3. Besides asserting that Barone somehow saved the Court's life (an assertion that is incorrect) and "the A.U.S.A.'s as well," Barone revealed only that he had been an informant working within the

Bonanno family and another crime family and was good friends with Dominick Cicale. (<u>Basciano</u>, 05-CR-060, DE# 925). Barone did not indicate in his letter to the Court that he possessed information exculpating Basciano. Instead, Barone provided a litany of medical complaints and some grievances about his incarceration and pending charges. In rejecting Basciano's recusal motion based on the Barone letter, the Court concluded,

> if this court's knowledge of an alleged death threat against this judge did not constitute grounds for recusal, *See Basciano*, 2010 WL 2802566, at *3-4, then an ambiguous and dubious letter from a third party claiming some responsibility for foiling that alleged death threat certainly does [not] constitute 'personal knowledge of disputed evidentiary facts concerning the proceeding' sufficient to satisfy 28 U.S.C. § 455(b)(1).

<u>Basciano</u>, 2010 WL 4484366, at *3.

In his recusal motion, Basciano argues in passing that Barone, a confidential informant, possessed exculpatory information that Cicale, not Basciano, had shot Santoro and claims the government suppressed that information. (Supp. Recusal Mot. at 61, 74 n.25 (noting that Barone advised his handling agent that Cicale told him that he (Cicale) "did the shotgun murder in Throgg's Neck"); GA 3). Basciano notes in his motion that the AUSAs in Basciano's case were unaware of Barone's letter and also notes that the Court's failure to disclose the letter prevented the AUSAs from complying with their disclosure responsibilities. (Supp. Recusal Mot. 64-65, 73, 83). In a July 8, 2013 filing, Basciano also seeks

an evidentiary hearing to develop the record with regard to a report by Barone to his FBI handling agent that Cicale admitted that he "did th[e] shotgun murder." (12-CV-280, DE#19 at 2).

As to the substance of Barone's information, while the brief handwritten note to which Basciano refers says Cicale, "did th[e] shotgun murder in Throggs Neck" with no other details about the Santoro murder, an earlier report by Barone says,

> Source advised that Bonanno LCN member Vinnie Basciano ordered the murder of Frank Santoro . . . just after his close associate, Dominick Cicale was released from prison. Santoro was a Caucasian male in his 30s who was killed by Cicale as a favor to his friend, Basciano. Santoro had discussed kidnapping various individuals for ransom and at one point made a remark about how much money they could get for Vinnie Basciano's son. It is unclear whether Santoro was serious or really intended to abduct Basciano's son. At any rate, Basciano learned of Santoro's remark and asked Cicale to kill Santoro. One night, while Santoro was walking his dog near the Throggs Neck Bridge/ Throggs Neck Expressway, Cicale approached Santoro and shot and killed him. After the murder, Cicale rose quickly in status and responsibility as a member of Basciano's 'crew.'

(FD-302 Report dated January 28, 2003; GA 1). Far from being exculpatory, this information is largely consistent with Cicale's testimony since Cicale never denied his own involvement in Santoro's murder and has consistently admitted firing at Santoro. Moreover, Barone's information inculpates Basciano since it establishes, consistent with Cicale's testimony and other proof at trial, that Basciano ordered the murder of Santoro because he had

81

learned Santoro had threatened to kidnap one of his sons.  Even assuming Barone's information had been disclosed and used by Basciano, the result at trial would not have been different in light of the "multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale . . . .  With respect to the Santoro murder charge, the jury considered Basciano's own recorded statements, the testimony of cooperating witnesses Salvatore Vitale, Nicholas Pisciotti, Richard Cantarella, and James Tartaglione, as well as the testimony of Kenneth Champlin and Carmine Naddeo, and physical evidence corroborating the details of the Santoro murder provided by the witnesses."  <u>Basciano</u>, 465 Fed. Appx. at 4.  As this Court has noted repeatedly, Basciano has "not dispute[d] the existence of the significant independent and corroborating evidence offered at trial in addition to Cicale's testimony."  <u>Basciano</u>, 2008 WL 905867, at *1.

### SUMMARY OF ARGUMENT

As is shown below, many of the grounds Basciano advances have been raised or could have been raised on direct appeal and are thus precluded from being raised here.  Those claims which are now based on new facts, such as the Gambina information and the Cicale/Santoro information, fare no better since Basciano cannot show that either piece of information was material to his charges in the '03 case.

Basciano's claims of ineffective assistance of counsel also lack merit because his counsel either acted consistently with the law or made strategic decisions and, in any event, Basciano cannot show prejudice.

Basciano's sixth recusal motion is also without merit and appears to be another attempt by Basciano to manipulate the judicial system.

<u>ARGUMENT</u>

I.   <u>MANY OF BASCIANO'S CLAIMS ARE PRECLUDED</u>

In his habeas petition, Basciano reprises, although in somewhat different form, several claims that have previously been rejected by this Court and the Second Circuit, specifically, his claim that the government failed to disclose information pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), that he asserts contradicts Dominick Cicale's testimony regarding the murder of Randolph Pizzolo as well as the government's alleged misconduct of improperly bolstering Cicale in summation, eliciting perjury at both trials from Dominick Cicale and suppressing information relating to Cicale.  Basciano claims the government also violated its disclosure obligations by failing to disclose information he believes would contradict Cicale's testimony that he did not recall whether he learned prior to his cooperation that he was going to be charged with the murder of Frank Santoro, a claim that again rests upon the belief that further impeachment of Cicale would have created a different result at Basciano's trials.  In addition, Basciano repeats the claim from his appeal of the denial of the 2010 New Trial motion that by failing to disclose information contradicting Cicale's account of the Pizzolo murder conspiracy, prosecutors "despoiled" this Court's calculus in determining whether to admit evidence of the Pizzolo murder.  Because these claims have previously been resolved against

Basciano, he is precluded from raising them in his habeas petition. In addition, even considering the merits of Basciano's <u>Brady</u> and <u>Brady</u>-related claims concerning the two new undisclosed pieces of information, the Gambina information and the Cicale/Santoro information, cannot provide Basciano relief since neither piece of information, whether considered individually or collectively with all of Basciano's prior <u>Brady</u> claims, creates a reasonable possibility of a different result at trial or any reasonable likelihood that Cicale's allegedly false testimony regarding these topics would have affected the judgment of the jury.

As to several other of his claims, Basciano could have but did not present these issues in his direct appeal or the appeal of the denial of his 2010 New Trial motion, including his claim that the use of non-racketeering activity to prove a pattern of racketeering activity was contrary to the RICO statute and violated due process and his claim that the jury instruction allowing the use of certain other crime evidence amounted to a constructive amendment of the indictment. Because these claims could have been raised on direct appeal but were not, Basciano is precluded from raising them now.

Finally, Basciano asserts that his various trial, post-trial and appellate counsel have provided ineffective assistance (1) by failing to object to the Court's instructions addressing how the jury could use other crimes evidence and by failing to object

to the use of predicates charged in the '05 case as evidence to prove a pattern of racketeering, (2) by failing to argue that the Pizzolo evidence was material under <u>Brady</u> because it was part of the charged crime, (3) by failing to raise the argument that the permitted use of non-racketeering activity to prove a pattern of racketeering violated RICO and the Due Process Clause, (4) by failing to raise the argument that the jury instructions permitting use of other crimes evidence to prove a pattern of racketeering amounted to a constructive amendment of the indictment, (5) by failing to object to hearsay testimony or to raise the improper admission of hearsay testimony on appeal, and (6) by conceding elements of the charged offense.  As discussed below, Basciano's counsel was not ineffective and, indeed, many of Basciano's arguments are premised on a misunderstanding of the applicable law.

   A.   <u>Legal Standards Applicable to § 2255 Petitions</u>

        "[A] § 2255 motion may not relitigate issues which were raised and considered on direct appeal."  <u>Yick Man Mui v. United States</u>, 614 F.3d 50, 55 (2d Cir. 2010)(quoting <u>United States v. Becker</u>, 502 F.3d 122, 127 (2d Cir. 2007)); <u>United States v. Perez</u>, 129 F.3d 255, 260 (2d Cir. 1997).  The Second Circuit "recognize[s] that, where a defendant alleges varying factual predicates to support identical legal claims relating to a particular event, all claims constitute a single 'ground' for relief for purposes of applying the mandate rule in collateral proceedings."  <u>Yick Man</u>

<u>Mui</u>, 614 F.3d at 55.  As this Court noted in rejecting Basciano's 2010 New Trial Motion, the mandate rule, which is a subset of the law of the case doctrine, obliges the district court to follow the decision of the appellate court where issues have been either explicitly or implicitly decided on appeal, <u>see</u> <u>United States v. Minicone</u>, 994 F.2d 86, 89 (2d Cir. 1993), and "bars the district court from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals," <u>United States v. Stanley</u>, 54 F.3d 103, 107 (2d Cir. 1995) (internal quotation marks and citations omitted); <u>see also</u> <u>United States v. Quintieri</u>, 306 F.3d 1217, 1229 (2d Cir. 2002).  Moreover, the mandate rule precludes not only claims that actually were raised on the prior appeal but also claims that could have been raised but were not. <u>See</u> <u>United States v. Ben Zvi</u>, 242 F.3d 89, 95 (2d Cir. 2001). Thus, the mandate rule is not limited to the specific <u>Brady</u> theories that Basciano advanced on the prior appeals but applies to all <u>Brady</u> theories that Basciano could have raised based upon this evidence.

A petitioner is also "barred from raising claims in his § 2255 motion that he failed to raise on direct appeal unless he shows cause for the omission and prejudice resulting therefrom." <u>Perez</u>, 129 F.3d at 260.  This "cause and prejudice" standard requires the petitioner to show not only that "some objective factor external to the defense" impeded his efforts to raise the

issue earlier, <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991), but also that the error alleged "worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error." <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982).

A petitioner may raise such claims "'where the issues were not raised at all on direct appeal due to ineffective assistance of counsel.'" <u>Perez</u>, 129 F.3d at 261 (quoting <u>Underwood v. United States</u>, 15 F.3d 16, 18 (2d Cir. 1993)). To establish that counsel was ineffective, Basciano must show that his attorney's performance fell below an objective standard of reasonableness and that the outcome of his case would have been different if the attorney had performed adequately. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984). However, as the Supreme Court observed in <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983), "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." <u>See also</u> <u>Smith v. Murray</u>, 477 U.S. 527, 535-36 (1986)(failure to raise issue on appeal that subsequently would have proved meritorious does not constitute ineffective assistance of counsel because winnowing out appellate arguments is sound strategy).[21]

---

[21] If a petitioner cannot show cause and prejudice, he cannot have his claim reviewed unless he can demonstrate "actual innocence," meaning "factual innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 620-23

II.  Grounds One and Two: Counsel Was Not Ineffective In Failing To
     Object To Instructions On The Use Of Other Crimes Evidence Or
     In Failing To Argue That The Undisclosed Pizzolo Evidence Was
     <u>Brady Material Because It Was Part Of The Charged Crime</u>

Basciano asserts that his counsel was ineffective in failing to object to instructions addressing how the jury was permitted to use other crimes evidence and, for appellate counsel, in failing to argue that the undisclosed Pizzolo information was <u>Brady</u>, and not simply <u>Giglio</u>, material because it was part of the charged crime.  (Habeas Pet. 11-12, 23, 28-29).  Basciano acknowledges that he did not raise these issues in their present form on direct appeal.  (Habeas Pet. 4, 25).  Thus, the underlying issues are procedurally defaulted.  Basciano attempts to excuse his default by arguing that his trial and appellate counsel were ineffective in failing to raise these issues.  Because, however, the district court instructed the jury consistent with the law, counsel was not ineffective in failing to challenge the jury instructions on how the jury could use other crimes evidence. Finally, because the evidence establishing the crimes of conviction, including the pattern element to which the Pizzolo evidence could have related, was overwhelming and corroborated by multiple witnesses and the Tartaglione consensual recordings, among other evidence, Basciano cannot show prejudice in his counsel's failure to raise his current arguments in connection with his <u>Brady</u>

(1980).  Basciano has no plausible claim of actual innocence either of the crimes he was convicted in the '03 case or for his involvement in the murder of Randolph Pizzolo.

claims.

Based on the Second Circuit's double jeopardy opinion, Basciano argues that the government should have been required to prove the conspiracies to murder Randolph Pizzolo, Joseph Bonelli and Patrick DeFilippo beyond a reasonable doubt since the government used these crimes as evidence supporting a finding that Basciano had engaged in a pattern of racketeering activity. (Habeas Pet. 9-12). Basciano, however, misconstrues the double jeopardy analysis and fails to appreciate that it does not change the permissible methods of proving the "pattern" element of racketeering, proof which may be accomplished by relying on a variety of evidence without each piece of evidence independently needing to be established beyond a reasonable doubt so long as proof of the element itself is established beyond a reasonable doubt.

In the double jeopardy opinion, the Circuit noted that the elements the government must prove, "at a minimum," are "the existence of an enterprise and a related pattern of racketeering activity." Basciano, 599 F.3d at 199. Acknowledging the myriad ways by which the government may prove the pattern element, the Circuit explained that, in Basciano's case, "[w]hile such a [broad] pattern gives the government the greatest latitude to rely on a wide range of crimes to prove substantive racketeering, it similarly provides the broadest shield against a successive

racketeering prosecution based on other criminal activities fitting within that pattern." Id. at 203, 205 ("a substantive racketeering charge does not put a defendant in jeopardy for any predicate acts. It puts a defendant in jeopardy for conducting an enterprise through a pattern of racketeering demonstrated by related predicate acts."); accord United States v. Pizzonia, 577 F.3d 455, 466 (2d Cir. 2009) (recognizing that the pattern of racketeering activity can continue beyond completion of the charged predicates). The Court also explained that the predicates themselves are not the sole means of proving the pattern element. For example,

> To be sure, a defendant must be found to have committed at least two predicate acts to be guilty of substantive racketeering. Nevertheless, it is the pattern of activity, not the predicates, that is punished by a racketeering conviction. For precisely this reason, the law permits a defendant to be prosecuted – either simultaneously or at separate times – for both substantive racketeering and the predicate crimes evidencing the pattern of racketeering.

Basciano, 599 F.3d at 205 (internal citations omitted); Pizzonia, 577 F.3d at 458 (explaining that racketeering conspiracy is a "concept distinct from" "the pattern of racketeering" and "the predicate acts that may evidence the pattern"); Id. at 463 & n.5, 466. Thus, the Second Circuit recognized that evidence of uncharged crimes could be used to prove the pattern element without those crimes themselves needing to be proved beyond a reasonable doubt. See Pizzonia, 577 F.3d at 466 (holding indictment pleading

that a pattern "consisted of" specified predicate acts "did not preclude a jury from considering those predicates in light of the totality of the evidence to determine whether they manifested a pattern of continuing criminal activity"); United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir. 1992)("Evidence of relatedness and continuity or the threat of continuity may arise from facts external to the two predicate acts."); United States v. Locascio, 6 F.3d 924, 943 (2d Cir. 1993)(upholding jury instructions informing jury it must find pattern element beyond a reasonable doubt but may consider evidence that the defendant was able to commit the act by virtue of his position in the enterprise or that the acts were related to the activities of the enterprise); cf. Richardson v. United States, 526 U.S. 813, 817 (1999)("a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime").

In this case, the jury was properly instructed that it needed to find all of the elements of RICO conspiracy or racketeering (depending on the trial) beyond a reasonable doubt (TI 10112, 10118; TII 4779-80, 4786-88) and it was also properly instructed that it could consider whatever evidence it found significant, not just the charged predicates, in determining whether the government had proven the elements of racketeering

beyond a reasonable doubt (TI 10120-21, 10124-25; TII 4788). See Basciano, 599 F.3d at 207 (noting that Basciano's jury had been charged consistent with Circuit precedent regarding what evidence it could consider in determining whether the government had proven the pattern element); accord Basciano, 465 Fed. Appx. at 14 (admission of Pizzolo evidence is "entirely appropriate to explain, as it did here, the development of criminal relationships and to illustrate that mutual trust existed between coconspirators"). Because the jury was properly instructed as to the use of the other crimes evidence and the need to find all elements of either RICO conspiracy or racketeering beyond a reasonable doubt, Basciano's counsel was not ineffective in failing to object to the jury instruction or to challenge the jury instruction on appeal.[22]

Basciano also asserts that the jury was given confusing and sometimes conflicting instructions on the use of this evidence and claims the Court "hoodwinked" the defense over the possible use of this evidence. First, the government provided notice prior to trial that it sought to admit this evidence on a variety of

---

[22]   Basciano also faults his counsel, who primarily raised a Giglio claim on appeal and on the appeal of the denial of the 2010 New Trial Motion, for failing to argue his new Brady theory. But as the Circuit has noted, the technical distinctions between Brady information and Giglio information "no longer have such broad meaning after [United States v.]Agurs[, 427 U.S. 97 (1976),] and [United States v.]Bagley[, 473 U.S. 667 (1985)];" instead, the emphasis is on whether the undisclosed information would have created a reasonable probability of a different result at trial had it been disclosed. United States v. Coppa, 267 F.3d 132, 142 (2d Cir. 2001). In both of Basciano's appeals, the Court applied this standard.

grounds, including to prove some of the elements of RICO conspiracy, to complete the story of the charged crime, to show the relationship of trust between Basciano and the cooperating witnesses and to corroborate the testimony of cooperating witnesses. (United States v. Basciano, 03-cr-929, DE# 446, Motion to Admit Certain Evidence in Limine at 21-23 & n.11, 28, 36-40, 45-46 (E.D.N.Y. Jan. 13, 2006). Thus, Basciano was on notice that the government sought to present this evidence pursuant to a variety of theories. While the Court did not initially accept all of these theories in light of both Basciano's and DeFilippo's willingness to concede certain elements of RICO conspiracy, see Basciano, 2006 WL 385325, at *1, *10, it still permitted the government to introduce evidence of the Pizzolo homicide and the conspiracies to murder Bonelli and DeFilippo. Notably, the Court's evolving instructions during the first trial of which Basciano now complains were in direct response to Basciano's defense counsel changing their theories, seeming to retract some aspects of Basciano's concession of certain elements of RICO and opening the door to new uses of this evidence in order to combat a favorable defense that Basciano was too afraid to risk reprisals by crime family boss, Joseph Massino, to engage in an unsanctioned murder like the murder of Santoro. (See, e.g., TI 2452-62, 2732-34, 3039-41, 3133-35, 3233-37, 3326, 3333, 3338, 3410-15, 3427-28, 3529-31, 3533, 3535, 4744-46, 4750-51, 5056, 5751-52, 5753-54, 6170-82, 8208-11, 10085-86,

10125; <u>Basciano</u>, 03-cr-929, DE# 509, 513, 517, 522, 524).[23]

Moreover, Basciano certainly had notice by the 2007 trial of the various grounds the government sought to use this evidence, yet he failed to object at that time to its use in summation or the Court's jury instruction as to the proper use of other crimes evidence. <u>See</u> <u>Basciano</u>, 599 F.3d at 201 n.13 (noting that prior to the 2007 trial, the government gave notice of its intention to introduce the Pizzolo, Bonelli and DeFilippo evidence pursuant to the district court's prior rulings and argued that those rulings remained law of the case).[24]   Indeed, during the second trial, Basciano persisted in his defense that he was too afraid of Massino to have committed an unsanctioned murder like the murder of Frank Santoro.  (TII 109-11, 4611, 4640).

---

[23]     To the extent the instructions given during the trial were piecemeal and did not reflect the full instructions in the final jury charge, the limited instructions were designed to respond to discrete issues that had arisen in testimony or were the basis of overruled objections.   Moreover, the Court's limited instructions during testimony were perceived to eliminate the risk that the jury, which had just heard evidence of the Pizzolo murder, would use the Pizzolo murder as propensity evidence to convict Basciano of the murder of Frank Santoro.   The court clarified during trial that it intended to give a full 404(b) charge during the final jury charge addressing all the categories for which the evidence could be used.  (TI 4746).

[24]     Had Basciano thought that such arguments unfairly prejudiced him, he could have moved to preclude the government from making them in advance of the 2007 trial since the government had previously made some of the same arguments at the 2006 trial.  (<u>See</u> TI 9422, 9433, 9971) (arguing that Basciano personified the mob that valued "earners" and "shooters" and that it was implausible that Basciano and DeFilippo were the only peaceful high-ranking members of the Bonanno family).

Basciano also claims that because the government suppressed certain evidence relating to the Pizzolo murder, he has shown prejudice since the Second Circuit surely would have granted him a new trial if it had properly considered the Pizzolo homicide as a charged predicate. However, as discussed above, the law in the Second Circuit is clear that other crimes evidence like the Pizzolo murder does not need to be proven beyond a reasonable doubt but can be used, in connection with other evidence, for a jury to find the pattern element of racketeering. Thus, the Circuit on Basciano's direct appeal did not err by failing to consider the Pizzolo homicide as a charged predicate.[25] As the Circuit concluded when considering both of Basciano's '03 appeals, the undisclosed information about the Pizzolo homicide simply was not material under Brady to undermine confidence in Basciano's conviction, which was supported by a multitude of evidence independent of and corroborative of Dominick Cicale. See Basciano, 384 Fed. Appx. at 31; Basciano, 465 Fed. Appx. at 14-15 (rejecting Basciano's additional Pizzolo-related Brady claims and concluding there "was a multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale, through whom evidence of the Pizzolo murder was admitted").

---

[25]     Moreover, Judge Raggi, the author of the double jeopardy decision, presided over the panel that heard Basciano's direct appeal. Surely, had the double jeopardy opinion meant what Basciano believes, Judge Raggi would have conducted a different analysis in reviewing his conviction.

Indeed, to cite but one example, Basciano's admissions on the
December 21, 2003 Tartaglione consensual recording, which included
admissions about his status within the Bonanno family, having his
own crew and hit team, his ability to use the resources of the
Bonanno family and about crimes like the murder of Frank Santoro
and the solicitation of the murders of Dominick Martino and
Salvatore Vitale, either for the Bonanno family or using the
resources of the family, were more than sufficient to establish the
pattern element.  See, e.g., Pizzonia, 577 F.3d at 467 (evidence
that defendant, a captain in the Gambino family, sat on a special
committee that sought to increase family revenues from the crime
family's activities "convincingly" demonstrated the pattern
element).  Thus, Basciano cannot show prejudice in his counsel's
alleged failure to use Basciano's current Brady argument in
addressing his Brady claim.[26]  Even adding the two new disclosures

---

[26]    Nor does United States v. Quinones, 511 F.3d 289, 309 (2d
Cir. 2007), assist Basciano.  In that case, the Circuit concluded
that evidence that the defendant had murdered two other
confidential informants was admissible in a case in which the
defendant was charged with murdering an informant because the
"other crimes" evidence was "inextricably intertwined" with the
evidence regarding the charged offense and was admissible without
reference to Rule 404(b).  Id.  Basciano asserts this case means
that to the extent that the government argued or the Court admitted
the Pizzolo evidence as "inextricably intertwined" with his charged
crimes, the Pizzolo evidence became part of the charged crime and
therefore any evidence that impeached Cicale about the Pizzolo
murder should have been analyzed as exculpatory evidence under
Brady.  Quinones did not discuss the Brady doctrine but dealt only
with the admissibility of the challenged evidence. Regardless, as
discussed above, even were the case examined under Basciano's Brady
theory, he cannot show a reasonable probability of a different
result had the Pizzolo information been disclosed.

97

of Gambina's account of the Pizzolo murder conspiracy and the Cicale/Santoro information does not change this result since this information, too, is either immaterial or cumulative of the substantial impeachment of Cicale.  None of this new information, whether considered individually or collectively with all of Basciano's past <u>Brady</u> claims, calls into question the significant independent evidence supporting Basciano's conviction of the charged crimes.  Accordingly, Grounds One and Two have no merit.

III. GROUND THREE: BASCIANO CANNOT ESTABLISH A <u>BRADY</u>
     VIOLATION FROM THE FAILURE TO DISCLOSE THE GAMBINA
     <u>PROFFER AND THE CICALE/SANTORO INFORMATION</u>

Basciano next claims a <u>Brady</u> violation from the government's failure to disclose the substance of Gambina's proffer regarding the progression of the Pizzolo murder conspiracy and the Cicale/Santoro information, claiming that this information "shatter[s] entirely the false illusion of truthfulness the government deceptively painted upon" Cicale.  (Habeas Pet. 45). The government's alleged <u>Brady</u> violations with respect to Pizzolo homicide evidence have been extensively litigated before this Court and the Second Circuit in both of Basciano's '03 appeals.  Basciano is therefore precluded from raising his Pizzolo-<u>Brady</u> claim, a claim that this Court and the Second Circuit have rejected on the merits, finding no <u>Brady</u> violation and concluding that all of the Pizzolo-related evidence that would have contradicted Cicale's account would not have demonstrated a reasonable probability of a different result at Basciano's trials given the abundant evidence in support of the crimes of conviction.  <u>See</u>, <u>e.g.</u>, <u>Basciano</u>, 465 Fed. Appx. at 15; <u>Basciano</u>, 384 Fed. Appx. at 31-32.  As discussed below, presuming the Court evaluates the merits of Basciano's claim, the addition of the Gambina information to Basciano's prior Pizzolo-related <u>Brady</u> claims does not establish a reasonable probability that the result of his trials would have been different.

The Cicale/Santoro information also does not create a reasonable probability of a different result at either of Basciano's trials since it is cumulative impeachment material at best. This Court has previously rejected arguments by Basciano regarding the purported significance of the Cicale/Santoro information. See Basciano, 03-cr-929, DE# 1157 at 19.[27]

A. <u>Legal Standard</u>

A <u>Brady</u> claim has three elements: "The evidence at issue must be favorable to the accused, . . . that evidence must have been suppressed by the State, . . . and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). The prejudice or materiality test looks at whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). That standard is satisfied when suppression of information "undermines confidence in the outcome of the trial." <u>Id.</u> at 678.

B. The New Information Does Not <u>Establish a Brady/Giglio Violation</u>

Even considered again on the merits in light of Basciano's new information, the totality of all of the Pizzolo non-

---

[27] Basciano also claims the government engaged in improper bolstering in summation with reference to Cicale's testimony, a claim he had raised in his prior appeals, although not in its present form. (Habeas Pet. 47). Should the Court reach the merits of that claim, the government addresses Basciano's improper bolstering claim in the next section.

disclosures would not lead to a different result at trial.  First, the Gambina information is not materially inconsistent with Cicale's testimony since, as discussed above, Gambina confirms that there was a conspiracy to murder Pizzolo and a second victim (who other evidence makes clear is Bonelli), that Basciano, Cicale and Aiello were part of that conspiracy, and that there was a plan in place to murder Pizzolo and Bonelli prior to Cicale's speaking with Gambina, who ultimately advised Cicale directly of his unwillingness to participate.  The contradiction in the timing about whether the initial conversation between Cicale and Gambina occurred prior to or just following Basciano's arrest is irrelevant in the '03 case since Basciano cannot show that he withdrew from the Pizzolo murder conspiracy.  See Pizzonia, 577 F.3d at 466 ("once the government presents sufficient evidence to show the existence of a conspiracy having a continuing purpose . . . the law presumes the continued existence of the conspiracy and places 'the burden . . . on the defendant to prove that the conspiracy was terminated or that he took affirmative steps to withdraw") (quoting United States v. Eppolito, 543 F.3d 25, 49 (2d Cir. 2008)); United States v. Spero, 331 F.3d 57, 60 (2d Cir. 2003).  Indeed, his conviction in the '05 case establishes that Basciano's arrest did not terminate the Pizzolo murder conspiracy.

        Second, this Court and the Second Circuit have rejected Basciano's argument that undisclosed evidence contradicting

Cicale's account of the Pizzolo murder or impeaching Cicale generally is material under Brady and Giglio. See Basciano, 2008 WL 794945, at *4 (alleged undisclosed information not material since "significant independent evidence and evidence that corroborated Cicale's testimony implicated Basciano in the crimes for which he was convicted"); Basciano, 2008 WL 905867, at *1-2; Basciano, 384 Fed. Appx. at 31 (rejecting Brady/Giglio claim regarding the false murder plot allegation and undisclosed information regarding the Pizzolo murder); Basciano, 2010 WL 3325409, at *11 ("None of Basciano's new claims, by themselves, show a reasonable probability that the result of his trial would have been different had the allegedly suppressed information been disclosed to the defense. Basciano's claims also do not rise to the level of a constitutional violation when considered in combination with all his Brady claims, including those previously litigated on appeal . . . . As this court previously noted, the Government presented significant evidence of Basciano's guilt for the crimes which he is convicted of – independent from and corroborative of Cicale's testimony."); Basciano, 465 Fed. Appx. at 14-15 (rejecting Basciano's theory that the undisclosed Pizzolo information would have had a significant impact on the consideration to admit evidence of the Pizzolo murder and concluding that even had evidence of the Pizzolo murder been excluded, there was not a reasonable probability of a different

result given the "multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale"). Although Basciano has now altered his characterization of Cicale from being the government's "star" witness to being a "crucial" one, he persists in "mischaracteriz[ing] the centrality of Cicale's testimony in establishing the elements of the charges for which Basciano was convicted and giv[ing] short shrift to the multitude of other evidence offered against him." <u>Basciano</u>, 2008 WL 794945, at *4.[28] Indeed, the Pizzolo evidence constituted only a small fraction of the evidence admitted at the 2006 and 2007 trials: for example, Cicale's direct examination about the murder at the 2007 trial takes up fourteen pages of a trial transcript of over 4000 pages. (TII 1217-30).

The Gambina information and the Cicale/Santoro information simply do not provide the devastating impeachment of Cicale that Basciano asserts. While Basciano's habeas petition appears to suggest that the government relied heavily on the

---

[28]   While at Cicale's sentencing this Court noted that Cicale was a "crucial" witness, that characterization was made following the Court's observation of Cicale's testimony at all three of Basciano's trials and its awareness of Cicale's assistance in securing the convictions of other members and associates of organized crime. This comment does not undercut the Court's prior findings in connection with Basciano's new trial motions about the multitude of other independent evidence supporting Basciano's conviction when the Court was presented squarely with the argument that Cicale's testimony was central to securing Basciano's conviction.

103

Pizzolo murder, the government in fact mentioned Pizzolo only four times during the course of its lengthy jury addresses in each of the trials.   Basciano has also complained that the government labeled the evidence of the Pizzolo murder "overwhelming," but the government did not belabor or even reference the proof of the Pizzolo murder in this passage.   Rather, it referenced several examples of evidence showing that Basciano trusted Cicale, including Basciano's statements on the Tartaglione consensual recording and Piscotti's testimony that Cicale was Basciano's "puppet."   (TII 4465).

The government's references to Basciano's ordering of the Pizzolo homicide to punish disrespect and make an example to the Bonanno family was consistent with the Court's ruling and, in any event, was given scant emphasis in the course of a six-hour summation that discussed in detail the voluminous proof of Basciano's guilt of the charged crimes.   Moreover, the risk of prejudice was further attenuated by the fact that the primary source of evidence about Basciano's involvement in the Pizzolo murder was the testimony of a witness (Cicale) who was the subject of devastating impeachment, including the argument that Cicale was falsely implicating Basciano in murders to save himself from the death penalty or life in prison.   See United States v. Mejia-Valez, 855 F. Supp. 607, 612 (E.D.N.Y. 1994) (finding that prior act evidence did not prejudice the defendant because the testifying co-

conspirators' testimony regarding this statement was subject to "the same devastating impeachment" as the testimony of the charged crime, namely, that the co-conspirators were falsely implicating the defendant to avoid a life sentence).

Moreover, there is no likelihood of a different result even considering the Pizzolo evidence as evidence helping to establish the pattern element given the overwhelming evidence supporting the proof that a "host" of "diverse crimes," such as illegal gambling, extortion, narcotics trafficking and murder, were committed in furtherance of the Bonanno family's affairs. Basciano, 599 F.3d at 210.   Indeed, as merely one example, Basciano's statements on the December 21, 2003 Tartaglione consensual recording were sufficient by themselves to establish the pattern, given that Basciano himself spoke at length about the existence and continuing nature of the Bonanno family, his crew of earners and shooters, his own hit team, the murder of Frank Santoro and the solicitations to murder Dominick Martino and Salvatore Vitale.

Basciano also argues that the Pizzolo murder was important in satisfying the pattern element since "there was a great deal of doubt as to whether the Santoro murder predicate had anything to do with the racketeering enterprise (because it was alleged to be a personal affair)."   (Habeas Pet. 43).   First, evidence beyond Cicale's testimony demonstrated that the Santoro

murder was related to the enterprise: Basciano used his position in organized crime to learn quickly about the plot to kidnap his son from a Genovese family associate and to receive assistance from the Genovese family in carrying out the murder.  Basciano also used the resources of the Bonanno family to create his hit team, who were largely other members and associates of the Bonanno family (Indelicato, Cicale, Donato, Tancredi), to plan and carry out the murder.  (See United States v. Basciano, 03-cr-929, Mem. & Order Denying Rule 29 Mots., DE# 660, at 11-14 (E.D.N.Y.); Gov't Mem. Of Law In Opp'n To The Dfts.' Post-Trial Mots., DE# 636 at 22-30).  Indeed, by retaliating swiftly against Santoro's act of aggression and disrespect, Basciano delivered a public signal of the Bonanno family's strength and ruthlessness in the face of a perceived threat.  See Irizarry, 341 F.3d at 302-03 (concluding that murder was related to the affairs of the enterprise because, even though defendant had personal grudge against victim, "the murder still served to send a message to someone who would demonstrate such complete disrespect of [defendant]'s stature in the enterprise," "disrespect was a threat to [defendant]'s role as the enterprise's enforcer and it therefore threatened to erode his value to the enterprise," and "jury could reasonably conclude that [defendant] murdered [victim] to show that he was in control and was to be feared"); United States v. Simmons, 923 F.2d 934, 952 (2d Cir.

1991).[25]   Moreover, in the 2007 trial, Pisciotti confirmed that Indelicato had told him that the Santoro murder had been a test for Cicale to be inducted into the crime family.   (TII 3429-30). Finally, Basciano's attorneys did not argue the lack of relatedness of the Santoro murder to the jury, but rather argued that Basciano did not commit the murder at all.

Next, Basciano argues that either the Pizzolo homicide should be treated as a charged crime under his theory from Ground One or it was not admissible at all because it was not a charged conspiracy.   (Habeas Pet. 39-40).   But this proposition fundamentally misstates the law.   First, as explained above, the Second Circuit's double jeopardy opinion does not transform the Pizzolo homicide into a charged crime that needed to be proven beyond a reasonable doubt.   Second, statements by Basciano's co-coonspirators in the Pizzolo murder were admissible even though the Pizzolo murder was not a charged crime in the '03 case. See, e.g., United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002)(statements by co-conspirators in furtherance of the conspiracy are admissible even when the crime is not charged in the indictment).[26]

---

[25]   As another example of Basciano's not tolerating threats to his authority outside of the Santoro and Pizzolo murders, the government also elicited testimony from Anthony Bottone about his conversation with Basciano regarding a dispute Bottone had with one Patsy Perillo, to which Basciano replied, "don't worry about Patsy, this is my fuckin' neighborhood."   (TII 2888).

[26]   Basciano also complains that his attorneys failed to object to the admission of statements by Gambina during Cicale's testimony relating to the Pizzolo murder conspiracy.   However, an examination of Cicale's direct testimony reveals that Cicale

Regarding the Cicale/Santoro information, because Cicale told Basciano of his suspicion that he "was going to be supposedly charged with" the Santoro murder, Basciano was on notice of the fact he now claims was suppressed and, thus, there is no Brady violation. See United States v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990) (finding defendant was on notice of witness's testimony that the defendant was not present during the offense because the defendant knew the underlying facts); United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)("Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence."). Indeed, Mr. Kousouros's questioning of Cicale shows that Mr. Kousouros believed that conversation between Cicale and Basciano had occurred.

The Cicale/Santoro information also does not demonstrate a reasonable probability of a different result at trial had it been

---

discussed only whether Gambina said he was going to participate and Gambina's subsequent refusal to participate. Both of these statements were admissible not for their truth but for their effect on the listener, Cicale, and to explain the actions Cicale took after meeting with Aiello and Gambina and when he learned of Gambina's refusal. Thus, any hearsay objection would have been overruled. Further, even assuming it was wrongly admitted, the admission of this limited hearsay testimony was harmless. Basciano also faults his attorneys for failing to object to Cicale's testimony about Michael Mancuso's statements regarding the murder, but Cicale's testimony establishes that Mancuso participated in the murder conspiracy. Mancuso's statements to Cicale following up on whether Cicale had carried out the murder and later reaffirming Basciano's order to kill Pizzolo were in furtherance of that conspiracy and were properly admitted. Thus, counsel would have no ground for objection.

108

disclosed.  As explained above, the Cicale/Santoro information does not appear materially inconsistent with Cicale's trial testimony of not recalling whether he learned he would be charged with the Santoro murder and his skepticism about whether he ultimately would be charged with that murder.   This information also does not establish that Cicale testified falsely when he testified he did not recall learning this.  Regardless, the jury heard that Cicale had been indicted for the death-eligible crime of murdering Pizzolo prior to deciding to cooperate.  It is difficult to fathom why the potential of being charged with an additional death-eligible murder would have changed Cicale's calculus about whether to cooperate when Cicale had already been confronted with the reality of having been charged with a death-eligible offense.   Even without the Cicale/Santoro information, Basciano's counsel was able to argue effectively that Cicale was falsely implicating Basciano in order to avoid the death penalty.  (TII 4579-4615, 4622-27, 4633-39). Indeed, his attorney was able to highlight skepticism about Cicale's testimony by mocking Cicale's failure to recall whether he learned he was to be charged with the Santoro murder.  Finally, given the significant impeachment of Cicale during both trials and the extensive evidence, both independent of and corroborating Cicale's testimony, that proved Basciano was guilty of the charged crimes, the Cicale/Santoro information would not have led to a different result at trial had it been disclosed.

IV.  GROUNDS FOUR AND FIVE: THE GOVERNMENT DID NOT KNOWINGLY PERMIT
     THE INTRODUCTION OF FALSE TESTIMONY AT EITHER TRIAL, NOR DID
     IT ENGAGE IN PROSECUTORIAL MISCONDUCT BY SUPPRESSING THE
     <u>GAMBINA INFORMATION OR THE CICALE/SANTORO INFORMATION</u>

     Citing to Gambina's proffer statements, Basciano argues
that the government knowingly permitted Cicale to testify falsely
at both trials.  (Habeas Pet. 51-52).   He further argues that in
the 2007 trial, the government failed to correct Cicale's allegedly
false testimony on cross-examination that he did not recall whether
he had been told he was going to be charged with the Santoro murder
before he cooperated.  (Habeas Pet. 49-50).   Basciano concedes he
did not raise either of these claims in their present forms on
direct appeal.   (Habeas Pet. 48).   Because Basciano was
undisputably aware of the Cicale/Santoro information even prior to
his first trial, he is procedurally barred from raising claims
about that information now.

     Basciano also claims the government improperly bolstered
Cicale's testimony in the first trial by eliciting from Cicale that
his information had been compared to other cooperators' information
by the government (TI 6293-94) and by eliciting on cross-
examination from Agent McCaffrey the purposes of proffer sessions.
Basciano claims that improper bolstering during his second trial by
the government's asking the jury in summation to make the defense
prove Cicale was lying (TII 4461).  (Habeas Pet. 41-42).   Because
both of these claims could have been raised in his direct appeal
but were not, they are procedurally defaulted.

Basciano also asserts that because the government suppressed the Gambina information and the Cicale/Santoro information, Basciano was deprived of the ability to develop information crucial to the defense theory that Cicale had fabricated his testimony to match the government's discovery because Cicale knew he was to be charged with the Santoro murder. (Habeas Pet. 55-58). However, neither piece of information is materially inconsistent with Cicale's trial testimony and, regardless, these two pieces of information did not deny Basciano his right to a fair trial.

A.  Legal Standard

"A defendant's conviction may be vacated if prosecutorial misconduct caused substantial prejudice implicating the right to due process." United States v. Fell, 531 F.3d 197, 209 (2d Cir. 2008). A prosecutor has a fundamental obligation to ensure that the testimony he or she elicits is true. See Shih Wei Su v. Filion, 335 F.3d 119, 126-27 (2d Cir. 2003).

"Perjury in and of itself is insufficient to justify relief." United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006). If the undisclosed evidence shows that the government knew or should have known that its case includes perjured testimony, a conviction should be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103

(1976).  If the prosecutors did not know of the perjury, due process is violated "only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003)(quoting United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991)). However, if the undisclosed evidence does not show the falsity of the evidence offered by the government, the usual Brady test applies, and a court must determine whether the undisclosed evidence is material, that is, whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

A prosecutor may also commit misconduct by making an argument the prosecutor knows to be factually untrue, even though it may be consistent with the evidence admitted at trial. United States v. Valentine, 820 F.2d 565, 570 (2d Cir. 1987) (reversal warranted where prosecutor's argument was refuted by unoffered evidence in the government files); Tankleff v. Senkowski, 135 F.3d 235, 252-53 (2d Cir. 1998)(improper to ask in summation why defense had not called defendant's sister, where prosecutor knew that sister had testified at suppression hearing in a manner consistent with defense theory).

"While it is well-settled that, 'absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible,' United States v. Gaind, 31 F.3d 73, 78 (2d Cir. 1994)(internal quotation marks omitted), once such an attack has been launched, a district court enjoys broad discretion in admitting rehabilitative evidence of credibility, see id.." Quinones, 511 F.3d at 312-13.

A defendant asserting that a prosecutor's remarks warrant a new trial "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right [] to a fair trial." United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993).  The Supreme Court has made clear that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11 (1985).  Even statements that amount to prosecutorial misconduct during summation do not warrant reversal unless they cause the defendant "substantial prejudice" in that they "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)); accord United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (quoting Shareef).

When considering whether a defendant has shown substantial prejudice, a court must examine three factors to determine whether the statements at issue amount to substantial prejudice: "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." E.g., Elias, 285 F.3d at 190. Even in a case where there is "serious misconduct" -- which is not the case here -- "proper instructions by the trial court may suffice to prevent undue prejudice and make the misconduct harmless." United States v. Walker, 835 F.2d 983, 988 (2d Cir. 1987).

In evaluating the propriety of a prosecutor's summation, the Second Circuit has recognized that both the prosecution and the defense "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998)(citation omitted). "A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." United States v. Rivera, 971 F.2d 876, 884 (2d Cir. 1992); accord United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995) (quoting Rivera). A prosecutor may point out the defense's "failure . . . to support [its] own factual theories with witnesses." United States v. Barnes, 604 F.2d 121, 148 (2d Cir. 1979). The government is also permitted greater latitude in responding to defense arguments that impugn the integrity of the government's case. United States v.

LaSorsa, 480 F.2d 522, 526 (2d Cir. 1973)(government may use "rebutting language suitable to the occasion"); United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994)(arguable vouching for a witness was not improper in light of defense summation that accused government of fabricating testimony).

In addition, in evaluating a claim of improper argument, a court cannot view the challenged remarks in isolation; rather, it "must consider the objectionable remarks within the context of the entire trial," United States v. Espinal, 981 F.2d 664, 666 (2d Cir. 1992) (citing United States v. Young, 470 U.S. 1, 11-12 (1985)), granting relief only if the remarks, "viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial." United States v. Pena, 793 F.2d 486, 490 (2d Cir. 1986)(citation omitted).

Moreover, under the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal.  For this reason, even greater leeway is afforded in rebuttal summations, which are not fully constructed in advance and are often improvised.  See United States v. Arias-Javier, 392 Fed. Appx. 896, 898-99 (2d Cir. 2010)(summary order).  "In particular, where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." Tocco, 135 F.3d at 130 (citation omitted); see generally Young, 470 U.S. at 12 (holding that "the

reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo").

In sum, disturbing a conviction based on remarks in a prosecutor's summation is a "drastic remedy," warranted only where the challenged remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Wainwright, 477 U.S. at 181 (1986) (internal quotation marks and citation omitted).

B.   The Government Did Not Engage In Prosecutorial Misconduct By Either Suppressing Evidence Or Introducing False Testimony

The government did not engage in prosecutorial misconduct by failing to disclose the Gambina information or the Cicale/Santoro information.   As explained above, Gambina's information does not materially contradict Cicale's account of the Pizzolo murder conspiracy.   A slight discrepancy between the two men's account of the date of their initial meeting does not show that Cicale testified falsely.   Similarly, other discrepancies in their accounts fail to undermine Cicale's testimony regarding the existence of the Pizzolo murder conspiracy or Basciano's role within that conspiracy.   Indeed, Gambina corroborates Cicale in establishing the existence of a plot to kill Pizzolo and a second victim that pre-dated Cicale's attempt to recruit Gambina to join the conspiracy and in establishing Basciano's, Cicale's and

Aiello's involvement in the conspiracy to murder both of these individuals. In short, any claim that the government committed misconduct by failing to disclose the Gambina information has no merit.

As is also explained above, the Cicale/Santoro information does not establish that Cicale perjured himself when he testified he did not recall whether he learned he would be charged with the Santoro murder prior to his decision to cooperate or when he testified that he did not know whether the government would ever charge him with the Santoro murder. Indeed, the Cicale/Santoro information confirms that the government never told him directly that he would be charged with the Santoro murder. Even presuming Cicale had been told by his own attorney that he could be charged, that fact does not establish proof that Cicale was lying when he testified he could not recall. Nor does it establish that the government, even if one of the AUSAs had discussed with Cicale's attorney the possibility of charging Cicale with the Santoro murder, would have been aware of whether Cicale's attorney advised Cicale of that fact or that Cicale was lying when he said he did not recall.

Even without the Cicale/Santoro information, Basciano's attorney was effectively able to argue Basciano's theory that Cicale, knowing he faced the death penalty, reviewed all of the discovery he had, tailored his testimony to that discovery and then

cooperated in order to spare himself from the death penalty by falsely implicating Basciano. (TII 4579-4615, 4622-27, 4633-39). For example, during the 2007 trial, Basciano's counsel questioned Cicale on whether he, a three-time murderer (Kehoe, Santoro and Pizzolo), would credibly have any sort of mitigation package to present to the Attorney General. (TII 1390-92). From this line of questioning, Mr. Kousouros forcefully argued in his summation that Cicale was falsely implicating Basciano in order to escape a death sentence. Even assuming Cicale was also aware he could be charged with the Santoro murder as another death-eligible murder, Basciano already had conducted extensive impeachment of Cicale regarding Basciano's theory that Cicale was falsely implicating Basciano to save himself. The challenged statement in rebuttal was also a fair response to Basciano's attorney's suggesting through his summation that his questions to Cicale constituted evidence.

Assuming for purposes of argument that the portion of the rebuttal referencing the lack of proof that Cicale was aware he was going to be charged with the Santoro murder was improper, it did not rise to the level of flagrant abuse and in any case was a passing argument following a six-week trial, brief in relation to the overall length and content of the rebuttal, and directly responsive to defense counsel's arguments.[27]

---

[27]    Basciano also references the government's statement in summation, "In his opening statement Mr. Kousouros said to you, promised that he would prove to you that Dominick Cicale was a liar. Hold him to it." (TII 4461). (Habeas Pet. 41). This

In addition, the Court's jury charge strongly cautioned that the testimony of cooperating witnesses "must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe." United States v. Basciano, 03-CR-929 (NGG), Final Jury Charge, DE# 891, at 24-26 (E.D.N.Y., filed Aug. 1, 2007).

Finally, as previously discussed, there was overwhelming evidence of Basciano's guilt, and the government's proof did not rely exclusively on Cicale but rather consisted of numerous sources of evidence, including most importantly Basciano's own recorded admissions to some of the most significant racketeering predicate acts. In light of the evidence as a whole, Cicale's extensive impeachment, Basciano's arguments to the jury regarding his credibility, and the Court's instruction cautioning the jury to view Cicale's and the other cooperating witnesses' testimony critically, the new evidence proffered by Basciano could not have

---

statement, however, was in direct response to Basciano's opening statement, where the defense repeatedly attacked the credibility of the government's cooperating witnesses, referring to them as "degenerate liars," and said in reference to Cicale, "By the end of this trial you're going to see this is a man with an ability to fabricate that is going to be beyond your ken. Hold me to that." (TII 120). Thus, the government's comment in summation was a proper response to the defense's opening statement. See, e.g., Young, 470 U.S. at 12 (recognizing that under the "invited response" doctrine, a court must also examine "defense counsel's opening salvo" to determine whether prosecutor's remarks rendered the trial unfair); Tocco, 135 F.3d at 130 (each of the challenged statements were fair response to the defense's summation; none were "so egregious as to infect the proceedings in such a manner as to deprive defendant of due process of the law").

made a difference in the jury's analysis and thus cannot support a motion for a new trial. See Middlemiss, 217 F.3d at 122-23; Diaz, 176 F.3d at 107-08; White, 972 F.2d at 20-22.   Basciano has not established that this Court or the Second Circuit erred in their findings about the strength of the government's case or the effects of additional impeachment on the jurors' perceptions of Cicale, nor has he shown that his minimal additional impeachment information warrants a new trial.   Accordingly, this passing reference in rebuttal did not cause prejudicial error.   Modica, 663 F.2d at 1181-82 ("The first question is whether the improper comments were minor aberrations in a prolonged trial or cumulative evidence of a proceeding dominated by passion and prejudice.") (internal quotation marks omitted); United States v. Biasucci, 786 F.2d 504, 514 (2d Cir. 1986) (upholding conviction when prosecutor's improper remarks were isolated and there was overwhelming evidence); United States v. Parker, 903 F.2d 91, 98 (2d Cir. 1990) ("Even where the prosecutor's argument was clearly impermissible, we have been reluctant to reverse where the transgression was isolated, the trial court took swift and clear steps to correct the implication of the argument, and the evidence against the defendant was strong."); Tankleff, 135 F.3d at 252-53 (no showing of prejudice where prosecutor's comment in summation regarding a missing witness who had in fact testified consistently with defendant in suppression hearing when the "prosecutor's comments were short and

120

fleeting," there was a curative instruction, and the evidence was not so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury); cf. Valentine, 820 F.2d at 571 (ordering a new trial where prosecutor misrepresented evidence in summation because "the error was of constitutional dimension, the case was close, and the misrepresentation was emphasized in the prosecutor's summation").

Basciano also claims the government vouched for Cicale's truthfulness during the 2006 trial, citing to an excerpt of the testimony of Special Agent Kim McCaffrey and a portion of Cicale's testimony.

During the 2006 trial, the defense called Agent McCaffrey to testify and asked a series of questions designed to elicit that notes of proffer and debriefing sessions of Salvatore Vitale did not contain certain details about the Santoro murder or the Sciascia murder, with which DeFilippo was charged, to which Vitale had testified.  On cross-examination, the government attempted to elicit the distinction between a proffer session, in which a defendant primarily discusses his own involvement in certain crimes, and a debriefing session following a defendant's pleading guilty pursuant to a cooperation agreement, where a cooperating witness provides information about the involvement of others in criminal activity.  During that testimony, the following exchange occurred,

Q.    When do the debriefings take place?

A.      After they've pled guilty or their
cooperation has been accepted.

Q.    And, what is the goal of the proffer
session?

MR. QUIJANO:  Objection.

THE COURT:  You can answer this and then we'll
go.

MR. QUIJANO:  Beyond the scope.

THE COURT:  We're going on to another subject
after this question.

      You may answer.

A.    The proffer sessions, again, the witness will give
us information.  We take that information and determine
whether we believe the witness is being truthful.  We'll
take that back, we'll corroborate the information, and
determine whether we can accept this person as a
cooperating witness.

(TI 9158-59).[28]

    In the 2006 trial, Cicale was aggressively cross-examined

by attorneys for Basciano and DeFilippo on a variety of topics,

including, by DeFilippo's attorney, about Cicale's lying at his

first proffer despite being told that he had to be truthful and

about his ultimate acceptance as a cooperating witness despite his

deceit.  (TI 6274-83).  On re-direct, the following exchange

occurred,

      Q      Mr. Cicale, do you remember, on
cross-examination, that Mr. Levitt asked you
questions about the proffer process?

---

[28]    Agent McCaffrey did not testify in the 2007 trial.

A     Yes, sir.

Q    During that proffer process, prior to the time you
signed a cooperation agreement, did anybody make any promises to you at all?

A     No, sir.

Q    Did anybody make any promises about the
death penalty?

A     No, sir.

Q     Anybody make any promises about whether or not you would get a cooperation agreement?

A     No, sir.

Q     When you provided information, were you told that the government would check your information?

A     Yes, sir.

Q    Did you have an understanding of how the government could check the information that you provided?

A     My understanding, I guess it would be through other cooperating witnesses and whatever other information they had.

                    *    *    *    *    *

Q     What did the government tell you about how they would check your information?

MR. LEVITT:  Asked and answered.

THE COURT:  You may answer.

A         Through cooperating witnesses and whatever the information that the government had.

Q    Anyone ever tell you they would take your

123

word alone?

A    No, sir.

(TI 6293-94).[29]

It is well established that prosecutors may not vouch for the truthfulness of their witnesses.  See United States v. Modica, 663 F.2d 1173, 1179 (2d Cir. 1981).  But "[p]rosecutors have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility."  Perez, 144 F.3d at 210; see also United States v. Praetorius, 622 F.2d 1054, 1060-61 (2d Cir. 1979) (prosecutor is entitled to respond to defense attacks with "rebutting language suitable to the occasion") (citation and internal quotation marks omitted).  Here, where the defense had challenged the cooperating witnesses' credibility, the government was fairly permitted to explore the witness's belief as to whether the government could learn whether he had lied.  See Quinones, 511 F.3d at 313 ("A cooperating witness's expectation as to how his testimony will be viewed by prosecutors or the court, whether realistic or not and whether characterized as fact or as opinion, is relevant to demonstrating his motive to lie or to tell the truth and, thus, may properly be explored by the government no less than the defense once the witness's credibility has been put in issue.").

---

[29]   In the second trial, Cicale testified on cross-examination that he was told during the proffering process that the government verified he was telling the truth.  (TII 1392).

The government made no reference during summation in the 2006 trial to the challenged testimony of Agent McCaffrey and Cicale, thereby diminishing its importance to the jury's deliberation. See United States v. Garcia, 413 F.3d 201, 217 (2d Cir. 2005) (error harmless where "harmful potential was minimized by the fact that the prosecution, after eliciting the [erroneous testimony], never referenced it again throughout the case" and where "in urging a guilty verdict, the prosecution focused the jury's attention only on the extensive admissible evidence supporting that result"). Despite Basciano's claim of impermissible bolstering of the government's cooperating witnesses during the 2006 trial, the jury's own verdict nullifies that claim. See Miller, 116 F.3d at 683 ("An acquittal by the jury on some counts may be evidence that the trial was not unfair."). To the contrary, during the jury's deliberation, it provided a note indicating that its inability to reach a verdict as to certain racketeering acts and counts had been caused by at least one juror's wholesale discrediting of the government's cooperating witnesses (TI 10333), notwithstanding the claimed evidentiary error.

In sum, Basciano's claims of improper bolstering and improper remarks during jury addresses lack merit.

V.   GROUND SIX: BASCIANO'S CLAIM THAT THE SUPPRESSION
     OF PIZZOLO-RELATED INFORMATION "DESPOILED" THE
     DISTRICT COURT'S CALCULUS UNDER RULE 403 ABOUT WHETHER
     TO ADMIT EVIDENCE OF THE PIZZOLO HOMICIDE LACKS MERIT

As he did in his appeal of the denial of the 2010 New Trial Motion, Basciano argues that the undisclosed information about the Pizzolo murder would have led this Court to exclude evidence of the murder as a matter of discretion under Fed. R. Evid. 403.   Because the Second Circuit directly addressed and rejected this claim, Basciano, 465 Fed. Appx. at 14-15, Basciano is precluded from raising it again in his habeas petition.   Nor does the addition of the Gambina information change this result because, as explained above, the Gambina information is not materially inconsistent with Cicale's account and, even if it were arguably inconsistent, Basciano has not shown a reasonable probability that the result of his trials would have been different.   See Basciano, 465 Fed. Appx. at 15 ("There was a multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale, through whom evidence of the Pizzolo murder was admitted.").

VI.  GROUND SEVEN: USE OF NON-RACKETEERING ACTIVITY TO
     PROVE A PATTERN OF RACKETEERING ACTIVITY IS NOT
     CONTRARY TO THE RICO STATUTE AND DID NOT RENDER
     THE RICO STATUTE OVERBROAD, VAGUE OR OTHERWISE
     <u>VIOLATE BASCIANO'S DUE PROCESS RIGHTS</u>

Basciano argues that permitting the jury to "mix and match" statutory predicates and Rule 404(b) other crimes evidence to establish a pattern of racketeering activity renders the RICO statute overbroad or void for vagueness.  (Habeas Pet. 72-74 (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 495 (1985)).  Because Basciano failed to raise this claim on direct appeal, he is precluded from raising it now.

To excuse his procedural default, Basciano claims his counsel was ineffective for failing to raise this argument at trial or on direct appeal and also relies on the claim's "novelty," citing <u>Reed v. Ross</u>, 468 U.S. 1 (1984).  Because Basciano's underlying argument has previously been rejected by the Second Circuit, counsel was not ineffective in failing to assert it.

A.  <u>Legal Standards</u>

"A statute is unconstitutionally vague if it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" <u>United States v. Burden</u>, 600 F.3d 204, 228 (2d Cir. 2010)(quoting <u>Connally v. Gen. Constr. Co.</u>, 269 U.S. 385, 391 (1926)).  In the absence of a First Amendment challenge, vagueness challenges must be evaluated on the

application of the statute to the facts of the case and not some speculative application of the statute.  Id.[30]

B.   Use Of Other Crimes Evidence To Establish
     The Pattern Element Does Not Render RICO
     Overbroad Or Void For Vagueness

Basciano's claim is not novel; to the contrary, the Second Circuit has repeatedly rejected vagueness challenges as to the meaning of the "conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity" element of the RICO statute and as to other elements of the RICO statute.  See, e.g., United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991); United States v. Ruggiero, 726 F.2d 913, 923 (2d Cir. 1984), abrogated on other grounds by Salinas v. United States, 522 U.S. 52, 61, 63 (1997); United States v. Huber, 603 F.2d 387, 393 (2d Cir. 1979); United States v. Stofsky, 409 F. Supp. 609, 613-14 (S.D.N.Y. 1973).  Basciano's quotation from the Sedima opinion does not address the totality of what must be proven

---

[30]   While Basciano's styles his claim also as an "overbreadth" challenge, the "overbreadth" doctrine, "which is a departure from traditional rules of standing, permits a defendant to make a facial challenge to an overly broad statute restricting speech even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute," Alexander v. United States, 509 U.S. 544, 555 (1993), does not apply to him, id. (because "the RICO statute does not criminalize constitutionally protected speech," the overbreadth principle did not apply); United States v. Salerno, 481 U.S. 739, 745 (1987)(noting "we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment").  In any event, because Basciano's conduct clearly falls within the RICO statute, he could not bring an "overbreadth" challenge even if one were available.  See United States v. Decastro, 682 F.3d 160, 169 (2d Cir. 2012).  Thus, the government treats Basciano's claim as a vagueness challenge.

to establish the pattern element.  The government must prove more than a defendant's commission of two predicate acts; it must also establish a threat of a continuing activity and relationship of those activities to each other or to the enterprise.  See Sedima, 473 U.S. at 496 n.14; Basciano, 599 F.3d at 202, 205 ("To be sure, a defendant must be found to have committed at least two predicate acts to be guilty of substantive racketeering.  Nevertheless, it is the pattern of activity, not the predicates, that is punished by a racketeering conviction.")(internal citations omitted).  As discussed in the sections addressing Grounds One and Eight, longstanding Second Circuit precedent permits the government to prove the "pattern" element or, more specifically, the "continuity and relationship" aspect of that element, by a multitude of evidence, not just the predicate acts charged against the particular defendant.  See, e.g., Basciano, 599 F.3d at 202-07 ("evidence beyond a defendant's own predicate acts – whether alleged or not – is relevant to establishing a charged pattern of racketeering") (citing, inter alia, United States v. Indelicato, 865 F.2d 1370, 1384 (2d Cir. 1989)(en banc), and United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992)).  Given Basciano's participation in many of the crimes enumerated in the broad pattern alleged in the indictment, such as murder, drug trafficking and gambling, as part of his participation in organized crime, he clearly had notice that his conduct was subject to prosecution

129

under the RICO statute.   <u>See</u> <u>Coiro</u>, 922 F.2d at 1017.   Thus,

Basciano's claim that such proof renders RICO void for vagueness or

otherwise violates due process must be rejected.

VII. GROUND EIGHT: COUNSEL WAS NOT INEFFECTIVE IN FAILING
     TO ARGUE THAT THE PERMITTED USE OF OTHER CRIMES EVIDENCE
     TO ESTABLISH A PATTERN OF RACKETEERING AMOUNTED
     TO A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT

Basciano asserts that the permitted use of other crimes evidence to establish a pattern of racketeering amounted to a constructive amendment of the indictment.  Although Basciano clearly was aware of the Court's jury instructions on the possible uses of "other crimes" evidence in both trials, he failed to raise this argument in his direct appeal or even the appeal of the denial of the 2010 New Trial Motion.  Thus, he is precluded from bringing this claim on its merits now.  To avoid preclusion, Basciano asserts that his counsel was ineffective in failing to raise his constructive amendment claim.  Because, however, the Second Circuit has clearly permitted the use of uncharged conduct as part of the proof of the pattern element of racketeering, Basciano's counsel was not ineffective in failing to raise this claim.

A.   Legal Standards

A constructive amendment arises when the government's proof and the trial court's jury instructions "modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996). The amendment must concern an essential element of the offense. United States v. LaSpina, 299 F.3d 165, 181 (2d Cir. 2002).  In a

conspiracy charge, the prosecution is not required to allege with precision every act furthering the conspiracy and may rely upon proof of an unalleged overt act as long as the acts proven reflect the essence of the overall scheme. United States v. Salmonese, 352 F.3d 608, 620-21 (2d Cir. 2003)(citing United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998)); United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975). "[S]ignificant flexibility in proof" is permitted "provided that the defendant was given notice of the 'core of criminality' to be proven at trial." United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992).

      B.    Basciano's Counsel Was Not Ineffective In
             Failing To Raise A Constructive Amendment Claim

Basciano claims his counsel was ineffective in failing to argue that the indictment had been constructively amended. Because, however, the Second Circuit has clearly permitted the use of uncharged conduct as part of the proof of the pattern element of racketeering, Basciano's counsel was not ineffective for failing to raise this claim. See Basciano, 599 F.3d at 203-07 ("Consistent with this precedent . . . the district court specifically charged the jury that it could consider the unlawful activities of other persons in deciding whether the government had carried its burden on the pattern element"); id. at 201 ("the 'story' being 'completed' [through the introduction of evidence of the Pizzolo murder and Bonelli and DeFilippo murder conspiracies] was the broad pattern of racketeering through which Basciano and others conducted

132

the affairs of the Bonanno crime family even after Basciano's November 19, 2004 arrest"); Indelicato, 865 F.2d at 1384 (racketeering acts of other defendants may constitute evidence of the nature of the enterprise, which, in turn, can prove the pattern element); DiNome, 954 F.2d at 843 ("The evidence of the DeMeo Crew's various criminal activities was, therefore, relevant to the RICO charges against each appellant . . . . because it tended to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."). Indeed, the Circuit explained in Basciano's double jeopardy appeal that the pattern element of Basciano's '03 indictment was broadly defined to include acts of murder and "self-preservation against both mob rivals and law enforcement challenges." Basciano, 599 F.3d at 213; id. at 200, 214. Thus, even though the '03 indictments did not specify the Pizzolo murder or the Bonelli and DeFilippo murder conspiracies, those crimes were within the charged core of criminality and, thus, there was no constructive amendment of the indictment. See Salmonese, 352 F.3d at 621.[31]

_____

[31] Notably, Basciano previously asserted in his motion to disqualify the United States Attorney's Office for the Eastern District of New York that the same grand jury presided over the '03 case and the '05 case, Basciano, 763 F. Supp. 2d at 314-15, and thus, according to this assertion, the grand jury that returned the '03 indictments would have heard evidence regarding the Pizzolo murder and Bonelli and DeFilippo conspiracies, all of which were charged in the '05 case. Even considering only the '03 indictment,

VIII.    GROUND NINE: COUNSEL WAS NOT INEFFECTIVE IN
         FAILING TO OBJECT TO HEARSAY TESTIMONY REGARDING
         THE PIZZOLO MURDER OR IN FAILING TO CHALLENGE
         <u>THE ADMISSION OF SUCH TESTIMONY ON APPEAL</u>

Basciano asserts that the statements by Gambina and Mancuso in relation to the Pizzolo murder and murder conspiracy were inadmissible hearsay and that his counsel thus was ineffective in failing to challenge their admission either at trial or to use their admission as a basis to argue on appeal that the Pizzolo murder was a charged crime.  (Habeas Pet. 78).

In making this argument, Basciano relies upon the statement in the Second Circuit's summary order rejecting his direct appeal that the Pizzolo murder was not a charged crime (Habeas Pet. 78-80) and argues that this means the Pizzolo murder was not part of the RICO conspiracy.  Since the Pizzolo murder was not part of the charged conspiracy, Basciano's argument continues, then any statements about it were not part of the RICO conspiracy or in furtherance of it.  (Habeas Pet. 80).

As explained above, Basciano has misconstrued the law, both as to the permitted use of the Pizzolo evidence in establishing the pattern element, among other uses, and as to the standard for the admission of co-conspirator statements, <u>see</u> <u>United</u>

_____

the grand jury was necessarily presented with additional acts of murder and other serious crimes since Basciano was included in an indictment with Joseph Massino, Patrick DeFilippo, Anthony Donato and John Spirito, among others, when the grand jury returned an indictment alleging a broad pattern of racketeering, including acts of murder.

134

States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002)(statements by co-conspirators in furtherance of the conspiracy are admissible even when the crime is not charged in the indictment). Because the government established that the conspiracy to murder Pizzolo existed and the hearsay statements of which Basciano complains were either in furtherance of the conspiracy (in the case of the Mancuso statements inquiring about the progress of the plot and reaffirming Basciano's order to kill Pizzolo) or were statements that may be considered as background to explain why Cicale and the other conspirators acted in the ways they did (in the case of the Gambina statements, assuming that Gambina never appeared to agree to participate in the plot), this evidence was properly admitted against Basciano and counsel would have had no meritorious grounds for objecting. As explained above, even assuming the Gambina statements were admitted erroneously, that error was harmless in light of the overwhelming proof of the crimes of conviction. Because Second Circuit precedent clearly permits the jury to use other crimes evidence as evidence establishing the pattern and the enterprise elements of racketeering and RICO conspiracy, appellate counsel was not ineffective in failing to raise Basciano's argument.

IX.  GROUND TEN: TRIAL COUNSEL WAS NOT INEFFECTIVE
     BY CONCEDING ELEMENTS OF THE CHARGED CRIME

          Prior to the first trial, Basciano's and DeFilippo's
attorneys agreed to concede certain elements of RICO conspiracy in
an effort to limit the government's ability to prove a host of
other crimes evidence.  Their concessions caused the Court to
exclude evidence of several crimes (mainly those committed by
Basciano).  See Basciano, 03-cr-929, Mem. & Order, DE# 491 at 4
(E.D.N.Y. Feb. 17, 2006)(excluding testimony relating to arson, car
theft, narcotics trafficking, fireworks purchasing, drafting of a
fraudulent deed, murder of John Doe in a Queens Social Club, the
murder of a numbers clerk, the solicitation to murder an individual
described as an Albanian, a murder in which Bonanno family
associate Alan Handler served as a lookout, the solicitation/
conspiracy to murder relatives of cooperating witnesses, multiple
murders (in excess of ten) with Bonanno family soldier Anthony
Donato, including the murder of an individual whose body was "hog
tied" and left on the property of Bonanno family associate
Salvatore Zotolla and the conspiracy to murder a federal
prosecutor).  Although this strategy was initially successful,
ultimately the Court permitted the government to introduce evidence
of some, although by no means all, of the previously excluded
crimes after Basciano's defense opened the door by arguing that
Basciano was too afraid of Massino to commit an unsanctioned
murder.  Basciano, 03-cr-929, Mem. & Order, DE# 517 at 4-5 (Mar. 6,

2006).   Additional evidence of uncharged crimes by Basciano that had previously been excluded, such as drug trafficking and home invasion robberies, was admitted in the first trial only after the defense created a misleading impression during cross-examination of Cicale that such crimes never occurred and that Basciano had never ordered Cicale to commit these crimes.   (TI 6181-82).[32]

Basciano now argues that because much of the other crimes evidence was ultimately admitted at trial, his trial counsel was ineffective in conceding certain elements.   (Habeas Pet. 83).   A trial strategy that ultimately proves to be unsuccessful, however, does not necessarily amount to ineffective assistance.  See Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986)("'we have repeatedly noted our reluctance to second-guess matters of trial strategy simply because the chosen strategy was not successful'")(quoting Trapnell v. United States, 725 F.2d 149, 155 (2d Cir. 1983)).   In Cuevas, the Circuit found counsel was not ineffective even though his trial strategy opened the door to the admission of harmful evidence since he had been attempting to "blunt the force" of other evidence, a situation similar to the one presented here, where Basciano attempted to avoid responsibility for the murder of Frank Santoro, which carried a life sentence, by arguing he was too afraid of Joseph Massino to commit an unsanctioned murder.

Indeed, counsel would have been foolish not to concede

---

[32]   Basciano was charged with conspiring to distribute marijuana in the second trial.

137

that the Bonanno family existed and Basciano was a part of it in light of the overwhelming proof of these facts. Basciano was recorded on December 21, 2003 being introduced as a captain in the Bonanno family and spoke of, among other things, his long history with the family, his closeness with Joseph Massino and Anthony Urso, the official boss and acting consigliere of the Bonanno family, and his own crew and hit team. In addition, the government introduced countless photographs of Basciano meeting with other organized crime members and also introduced an induction list with Basciano's name on it. Basciano's attorneys would have lost credibility with the jury by disputing these RICO elements, which in this case were irrefutable. Rather, they chose a sensible – and, here, unchallengeable – strategy to credibly admit what they could not deny and zealously challenge whether the government had proven Basciano's commission of the charged predicate acts. See Strickland, 466 U.S. at 690 (strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

X.   GROUND ELEVEN: AUSAS ANDRES AND BURETTA
     DID NOT SHOW ACTUAL PROSECUTORIAL BIAS

          Basciano asserts that AUSAs Andres and Buretta, the lead

prosecutors of the 2006 and 2007 trials, respectively, were

actually biased against him due to their belief that Basciano had

solicited the murder of AUSA Andres.[33]  For support, Basciano cites

their purported concealment of Brady material, specifically, the

Gambina proffer 302 and the Cicale/Santoro information, and the

alleged unfair exploitation of the nondisclosure of this and other

previously litigated alleged Brady material for tactical advantage

through either the bolstering of witnesses or the making of an

improper argument during the rebuttal at his 2007 trial.  Finally,

Basciano cites to an affidavit by Paul Villanueva, who claims that

he felt that two AUSAs (not alleged to be AUSA Andres or Buretta or

any of Basciano's trial prosecutors) pressured him falsely to

accuse Basciano of asking Villanueva to kill an inmate named Joseph

Borelli at MDC (which was never the subject of any charges against

Basciano) but that Borelli refused.  (Basciano v. United States,

12-cv-280, DE # 1-2 at 11).  Basciano believes that the statement

by one of the AUSAs, "don't worry we got your back on this," means

that the AUSAs were willing to suborn perjury, and, from this

assumption, he surmises that the AUSAs in his prosecution

necessarily were willing to suborn perjury from Cicale so that

_____

     [33]   Basciano's defense counsel had previously praised AUSA
Buretta for his efforts in disclosing alleged Brady material.  See
03-CR-929, DE # 1125 at 148.

139

Cicale would not disclose "what was said during Cicale's secret meetings with the government". (Basciano, 12-cv-280, DE# 1-3 at 68-69).

In his memorandum of law, Basciano further recites a litany of alleged prosecutorial misconduct, including the failure to investigate adequately Cicale's prison misconduct and the false murder plot allegation, the failure to immunize Marco Santomaggio or Vic Juliano, a defense investigator the government alleged to be one of the conduits of messages passed between Basciano and Massino, the use of the purported hit list to place Basciano in SAMs and, Basciano speculates, in the grand jury, and an inconsistent assertion by prosecutors about when the conspiracy to murder DeFilippo occurred. However, almost all of these instances of misconduct have previously been raised by Basciano and rejected by this Court, see, e.g., Basciano v. Lindsay, 530 F. Supp. 2d 435 Basciano, 2008 WL 794945; Basciano, 2010 WL 3325409; Basciano, 763 F. Supp. 2d at 314-18, and, as to the claims regarding the false murder plot allegation, the Vasaturo proffer regarding Nicholas Cirillo's disappearance, and the use of the allegedly unreliable List to place Basciano in SAMs, rejected by the Second Circuit, see Basciano, 384 Fed. Appx. at 31; Basciano, 465 Fed. Appx. at 14-15; Martinez, 316 Fed. Appx. 50, 51 (2d Cir. 2009)(summary order)("We have considered all of Appellant's arguments and have found them to be without merit."). Indeed, in rejecting Basciano's motion to

recuse the United States Attorney's Office, this Court has found after reviewing carefully Basciano's same "free-standing theories of sinister prosecutorial motives" that "none of them assert any particular act of bad faith or unethical conduct." Basciano, 763 F. Supp. 2d at 312, 314; id. at 314-18 (finding Basciano's speculation that the government used the List in the grand jury to be unfounded and noting that Basciano had been charged with every count and predicate before the List was discovered).[34] Because these arguments have previously been raised and rejected, Basciano should not be permitted to re-litigate them in his habeas petition.

Basciano is left with his claim that AUSAs Andres and Buretta were actually biased against him through their suppression of the Gambina proffer and the Cicale/Santoro information and their alleged subsequent exploitation of this suppression at Basciano's trials either through the improper elicitation of false testimony from Cicale in both trials, the improper bolstering of witnesses (Agent McCaffrey and Cicale) in the 2006 trial or the making of an improper argument in rebuttal in the 2007 trial.

A.    Legal Standards

The government previously addressed the law regarding the introduction of false testimony, improper bolstering and improper summation and rebuttal arguments in Grounds Four and Five.

---

[34]    The government respectfully refers the Court to, and incorporates by reference, its arguments refuting Basciano's claims. See Basciano, 05-CR-060, Gov't's Mem. In Opp. To Def.'s Pre-trial Motions, DE# 668 at 20-33.

B.   Basciano Has Not Established Actual Bias
     <u>Or Prosecutorial Misconduct By AUSAs Andres and Buretta</u>

As discussed above, the Gambina information does not materially contradict Cicale's testimony on the essential points of the Pizzolo murder conspiracy, nor exculpate Basciano.  Thus, Gambina's information does not establish that Cicale's testimony was perjurious.[35]  In rejecting Basciano's arguments about other undisclosed information that allegedly differed from Cicale's trial testimony regarding the Pizzolo murder, the Second Circuit concluded,

> The evidence identified in Basciano's brief on appeal suggests only that it would have been helpful to the defense to argue that others had a motive to murder Pizzolo and that Cicale's testimony was not credible.  The record reveals, however, that both arguments *were* put before the district court and the jury. . . .  Additionally, as we noted in our prior decision, "Cicale's life-long and murderous criminal history, coupled with his record of deceit and violence while cooperating with federal authorities and inconsistent statements in his own testimony, provided such fertile grounds for impeachment as to occupy nearly 300 pages of transcript spanning two days." <u>Basciano</u>, 384 Fed. Appx. at 31.  We cannot hold, therefore, that the disclosure of evidence further impeaching Cicale's credibility would have persuaded the district court to exclude evidence of the Pizzolo murder.

---

[35]   The government's 2009 disclosure in John Gotti, Jr.'s trial also does not establish the actual bias of AUSA Buretta.  AUSA Buretta represented only that Gambina's account differed from Cicale's, which is correct, but he did not represent that Gambina's account was materially different than Cicale's under the standards of <u>Brady</u> and <u>Giglio</u>.

> Furthermore, even if we were to decide that the non-disclosed evidence should have been disclosed to the district court and that the district court thereafter would have excluded evidence of the Pizzolo murder, Basciano would still not be entitled to a new trial . . . . There was a multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale, through whom the evidence of the Pizzolo murder was admitted. . . .

Basciano, 465 Fed. Appx. at 14-15.  Under the mandate rule, this Court is bound by those conclusions.  Even assuming Basciano could have used the Gambina information to impeach Cicale, as the Circuit found, Cicale was extensively impeached at both trials, and the government introduced testimony from other cooperating witnesses that at times contradicted Cicale's testimony, including testimony from Pisciotti that Cicale took credit for the Pizzolo murder, with no attribution that Basciano had been involved and including testimony that others, besides Basciano, had a motive to kill Pizzolo.  In light of the significant independent evidence of guilt of the charged crimes, there is no reasonable likelihood, assuming the government was aware of – yet used – Cicale's perjured testimony regarding the Pizzolo murder, of any different result at either the 2006 or 2007 trial had Gambina's information been disclosed.

The Cicale/Santoro information also does not establish that Cicale's testimony that he did not recall being informed of whether he was going to be charged with the Santoro murder was

143

perjurious or that even if it were perjurious, that the AUSAs would have reason to believe that he was not being truthful when he said he did not recall.   Moreover, there is no Brady/Giglio violation because Basciano has been aware since his December 2005 co-defendant meeting with Cicale that Cicale told Basciano he believed the government was seeking to charge him with the Santoro murder. See United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence."); United States v. Brown, 582 F.2d 197, 202-03 (2d Cir. 1978) (affirming denial of Rule 33 motion where defense counsel possessed sufficient information to question government witness about information that was alleged to be newly discovered).   As discussed above, AUSA Andres did not improperly bolster Cicale's testimony in the 2006 trial through his brief questioning of Cicale and Agent McCaffrey and AUSA Buretta did not make an improper remark during his rebuttal.   Even had either AUSA done anything improper in these regards, these were fleeting moments in lengthy trials with overwhelming evidence in support of Basciano's conviction. Finally, Basciano's attorney was able effectively to argue the defense theory that Cicale, for fear that the government would seek the death penalty against him, a three-time murderer (the murders of Frank Santoro and Randolph Pizzolo and the manslaughter of

George Kehoe), studied the government's discovery and then falsely
implicated Basciano.   In light of the significant independent
evidence of the crimes of conviction that also corroborated
Cicale's testimony, the jury apparently chose not to believe the
defense theory.  The addition of the Cicale/Santoro information, at
best, would have constituted cumulative impeachment or would have
had little to no impact due to Cicale's failure to recall.  See
Stewart, 433 F.3d at 299-302 (perjured testimony of expert witness
did not warrant a new trial where ample evidence unrelated to that
testimony supported the verdict); White, 972 F.2d at 22.[36]

Basciano also asserts that information concerning the
November 2005 meetings between Cicale and the government contradict
the government's representation, during the colloquy about whether
the defense could admit Joseph "Joe Monk" Fillipone's grand jury
testimony, that at the time of Fillipone's testimony on December

---

[36]    Basciano also seeks a hearing to determine what was said
to Cicale during the November 2005 meetings.  (Habeas Mem. of Law
68-69).  However, Basciano must show more than mere speculation or
a desire for a hearing to warrant one.  Here, he has raised no
facts to suggest that Cicale's statements in 2007 that he did not
recall whether he was told he would be charged with the Santoro
murder and that he did not know whether the government ultimately
would ever charge him with the murder were false and, again, even
if they were false, that testimony would have had no likelihood of
resulting in a different verdict.  White, 972 F.2d at 22 (no abuse
of discretion in denying evidentiary hearing where it was
unnecessary to resolve any issues that might be the focus of the
hearing); Garcia Montalvo v. United States, 862 F.2d 425, 426-27
(2d Cir. 1988) (per curiam); see also United States v. Aiello, 814
F.2d 109, 113 (2d Cir. 1987) (dismissal proper where files and
records show prisoner is not entitled to relief); Johnson v. Fogg,
653 F.2d 750, 753 (2d Cir. 1981) (no hearing required when issues
raised in petition are meritless).

29, 2005, the government had not spoken to Cicale about the substance of the Santoro murder.  Basciano also believes the existence of the November 2005 meetings shows that Cicale was the government's agent during co-defendant meetings.[37]  Cicale's § 3500 material from the capital trial, however, shows Cicale was told not to obtain information from co-defendant meetings (05-CR-060, GX 3500-DC-12; GA 34) and that Cicale did not begin proffering and, therefore, discussing criminal activity, such as the Santoro murder, until January 11, 2006 (05-CR-060, GX 3500-DC-6, GX 3500-DC-13, 3500-DC-88; GA 31-33, 35-38, 41-44).[38]

Finally, to the extent Basciano is raising a claim of a due process violation from having AUSAs Andres and Buretta, who he

---

[37]   The government did not elicit at Basciano's 2006 and 2007 trials statements by Basciano at a co-defendant meeting.  Rather, what was elicited was Cicale's statement to Basciano prior to a co-defendant meeting that Cicale believed, based on the Santoro autopsy, that Cicale had hit Santoro when he had shot at him. (TI 5577 (direct), 6100 (cross), 6320-21 (redirect), 6323-24 (redirect), 6329 (re-cross); TII 1487-88 (cross)).  Thus, to the extent Basciano is obliquely raising a Massiah claim, it has no merit since the government did not elicit any statement by Basciano.

[38]   Moreover, the Court observed what appeared to be a questionable relationship between Basciano and Filippone when Filippone refused to testify at trial, noting,

> I would also point out that the Joe Monk situation, it was not lost on me.  That is, Mr. Monk left the courtroom after he came in, mutters profanity under his breath.  I'll tell you he did it.  So, don't question it. . . . And when he left, he threw a kiss at Mr. Basciano, and Mr. Basciano, with a big smile, gave him the thumbs-up.

(TI 9667-68).

claims are not disinterested, as his prosecutors, Basciano cannot meet the high standards for collateral relief necessary to show a due process violation on that ground, especially since he has been convicted at a fair trial before an unbiased jury.  See <u>Wright v. United States</u>, 732 F.2d 1048, 1057-58 (2d Cir. 1984).[39]

---

[39]    Any claim that the AUSAs improperly used evidence of the conspiracy to murder Patrick DeFilippo to support the imposition or maintenance of SAMs is moot since Basciano is no longer subject to them and his past conditions of confinement are not cognizable under § 2255.  Moreover, the evidence establishes that Basciano was more than willing to send messages about killing DeFilippo to Massino while Massino was in prison (TII 1197-98, 1255-56, 3077-78) and the Massino consensual recordings establish without a doubt that Basciano discussed his history of wanting to kill DeFilippo while he himself was in prison and noted that he (Basciano) had ways to send criminal messages out of prison.  (<u>See</u>, <u>e.g.</u>, Massino consensual recording Jan. 3, 2005 at 31-34, 74-75, 87; GA 50-53, 54-55, 56).

XI.  <u>BASCIANO'S MOTION FOR RECUSAL LACKS MERIT</u>

     In his February 2012 recusal motion, Basciano seeks this
Court's recusal on the basis of the Court's alleged actual bias,
pursuant to 28 U.S.C. §§ 144 and 455(b)(1), and appearance of bias,
pursuant to 28 U.S.C. § 455(a), in having presided over the
sentencing of cooperating witness Dominick Cicale, who Basciano
claims perjured himself during Basciano's trials, and in allegedly
interfering with Basciano's attorney-client relationships.
Specifically, as to the latter claim, Basciano cites the Court's
failure to appoint <u>Curcio</u> counsel in the capital case when Basciano
asserted one of his three attorneys possessed a conflict after
interviewing a witness and its instruction to Basciano's attorneys
in the '03 and '05 cases not to advise Basciano on any matter not
encompassed within the scope of their appointment.  (Aff. Of Bias
or Prejudice by Vincent J. Basciano ¶¶ 8-12; Supp. Recusal Mot. 17-
57).

     In his supplemental recusal motion, Basciano casts a
sinister theory that the Court engaged in various judicial actions
or inactions once it learned that its name was on a purported hit
list authored by Basciano.  These actions or inactions, Basciano's
theory continues, either ensured Basciano's conviction or enabled
the Court to remain on the case by taking certain actions that
appeared to be neutral under the precedent addressing recusal
claims.  Specifically, Basciano asserts that the Court's sentencing

of several of the cooperating witnesses who testified against Basciano and whose testimony conflicted with Cicale's gives an appearance of bias.  Basciano also re-raises his argument that the Court's failure to immediately disclose to the parties the letter from Joseph Barone creates an appearance of bias.  Basciano also recycles his argument that the Court's letter to the Attorney General asking whether the Attorney General intended to continue to pursue the death penalty once Basciano's '03 conviction was affirmed (the "AG letter") is evidence of bias, although now Basciano claims that the AG letter was a ruse designed to make the Court appear neutral.  Finally, Basciano asserts that in denying his motion for a stay, this Court is insuring its views will "possibly . . . contaminat[e] future decision-makers" in order to preserve Basciano's conviction.  (Supp. Recusal Mot. 7-8).

        The vast majority of Basciano's allegations have previously been raised and rejected by this Court and the Second Circuit.  As such, they should not be permitted to be raised again.  See Yick Man Mui, 614 F.3d at 55.  In addition, other theories, such as the claim that the Court, in sentencing, or in anticipation of sentencing, the cooperating witnesses who testified before Basciano, would have the incentive to credit their alleged perjury while ruling against Basciano in light of Basciano's apparent threat to the Court, could have been brought in Basciano's direct appeal but were not.  These theories should also be rejected.  See

Ben Zvi, 242 F.3d at 95 (mandate rule bars claims that could have been raised in direct appeal but were not).

Recognizing that the Circuit praised this Court's careful handling of Basciano's past recusal motions, Basciano attempts to use that handling as evidence of the Court's alleged nefarious plot to appear reasonable and neutral while secretly believing that the hit list was a viable threat.  Thus, Basciano's current recusal motion, like many of his prior motions and his two recusal-related appeals, is still premised upon the alleged hit list.  Basciano should not be permitted to recast previously rejected theories in endless bites at the recusal apple.  Thus, any recusal theory premised on the alleged hit list should be rejected.

In examining the information Basciano has not previously raised, the Court is left with the following new arguments supporting Basciano's claims that a reasonable observer would find an appearance of bias warranting recusal: (1) the Court's sentencing of Cicale and various other cooperating witnesses that Basciano alleges have perjured themselves creates an appearance of bias (or in Cicale's case, actual bias) since the Court, under this theory, would be required to reject Basciano's habeas petition in order to rule consistently; (2) the Court's refusal to grant a stay for Basciano to seek a writ of mandamus establishes bias because it allegedly permits the Court to insert its unchecked view into the litigation; (3) the Court's ruling permitting the introduction of

evidence about the purported hit list during the capital trial's penalty phase allegedly proves the Court's "true" view of the hit list; and (4) the Court's alleged interference in Basciano's attorney-client relationships.   None of these grounds create an appearance of bias, let alone establish actual bias, whether considered individually or collectively.

A.   Legal Standards

A "district judge must recuse himself 'in any proceeding in which his impartiality might reasonably be questioned,'" a standard which is met by "asking whether 'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal.'"   Basciano, 384 Fed. Appx. at 32 (quoting 28 U.S.C. § 455(a) and United States v. Amico, 486 F.3d 764, 775 (2d Cir. 2007)).   A court evaluating a recusal motion must "'carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid' the adverse consequences of his expected adverse decisions."   In re Basciano, 542 F.3d 950, 956 (2d Cir. 2008)(quoting In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988)).   In cases in which the court is the subject of a plot or threat (whether real or feigned), the "principal indicium of whether a judge's 'impartiality might reasonably be questioned' . . . is whether judicial action subsequently taken by

the judge with respect to the defendant in the wake of his or her discovery of the plot or threat does or does not appear to be impartial." In re Basciano, 542 F.3d at 957 n.6.

A party seeking recusal on the grounds of actual bias pursuant to 28 U.S.C. §§ 144, 455(b)(1) must establish that the judge has personal knowledge arising outside of the judicial function of disputed evidentiary facts concerning the proceeding. United States v. Carlton, 534 F.3d 97, 101 & n.4 (2d Cir. 2008). However, this requirement "is commonly limited to those circumstances in which the alleged partiality 'stem[s] from an extrajudicial source'" and "'opinions held by judges as a result of what they learned in earlier proceedings' in a particular case are not ordinarily a basis for recusal." Carlton, 534 F.3d at 100(quoting Liteky v. United States, 510 U.S. 540, 544 (1994) (prior finding that defendant violated supervision by committing charged crime does not disqualify a judge from presiding over the criminal trial); United States v. Arena, 180 F.3d 380, 398 (2d Cir. 1999)(ruling in matter ten years earlier against a defendant does not require recusal in current litigation). Moreover, "a judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" Carlton, 534 F.3d at 100 (citation omitted). Rather, the judge's opinions or comments must show "such a high degree of favoritism or

antagonism to make fair judgment impossible." _Id._ (internal quotation marks and citation omitted). Claims that are "remote, contingent, indirect or speculative" do not, as a matter of law, permit recusal. _United States v. Lovaglia_, 954 F.2d 811, 815 (2d Cir. 1992).

>    B.   Basciano Has Not Demonstrated
>         That The Court Must Recuse Itself

Basciano has not shown under either standard that recusal is required.

>    1.   Cicale's Sentencing

Basciano posits that in sentencing Cicale, the Court must necessarily have decided that Cicale did not perjure himself at Basciano's '03 trials, a "central" issue in his habeas petition. Thus, Basciano contends, the Court has a vested interest in "saving face" by sweeping Basciano's accusations of perjury under the rug and denying Basciano's petition. (Recusal Mot. 6-7). Basciano's speculative theory lacks merit.

The primary evidence Basciano cites as proof of Cicale's perjury is Gambina's proffer statements. But as explained above, Gambina's account is not materially inconsistent with Cicale's. Thus, the factual premise underlying Basciano's argument is incorrect and, accordingly, this ground for recusal lacks merit.

A full review of the Court's sentencing transcript of Cicale reveals that the Court did not make an express finding that Cicale did not perjure himself at Basciano's trial. Moreover, as

explained above, even if the Court now finds that Cicale perjured himself or assumes for purposes of argument that Cicale did,[40] Basciano's conviction in the '03 case cannot be overturned given the significant evidence independent of and corroborating Cicale's testimony in support of Basciano's crimes of conviction.   Thus, even if the Court were to deny Basciano's habeas petition, an objective observer knowing the relevant facts would not conclude that the Court was attempting to protect its reputation in making that ruling.   See Liteky, 510 U.S. at 1157 ("judicial rulings alone almost never constitute a valid basis for a bias or partiality motion"); Carlton, 534 F.3d at 100-01 (recusal not warranted under either §§ 455(a) or 455(b)(1) when judge previously found defendant guilty of supervised release violation relating to the same charged crime).[41]

---

[40]   Basciano also argues that the Court's silence on the "Medina affair" would lead an objective observer to find an appearance of bias by the Court. (Supp. Recusal Mot. 46-57).   But, consistent with its ruling on Basciano's Rule 33 motion, the Court may assume for the purposes of Basciano's petition that the false murder plot allegations (or indeed any of Basciano's Brady/Giglio allegations) are true.   See, e.g., Basciano, 2008 WL 794945, at *1 n.2.   By doing so, the Court does not need to contradict its decision to grant the government's § 5K1.1 motion at Cicale's sentencing to decide Basciano's petition.   Thus, the Court would not be required to put itself in the position of needing to "save face" or to engage in Basciano's perceived machinations in order to rule impartially on Basciano's claims.

[41]   Basciano also finds it suspicious that the Court has not yet sentenced Giuseppe Gambina. (Supp. Recusal Mot. 18).   But Gambina's pre-sentence report has not yet been prepared and Gambina recently testified at the trial of Bartolomeo Vernace, whose case is unrelated to Basciano's, and, thus, the Court currently lacks all the facts it would need to consider in sentencing Gambina.   In

154

Nor is there any credible showing that, by performing its judicial functions in presiding over Cicale's sentencing, the Court has shown any actual bias, either for Cicale or against Basciano. Indeed, the Second Circuit has previously noted this Court's "exemplary attention to Basciano's rights" during both trials, Basciano, 384 Fed. Appx. at 33, attention that continued even after Basciano's direct appeal.  The Court has made numerous rulings and taken various actions leading up to and during Basciano's capital trial that have favored Basciano, including excluding evidence, (see, e.g., 05-CR-060, DE# 1048 (excluding evidence of solicitation to murder AUSA Andres)), attempting to facilitate Basciano's communication and visits with his family and legal counsel while Basciano was subject to the SAMs, and inquiring of the Attorney General whether the Attorney General would continue to seek the death penalty after Basciano's conviction and life sentence had been affirmed.[42]  The Court also thoroughly considered Basciano's 2010 New Trial Motion in the '03 case.  Finally, at Cicale's sentencing, the Court emphasized Cicale's violent history and utter disregard of the law and expressed skepticism that Cicale will be able to live a productive life but determined that in light of his cooperation, Cicale deserved the chance to try.  This ruling hardly

---

any event, Basciano's baseless suspicions do not provide grounds for recusal.  See Lovaglia, 954 F.2d at 815.

[42]   The Court has written a similar letter to the Attorney General in the case of Ronell Wilson.  See Mosi Secret, Prosecutors Again Argue for Execution of Killer of New York Detectives, The New York Times (June 25, 2013).

expresses a high degree of favoritism toward Cicale. Nothing in the Court's history of presiding over the '03 case or the '05 case provides an objective observer a significant reason to doubt justice will be done if the Court continues to preside over Basciano's habeas petition.

Nor does this result change if the Court expansively examines the different Bonanno family cooperating witnesses the Court has sentenced, even though Basciano claims they have testified inconsistently with other cooperating witnesses. Many of the conflicts in testimony Basciano raises now have previously been raised to the juries presiding over Basciano's three trials or to this Court, the Second Circuit and Magistrate Levy in the SAMs litigation, all of whom have found against Basciano. See, e.g., Basciano v. Lindsay, 530 F. Supp. 2d 435, 440, 444 (E.D.N.Y. 2008) (conflict between Cicale's account of a plot to kill Michael Mancuso with testimony of Nicholas Pisciotti and Thomas Lee), aff'd Basciano v. Martinez, 316 Fed. Appx. 50 (2d Cir. 2009)(summary order); TII 4663; Basciano, 05-cr-060 T 8128, 8147-53 (Medina), 8171-76). Perjury, however, requires more: it requires a showing that the witness gave "false testimony concerning a material matter with the willful intent to provide false testimony, . . . [s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001); United States v. Gambino, 59 F.3d 353, 365 (2d Cir.

1995)("even a direct conflict in testimony does not in itself constitute perjury"), a showing that Basciano has failed to make.[43]

Basciano also has not shown that the Court has received any extra-judicial knowledge from these witnesses.  Even if the Court held opinions about these witnesses from observing their testimony at trial or at their respective guilty pleas and sentencings, those opinions "are not ordinarily a basis for recusal." Carlton, 534 F.3d at 100 (citation omitted).  In ruling on Basciano's claims in his pending habeas, the Court is permitted to look beyond the alleged inconsistencies Basciano raises to determine whether evidence of Basciano's crimes was corroborated rather than accept these witnesses on faith or discount them completely.  From its past rulings, it is clear the Court did just that.  See Basciano, 2008 WL 794945, at *4; Basciano, 2010 WL 3325409, at *11.

In sum, the Court's sentencings of Cicale or the other cooperating witnesses do not provide bases for recusal.

---

[43]    Even assuming the inconsistencies to which Basciano points were evidence of perjury by Cicale or other witnesses and the government was aware of that perjury, there is no reasonable likelihood that the false testimony could have affected the judgment of the jury in Basciano's trials, United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991), since each instance was on a matter collateral to the charged crimes, the evidence of the charged crimes was overwhelming and Cicale and the other cooperating witnesses were extensively impeached.  See, e.g., Gambino, 59 F.3d at 366.

2.   The Court's Rulings On The Purported
      <u>Hit List And The Request For A Stay</u>

Basciano also claims that the Court's ruling permitting evidence of the List in the penalty phase of his capital trial establishes that the Court all along believed the List was a genuine threat and not a recusal tool.   But the Court's ruling admitting evidence about the List does not discuss the Court's personal views of the List but notes only Judge Levy's finding that "sufficient indicia of reliability suggested it was a hit list." 763 F. Supp. 2d at 352.   The Court also made clear that Basciano would be able to challenge the reliability of the hit list evidence through adversarial testing, which is hardly a ruling that the List is indeed a hit list.   A finding simply that evidence may be relevant is far less certain than an ultimate conclusion that the List is what the government alleges.   Evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence."   <u>See</u>, <u>e.g.</u>, <u>United States v. White</u>, 692 F.3d 235, 246 (2d Cir. 2012).   Thus, the Court's decision to use Magistrate Levy's finding to cross the low relevancy threshold does not, without more, suggest bias or that an objective observer would infer bias.   The Court itself has made no direct finding that the List was a hit list.   Thus, the Court's penalty phase evidentiary ruling does not call into question the Court's earlier findings that one of Basciano's possible motives in authoring the List was

158

to engineer the Court's recusal, much less create an appearance of bias.  See Lindsay, 2008 WL 141860, at *11.

Similarly, this Court's decision not to grant a stay was reasonable since, consistent with the law, a disqualification motion asserting the appearance of partiality is committed to the sound discretion of the judge whose disqualification is sought. See In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1312 (2d Cir. 1988)(explaining that in a case asserting both the appearance of partiality and personal bias, "the judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion").

The Court's decision denying the stay noted that it would first address recusal, and that only if it denied the recusal motion would it proceed to address Basciano's habeas petition, a process that would permit Basciano to seek appellate review of recusal following the decision on the habeas petition.  Should the Circuit on appeal conclude that recusal was warranted, it may direct another judge to rule anew on Basciano's habeas petition. Thus, were it to be found that the Court had erroneously denied Basciano's recusal motion, the Court would not have the unchecked ability to leave its imprint on Basciano's habeas petition.

Other than Basciano's speculative theory, which resembles the "[f]ree-wheeling theories of sinister prosecutorial motives" this Court has previously rejected, see Basciano, 763 F. Supp. 2d

at 312, 318, Basciano has pointed to no facts connected to these or any of the Court's rulings or actions to suggest that the Court holds "such a high degree of favoritism or antagonism to make fair judgment impossible." Carlton, 534 F.3d at 100 (internal quotation marks and citation omitted).

Finally, Basciano's effort to use the Court's prior favorable or neutral rulings as evidence of its sinister plot to appear consistent with recusal caselaw should be rejected. If accepted, Basciano's arguments would place any judge in a Catch-22, for if the court ruled favorably for the defendant, those favorable rulings could then lay the groundwork for recusal. That simply is not the law. Cf. In re IBM, 618 F.2d 923, 929 (2d Cir. 1980)(trial court must be free to rule on the merits without fear that if it rules disproportionately in favor of one party it will raise an appearance of bias).

3.   The Court's Alleged Interference With
     Basciano's Attorney-Client Relationships

a.   Alleged Conflict Regarding Barone

Basciano asserts that one can infer bias from the Court's failing to engage in a inquiry or appoint counsel pursuant to United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), upon receipt of Basciano's December 3, 2010 letter stating that, although George Goltzer, Basciano's lead attorney in his capital case, believed no conflict existed after interviewing an "explosive" witness the government presumes is Joseph Barone, Basciano's appellate counsel

in the '03 case stated there was a conflict.  Basciano's letter,
however, did not explain what the alleged conflict was; rather, it
contained only the bare allegation that there was an unspecified
conflict.  Indeed, even now Basciano has not explained the nature
of the conflict between himself and Golzter as to this witness.  A
court does not have "a duty to inquire whenever, as a result of
creative speculation, one could imagine a situation in which a
conflict may have arisen." United States v. Velez, 354 F.3d 190,
198 (2d Cir. 2004).  Thus, an objective observer would be hard-
pressed to infer bias when Basciano and his other unconflicted
counsel in the '05 case failed to explain any reasons that would
require the Court to act.

     While Barone ultimately did not testify at the capital
trial, there is no indication in the record that the failure to
call Barone was due to a conflict of interest under Curcio.
Unconflicted counsel would have had powerful strategic reasons not
to call Barone as a witness during the guilt phase because had
Barone testified, the government, in order to prove that Barone was
lying, would necessarily have needed to question Barone about his
claims of saving the Court's and AUSA Andres's lives.  Basciano's
defense, however, had successfully precluded admission of the
Andres murder plot during the guilt phase of Basciano's capital
trial (05-CR-060, DE# 1048 (Feb. 4, 2011); T 5391-92)[44] and the

--------

[44]   The defense also successfully precluded evidence of the
Andres murder solicitation in the '03 trials, see, e.g., Basciano,

government had agreed not to offer evidence relating to the hit list in the guilt phase (Basciano, 05-CR-060, DE # 1018, Mem. & Order at 21-22).[45]  Thus, it may be that whatever "conflict" Goltzer possessed as to this witness was not a conflict based on canons of ethics under Curcio at all but, rather, a routine conflict in trial strategy with Basciano that is not covered by Curcio.  United States v. White, 174 F.3d 290, 296 (2d Cir. 1999)(rejecting attempt by defendant to "characterize[] a routine disagreement with his appointed counsel over defense strategy [such as "whether to file certain motion, to pursue certain evidentiary leads . . . and to call certain witnesses at trial"] as a conflict of interest");  United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir. 1995) (observing *in dicta* that no lapse in representation would occur if strategy not pursued was completely insubstantial or contrary to defendant's interest).[46]  In light of the considerable risks calling

---

2006 WL 385325, at *9, and the government never sought to offer evidence surrounding the List in Basciano's 2007 trial.

[45]   When issues surrounding Barone surfaced prior to Basciano's capital trial, the government by a letter filed under seal on October 1, 2010, explained in detail why it believed Barone had testified falsely in the Southern District of New York.  When the defense in Basciano's capital trial announced that it sought to call Barone during its case in the guilt phase, the government reminded the Court and the defense of the potential of opening the door to evidence of the plot to kill AUSA Andres and evidence surrounding the purported hit list.  Over Basciano's personal objection, defense counsel, which included two attorneys Basciano does not allege to have had a conflict, then declined to call Barone.  (Basciano, 05-cr-060, T 7899-7907).

[46]   To the extent Basciano believes Goltzer would become an unsworn witness to Barone's alleged Brady information on the Santoro murder that Cicale shot Santoro, see United States v. Kliti, 156 F.3d 150 (2d Cir. 1998), that concern is baseless since

Barone would have presented, Basciano cannot show that the decision not to call Barone was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests," United States v. Moree, 220 F.3d 65, 69 (2d Cir. 2000), as he would need to do to prevail under a Curcio challenge.

Basciano also finds something sinister in the Court's failure to disclose the existence of the Barone letter to the parties prior to the three year filing deadline for Basciano's Rule 33 motion in the '03 case, citing a judicial canon, which appears to be Canon 3(A)(4) of the Code of Conduct for United States Judges, advising a judge receiving an ex parte communication to promptly provide notice to the parties of the subject matter of the communication.  But there is nothing in Barone's "ambiguous and dubious" letter, the relevance of which to Basciano's Rule 33 motion was not apparent, Basciano, 2010 WL 4484366, at *3, to put the Court on notice that it needed to provide the letter from a third person to the parties.  Indeed, there is nothing in Barone's letter to the Court that establishes Barone possessed any exculpatory material as to either the '03 or '05 charges.  The vague and unsubstantiated reference to saving the Court's and the

---

the entirety of Barone's information does not exculpate Basciano of that murder.  Rather, it inculpates Basciano by confirming Basciano ordered Cicale to kill Santoro to eliminate Santoro's threat to kidnap one of Basciano's sons and by confirming that Basciano awarded Cicale after the murder.  There is also no showing that Barone would have testified inconsistently to whatever he told Goltzer that pertained to Basciano's capital trial.

AUSA's life had nothing to do with the '03 trials since Basciano was not charged with and the government did not introduce evidence of either the List or the solicitation to murder AUSA Andres. Similarly, Barone's mere recitation that he was friends with Cicale did not establish that Barone possessed undisclosed impeachment material about Cicale.

Even assuming the Court erred by failing to conduct a <u>Curcio</u> investigation and, if necessary, inquiry, or to disclose the existence of the Barone letter earlier, that error does not establish actual bias or the appearance of bias. <u>See</u> <u>Liteky</u>, 510 U.S. at 556 (noting that "judicial rulings, routine trial administration efforts and ordinary admonishments (<u>whether or not legally supportable</u>)" that did not "display[] deep-seated and unequivocal antagonism that would render fair judgment impossible" did not warrant recusal).

b.   <u>The Court's Relieving of Jane Simkin Smith</u>

Finally, Basciano cites instances in which the Court sought to clarify the role and the source of funds paying Jane Simkin Smith, Esq., who for a time had assisted in preparing the pre-trial motions in the '05 case and the post-trial motions and appeal in the '03 case.  Basciano also cites a separate instance during Basciano's capital trial in which the Court noted that Ms. Smith, who by then had been relieved in the '05 case, had been disruptive in the audience while observing the capital trial.  None

164

of these instances, whether considered individually or collectively, gives rise to any inference of bias. First, although the Court had relieved Ms. Smith of her appointment once she had completed the purposes of her assignment, the Court noted that there was no "gag order" between the '03 appellate team (which included Smith and was being funded by the Second Circuit) and the '05 team funded by the district court's CJA funds. Rather, the Court expressed the reasonable concern that the appropriate court (the district court or the Second Circuit) was being billed for the respective attorney's services. In addition, the Court properly was concerned about whether the attorneys assigned to the '03 case understood all of the developments and nuances in Basciano's capital case, for fear they could render advice as to the '05 case that might be confusing to Basciano, who already had three competent attorneys appointed pursuant to the CJA to represent him in the '05 case.

Second, the Court's admonishment of Ms. Smith for her disruptive behavior during a capital trial was reasonable and a proper exercise of its discretion in maintaining control of the courtroom and ensuring that the jury would decide the case based on the evidence received at trial, not on the distractions presented by former counsel in the audience. See, e.g., Huminski v. Corsones, 396 F.3d 53, 86-87 (2d Cir. 2005)(noting a "legitimate

165

countervailing interest of the highest order" in excluding
disruptive spectator from courtroom).

Finally, the Court's bookkeeping concerns were warranted
by the history of Basciano's mixing of attorneys and other defense
team members in the '03 and '05 cases. Prior to and during the
2006 trial, Basciano had privately retained his defense team in the
'03 case, although he had court-appointed attorneys and a court-
appointed paralegal and investigator in the '05 case. Concerns
arose, however, when several members of the defense team working on
the '03 trial appeared to have been paid through CJA funds in
connection with the '05 case. (See, e.g., United States v.
Basciano, 03-CR-929, Transcript of Proceedings 2-5, 25-28 (E.D.N.Y.
Jan. 17, 2006); GA 5-8, 9-12; TI 9329-37).

Even assuming one could read any of the Court's comments
as critical of Ms. Smith or Basciano's other attorneys, which they
do not appear to be, "a judge's comments during a proceeding that
are 'critical or disapproving of, or even hostile to, counsel, the
parties, or their cases, ordinarily do not support a bias or
partiality challenge.'" Carlton, 534 F.3d at 100 (citation
omitted). In sum, none of the instances Basciano raises shows
either actual bias by the court or give rise to an appearance of
bias.

                    *      *      *      *      *

166

None of the actions or inactions cited by Basciano, whether considered individually or collectively, would cause an objective observer fully informed of all the facts to entertain significant doubt that justice will be done by this Court's presiding over Basciano's habeas petition.  Basciano's sinister theory of a nefarious plot on the Court's part to ensure that Basciano's conviction and life sentence are upheld does not hold water.  It simply strains credulity to believe that the Court, if it really were prejudiced by the existence of the List, would wait several years before taking actions adverse to Basciano that were motivated by bias.  Other than the fact of the List itself, which has already provided the basis for Basciano's prior unsuccessful recusal motions, Basciano alleges no significant action by the Court to show bias other than occasional rulings with which Basciano disagrees or believes to be erroneous.  At best, Basciano has shown error, but ruling against Basciano, even erroneously, does not, without more, reveal partiality.  See In re Basciano, 542 F.3d at 957.

Rather, especially considered in light of his repeated attempts to manipulate the judicial process through multiple recusal and disqualification motions, Basciano again appears to be attempting to "avoid the adverse consequences of [the Court's] presiding over [his] case," In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1312 (2d Cir. 1988), since this Court has personally

167

presided over Basciano's trials and previously determined that Basciano's motions based on Cicale's credibility and the government's alleged Brady violations lacked merit, decisions that have been affirmed on appeal.  As this Court has repeatedly concluded, Basciano's attempts to manipulate the judicial system should not be rewarded.  Basciano's sixth recusal attempt is no different from his past efforts and should be rejected.

## XII. AN EVIDENTIARY HEARING REGARDING BARONE'S INFORMATION IS NOT NECESSARY

In a filing dated July 8, 2013, Basciano requests an evidentiary hearing regarding the information relating to the Santoro murder that Joseph Barone told his FBI handling agent. As discussed above, Barone's information on the whole inculpates Basciano and is largely consistent with Cicale's testimony at trial since Cicale has consistently admitted firing at Santoro and since Barone's information establishes, consistent with Cicale's testimony and other proof at trial, that Basciano ordered the murder of Santoro because he had learned Santoro had threatened to kidnap one of his sons. Even assuming for purposes of Basciano's motion that Barone's information was known to and suppressed by the members of the trial team prosecuting Basciano in the '03 case, the result at trial would not have been different in light of the "multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale . . . . With respect to the Santoro murder charge, the jury considered Basciano's own recorded statements, the testimony of cooperating witnesses Salvatore Vitale, Nicholas Pisciotti, Richard Cantarella, and James Tartaglione, as well as the testimony of Kenneth Champlin and Carmine Naddeo, and physical evidence corroborating the details of the Santoro murder provided by the

witnesses."  <u>Basciano</u>, 465 Fed. Appx. at 4.[47]   In particular, Basciano's admissions on the Tartaglione recording regarding his involvement in the murder were devastating evidence of guilt.  As this Court has noted repeatedly, Basciano has "not dispute[d] the existence of the significant independent and corroborating evidence offered at trial in addition to Cicale's testimony."  <u>Basciano</u>, 2008 WL 905867, at *1.

Because Barone's information is not sufficiently material to undermine confidence in the verdict, no evidentiary hearing about Barone's information is necessary.  See <u>Basciano</u>, 2008 WL 794945, at *6 (denying motion for evidentiary hearing into Cicale false murder plot allegation)(citing <u>United States v. Stewart</u>, 433 F.3d 273, 302 (2d Cir. 2006)).  Basciano's motion for a hearing should therefore be denied.

---

[47]   Basciano's counsel in the '03 case would have faced a similar issue in calling Barone as counsel in the '05 case did since the government's impeachment of Barone would have necessarily entailed a discussion of the Andres murder solicitation and the purported hit list plot, both of which were not elicited at the 2006 and 2007 trials.

170

<u>CONCLUSION</u>

Because Basciano's arguments are without merit, his motion to recuse the Court, his motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 and his motion for an evidentiary hearing should be denied.

Dated:  Brooklyn, New York
        July 18, 2013

                              Respectfully submitted,

                              LORETTA E. LYNCH,
                              <u>United States Attorney</u>,
                              <u>Eastern District of New York</u>.


                    By:  _____/s/_____
                              AMY BUSA
                              Assistant U.S. Attorney



AMY BUSA,
<u>Assistant United States Attorney</u>,
      (<u>Of Counsel</u>).

171

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the within memorandum were served by mail on July 18, 2013  upon Vincent Basciano, FBOP # 30694-054, USP Florence ADX, P.O. Box 8500, Florence, CO 81266-8500.


_____/s/_____

Amy Busa