UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

VINCENT JOHN BASCIANO,

                         Petitioner,

      -against-

UNITED STATES OF AMERICA,

                         Respondent.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CV-280 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Petitioner Vincent Basciano ("Petitioner" or "Basciano") brings a pro se Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 (Pet. (Dkt. 1)),[1] as well as a variety of motions. By this Memorandum & Order (the "Recusal and Discovery Order") the court addresses Petitioner's pending recusal and discovery-related motions. For the following reasons, Petitioner's motions are GRANTED in part and DENIED in part.

## I.     BACKGROUND

      Petitioner is currently serving a sentence of life imprisonment following convictions in two separate trials on charges stemming from Petitioner's involvement in the Bonanno crime family of La Cosa Nostra ("Bonanno family"). (See Am. J. (Trial Dkt. 1077).) On May 9, 2006,

---

[1] Citations which reference "Dkt." are documents from the instant case, Basciano v. United States, No. 12-CV-280 (NGG) (E.D.N.Y.). Citations referencing "Sealed Dkt." refer to sealed entries on the same docket. Citations referring to "Trial Dkt." are documents filed during the underlying criminal proceedings, United States v. Basciano, No. 03-CR-929 (NGG) (E.D.N.Y.), which the court sometimes refers to as the "03-CR-929 case." "T-I" refers to pages in the 2006 trial transcript and "T-II" refers to pages in the 2007 trial transcript, both corresponding to the 03-CR-929 docket. Citations referring to "Capital Trial Dkt." are documents filed during a later capital proceeding, United States v. Basciano, No. 05-CR-060 (NGG) (E.D.N.Y.), which the court will occasionally refer to as the "capital case" or the "05-CR-060 case." All page references refer to the page numbering assigned by the court's electronic docketing system (ECF).

a jury found Basciano guilty of the racketeering conspiracy charge in Superseding Indictment S-5, including the predicate acts of illegal gambling and attempted murder and conspiracy to murder David Nunez.  (See Superseding Indictment 5 ("S-5") (Trial Dkt. 445); Verdict Sheet (Trial Dkt. 749).)  The jury found certain other racketeering acts not proved and failed to reach a verdict on the remaining acts, including the murder of Frank Santoro.  See United States v. Basciano, Nos. 03-CR-929 (NGG), 05-CR-060 (NGG), 2006 WL 3486774, at *1 (E.D.N.Y. Dec. 1, 2006).  The following year, Basciano was indicted on Superseding Indictment S-8 and retried on the charges with respect to which the first jury could not reach a verdict, as well as on additional charges.  (See Superseding Indictment 8 ("S-8") (Trial Dkt. 840).)  On July 31, 2007, after his second trial, a jury found Basciano guilty of conspiracy to distribute marijuana, three counts of illegal gambling, and racketeering, including the predicate acts of illegal gambling, murder and conspiracy to murder Frank Santoro, solicitation to murder Dominick Martino, and solicitation to murder Salvatore Vitale.  (See Verdict Sheet (Trial Dkt. 981).)  On July 16, 2010, the Second Circuit affirmed Petitioner's conviction by summary order, United States v. Basciano, 384 F. App'x 28 (2d Cir. 2010), and the United States Supreme Court denied Basciano's petition for a writ of certiorari, Basciano v. United States, 131 S. Ct. 1025 (Jan. 18, 2011).[2]  Pursuant to a separate indictment, 05-CR-060, Petitioner was convicted of several additional charges after a jury trial in 2011.  (Verdict Sheet (Capital Trial Dkt. 1232).)

On January 17, 2012, Petitioner filed the instant Motion to Vacate the 2006 and 2007 convictions.  (See Pet.)  Petitioner also filed several recusal and discovery-related motions, which the court addresses in this Memorandum and Order.  These include: (1) three Motions to Disqualify Judge; (2) two Motions to Stay All Proceedings; (3) a Motion to Unseal Sentencing

---

[2] Petitioner also filed three motions for a new trial—in 2006, 2008, and 2010, respectively—which the court denied. On February 16, 2012, the Second Circuit affirmed this court's refusal to grant Petitioner a new trial.  See United States v. Basciano, 465 F. App'x 9 (2d Cir. 2012).

Minutes of Generoso Barbieri; (4) a Motion to Unseal Sentencing Minutes of Dominick Cicale; (5) a Motion for Evidentiary Hearing; (6) a Motion to Appoint Counsel; (7) a Motion to Compel Discovery of Brady Materials and Stay Proceedings ("Motion to Compel"); and (8) a Motion to Apply Federal Rule of Civil Procedure 15 ("Motion to Amend").  (See Mot. to Disqualify (Dkt. 2); First Suppl. Mot. to Disqualify (Dkt. 14); Second Suppl. Mot. to Disqualify (Dkt. 28); Mot. to Alter Scheduling Order and Stay All Section 2255 Proceedings ("First Mot. to Stay") (Dkt. 7); Mot. to Stay/Postpone All Proceedings Until After the Sentencing of Giuseppe Gambina ("Second Mot. to Stay") (Dkt. 13); Mot. to Unseal Barbieri Mins. (Dkt. 18); Mot. to Unseal Cicale Mins. (Dkt. 3); Mot. for Ev. Hr'g (Dkt. 19); Mot. to Appoint Counsel (Dkt. 4); Mot. to Compel (Dkt. 27); Mot. to Amend (Dkt. 26).)

On July 18, 2013, the Government filed its opposition brief to Basciano's Petition and various motions.  (See Gov't Opp'n (Dkt. 20); Gov't Ltr. in Resp. to Mot. to Unseal (Dkt. 25); Gov't Resp. in Opp'n to Pet'r's Mot. to Amend (Dkt. 33); Gov't Resp. in Opp'n to Pet'r's Mot. to Compel ("Resp. to Mot. to Compel") (Dkt. 34).)

On November 27, 2013, Petitioner filed reply briefs in support of his Motions to Disqualify Judge and his Motion to Amend.  (See Pet'r's Reply to Gov't's Resp. Regarding Mot. to Recuse Judge Nicholas G. Garaufis (Dkt. 36); Pet'r's Reply to Gov't's Resp. Regarding Amendment of Pet. (Dkt. 37).)  Also on November 27, 2013, before the court could rule on his pending Motion to Amend, Petitioner filed an Amended Petition, which adds new claims that were not part of his original Petition.  (See Am. Pet. (Dkt. 38).)  On March 19, 2013, the court denied Petitioner's first Motion to Stay.  (Mar. 19, 2013, Order (Dkt. 9).)  The court now addresses the remaining motions.

## II.    MOTIONS TO DISQUALIFY

In his three Motions to Disqualify, Petitioner reprises his assertion, which he has made unsuccessfully on at least five prior occasions, that the court must recuse itself on the basis of actual bias, pursuant to 28 U.S.C. §§ 144 and 455(b)(1), and the appearance of bias, pursuant to 28 U.S.C. § 455(a).  (See Mot. to Disqualify; First Suppl. Mot. to Disqualify; Second Suppl. Mot. to Disqualify.)  Petitioner alleges that the court's bias is evidenced by its: (1) admitting the "hit list" in his capital proceedings (Mot. to Disqualify at 8-9; First Suppl. Mot. to Disqualify at 9-13); (2) imposing favorable sentences on cooperating witnesses (Mot. to Disqualify at 6-8; First Suppl. Mot. to Disqualify at 13); (3) interfering with Petitioner's attorney-client relationships (Mot. to Disqualify at 6-8; First Suppl. Mot. to Disqualify at 13); (4) denying a stay of the instant proceedings (First Suppl. Mot. to Disqualify at 6-9); (5) delaying the disclosure of an ex parte letter to the court (id. at 59-87); and (6) delaying action on Petitioner's prior motion for extension of time (Second Suppl. Mot. to Disqualify at 2).

### A.    Legal Standard

A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), and also where he "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," id. § 455(b)(1).  A judge's impartiality might reasonably be questioned if "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal, or alternatively, whether a reasonable person, knowing all the facts, would question the judge's impartiality."  See United States v. Yousef, 327 F.3d 56, 169 (2d Cir. 2003) (internal quotation marks omitted).  A district judge has discretion "in the first instance to determine whether to disqualify himself."  In re Drexel

4

Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988).  The recusal decision requires that the court "carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." Id.

A party seeking recusal on the grounds of actual bias pursuant to 28 U.S.C. §§ 144 and 455(b)(1) must establish that the judge has personal knowledge of disputed evidentiary facts concerning the proceeding arising outside of the judicial function. See United States v. Carlton, 534 F.3d 97, 101 & n.4 (2d Cir. 2008).  However, this requirement "is commonly limited to those circumstances in which the alleged partiality 'stem[s] from an extrajudicial source'" and "'opinions held by judges as a result of what they learned in earlier proceedings' in a particular case are not ordinarily a basis for recusal." Id. at 100 (quoting Liteky v. United States, 510 U.S. 540, 544 (1994)).  Moreover, "a judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" Id. (citation omitted).  Rather, the judge's opinions or comments must show "such a high degree of favoritism or antagonism to make fair judgment impossible." Id. (internal quotation marks and citation omitted).  Claims that are "remote, contingent, indirect or speculative" do not, as a matter of law, permit recusal. United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992).

    **B.**    **Discussion**

        1.    Admitting the "hit list" in Petitioner's capital proceedings

Petitioner's first basis for recusal concerns the so-called "hit list," which has been the subject of considerable litigation in this case and in the capital case.  In April or May of 2006, just before or shortly after the conclusion of Petitioner's first trial, Basciano wrote a list

containing the names of the court, the lead prosecutor, and three cooperating witnesses involved in his trial and provided this list to a fellow inmate. See United States v. Basciano, Nos. 03-CR-929 (NGG), 05-CR-060 (NGG), 2006 WL 3483924, at *1 (E.D.N.Y. Nov. 30, 2006). According to the Government, Basciano indicated to the inmate that he sought to have the listed individuals killed, the inmate took no action, and Basciano did not pursue the matter any further. Id. The alleged threat was disclosed to the court in July of 2006 and to defense counsel on August 28, 2006. Id. Petitioner responded that the list was created for use in a Santeria ritual that required it to be placed in his right shoe and stomped five times a day during the course of trial. Id.

On October 11, 2006, Basciano first moved pursuant to 28 U.S.C. § 455(a) to recuse the court from his criminal trials, including his upcoming retrial in the present case and the separate capital trial, due to "an alleged death threat made by Basciano against this court." Id. Based upon the Government's representation that Basciano was intercepted telling his wife that he wanted a "different judge" to preside over his retrial, the court concluded that the alleged "hit list" was a "thinly disguised effort to manipulate the judicial process" and "'engineer' this court's recusal." Id. at *2. On November 30, 2006, the court denied the motion. See id. The Second Circuit thereafter denied Basciano's petition for a writ of mandamus requiring the court to recuse itself on the basis of the "hit list." In re Basciano, 542 F.3d 950, 957-58 (2d Cir. 2008).

On March 24, 2008, following the 2007 retrial, the court denied Petitioner's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis of this court's refusal to recuse itself subsequent to discovery of an alleged "hit list." United States v. Basciano, No. 03-CR-929 (NGG), 2008 WL 794945, at *9-12 (E.D.N.Y. Mar. 24, 2008). The Second Circuit affirmed the court on direct appeal. See Basciano, 384 F. App'x at 33.

6

In his instant motions, Petitioner argues that the court must recuse itself from the collateral proceedings because, having denied his previous recusal requests on the basis of the "hit list," the court later admitted the list into evidence during the penalty phase of his capital trial.[3] (Mot. to Disqualify at 8-9; First Suppl. Mot. to Disqualify at 9-13.) Petitioner argues that this court has purposely misrepresented the "hit list" in different proceedings, downplaying it as a harmless device intended to manipulate the judicial process in this case, see Basciano, 2006 WL 3483924, at *2, while admitting it as evidence of a credible threat in his capital case, see Basciano, 763 F. Supp. 2d at 312. According to Petitioner, the later admission of the "hit list" in the capital proceedings demonstrates that "this Court believed all along that the threat upon its life by Basciano was real and credible." (First Suppl. Mot. to Disqualify at 12.) According to Petitioner, that real fear can be expected to prejudice his interests in the pending collateral proceedings.[4] (Id.)

Petitioner's recusal motions are procedurally barred insofar as they are premised on the "hit list." On multiple occasions, the Second Circuit and this court have carefully detailed the reasons why Petitioner's motions for recusal based on the existence of the "hit list" are without merit. See Basciano, 384 F. App'x at 33 (finding no abuse of discretion in the court's refusal to grant a new trial on the basis of the court's failure to recuse itself); In re Basciano, 542 F.3d at 957-58 (denying Basciano's petition for a writ of mandamus requiring the court to recuse itself); Basciano, 2008 WL 794945, at *12 (denying Petitioner's Rule 33 motion for a new trial on the basis of this court's refusal to recuse itself); Basciano, 2006 WL 3483924, at *1-3 (denying the

---

[3] The court admitted the "hit list" to allow the jury to consider it as a non-statutory aggravating factor in determining Petitioner's death penalty eligibility under the Federal Death Penalty Act. See United States v. Basciano, 763 F. Supp. 2d 303, 354-57 (E.D.N.Y. 2011).

[4] For example, Petitioner argues that because the "hit list" included not only the name of the court but also the name of cooperating witness Dominick Cicale, as "[c]o-victims of the same alleged victimizer," the court is partial to Cicale and "incapable of neutrality toward their alleged perpetrator." (First Suppl. Mot. to Disqualify at 42 n.10.)

7

motion to recuse). The court concludes that Petitioner's latest claim is but an artful improvisation on his prior motions. Petitioner is therefore procedurally barred from relitigating this issue in these collateral proceedings. See Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (holding that the mandate rule "bars re-litigation of issues already decided on direct appeal").

In any event, even if Petitioner is not barred, his claim is without merit. While Petitioner correctly notes that the "hit list" has been at times characterized differently in different proceedings, the court has already addressed the same argument during litigation concerning Petitioner's conditions of confinement (which preceded the capital trial). During that litigation, Petitioner argued that the court's prior decision not to recuse itself on the basis of the "hit list" was in conflict with Magistrate Judge Robert M. Levy's conclusion that sufficient indicia of reliability suggested that it was a hit list. Basciano v. Lindsay, 530 F. Supp. 2d 435, 448 (E.D.N.Y. 2008), aff'd sub nom. Basciano v. Martinez, 316 F. App'x 50 (2d Cir. 2009). The court responded:

> The court's November 30, 2006 opinion found that "it appears that *one of Basciano's objectives* in writing the May 2006 list and filing this motion is to 'engineer' this court's recusal." Earlier in the opinion, the court wrote that "if the court concludes that recusal is one of the objectives underlying the threat, irrespective of whether or not the threat is taken seriously," then recusal is not mandated. Nowhere in the opinion did the court find that the list was not a hit list, and indeed, the decision to deny the recusal motion was based solely on the court's finding that recusal was one of Basciano's objectives. I make no finding here, as I made no finding before, on whether or not the list is a hit list in addition to functioning as a recusal tool. I note simply that the court's recusal decision and Judge Levy's conclusion about the list are not mutually exclusive. I also caution that the court's decision to decline to make a definitive finding on the list should not be construed as a pronouncement by implication in either direction.

8

Id. (internal citations omitted).  The same reasoning applies to Petitioner's present argument regarding the admission of the "hit list" during the capital proceedings.  The court's decision to admit the list during the penalty phase of the capital trial was not a definitive finding about its nature, but only a pretrial ruling that allowed the issue to go to the jury.  Thus, there is no conflict between this ruling and the court's earlier finding that "one of Basciano's objectives" in writing the list was to engineer recusal.  Accordingly, the different characterizations of the list do not evidence actual bias and would not lead an objective observer, fully informed of the facts, to infer bias.

### 2.   Imposing favorable sentences on cooperating witnesses

Petitioner next claims that the court's favorable sentencing of cooperating witnesses, who allegedly perjured themselves at trial, provides further evidence of the court's bias against him that stems from the "hit list." (Mot. to Disqualify at 6-8; First Suppl. Mot. to Disqualify at 13, 25.) Basciano primarily takes issue with the sentence imposed on Dominick Cicale, a Bonanno family captain and a close associate of Basciano's, who testified extensively against him at all three trials, as well as the sentences imposed on Nicholas "P.J." Pisciotti and Generoso Barbieri. (First Suppl. Mot. to Disqualify at 13-41.)

Petitioner observes that Cicale's testimony was inconsistent with that of Giuseppe "Joey" Gambina regarding the Randolph "Randy" Pizzolo murder conspiracy, with that of Carlos Medina regarding a certain false murder plot, and with that of Nicholas Pisciotti regarding the Michael Mancuso murder conspiracy.  (Pet. at 35-36; First Suppl. Mot. to Disqualify at 19-25, 41-58.) Petitioner notes that because these inconsistent accounts cannot be reconciled, Cicale must have committed "irrefutable perjury." (First Suppl. Mot. to Disqualify at 14.) Petitioner reasons that the court must have overlooked its obligation to decide if Cicale, Pisciotti, and

Barbieri testified truthfully when it later sentenced them principally to time served.[5]   (Id. at 19-25.)  Moreover, Petitioner infers that in sentencing Cicale the court must have affirmatively decided that Cicale did *not* perjure himself, a "central" issue in Basciano's Petition.  Basciano reasons that the court now has a vested interest in "saving face" by sweeping Basciano's perjury-related claims under the rug and denying Basciano's Petition.[6]  (Mot. to Disqualify at 6-7.)

However, in contrast to Petitioner's theory, the grant of downward departures to Cicale, Pisciotti, and Barbieri pursuant to § 5K1.1 of the U.S. Sentencing Guidelines, resulting in sentences principally of time served, constitutes an acknowledgment of their significant cooperation and the inherent dangers in testifying against numerous members of the Bonanno crime family of La Cosa Nostra.  See, e.g., Cicale Sent. Tr. at 19-27.  This policy is firmly enshrined in federal law.  Section 3553(e) of Title 18 of the United States Code empowers district courts, "[u]pon motion of the Government," to impose a sentence below the statutory minimum to reflect a defendant's "substantial assistance in the investigation or prosecution of another person who has committed an offense."  18 U.S.C. § 3553(e).  Similarly, § 5K1.1 of the U.S. Sentencing Guidelines permits district courts to depart from the minimum sentence required under the Guidelines if the Government files a "substantial assistance" motion, as the Government did for Cicale, Pisciotti, and Barbieri.

As Cicale's sentencing demonstrates, the court directly addressed Cicale's crimes of conviction, his criminal history, the extensive assistance Cicale provided to the Government, and

---

[5] On January 30, 2012, this court sentenced Cicale principally to 120 months' imprisonment.  See Sentencing Tr. ("Cicale Sent. Tr."), United States v. Cicale, No. 05-CR-060 (NGG) (E.D.N.Y. Jan. 30, 2012), Dkt. 1356.  Pisciotti, a Bonanno family acting captain, testified against Petitioner at the 2007 trial and was later sentenced to time served.  See J., United States v. Pisciotti, No. 07-CR-330 (NGG) (E.D.N.Y. Jan. 7, 2013), Sealed Dkt. 11.  Barbieri, a Bonanno family captain, testified at the 2006 trial and the capital trial and was also sentenced to time served.  See J., United States v. Barbieri, No. 03-CR-1382 (NGG) (E.D.N.Y. Apr. 17, 2013), Dkt. 1109.

[6] Petitioner similarly assails Barbieri's character for truthfulness—particularly with respect to his testimony at the capital trial—and suggests that the favorable sentence received by such a dangerous criminal is further evidence of the court's clouded judgment resulting from its bias against Petitioner.  (Id. at 25-41.)

the risks to Cicale and his family from his cooperation.  Cicale Sent. Tr. at 19-20.  The court

acknowledged that Cicale is "a true career criminal" and expressed skepticism that Cicale would

be able to live a law-abiding life, but emphasized that he had been "an important and effective

government witness" who provided information about dozens of Mafia associates that led to the

convictions of at least nine defendants.  Id. at 23-27.  In contrast to Petitioner's theory, in

sentencing Cicale, Pisciotti, and Barbieri pursuant to their cooperation agreements, the court did

not make an express finding that they did not perjure themselves at Basciano's trials.  Thus, the

court has no incentive to "save face" by blindly rejecting Basciano's substantive allegations that

they committed perjury.[7]

    As a result, the sentences received by these cooperating witnesses do not support

Petitioner's claim of actual bias or appearance of bias.  Petitioner has not demonstrated that the

court has received any improper extrajudicial knowledge from these witnesses that would

support a claim of actual bias.  Nor would these sentences lead a reasonable person,

---

[7] Basciano also argues that the court's silence, during Cicale's sentencing proceedings, concerning a false murder plot concocted by Cicale raises an appearance of bias.  (Id. at 41-58.)  Basciano refers to August 13, 2007, when a Metropolitan Correctional Center ("MCC") prison guard informed Basciano's attorneys that, just prior to jury selection in Basciano's 2007 trial, Cicale solicited Carlos Medina—a cooperating witness in an unrelated case who was also held at the MCC—to claim falsely that Basciano had asked Medina to kill Cicale on Basciano's behalf.  The Government's alleged suppression of Cicale's false murder plot in violation of Brady at its progeny provided the basis for Petitioner's second motion for a new trial.  See Basciano, 2008 WL 794945, at *1.  At the time, the court assumed for the purposes of Basciano's motion that the false murder plot allegations were true, see, e.g., id. at *1 n.2, but nevertheless denied the motion.  Petitioner observes that since Cicale's false murder plot came to light the Government has continued to rely on both Medina and Cicale by calling them as cooperating witnesses in various trials.  (First Suppl. Mot. to Disqualify at 48.)  In addition, the defense called Medina as a defense witness at the capital trial in order to impeach Cicale.  (Capital Trial Dkt. 1213.)  Petitioner notes that the testimony of Cicale and Medina about the false murder plot has continued to conflict during these proceedings despite the truth-telling provisions of their respective cooperation agreements.  (First Suppl. Mot. to Disqualify at 48-52.)  Petitioner argues that in sentencing Cicale the court has been "complicit in the scam" (id. at 54), and "disregarded the weight of the evidence and taken Cicale's side" (id. at 45), because the court has a "vested interest in Basciano's . . . imprisonment for life" (id. at 55).  Petitioner alleges that the court will disregard other Brady claims in his Petition so as to avoid contradicting its prior favorable sentence of Cicale.  But, consistent with its ruling on Petitioner's second motion for a new trial, the court may assume for the purpose of Basciano's Petition that his new Brady allegations (like his prior false murder plot Brady allegations) are true.  In doing so, the court need not contradict its decision to grant the Government's § 5K1.1 motion at Cicale's sentencing to decide Basciano's Petition.  Thus, the court is not required to put itself in the position of needing to "save face" or to engage in machinations in order to rule impartially on Petitioner's new claims.

knowledgeable about the criminal justice system's reliance on cooperating witnesses and these cooperators' roles, to reasonably question the judge's impartiality in adjudicating Basciano's Petition. Basciano's claim is meritless, and insofar as it is but an extension of his allegations of bias on the basis of the "hit list," the claim is procedurally barred by numerous prior decisions of this court and the Second Circuit. See supra Part II.B.1.

### 3.   Interfering with Petitioner's attorney-client relationships

Petitioner further contends that the court's bias is evidenced by the court's interference with his attorney-client relationships. Petitioner argues that on three prior occasions, the court "threaten[ed] [Petitioner's] attorneys not to help or advise [him] on any matter not strictly encompassed within the parameters of their particular appointments." (Mot. to Disqualify at 9.)

The first instance that Petitioner cites is the court's June 26, 2009, Order at oral argument in the capital proceedings relieving Jane Simkin Smith (one of Basciano's appellate attorneys on the 03-CR-929 case) of her limited pre-trial obligations on the capital case and directing the Government to advise the Bureau of Prisons that Ms. Smith is "no longer assigned to the case." (See Capital Trial Dkts. 723, 727.) On July 9, 2009, the court denied Petitioner's request for reconsideration and directed Petitioner's capital trial counsel to file appearances in the Second Circuit in connection with the then-pending double jeopardy appeal in the capital case. (Capital Trial Dkt. 725.)

The second instance that Petitioner cites is the court's ex parte conference with defense counsel on February 17, 2011 in his capital case. (See Pet., Ex. 1 (Feb. 17, 2011, Ex Parte Conf. Tr.) (Dkt. 2-1).) At the conference, the court made inquiries to Petitioner's capital trial counsel reflecting a concern that Petitioner's appellate counsel, Michael Bachrach (appointed along with

12

Jane Simkin Smith by the Second Circuit for the purpose of the appeal in the 03-CR-929 case),

may have engaged in substantive work on the 05-CR-060 capital case. (See id.)

The third instance is a conference in the capital case on April 15, 2011, at which the court

observed that Ms. Smith and Mr. Bachrach (at the time both still assigned as appellate attorneys

on the 03-CR-929 case) had attended "virtually the entire [capital] trial" and inquired whether

they were being paid for their assistance in the capital case and, if so, by whom. (See Pet., Ex. 2

(Apr. 15, 2011, Conf. Tr.) (Dkt. 2-2).) Petitioner's capital trial counsel assured the court that the

appellate attorneys were attending voluntarily and were not being paid by Petitioner. (Id.)

During the colloquy with counsel, the court also noted that one of the appellate attorneys had

been disruptive.

Nothing in these proceedings, however, suggests that the court improperly interfered with

Petitioner's attorney-client relationships. Rather, it is evident that the court was continuously

concerned that no improper conduct occurred on the part of court-appointed counsel. The

Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, provides funding for the representation of

individuals with limited financial resources in federal criminal proceedings. Under the CJA, the

court appoints counsel and also bears an independent responsibility to ensure proper

representation by counsel. See id. The use of counsel appointed for one purpose to work on

another purpose would be improper. See United States v. Oddo, 474 F.2d 978, 980 (2d Cir.

1973) (independent contracting out by CJA attorneys improperly "removes control over the

assignment of appointed counsel from the judicial branch and places it in the hands of private

counsel").

As the court stated at oral argument on June 26, 2009, the court was concerned that

Petitioner had four court-appointed attorneys representing him at the time on the capital case,

whereas the statute, 18 U.S.C. § 3005, entitled him to only two attorneys. See June 26, 2006, Status Conf. Tr. at 155-69, United States v. Basciano, No. 05-CR-060 (E.D.N.Y June 26, 2006). Since the purpose for which Ms. Smith was appointed by the court had been fulfilled, the court simply deemed it an appropriate time to relieve her as counsel. (See Capital Trial Dkt. 330.) Later in 2011, as the capital trial started, the court again became concerned that Ms. Smith and Mr. Bachrach (who by that time were appointed by the Second Circuit for the purpose of the appeal in the 03-CR-929 case) may have been providing assistance in the capital case. Broadly speaking, the court sought to ensure that all attorneys were performing the type of assignments for which the district court and the Second Circuit had appointed them and that appropriate courts were being billed for these services. The court's bookkeeping concerns were warranted by Basciano's history of mixing of attorneys and other defense team members in the 03-CR-929 and 05-CR-060 cases.[8] The court's inquiries referenced above are consistent with the practice of monitoring the representation of CJA counsel and do not support Petitioner's claim of actual bias or appearance of bias.

### 4.   Denying a stay of the instant proceedings

Petitioner next asserts that the court's denial of his First Motion to Stay provides further evidence of the court's bias against him. (First Suppl. Mot. to Disqualify at 6-9.) Petitioner sought a stay of the instant proceedings shortly after filing his first Motion to Disqualify in order to immediately appeal any denial of this motion or to seek mandamus from the Second Circuit. (See First Mot. to Stay.) The court denied his First Motion to Stay, stating that it "will first address Petitioner's motion for recusal and, if granted, not comment on the merits of Petitioner's

---

[8] Prior to and during the 2006 trial, Basciano had privately retained his defense team in the 03-CR-929 case, although he had court-appointed attorneys and a court-appointed paralegal and investigator in the 05-CR-060 case. Concerns arose when several members of the defense team working on the 03-CR-929 trial appeared to have been paid through CJA funds provided in connection with the 05-CR-060 case. (See, e.g., T-I at 9329-37.)

§ 2255 claim or his request for pro bono counsel." (Mar. 21, 2013, Order (Dkt. 9).)  On the other

hand, if the court denied Petitioner's Motion to Disqualify, the court would address the

remaining items on the docket.  (Id.)  Calling the court's denial of his First Motion to Stay

"suspect and irregular," Petitioner again infers bias as the "only one explanation for why the

Court will not allow [the stay]."[9]  (First Suppl. Mot. to Disqualify at 4, 7.)

    As explained in greater detail below in the discussion of his Second Motion to Stay, see

infra Part III, which remains pending, "[a] stay is not a matter of right," but is instead "an

exercise of judicial discretion."  Nken v. Holder, 556 U.S. 418, 433 (2009) (internal quotation

marks omitted).  A key factor in deciding whether to grant a stay is whether the movant has

made a strong showing that he is likely to succeed on the merits.  Id. at 434.  In other words,

Petitioner's entitlement to a stay depended on the likelihood of success of his recusal motion.

But the central claims underlying that motion, such as this court's alleged bias against him

resulting from the "hit list," are mere variations of those arguments that the Second Circuit has

twice rejected in the past.  See Basciano, 384 F. App'x at 33 (finding no abuse of discretion in

the court's refusal to grant a new trial on the basis of the court's failure to recuse itself); In re

Basciano, 542 F.3d at 957-58 (denying Basciano's petition for a writ of mandamus requiring the

court to recuse itself).  Accordingly, there was little reason to stay the instant collateral

proceedings in order to allow Petitioner to appeal or to seek mandamus on a claim that the

Second Circuit has already rejected.  On these facts, the court's discretionary decision to deny

Petitioner's First Motion to Stay does not lend support to his claim of actual bias or appearance

of bias.

---

[9] Petitioner's argument is circular since apparently anything other than an immediate grant of his motions, including his recusal motions, constitutes further evidence of bias.

5. <u>Delaying the disclosure of an ex parte letter to the court</u>

Next, Petitioner argues that recusal is necessary because in 2010 the court delayed the

disclosure of an ex parte letter mailed to the court by FBI informant Joseph Barone. (First Suppl.

Mot. to Disqualify at 59-87.) Barone was a confidential informant reporting to a special agent

working at the White Plains Residential Agency of the FBI, investigating both the Genovese and

Bonanno organized crime families. (See Mot. to Compel at 2-3; Resp. to Mot. to Compel at 2-

3.) Between February 2001 and January 2003, Barone provided the FBI with information about

several incidents at issue in Petitioner's trial, as discussed in greater detail below in connection

with Petitioner's Motion to Compel. See infra Part V.B.2.

Arrested in early 2009, Barone sought to capitalize on his long record of service to the

FBI in an attempt to receive favorable treatment from the courts. See Superseding Indictment

(S-1), <u>United States v. Barone</u>, No. 09-CR-91 (NRB) (S.D.N.Y Oct. 30, 2009). At a detention

hearing before District Judge Naomi Buchwald in the Southern District of New York, Barone

claimed credit for saving the lives of the undersigned and Assistant U.S. Attorney Greg Andres

by foiling an alleged murder plot by Petitioner. See Detention Hr'g Tr. at 14-15, <u>United States v.</u>

<u>Barone</u>, No. 09-CR-91 (NRB) (S.D.N.Y. Aug. 20, 2009). On January 31, 2010, Barone sent a

letter to this court (the "Barone Letter") in which he made similar representations about his

record of service. (See Capital Trial Dkt. 925.) On June 28, 2010, Barone's counsel, José

Muñiz, sent another letter to the court repeating many of the assertions in the earlier Barone

Letter. (See Capital Trial Dkt. 922-2.)

Having learned of Barone's criminal case, including his service as an FBI informant

within the Bonanno family, on August 10 and September 18, 2010, Petitioner requested that the

Government immediately disclose any discovery materials relating to Barone in his capital

proceedings.  (Capital Trial Dkts. 922, 937.)  Petitioner requested, inter alia, information

provided by Barone about Petitioner, Cicale, and any aspect of Petitioner's case, as well as

Barone's FBI informant file.  (Capital Trial Dkts. 922, 937.)  Petitioner also requested that the

court refrain from deciding the then-pending third Rule 33 motion in the 03-CR-929 case until he

received the requested documents from the Government in the capital proceedings.  (Capital

Trial Dkts. 922, 937.)

On August 19, 2010, the court denied Petitioner's third Rule 33 motion in the 03-CR-929

case without waiting for the production of the requested discovery.  See United States v.

Basciano, No. 03-CR-929 (NGG), 2010 WL 3325409 (E.D.N.Y. Aug. 19, 2010).  In addition,

the court denied without prejudice Petitioner's motion for the production of evidence in the

capital proceedings, United States v. Basciano, No. 05-CR-060 (NGG), 2010 WL 4668789, at

*2-3 (E.D.N.Y. Nov. 9, 2010), and denied Petitioner's motion to recuse on the basis of the

court's delayed disclosure of the Barone Letter, United States v. Basciano, No. 05-CR-060

(NGG), 2010 WL 4484366, at *3 (E.D.N.Y. Nov. 1, 2010).  By January 10, 2011, having

reviewed Barone's file for discovery materials that Petitioner was entitled to receive, the

Government provided Petitioner's counsel, pursuant to a protective order, with a packet titled the

"Barone Materials," which contained Barone's informant reports pertaining to the murders of

Frank Santoro and Randy Pizzolo.  (Resp. to Mot. to Compel at 2 n.1; Capital Trial Dkt. 1027.)

Viewing the Barone Materials as significantly helpful to his case, Petitioner argues that

the court's delay in disclosing the Barone Letter prior to the expiration of the three-year filing

deadline for his third Rule 33 motion in the 03-CR-929 case "severely prejudiced [his] ability to

seek a fair trial through Rule 33 and on appeal."  (First Suppl. Mot. to Disqualify at 80.)

Petitioner reasons that it was obvious from the face of the Barone Letter how valuable Barone's

testimony would be for Petitioner's defense case, and the court thus violated Judicial Canon 3(A)(4) by not advising the parties promptly of its receipt of the Barone Letter. (Id. at 61, 64 n.17.) Basciano concludes that that the delay provides further evidence of the court's intent to harm him all along. (Id. at 80, 87.)

However, Petitioner's motion is meritless for substantially the same reasons that the court denied his analogous motion to recuse in the capital case. See Basciano, 2010 WL 4484366, at *3 (denying Petitioner's motion to recuse). As the court stated in its prior Order, the "section of the Barone letter at issue . . . consists solely of the bald and unsubstantiated assertions that Barone somehow saved this judge's life, without providing any additional facts." Id. Barone revealed only that he had been an informant working within the Bonanno family and that he was good friends with Cicale. (See Capital Trial Dkt. 925.) Barone did not indicate that he possessed information exculpating Petitioner or impeaching Cicale, giving the court no reason to immediately disclose the letter. On these facts, the court's failure to immediately provide the parties with a copy of the Barone Letter would not lead a reasonable person to reasonably question the judge's impartiality. See Basciano, 2010 WL 4484366, at *3. Nor would the ambiguous letter from a third party constitute personal knowledge of disputed evidentiary facts sufficient to make out a claim of actual bias. Id. Although Petitioner is correct that subsequent to the prior Order, the Barone Letter did lead to the disclosure of the Barone Materials (First Suppl. Mot. to Disqualify at 86), the benefit derived by Petitioner, as seen in hindsight, does not lead to the conclusion that the court is biased against Petitioner.

### 6. Delaying action on Petitioner's prior motion for extension of time

Finally, Petitioner contends that the court "intentionally delayed action" on his earlier request for an extension of time to file a reply in this case (see First Mot. for Extension of Time

(Dkt. 21)), "in an effort to force the Petitioner to forgo the requested extension altogether." (Second Suppl. Mot. to Disqualify at 2.) On June 26, 2013, the court granted the Government's request to extend the deadline to file its opposition brief until July 19, 2013. (June 26, 2013, Order (Dkt. 17).) According to the Order to Show Cause, Basciano's deadline to file his reply was "within twenty-one (21) days of the date of receipt by him" of the Government's opposition brief. (See Order to Show Cause (Dkt. 6).) The Government filed its opposition brief on July 18, 2013. (See Gov't Opp'n.) Petitioner's application for an extension of time to file his reply was dated July 8, 2013, and it was entered on the court's electronic docket on July 19, 2013. (First Mot. for Extension of Time.) The court granted Petitioner's application on July 22, 2013, extending his time to file his reply until September 19, 2013. (July 22, 2013, Order (Dkt. 24).)

Petitioner correctly notes that there was a delay between the date on which the Order granting Petitioner's request was signed on July 22, 2013, and the date on which it was entered on the court's electronic docket on August 9, 2013, which would have been near the time of his original reply deadline. (Second Suppl. Mot. to Disqualify at 2.) Although he concedes that "there may be some justifiable explanation" for the delay and that he does not have a legal entitlement to an extension of time, Petitioner nevertheless alleges that a reasonable observer would conclude that the court deliberately manipulated the briefing process "with the intent of forcing the Petitioner to file his Reply prematurely." (Id. at 3.) Petitioner thereafter reprises his theory that the court is biased against him on account of the "hit list." (Id. at 4.)

While this delay was unfortunate, Petitioner does not allege that he was in any way prejudiced by the delayed docketing of the Order. In fact, his Second Supplemental Motion to Disqualify, which raises the instant claim, was quickly followed by a second request for an extension of time to file his reply, which the court granted. (Second Mot. for Extension of Time

(Dkt. 29).) Noting Petitioner's past difficulty meeting his briefing deadlines, and in an abundance of caution, the court granted Petitioner a six week extension beyond his requested deadline, until November 28, 2013. (Dkt. 32.) Petitioner eventually filed reply briefs in support of his Motion to Disqualify Judge and his Motion to Amend, which he signed on November 27, 2013. Petitioner also filed an Amended Petition, which he signed on the same date. (See Am. Pet.) Accordingly, any delay in the granting of his earlier request for an extension of time to file a reply was harmless, and cannot support Petitioner's claim of actual bias or appearance of bias. Moreover, insofar as this claim is an extension of Petitioner's allegations of bias on the basis of the "hit list," it is procedurally barred by numerous prior decisions of this court and the Second Circuit. See supra Part II.B.1.

*   *   *   *   *

In sum, Petitioner fails to cite any instances that would cause "an objective, disinterested observer fully informed of the underlying facts, [to] entertain significant doubt that justice would be done absent recusal," or alternatively, that would cause "a reasonable person, knowing all the facts, [to] question the judge's impartiality." See Yousef, 327 F.3d at 169 (internal quotation marks omitted). Nor has Petitioner demonstrated that the court has personal knowledge of disputed evidentiary facts concerning the proceedings that would support a claim of actual bias. Carlton, 534 F.3d at 101 & n.4. Rather, it is evident that the majority of his claims are premised on highly speculative theories and do not require recusal. Lovaglia, 954 F.2d at 815. As a result, after examining the particular circumstances of Petitioner's case, his Motion to Disqualify, First Supplemental Motion to Disqualify, and Second Supplemental Motion to Disqualify, filed pursuant to 28 U.S.C. §§ 144, 455(a), and 455(b)(1), are DENIED. Accordingly, the court proceeds to address Petitioner's remaining discovery-related motions.

20

### III.  MOTION TO STAY

Petitioner again requests a stay of all proceedings—this time pending the sentencing of Joey Gambina.  (Second Mot. to Stay.)  Gambina, a member of the Bonanno family, met with the Government at proffer sessions on August 31, 2005; September 9, 2005; September 16, 2005; and September 23, 2005.  (Gov't Opp'n, Ex. 1 (Excerpts from 3500-GG ("Gambina Proffer Reports")) (Dkt. 20-1) at 47-50; Pet., Ex. 10 (Excerpts from 3500-GG ("Gambina Proffer Agreements")) (Dkt. 1-2) at 16-23.)  At these sessions, Gambina provided information about the conspiracy to murder Randy Pizzolo, which was later admitted as an uncharged act at Petitioner's 2006 and 2007 trials.[10]  Basciano alleges that Gambina's proffer statements contradict Cicale's trial testimony concerning the Pizzolo murder, providing the basis for several claims in Basciano's Petition.  (See, e.g., Pet. at 35-36.)

Petitioner seeks to stay these proceedings until Gambina is sentenced in order to make another recusal motion on the basis of this court's bias.  (See Second Mot. to Stay).  Petitioner intends to compare the sentence that will be imposed on Gambina (who allegedly provided evidence favorable to Petitioner that was withheld from the defense) with the sentence already imposed on Cicale (who allegedly perjured himself when he provided evidence favorable to the Government).  (Id.)  In this way, Petitioner expects to demonstrate a discrepancy in the sentences that this court imposes on different cooperators, providing further evidence of the court's bias. (Id.)

#### A.    Legal Standard

A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket."  Clinton v. Jones, 520 U.S. 681, 706-07 (1997).  "A stay is not a matter

---

[10] Gambina did not testify at Petitioner's 2006 or 2007 trials, but did testify regarding the Pizzolo murder at Petitioner's 2011 capital trial.

of right, even if irreparable injury might otherwise result." Nken, 556 U.S. at 433 (quoting

Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926) (internal quotation marks

omitted)). "It is instead 'an exercise of judicial discretion.'" Verizon N.Y. Inc. v. Vill. of

Westhampton Beach, No. 11-CV-252 (AKT), 2013 WL 5762926, at *2 (E.D.N.Y. Oct. 18, 2013)

(quoting Nken, 556 U.S. at 433).  As the party requesting the stay, Petitioner "bears the burden

of showing that the circumstances justify an exercise of discretion." Id. (quoting Nken, 556 U.S.

at 433-34).

> In determining whether to grant a stay, courts consider four
> factors: (1) whether the stay applicant has made a strong showing
> that he is likely to succeed on the merits; (2) whether the applicant
> will be irreparably injured absent a stay; (3) whether issuance of
> the stay will substantially injure the other parties interested in the
> proceeding; and (4) where the public interest lies.

Id. (quoting Nken, 556 U.S. at 434) (internal quotation marks omitted).  The first two factors are

the most critical to the analysis.  See id.

**B.    Discussion**

In seeking the stay, Petitioner's ultimate objective is to disqualify the court from his

collateral proceedings on the basis of bias.  Accordingly, his entitlement to a stay depends on the

likelihood of success of his anticipated recusal motion.  In fact, there is no likelihood of success

on the merits of that motion, even if the court stayed these proceedings until after Gambina was

sentenced.  First, Petitioner has failed on multiple occasions, both before this court and the

Second Circuit, to demonstrate that the court was biased against him.  See Basciano, 384 F.

App'x at 33 (finding no abuse of discretion in the court's refusal to grant a new trial on the basis

of the court's failure to recuse itself); In re Basciano, 542 F.3d at 957-58 (denying Basciano's

petition for a writ of mandamus requiring the court to recuse itself).  Furthermore, the court

rejects Petitioner's theory that a sentence ultimately imposed upon Gambina will provide

22

evidence of this court's bias for the same reason that the court denied Petitioner's recusal motion on the basis of the sentences imposed upon Cicale, Pisciotti, and Barbieri. See supra Part II.B.2.

Moreover, Petitioner will not be irreparably injured absent a stay. Rather, absent a stay, the court will proceed to carefully address the merits of his Petition. Although that might not be Petitioner's desired outcome, he will have an opportunity to seek appellate review at the conclusion of proceedings in this court, including review of the court's failure to recuse itself. With regard to the remaining factors, although a stay of these proceedings will not substantially injure the Government, the strong public interest "in the finality of criminal convictions" weighs against Petitioner's motion. Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995) (citing United States v. Frady, 456 U.S. 152, 165 (1982)). The court concludes that Petitioner did not make a showing sufficient to merit a stay of the instant collateral proceedings pending the sentencing of Joey Gambina. Petitioner's Second Motion to Stay is therefore DENIED.

## IV.   MOTION TO UNSEAL SENTENCING MINUTES

### A.   Generoso Barbieri

Petitioner next moves to unseal the sentencing transcript of Generoso Barbieri, the Bonanno cooperator who was sentenced to time served after having testified in the 2006 trial and the capital trial. (Mot. to Unseal Barbieri Mins.) The Government and Barbieri's attorney consent to the unsealing of Barbieri's sentencing transcript, with certain identifying information redacted. (See Gov't Ltr. in Resp. to Mot. to Unseal.) Because the parties agree on this issue, the court GRANTS Petitioner's Motion to Unseal Sentencing Minutes of Generoso Barbieri and ORDERS those documents unsealed and placed on the public docket in their redacted form.

### B.    Dominick Cicale

Petitioner also requests that the court unseal the transcript of Cicale's sentencing.  (Mot. to Unseal Cicale Mins.)  However, Cicale was sentenced in open court and the transcript is not under seal.  See Cicale Sent. Tr.  Moreover, in his moving papers Petitioner quotes from the transcript of Cicale's sentencing.  (See First Suppl. Mot. to Disqualify at 42-44.)  Thus, it is apparent that Petitioner is already in possession of Cicale's sentencing transcript.  Accordingly, Petitioner's Motion to Unseal Sentencing Minutes of Dominick Cicale is DENIED as moot.

## V.    MOTION TO COMPEL

Petitioner next brings a Motion to Compel, pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Court ("Section 2255 Rules"), seeking disclosure of materials that allegedly should have been produced to him under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  (See Mot. to Compel.)  Should he succeed in gaining access to such materials, Petitioner seeks to stay these proceedings to make use of them in drafting and filing an amended § 2255 petition.  (Id.)

Specifically, Petitioner seeks to compel disclosure of: (1) all materials in the Government's possession that have within them "any exculpatory content whatsoever" (id. at 5-6); (2) all FBI reports or notes regarding the murder of Frank Santoro (id.); (3) the Barone Materials (id.); (4) all Brady materials in Joseph Barone's FBI informant file (id. at 6-7); (5) a complete, unredacted copy of Barone's FBI informant file (id. at 7); and (6) any Brady materials pertaining to trial witness Detective Thomas Crowe (id. at 8-9).  Petitioner also seeks an order requiring the Government to admit or deny whether it previously disclosed Barone's January 28, 2003, FBI 302 report to the court.  (Id. at 7-8.)

24

## A.      Legal Standard

Under Rule 6 of the Section 2255 Rules, "a judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Fed. R. Governing Section 2255 Proceedings 6. However, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). "At the very least, it is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions . . . of the . . . [Federal Rules of Civil Procedure]." Harris v. Nelson, 394 U.S. 286, 295 (1969) (citing Hickman v. Taylor, 329 U.S. 495, 500 (1947)).

To establish "good cause," a petitioner must provide "specific allegations before the court show[ing] reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy, 520 U.S. at 908-09 (ellipsis in original) (quoting Harris, 394 U.S. at 300); Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (granting discovery to develop the record). Conversely, "[t]he Court may, in its discretion, deny discovery where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition." McCrary v. Lee, No. 12-CV-2867 (SJF), 2013 WL 784581, at *3 (E.D.N.Y. Feb. 26, 2013) (quoting Hirschfeld v. Comm'r of Div. of Parole, 215 F.R.D. 464, 465 (S.D.N.Y. 2003). Furthermore, "[t]he district court enjoys 'broad discretion' to determine whether discovery is warranted in a habeas proceeding, and its decision will be overturned only if it abused its discretion." Ferranti v. United States, 480 F. App'x 634, 638-39 (2d Cir. 2012) (citing Nieblas v. Smith, 204 F.3d 29, 31 (2d Cir. 1999)).

In other words, to establish "good cause" to compel discovery under Rule 6, Basciano must establish that there is reason to believe that, if he receives the materials he seeks, he would be able to demonstrate that he is entitled to relief under Brady. In turn, to be entitled to relief on a Brady claim, Petitioner must show that: (1) the evidence at issue is favorable to him, either because it is exculpatory, or because it is impeaching; (2) the evidence was suppressed by the Government; and (3) prejudice ensued. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999). To establish prejudice, also known as the "materiality" inquiry, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 280 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)); see also Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). A "reasonable probability" of a different result is shown when suppression of the evidence "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678). In making the determination as to whether suppressed evidence is material, the court looks to the "cumulative effect of suppression in light of the evidence as a whole." United States v. Jackson, 345 F.3d 59, 74 (2d Cir. 2003) (citing Kyles, 514 U.S.at 436-37) (internal quotation marks omitted).

**B.    Discussion**

The court considers each of Petitioner's requests in turn.

1.    General requests

By way of his first two requests, Petitioner seeks an extremely broad category of disclosures. He first requests all materials in the Government's possession that have within them "any exculpatory content whatsoever, even if said materials also include inculpatory components," or that "may be construed as either inculpatory or exculpatory in nature." (Mot. to Compel. at 5-6.) Petitioner also seeks all reports or notes "generated or processed by the Federal Bureau of Investigation regarding the murder of Frank Santoro, with special emphasis on any

26

material that mentions or alludes to the possibility that Santoro's death was in any way related to or associated with the Genovese [La Cosa Nostra] Family." (Id.)  Petitioner reasons that he is entitled to such broad discovery based on his belief that the Government has not properly complied with its Brady obligations during his underlying criminal proceedings.  (Id. at 5.) Petitioner cites Joseph Barone's January 28, 2003, FBI 302 report in support of his view that the Government proceeded on the mistaken belief that material containing both exculpatory and inculpatory evidence is not Brady material.  (Id. at 4-5; see also Gov't Opp'n, Ex. 1 (FD-302 Report Dated Jan. 28, 2003) (Dkt. 20-1) at 3.)  The Government vehemently disagrees with Petitioner's characterization of its compliance with Brady.  (See Resp. to Mot. to Compel at 12.)

Petitioner's first two requests are entirely overbroad and lack proper support for his underlying Brady claims.  As demonstrated by the court's Brady analysis of the Barone Materials (including the January 28, 2003, FBI 302 report), see infra Part V.B.2, the court has no reason to believe that the Government generally proceeded under a mistaken understanding of its Brady obligations in this case.  Lacking any additional support, Petitioner's first two requests constitute an open-ended fishing expedition through which Petitioner hopes to discover something of value.  See Charles v. Artuz, 21 F. Supp. 2d 168, 169-70 (E.D.N.Y. 1998) (a petitioner does not establish "good cause" where the "stated purpose is merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error" and such a motion amounts to a "fishing expedition he hopes will yield a document providing ground for a writ") (internal quotation marks omitted); see also Pizzuti v. United States, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011) ("Generalized statements regarding the possibility of the existence of discoverable material will not be sufficient to establish the requisite 'good cause.'") (internal citations omitted).  Because

Petitioner has not established "good cause" for such broad discovery, the court DENIES his first two requests.

### 2.    Requests pertaining to Joseph Barone

Petitioner's next set of requests pertain to Joseph Barone's informant reports to the FBI, which were provided to Petitioner's counsel during his capital trial in a packet titled the "Barone Materials." (Mot. to Compel at 6.)  See also supra Part II.B.5 (discussing the events leading to the production of the Barone Materials).  Principally, Petitioner seeks to compel the disclosure of the Barone Materials again to make use of them in the instant collateral proceedings.[11]  (Mot. to Compel at 6.)  Petitioner also seeks to compel the production of the complete, unredacted copy of Barone's FBI informant file so that the court may conduct an in camera review of the file to confirm the Government's compliance with its Brady obligations.  (Id. at 7.)

As he claims in his other discovery-related motions, Petitioner alleges that Barone's reports prove his innocence of the charged Santoro murder and uncharged Pizzolo murder, as well as other charged and uncharged crimes that were the subject of his 2006 and 2007 trials. (Id. at 3-5; see also First Suppl. Mot. to Disqualify; Mot. for Ev. Hr'g; Mot. to Amend.) Petitioner claims that Barone's reports contradict the Government's "entire theory" and Cicale's testimony at trial.  (Mot. to Compel at 5.)  Accordingly, Petitioner seeks the production of these materials to enable him to make additional Brady claims in his Amended Petition.

The Government responds that there is no good cause to justify the request because it has now disclosed to Petitioner "the substance of Barone's reporting regarding the Santoro and Pizzolo murders" in its response to his Motion to Compel.  (Resp. to Mot. to Compel at 13.)  The

---

[11] Petitioner also seeks any Brady material that may exist in Joseph Barone's FBI informant file referencing the murders of Santoro or Pizzolo, or any of the crimes, racketeering predicates, or acts admitted at his 2006 and 2007 trials pursuant to Federal Rule of Evidence 404(b).  (Mot. to Compel at 6-7.)  However, this request appears to be duplicative since the Barone Materials constitute Brady material in Joseph Barone's FBI informant file that reference criminal conduct at issue in Petitioner's trials.  See supra Part II.B.5.

Government also provides the court with a copy of the Barone Materials ex parte and under seal "so that it may confirm that the government has provided Basciano with the information contained within those materials that relates to the murders of Frank Santoro and Randolph Pizzolo."[12] (See id. at 2.) The Government posits, in the alternative, that even if these materials had been disclosed earlier, there is no reasonable probability of a different result at trial. (Id. at 12.) The Government, however, opposes the disclosure of Barone's unredacted FBI informant file to the court, contending that it contains sensitive information, the disclosure of which could endanger Barone. (Id. at 13 n.8.)

Having reviewed the Government's ex parte and sealed submission, the court concludes that Petitioner fails to establish good cause to compel the discovery of the Barone Materials under Rule 6 because there is no reason to believe that Petitioner can demonstrate entitlement to relief under Brady should he gain access these materials.

a.   *Reports related to the uncharged Pizzolo murder*

A number of Barone's reports pertain to the Pizzolo murder, an uncharged crime that was admitted at both trials pursuant to Federal Rule of Evidence 404(b). On December 8, 2004, Barone reported that Pizzolo had been murdered in the preceding week. (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 50.) Opining on the motive of the perpetrators, Barone reported that Pizzolo was "known to have 'scammed' a large number of people, and the speculation [was] that he was murdered as a result of such dealings." (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 50.) On March 11, 2005, Barone reported that he overheard a conversation between Louis DeCicco and Cicale's cousin, Matthew Amoroso, referring to Pizzolo as "no good" and as

---

[12] The Barone Materials consist of 90 pages of documents, including many FBI 302 reports documenting the intelligence provided by Joseph Barone to his FBI handling agent. They also include a number of handwritten notes, apparently by the FBI agent, which appear to be rough notes of observations that were later incorporated into the FBI 302 reports. The notes pertain to the Santoro murder, the Pizzolo murder, the disappearance of Nicholas Cirillo, and other observations about Basciano, Cicale, Aiello, Gambina, and other associates of Bonanno family, which the Government summarizes in its opposition brief. (See generally Sealed Dkt. 35.)

"robbing everybody." (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 63.)  On January 20, 2006, Barone reported that Bonanno family acting boss Michael Mancuso gave the order to kill Pizzolo and that Cicale carried it out with soldier Anthony Aiello.  (Resp. to Mot. to Compel at 5.)[13]

Petitioner argues that compelling production of the above materials would enable him "to show that [the murder of Randy Pizzolo] . . . had nothing to do with Petitioner." (Mot. to Compel at 3.)  According to Petitioner, these reports support his theory that Cicale had a motive to murder Pizzolo independent of Petitioner and would thus impeach Cicale's testimony.  However, this claim is procedurally barred by prior decisions of the Second Circuit, which previously rejected Petitioner's Brady claims based on other materials that allegedly impeached Cicale's credibility and demonstrated that Cicale had his own personal motive to kill Pizzolo independent of Petitioner.  First, on direct appeal, the Second Circuit expressly rejected Petitioner's theory that the suppression of additional evidence that Cicale had an independent motive to kill Pizzolo constituted a Brady violation.  See Basciano, 384 F. App'x at 31.[14]  The

---

[13] Barone's reports also speculated about the earlier disappearance of Nicholas Cirillo, the son of Genovese family boss Dominick "Quiet Dom" Cirillo, including the possibility that Pizzolo and Cicale had been responsible.  On May 24, 2004, Barone reported that, two to three weeks earlier, the elder Cirillo sent his son Nicholas "to relay a message to Cicale." (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 32.)  Cicale was reportedly offended by Cirillo sending someone of no stature to relay a message, slapped Nicholas, and told him to tell his father to send someone more important. (Sealed Dkt. 35 at 32.)  Nicholas was reported missing one week later. (Id.)  Barone reported that he did not know if Nicholas's disappearance had to do with Cicale or with Nicholas's rumored drug use. (Id.)  On June 9, 2004, Barone reported that Cicale had an aunt who lived near the location where Nicholas's car was found. (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 34.)  On July 12, 2004, Barone reported that he learned that a Bonanno captain was told by a Genovese member or associate close to Dom Cirillo that Cicale needed to be careful because it appeared that people were looking to do him harm. (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 39.)  Barone believed that this had something to do with the disappearance of the younger Cirillo. (Resp. to Mot. to Compel at 5; Sealed Dkt. 35 at 39.)  On October 6, 2005, Barone told his handling agent that he believed Dom Cirillo and Cicale acted together in Nicholas's disappearance. (Resp. to Mot. to Compel at 5.)  On November 1, 2005, Barone also reported that Cicale's father said that the "Albanians" killed Nicholas, while others believed that Pizzolo killed him. (Id.; Sealed Dkt. 35 at 75.)

[14] It appears that during the underlying criminal proceedings the defense theory was that Cicale murdered Pizzolo in connection with Nicholas Cirillo's disappearance, independent of Basciano.  During Basciano's 2006 trial, for example, the defense sought to cross-examine Cicale regarding Nicholas Cirillo's disappearance, which the court denied. (T-I at 5644-45, 5661.)  On his direct appeal, Petitioner raised a Brady claim premised on the same theory.

Second Circuit observed that Cicale was thoroughly impeached at trial with his long record of criminal activity, deceit, and violence. Id. As the court found,

> [e]ven assuming that Basciano could have used this information—
> *or other allegedly suppressed information regarding Pizzolo*—to
> impeach Cicale's testimony that Basciano ordered the Pizzolo
> murder, because that murder was not a charged predicate in either
> the 2006 or 2007 trial, the impeachment is properly deemed
> cumulative of the many other attacks that were mounted against
> Cicale's credibility and, thus, immaterial.

Id. (emphasis added).

Then, on Petitioner's second trip to the Second Circuit, the court again noted that yet other allegedly suppressed information "suggests only that it would have been helpful to the defense to argue that others had a motive to murder Pizzolo and that Cicale's testimony was not credible." See Basciano, 465 F. App'x at 14. "The record reveals, however, that both arguments *were* put before the district court and the jury." Id. (emphasis in original). The Second Circuit observed that the jury heard testimony that Pizzolo had shot but not killed Darren D'Amico at "Café on the Green" in 2002 (T-I at 6133-34); that Cicale had told others, without referencing Petitioner, that he, Cicale, "took care of" the Pizzolo murder (T-II at 3363-64); and that acting boss Michael Mancuso had ordered the hit on Pizzolo (T-II at 1227-28). See also Basciano, 465 F. App'x at 14-15. Most sweepingly, the Second Circuit concluded that

---

Petitioner argued that the Government improperly suppressed notes of a proffer session with Frank Vasaturo, who stated that prior to Pizzolo's murder, Pizzolo indicated to Vasaturo that Nicholas Cirillo would never be found and that he and Cicale were responsible for the disappearance. Petitioner reasoned that Pizzolo's statements to Vasaturo implicating Cicale in the Cirillo disappearance could have provided a motive for Cicale to kill Pizzolo, exculpating Petitioner of the Pizzolo murder. See Brief of Defendant-Appellant at 170-73, United States v. Basciano, No. 08-CR-1699 (2d Cir. Dec. 9, 2009). The Second Circuit implicitly rejected this Brady claim when it affirmed Basciano's conviction by summary order. See Basciano, 384 F. App'x at 28. In 2010, Petitioner filed a third motion for new trial, which again raised a Brady claim based the suppression of information related to Nicholas Cirillo including: (1) Vasaturo's proffer reports, and (2) the grand jury testimony of Pizzolo's girlfriend that Pizzolo had confided to her that he had killed a man on October 23, 2004, a man Basciano inferred to be Nicholas Cirillo. The court denied Petitioner's motion, finding that the claim based on Vasaturo's proffer reports was barred by a prior Second Circuit opinion and that the claim based on the grand jury testimony of Pizzolo's girlfriend was not material. Basciano, 2010 WL 3325409, *11. The Second Circuit affirmed the denial of Basciano's new trial motion by summary order. Basciano, 465 F. App'x at 11.

31

> even if we were to decide that the non-disclosed evidence [showing that others had their own independent motives to kill Pizzolo independent of Petitioner] should have been disclosed to the district court and that the district court thereafter would have excluded evidence of the Pizzolo murder, Basciano would still not be entitled to a new trial. There was a multitude of other evidence presented concerning the actual charges against Basciano that did not hinge on the testimony of Cicale, through whom evidence of the Pizzolo murder was admitted.

Id. at 15. This holding forecloses Petitioner's challenge to the admission of the Pizzolo murder.

Furthermore, even if they are not procedurally barred, Petitioner's arguments are meritless. Simply put, there is no reasonable probability that the disclosure of Barone's report concerning the Pizzolo murder would have changed the result of the proceeding. See Strickler, 527 U.S. at 280. In the 03-CR-929 case, Petitioner was not charged with the Pizzolo murder. Rather, evidence of the Pizzolo murder conspiracy and Basciano's involvement was admitted for the purpose of telling the complete story behind the charged crimes—namely, the murder of Frank Santoro—to show the evolution of relationships of trust among the participants, to shed light on the background of the enterprise, to corroborate the testimony of cooperating witnesses, and to rebut Basciano's claim that he was incapable or unwilling to violate the rules of organized crime. See United States v. Basciano, No. 03-CR-929, 2006 WL 385325, at *1, 10 (E.D.N.Y. Feb. 17, 2006); United States v. Basciano, No. 03-CR-929, 2007 WL 1791221, at *1 (E.D.N.Y. June 19, 2007). (See also Mar. 6, 2006, Order (Trial Dkt. 517); Mar. 8, 2006, Order (Trial Dkt. 522); T-I at 10085-86; T-II at 4752-53.)[15]

Evidence of the Pizzolo murder was admitted through the testimony of Cicale, who testified that Petitioner was "furious" with Pizzolo because Pizzolo, a construction manager and a Bonanno family associate, was mismanaging work on Basciano's house, "running his mouth a

---

[15] The court also charged the jury that it could consider evidence of uncharged crimes in deciding whether the Government had proved the "pattern" element of racketeering conspiracy and racketeering, respectively. (Final 2006 Jury Charge (Trial Dkt. 593) at 63; Final 2007 Jury Charge (Trial Dkt. 891) at 20, 56-57.)

lot," and "acting wild." Pizzolo had also refused a Bonanno family invitation to move to Florida to manage property there. (T-II at 1219-24.) At the time, Basciano had been the acting boss of the Bonanno family for "a little bit less than a year," and he wanted to make a point that he "will not tolerate people acting out of line." (Id.) Cicale testified that Basciano had ordered the Pizzolo murder before he was arrested, that the murder was called off after Petitioner's arrest, but that new acting boss of the Bonanno family, Michael Mancuso, later ordered Cicale to proceed with the hit on Pizzolo. (T-II at 1225-27.)[16]

In light of this trial testimony, the value of Barone's undercover reports is not significant. The January 20, 2006, report that Mancuso gave the order to kill Pizzolo and that Aiello and Cicale had carried it out (Resp. to Mot. to Compel at 5) is fairly consistent with Cicale's trial testimony. The balance of Barone's reports, such as his opinions about Pizzolo's reputation, the possible motives that Cicale and many others may have had for killing Pizzolo, and reports about the disappearance of Nicholas Cirillo are speculative at best.

Furthermore, while on the stand, Cicale was so thoroughly impeached by evidence of his life-long record of criminal activity, deceit, and violence, as well as possible motives of other persons to murder Pizzolo, that any further impeachment would be cumulative. See Basciano, 384 F. App'x at 31; Basciano, 465 F. App'x at 14.

By contrast, the charged offenses, including the Santoro murder, were proven through a multitude of other evidence that did not hinge on Cicale's testimony, as this court and the Second Circuit have both observed on multiple occasions. See, e.g., Basciano, 465 F. App'x at 15. See also infra Part V.B.2.b (discussing the other evidence presented concerning the actual charges against Petitioner). In light of the other evidence at trial concerning the charged conduct, there

---

[16] The Government also introduced testimony from other cooperating witnesses that at times contradicted Cicale's testimony, including testimony by Pisciotti that Cicale took credit for the Pizzolo murder, with no attribution that Basciano had been involved. (T-II at 3363-64.)

is, therefore, no reasonable probability that the disclosure of Barone's speculative reports concerning the uncharged Pizzolo murder could have changed the result of the proceeding.  See also Strickler, 527 U.S. at 280; United States v. Gambino, 59 F.3d 353, 366 (2d Cir. 1995). Accordingly, because Petitioner is unable to demonstrate that he is entitled to relief under Brady even with access to Barone's reports regarding the Pizzolo murder, he fails to establish "good cause" to compel their production under Rule 6.[17]

b.    *Reports related to the charged Santoro murder*

At the 2007 trial, the jury found that the Government proved the charged predicate racketeering acts of conspiracy to murder and the murder of Frank Santoro.  See Basciano, 2008 WL 794945, at *1.  With respect to the Santoro murder, the Barone Materials include an FBI 302 report dated January 28, 2003, which records Barone's report that Petitioner "ordered the murder of Frank Santoro."  (See Gov't Opp'n, Ex. 1 (FD-302 Report Dated Jan. 28, 2003) (Dkt. 20-1) at 3; Sealed Dkt. 35 at 12.)  The report states that Santoro was "killed by Cicale as a favor to [Petitioner]" after Petitioner found out that Santoro had made a remark about kidnapping Petitioner's son.  (Gov't Opp'n, Ex. 1 (Dkt. 20-1) at 3.)  The report also states that "[Petitioner] learned of Santoro's remark and asked Cicale to kill Santoro."  (Id.)  Barone reported that Cicale approached Santoro while he was walking his dog near the Throgs Neck Bridge/Throgs Neck Expressway, "and shot and killed him."  (Id.)  "After the murder, Cicale rose quickly in status and responsibility as a member of [Petitioner's] crew."  (Id.)[18]

---

[17] For the same reasons, the court also denies Petitioner's request for all Brady materials in Barone's FBI informant file. (Mot. to Compel. at 6-7.)

[18] Petitioner also asks the court to order the Government "to admit or deny" whether or not it disclosed this January 28, 2003, FBI 302 report to this court prior to August 13, 2010, the date on which the court placed the Barone Letter on the public docket. (Mot. to Amend at 5 n.4.) His intention appears to be to determine whether the court intentionally withheld the FBI 302 report from him in the past. (See Mot. to Compel at 5 n.4.) In its Response to the Motion to Compel, the Government correctly states that it did not disclose this FBI 302 report to the court prior to August 13, 2010. (Resp. to Mot. to Compel at 2.) Thus, Petition's request is DENIED as moot.

Next, on two occasions Barone reported having learned from others that Cicale admitted murdering Santoro. (Resp. to Mot. to Compel at 3; Sealed Dkt. 35 at 14.) On February 4, 2003, Barone reported that Genovese captain Patty Falcetti told Petitioner that he heard Cicale "had killed Frank Santoro and that Cicale needed to be more careful about who he has told about his murder of Santoro." (Resp. to Mot. to Compel at 3-4; Sealed Dkt. 35 at 14.) Barone speculated that Falcetti may have learned about the murder through his wife, who worked at Petitioner's beauty salon. (Resp. to Mot. to Compel at 3-4; Sealed Dkt. 35 at 14.) On December 20, 2004, Barone reported that Falcetti's wife had been overheard stating that Petitioner was in jail for a crime committed by Cicale. (Id.) Finally, the Barone Materials include a handwritten note by Barone's FBI handling agent, dated January 20, 2006, recording Barone's report that Cicale "did the shotgun murder in Throggs [sic] Neck." (Gov't Opp'n, Ex. 1 (Handwritten Notes Dated Jan. 20, 2006) (Dkt. 20-1) at 5; Sealed Dkt. 35 at 89.)[19]

Petitioner argues that compelling production of the above materials would enable him to impeach Cicale's testimony concerning the Santoro murder and ultimately demonstrate that "Petitioner was innocent of killing Frank Santoro." (Mot. to Compel at 4-5.) Petitioner's claim, however, is procedurally barred by the Second Circuit decisions previously discussed, which rejected Petitioner's Brady claims based on other materials that allegedly impeached Cicale and concluded that the jury's conviction on the Santoro murder charge would stand even if Cicale's testimony was entirely disregarded. See also supra Part V.B.2.a. In particular, the Second Circuit found that "Cicale's life-long and murderous criminal history, coupled with his record of deceit and violence while cooperating with federal authorities and inconsistent statements in his own testimony, provided such fertile grounds for impeachment as to occupy nearly 300 pages of

---

[19] The Government attached this handwritten note to its opposition brief in response to Basciano's Petition, along with the January 28, 2003, FBI 302 report, which Petitioner in turn cites in his pending Motion to Compel. (Gov't Opp'n, Ex. 1 (Handwritten Notes Dated Jan. 20, 2006) (Dkt. 20-1) at 5.)

transcript spanning two days." See Basciano, 384 F. App'x at 31. Subjects of impeachment included his conviction for manslaughter in the homicide of George Kehoe, his commission of and guilty plea to the murders of Santoro and Pizzolo, his involvement in drug dealing, assaults, shootings, armed robbery while on bail, arson, violations of prison rules and supervised release, his attempts to cash fraudulent checks, and accusations of domestic violence, defrauding his grandmother, and lies at his first proffer session. (See, e.g., T-II at 965, 968-69, 972-73, 974-76, 978-84, 991-92, 1007-09, 1010-11, 1298-1300, 1326, 1331-32, 1354, 1376-78, 1380, 1383-85, 1387-89, 1392-93, 1425-26, 1512-15.) The defense impeached Cicale further with his prior inconsistent statements on a variety of topics, including his recollection of the Santoro murder (see, e.g., T-II at 1439-44, 1458, 1472-74, 1478-80) and his motive to cooperate, including his indictment for a death-eligible Pizzolo murder and potential indictment for the death-eligible Santoro murder prior to his decision to cooperate (see, e.g., T-II at 1390-92, 1400). Thus even if Barone's reporting regarding the Santoro murder is helpful to petitioner, the Second Circuit's holdings foreclose Petitioner's claim, which is premised on further impeachment of Cicale. See Yick Man Mui, 614 F.3d at 53.

The Second Circuit also concluded that there was a "multitude of other evidence presented concerning the actual charges against [Petitioner] that did not hinge on the testimony of Cicale." Basciano, 465 F. App'x at 15. With respect to the charged Santoro murder, which Petitioner attacks here, "the jury considered Basciano's own recorded statements, the testimony of cooperating witnesses Salvatore Vitale, Nicholas Pisciotti, Richard Cantarella, and James Tartaglione, as well as the testimony of Kenneth Champlin and Carmine Naddeo, and physical evidence corroborating the details of the Santoro murder provided by the witnesses." Id.; see also Basciano, 2008 WL 794945, at *4-5 (holding that even if it was improperly suppressed,

36

information that Cicale had solicited a fellow inmate to frame Petitioner in a bogus plot to murder Cicale was not material and therefore did not warrant a new trial). Accordingly, Petitioner's Brady arguments are procedurally barred by two prior decisions of the Second Circuit.

Furthermore, even if these decisions do not bar consideration of the Barone Materials, Petitioner's argument is without merit. While Barone's reports may be favorable to Basciano because they tend to show that Cicale shot and killed Santoro (Sealed Dkt. 35 at 12), they ultimately neither impeach Cicale nor exculpate Basciano.[20] Barone's reports regarding the motive for the murder are largely consistent with inculpatory testimony at trial that Petitioner ordered the murder in response to Santoro's threat to kidnap Basciano's son. (Id.) Nor do Barone's reports refute Cicale's testimony that he, along with Basciano and others, planned the Santoro murder and that Petitioner was present at the scene of the crime and fired at Santoro.[21] (T-II at 964-65.)

Barone's reports certainly do not undermine the testimony of five cooperating witnesses (Salvatore Vitale, Richard Cantarella, James Tartaglione, Nicholas Pisciotti, and Dominick Cicale); the corroborating testimony from civilian eyewitnesses Kenneth Champlin and Carmine Naddeo; law enforcement witnesses Michael Breslin, Luis Fontanez, and Rita Fitzpatrick; medical examiner Dr. James Gill; Basciano's own recorded statements captured on consensual recordings made by James Tartaglione; Anthony Indelicato's prison phone calls after Petitioner's arrest; Anthony Donato's and Cicale's telephone records upon Basciano's arrest; and physical

---

[20] As before, Petitioner has "not dispute[d] the existence of the significant independent and corroborating evidence offered at trial in addition to Cicale's testimony, . . . nor does he dispute the multitude of impeachment evidence offered against Cicale." United States v. Basciano, No. 03-CR-929 (NGG) 2008 WL 905867, at *1 (E.D.N.Y. Mar. 31, 2008); see also United States v. Orena, 145 F.3d 551, 558 (2d Cir. 1998) ("[T]he existence of substantial independent evidence of guilt is unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question." (citing United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998))).

[21] The other participants in the murder were Anthony Donato, Anthony "Bruno" Indelicato, and John Tancredi.

evidence.  (T-II at 307-09, 706-08, 819-22, 846, 1628-29, 1709-12, 1974-75, 2259, 3429-32, 4056.)  Contrary to Petitioner's allegations, there is no reasonable probability that the disclosure of Barone's reports concerning the Santoro murder, in light of the overwhelming other evidence, would have resulted in a different outcome at trial.  See Strickler, 527 U.S. at 280; Gambino, 59 F.3d at 366 ("Finding a lack of materiality, we need not decide whether the [evidence] was 'suppressed,' in other words, whether the knowledge of the tape's existence should be imputed to the prosecution, based on its having been [previously] available to the F.B.I.").  Given Petitioner's unlikelihood of success on the merits of his Brady claim, there is no good cause to compel the production of Barone's reports concerning the Santoro murder under Rule 6.

### 3.    Requests pertaining to Detective Thomas Crowe

Petitioner next seeks to compel the production of "any and all information that . . . should have [been] disclosed" pursuant to Brady and its progeny regarding Government witness Detective Thomas Crowe.  (Mot. to Compel at 8.)  Detective Crowe was a retired police officer who testified at Petitioner's 2006 and 2007 trials about his extensive surveillance of Petitioner and his co-conspirators.  (See T-I at 3730-3804; T-II at 1651-85.)  This surveillance occurred between 1999 and 2003, when Detective Crowe observed Petitioner associating with Joseph Mondelli, Anthony Indelicato, Dominick Cicale, Anthony Donato, Larry Weinstein, and Salvatore Zattola.  (T-I at 3730-3804; T-II at 1651-85.)  Detective Crowe also testified that in June 2002 he moved into a Bronx apartment that was located across the street from the residence of Petitioner's mistress Deborah Kalb.  (T-II at 1660-61.)  Detective Crowe testified that at the time that he moved he was at first unaware that Kalb lived across the street but later came to observe and photograph people arriving and leaving Kalb's house, including Basciano.  (T-II at 1661-63.)  The Government admitted photographs that Detective Crowe had taken of Petitioner and his associates at Kalb's house in the period between June 2002 and May 2003.  Detective

38

Crowe testified, however, that he no longer had access to reports he made regarding his observations out of his home. (T-II at 1670-73, 1676.) He also conceded that prior to September 2001, he did not know who Dominick Cicale was and thus could not confirm whether he had seen him prior to that time. (T-II at 1680-81.) Detective Crowe's testimony was referenced in the Government's summation at both trials. (T-I at 9445, 10018-19; T-II at 4470, 4515-16.) By his present motion, Petitioner principally seeks to compel the production of: (1) Detective Crowe's disciplinary records, and (2) any information showing that Detective Crowe was aware of Deborah Kalb's residence when he moved across the street from her.

   a.   *Detective Crowe's disciplinary records*

   Petitioner first seeks to compel the production of Detective Crowe's disciplinary records. (Mot. to Compel at 8.) Petitioner notes that it has recently been revealed that the Government had suppressed certain Brady materials that he could have used to show that Detective Crowe had "suborned perjury, . . . falsified evidence, mishandled and corrupted information, and been convicted in disciplinary proceedings for such unethical and unprofessional misconduct." (Id.) It appears that Petitioner refers to Detective Crowe's disciplinary records, which were the subject of Brady analysis in unrelated habeas proceedings in the Southern District of New York. See Gonzalez v. United States, Nos. 12-CV-5226 (JSR) (JLC), 94-CR-134 (JSR), 2013 WL 4584794 (S.D.N.Y. Aug. 29, 2013).

   Petitioner's claim regarding Detective Crowe's disciplinary records is substantial, but ultimately unsuccessful. Even if the Government improperly suppressed these disciplinary records, they are not material to the outcome of his trials. Principally, the court finds persuasive the conclusions of Magistrate Judge James L. Cott in Gonzalez regarding the impeachment value of the disciplinary records. See generally id. Judge Cott observed that there were four disciplinary complaints against Detective Crowe in the records of the Civilian Complaint Review

39

Board ("CCRB"): (1) a 1987 complaint by Gloria Allen; (2) a 1989 complaint by Angel

Alejandro; (3) a 1990 complaint by Javier Zavala; and (4) a 1992 complaint by Reinaldo Ortiz.

Id. at *9-11.  Judge Cott determined in Gonzalez that although the Government suppressed the

CCRB records, which held impeachment value to the defendant, they were not material under

Brady and its progeny.  Id. at *11-13.

Of the four CCRB complaints against Detective Crowe, three—the Allen, Zavala, and

Ortiz complaints—did not involve conduct bearing on Detective Crowe's credibility and would

not have provided a basis for cross-examining him at trial under Federal Rule of Evidence 608.

Id. at *12-13.  The CCRB only found the Alejandro complaint to be "substantiated," which

"necessarily implied" that Detective Crowe provided false statements in the course of

disciplinary proceedings.  Id. at *9, 14.  Judge Cott concluded that while the conduct underlying

Alejandro's complaint was relevant to Detective Crowe's character for truthfulness, it would not

have altered the outcome of defendant's case in Gonzalez if it had been properly disclosed

because: (1) any cross-examination of Detective Crowe based upon the CCRB records would

have been extremely limited in scope; (2) the jurors had already been presented with evidence

undermining Detective Crowe's credibility; and (3) the remaining evidentiary record amply

supported the verdict, even setting aside Detective Crowe's testimony.  Id. at *14-16.  Judge Cott

also found that disciplinary records from the New York Police Department's Internal Affairs

Bureau did not contain any material impeachment or exculpatory evidence.  Id. at *18.

In Petitioner's case, Detective Crowe was not a primary witness at trial.  Cf. United

States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998) ("In general, evidence whose function is

impeachment may be considered to be material where the witness in question supplied the only

evidence linking the defendant to the crime.").  Rather, Detective Crowe testified as a

surveillance witness, and multiple photographs that he had taken of Petitioner and his co-conspirators were admitted through Detective Crowe's testimony. (See, e.g., T-II at 1653, 1656, 1658.) In a number of these photographs, Petitioner could be seen exchanging various satchels and bags during meetings with his co-conspirators. Detective Crowe's testimony and photographs thus tended to prove in general terms a relationship between Petitioner and his co-conspirators. On cross-examination, however, Detective Crowe conceded that he did not know what was contained in the satchels and bags that he observed during his surveillance. (T-II at 1677-78.) He also admitted that he did not know who Cicale was and thus could not confirm whether he had seen him prior to September 2001, including around the time of Santoro's murder in early 2001. (T-II at 1680-81.) While impeachment of Detective Crowe based upon the CCRB's credibility determination in connection with the Alejandro complaint might have been helpful to Petitioner, it would have been of extremely limited value, since it would not have undermined the impact of the photographic evidence. Furthermore, any impeachment would not have altered the outcome of trial given the overwhelming evidence presented concerning the actual charges against Petitioner. See supra Part V.B.2.b. Accordingly, there is little reason to believe that Petitioner can demonstrate entitlement to relief under Brady and its progeny should he gain access to Detective Crowe's disciplinary records.

b. *Information regarding Deborah Kalb's residence*

Petitioner also alleges that Detective Crowe perjured himself at trial when he testified that he did not know Deborah Kalb's address when he moved across the street from her in June 2002. (Mot. to Compel at 8-9.) Accordingly, Petitioner seeks to compel the production of "any and all materials . . . dated prior to July 2002, prepared by or known to Detective Thomas Crowe before he moved into the premises across the street from Deborah Kalb, which make note of or refer to the fact that Deborah Kalb lived at said residence." (Id. at 9.) Unlike his request for

41

disciplinary records, this request is purely speculative.  Petitioner cites nothing in support of his

allegations of perjury and points to no evidence that may call Detective Crowe's testimony in

question.  Indeed, with Detective Crowe having testified about moving across the street from

Kalb, there was nothing preventing Basciano from cross-examining Detective Crowe at trial

about this topic.  Absent any additional support, this claim is but an aspirational fishing

expedition that does not constitute "good cause" to compel discovery.  See Charles, 21 F. Supp.

2d at 169-70; Pizzuti, 809 F. Supp. 2d at 176.

*   *   *   *   *

In sum, Petitioner fails to establish "good cause" to compel the production of the

requested evidence because he is unable to demonstrate that he is entitled to relief under Brady

and its progeny should he gain access to such records.  Further discovery into these materials is

therefore DENIED.[22]

## VI.   MOTION FOR EVIDENTIARY HEARING

Basciano also seeks an evidentiary hearing on the Government's alleged suppression of

the Barone Materials.  (Mot. for Ev. Hr'g.)  Basciano seeks to develop the record to demonstrate

that prior to his 2006 and 2007 trials the Government suppressed Barone's reports that Cicale,

and not Basciano, was responsible for the Santoro murder.  (Id. at 11.)  According to Basciano,

this fact-finding would offer further support for his Brady claims.

### A.   Legal Standard

Section 2255 provides that "[u]nless the motion and the files and records of the case

conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt

hearing thereon, determine the issues and make findings of fact and conclusions of law with

---

[22] Incorporated within Petitioner's Motion to Compel is a request to stay the instant collateral proceedings pending resolution of his Motion to Compel.  (Mot. to Compel at 10.)  Since the court denies Petitioner's Motion to Compel in its entirety, the corresponding request to stay is also DENIED.

respect thereto." 28 U.S.C. § 2255(b); see also Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009). However, a petitioner is not automatically entitled to an evidentiary hearing; rather, the decision to hold an evidentiary hearing is left to the discretion of the court. See Puglisi, 586 F.3d at 216 (citing Dalli v. United States, 491 F.2d 758, 760 (2d Cir. 1974)). "The language of [Section 2255] does not strip the district courts of all discretion to exercise their common sense." Machibroda v. United States, 368 U.S. 487, 495 (1962); accord Puglisi, 586 F.3d at 218. Rather, where there are no controverted facts and where all of the relevant evidence is in the record, an evidentiary hearing is not required. See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001). Furthermore, a court "is not required to provide an evidentiary hearing to [pro se] litigants when their petitions do not raise issues sufficient to merit a hearing." Johnson v. Fogg, 653 F.2d 750, 753 (2d Cir. 1981); see also Chang, 250 F.3d at 86.

### B.    Discussion

Petitioner fails to make a showing sufficient to warrant an evidentiary hearing on the Barone Materials. Unsurprisingly, in his Motion for Evidentiary Hearing, Petitioner raises substantially the same assertions regarding Barone's reports about the Santoro murder as he does in his Motion to Compel. As the court discussed in detail above, however, even if Barone's reports regarding the Santoro murder were suppressed by the Government, they are not material under Brady and its progeny, meaning that the underlying Brady claim is without merit. See supra Part V.B.2.b. As a result, the court DENIES Petitioner's Motion for Evidentiary Hearing on these reports since any potential hearing about their suppression is unnecessary to resolve the Brady claim. See United States v. Stewart, 433 F.3d 273, 302 (2d Cir. 2006) (no need for hearing to probe extent of government awareness of witness's perjury where perjury "not sufficiently material to undermine confidence in the verdict"); United States v. White, 972 F.2d

43

16, 22 (2d Cir. 1992) (district court did not abuse its discretion by not conducting an evidentiary hearing where it was unnecessary to resolve issues that would be hearing's focus); see also Basciano, 2008 WL 794945, at *6 (denying motion for evidentiary hearing into Cicale false murder plot allegations).

## VII.  MOTION TO APPOINT COUNSEL

Having filed his Petition and his discovery-related motions pro se, Petitioner requests that the court appoint counsel for the remainder of these proceedings.  (Mot. to Appoint Counsel.)

### A.  Legal Standard

If an evidentiary hearing is warranted, "the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed." United States v. Sessa, Nos. 92-CR-351 (ARR), 97-CV-2079 (ARR), 2011 WL 256330, at *58 (E.D.N.Y. Jan. 25, 2011) (internal quotation marks omitted) (citing 28 U.S.C. § 2255(g); Fed. R. Governing Section 2255 Proceedings 8(c)).  Otherwise, "the Second Circuit and the Rules Governing Section 2255 Proceedings do not mandate the appointment of counsel in those habeas proceedings not requiring an evidentiary hearing." Id.  "[R]ather, the appointment of counsel in such a proceeding is a matter of discretion." In re Pizzuti, No. 10-CV-199 (RJH) (HBP), 2010 WL 4968244, at *1 (S.D.N.Y. Dec. 7, 2010) (citing Wright v. West, 505 U.S. 277, 293 (1992)). Counsel may be appointed to a petitioner seeking relief under 28 U.S.C. § 2255 if the court "determines that the interests of justice so require" and the petitioner is "financially eligible." 18 U.S.C. § 3006A(a)(2); see also 28 U.S.C. § 2255(g) ("in all proceedings brought under this section, and any subsequent proceedings on review, the court *may* appoint counsel" (emphasis added)).

44

In making the discretionary decision of whether to appoint counsel to a petitioner in Section 2255 proceedings, the court "should first determine whether the indigent's position seems likely to be of substance." Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986).

> If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present that case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Id. at 61-62. "This is not to say that all, or indeed any, of the factors must be controlling in a particular case" in determining whether appointment of counsel is in the interest of justice. Id. at 61.

**B.    Discussion**

Although Petitioner concedes that he is not legally entitled to appointed counsel in collateral proceedings, he cites several cases in support of his position that the court should nevertheless appoint one.[23] (Mot. to Appoint Counsel at 10.) Petitioner first cites Coleman v. Thompson, 501 U.S. 722, 752 (1991), for the proposition that the court should appoint counsel because certain facts are being litigated for the first time in these collateral proceedings, amounting—in effect—to his one appeal as of right. (Mot. to Appoint Counsel at 10-14.) See Coleman, 501 U.S. at 756-77 (noting that the right to counsel extends only to a first appeal as of right). Petitioner argues that his current habeas proceedings effectively constitute his first appeal as of right because he raises certain Brady claims for the first time ever based on materials that were previously unavailable to him. (Mot. to Appoint Counsel at 4-5.) Petitioner also cites Martinez v. Ryan, 132 S. Ct. 1309 (2012), for the proposition that the instant habeas proceedings

---

[23] Petitioner proposes that the court appoint Nicholas J. Pinto, his court-appointed appellate counsel in the 05-CR-060 case, to assist Petitioner in these collateral proceedings. (Mot. to Appoint Counsel at 8.)

constitute "initial review collateral proceedings" proceedings, which require the appointment of counsel. (Mot. to Appoint Counsel at 10, 14-16.)

However, these arguments do not persuade court that the Sixth Amendment requires the appointment of counsel for the duration of Petitioner's collateral proceedings. As the Martinez court noted, the Coleman court suggested, without holding, that state collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial (the so-called "initial-review collateral proceedings") may constitute a prisoner's "one and only appeal" as to an ineffective assistance claim, justifying an exception to rule that there is no right to counsel in collateral proceedings. Martinez, 132 S. Ct. at 1315 (quoting Coleman, 501 U.S. at 755). Martinez proceeded to recognize this narrow exception. Id. However, the Martinez holding regarding "initial review collateral proceedings" applies to claims brought pursuant to section 2254 that were procedurally defaulted according to state law. See id. This case law is inapplicable to the instant Petition, because this is a federal habeas proceeding, rather than a petition from a state collateral proceeding. See Rivera v. United States, No. 02-CV-1349 (RJD), 2012 WL 6553600, at *2 (E.D.N.Y. Dec. 14, 2012) ("Martinez simply cannot be read as having disturbed the long-standing rule that there is no right to counsel in section 2255 proceedings.") Plainly, then, these collateral proceedings do not require the provision of court-appointed counsel despite the novelty of any claims that Petitioner might bring. Rather, having denied Petitioner's Motion for Evidentiary Hearing, see supra Part VI, the court is left with a discretionary choice of whether to appoint counsel in these proceedings.

In making this discretionary decision, the court must first consider the "threshold requirement" regarding the likely merits of Petitioner's claims. See Hodge, 802 F.2d at 61. The court observes that the Petition alleges eleven grounds of error, which the court groups into the

following categories: (1) violations of <u>Brady</u> and its progeny (Pet. at 34-46); (2) ineffective assistance of trial and appellate counsel (<u>id.</u> at 5-24, 26-32, 78-82, 83-84); (3) improper admission of uncharged acts (<u>id.</u> at 69-71, 72-74, 75-77); and (4) prosecutorial misconduct and bias (<u>id.</u> at 49-53, 55-68, 85-94). The majority of these claims derive from Petitioner's objections to the admission of the uncharged Pizzolo murder and allegations that Cicale perjured himself repeatedly at trial. However, Petitioner's arguments concerning the admission of the Pizzolo murder and Cicale's credibility appear to be largely foreclosed by prior decisions of the Second Circuit. <u>See</u> <u>Basciano</u>, 384 F. App'x at 31; <u>Basciano</u>, 465 F. App'x at 14. Moreover, as this court has stated previously, Petitioner significantly overstates the centrality of Cicale's testimony. <u>See</u> <u>Basciano</u>, 2008 WL 794945, at *4 ("Defendant mischaracterizes the centrality of Cicale's testimony in establishing the elements of the charges for which Basciano was convicted and gives short shrift to the multitude of other evidence offered against him.") Accordingly, Basciano's Petition is unlikely to be of substance.

Furthermore, consideration of the additional factors, such as Petitioner's ability to investigate facts and complexity of legal issues, <u>see</u> <u>Hodge</u>, 802 F.2d at 61-62, confirms the court's conclusion that Petitioner does not merit the appointment of counsel in these proceedings. As the court has said in the past, Petitioner is a "sophisticated party." <u>Basciano</u>, 2006 WL 3483924, at *2. This is evidenced by Basciano's Petition, which alleges eleven grounds of error, and seven discovery-related motions that are the subject of this Memorandum and Order. Although the legal issues are complex, Petitioner's submissions demonstrate that he is fully capable of investigating the facts and offering sophisticated arguments throughout these proceedings. Petitioner makes advanced legal claims, effectively responds to the Government's arguments, and presents his case with great skill. His briefs include citations to legal authority,

47

excerpts from the trial record, and multiple exhibits.  The court concludes that appointing

counsel for the purpose of these § 2255 proceedings is an inappropriate use of limited judicial

resources.  Accordingly, Petitioner's Motion to Appoint Counsel is DENIED.

## VIII.   MOTION TO AMEND

Finally, Petitioner moves the court to "apply Federal Rule of Civil Procedure 15,"

allowing him to file an amended petition that incorporates new Brady claims and allegations of

prosecutorial misconduct.  (Mot. to Amend at 2.)

### A.      Background

Basciano's original Petition raised two Brady claims based on the Government's failure

to disclose: (1) Gambina's proffer statements regarding the Pizzolo murder, and (2) information

about whether Cicale had been advised by the Government that he was to be charged with the

Santoro murder before he decided to cooperate.  (See Pet. at 34-45.)  Basciano's Petition also

raised a corresponding claim of prosecutorial misconduct based on the Government's alleged

introduction of false testimony by Cicale regarding: (1) the uncharged Pizzolo murder, and (2)

whether Cicale knew he would be charged with the Santoro murder before he cooperated.  (See

id. at 49-53.)  The original Petition did not include any Brady or prosecutorial misconduct claims

based on the Barone Materials or the testimony of Detective Crowe.

On July 18, 2013, the Government filed its opposition brief in this case, which included

several references to Joseph Barone's informant reports.  (See Gov't Opp'n.)  While Petitioner

did not file an Amended Petition "as a matter of course" during the 21-day period following the

Government's submission, Fed. R. Civ. P. 15(a)(1)(B), he filed the instant Motion to Amend on

August 20, 2013.  (See Mot. to Amend.)  By this motion, Petitioner seeks permission to file an

Amended Petition to incorporate new Brady claims premised on Barone's reports.  (Id. at 2.)  In

support, Petitioner notes rather implausibly that it was not until his receipt of the Government's opposition brief that he learned of the existence of such informant reports.[24]   (Id.)

On November 27, 2013, before the court ruled on his pending Motion to Amend, Petitioner filed an Amended Petition, which has elements of both a reply memorandum and an amended filing.  The Amended Petition restates all of his previous claims, renumbers and elaborates several of them, and adds altogether new claims that were not part of his original Petition.  (See Am. Pet.)  Consistent with his earlier Motion to Amend, the Amended Petition contains new Brady claims based on: (1) Barone's reports, and (2) the disciplinary records of Detective Crowe.  (Id. at 22-27.)  Basciano also adds corresponding claims of prosecutorial misconduct based on the Government's alleged introduction of false testimony by: (1) Cicale concerning the Santoro murder and the plot to murder Michael Mancuso, and (2) Detective Crowe concerning his ignorance of the location of Deborah Kalb's residence when he moved.  (Id. at 166-69, 172-90.)  The Government opposes the Motion to Amend, arguing that the desired amendments are untimely and futile.  (Gov't Resp. in Opp'n to Pet'r's Mot. to Amend at 1.)

### B.    Legal Standard

Federal Rule of Civil Procedure 15 governs the amendment of pleadings, applicable here pursuant to Rule 12 of the Section 2255 Rules, which provides that "[t]he Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."  Rule 15 permits "a party [to] amend its pleading once" as a matter of right "21 days

---

[24] Petitioner claims that the Government revealed the January 28, 2003, FBI 302 report to him "for the first time ever" with the opposition brief submitted on July 18, 2013. (Mot. to Amend at 5; Mot. to Compel at 4.)  However, based on the in camera review of the Barone Materials, the court has reason to believe this document was also part of the packet of materials which was shared with Petitioner's capital trial counsel on January 10, 2011. (See Capital Trial Dkt. 1027.)  Insofar as Petitioner previously referenced the Barone Materials in his opening Petition "based purely upon his memory" (Mot. to Compel. at 4), Petitioner must have been aware of these materials previously.

after service of a responsive pleading." Fed. R. Civ. P. 15(a)(1)(B).  Otherwise, under Rule

15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the

court's leave." Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice

requires." Id.  However, "[l]eave to amend, though liberally granted, may properly be denied

for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

of allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514

F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  Thus, it is

within the district court's discretion to grant or deny leave to amend.  See McCarthy v. Dun &

Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).

    **C.**    **Discussion**

      Faced with an untimely Amended Petition, as well as the still-pending Motion to Amend,

the court is called to decide whether to consider Petitioner's amended claims.  In light of

Petitioner's pro se status, insofar as he elaborates his prior claims—such as his ineffective

assistance of counsel, Brady, and prosecutorial misconduct claims—and responds narrowly to

arguments raised in the Government's opposition brief, the court will read the Amended Petition

together with his opening filing as a reply memorandum.  However, for the following reasons,

insofar as Petitioner adds new, futile Brady and prosecutorial misconduct claims, the court

denies Petitioner's Motion to Amend and strikes these claims.

      First, the new Brady claims, based on Barone's reports and the disciplinary records of

Detective Crowe, raise substantially the same arguments as those made in Petitioner's Motion to

Compel.  (See Mot. to Compel.)  As the court discussed in detail above, see supra Parts V.B.2-3,

even if Barone's reports and Detective Crowe's disciplinary records are favorable to Petitioner

and were suppressed by the Government during the 2006 and 2007 trials, they are not material to the outcome of Petitioner's case.  Accordingly, Petitioner's new <u>Brady</u> claims are futile.  <u>Id.</u>  As a result, the court DENIES this part of Petitioner's Motion to Amend.

Furthermore, the corresponding new claim of prosecutorial misconduct based on the Government's alleged introduction of false testimony by Detective Crowe is derivative of Petitioner <u>Brady</u> claim, which the court finds to be futile.  (<u>See</u> Am. Pet. at 172-90.)  Detective Crowe's disciplinary records do not support Petitioner's claim of prosecutorial elicitation of perjury, and Petitioner's claims that Detective Crowe perjured himself concerning his knowledge of Deborah Kalb's residence consist of unconfirmed allegations.  Absent any showing that the Government elicited false evidence by Detective Crowe, the court deems this prosecutorial misconduct claim to be futile.  Accordingly, this part of Petitioner's Motion to Amend is DENIED, as well.

Similarly, the court declines to entertain Petitioner's new claim of prosecutorial misconduct based on the Government's alleged introduction of false testimony by Cicale concerning the Santoro murder.  (<u>Id.</u> at 166-69.)  This claim, too, is but a variation on his Motion to Compel, Motion for Evidentiary Hearing, and proposed new <u>Brady</u> claim.  As the court already explained, Barone's reports regarding the Santoro murder are not inconsistent with Cicale's trial testimony.  <u>See</u> <u>supra</u> Part V.B.2.b.  Accordingly, there is no evidence that Cicale perjured himself at trial when he testified about the Santoro murder or that the Government was aware of such alleged perjury.  Finding this prosecutorial misconduct claim to be futile, the court declines to entertain it and DENIES this part of Petitioner's Motion to Amend.

The court, however, will consider Petitioner's new claim of prosecutorial misconduct arising from the Government's alleged elicitation of Cicale's false testimony concerning the plot

to murder Michael Mancuso.  (Am. Pet. at 170-71.)  This claim is factually distinct from the other new claims in Basciano's Amended Petition, and its futility is not immediately apparent at this time.  Accordingly, this part of Petitioner's Motion to Amend is GRANTED.

## IX.  CONCLUSION

Accordingly, for reasons set forth above:

- Petitioner's Motions to Disqualify Judge (Dkts. 2, 14, 28) are DENIED;

- Petitioner's Motion to Stay All Proceedings (Dkt. 13) is DENIED;

- Petitioner's Motion to Unseal Sentencing Minutes of Generoso Barbieri (Dkt. 18) is GRANTED and Petitioner's Motion to Unseal Sentencing Minutes of Dominick Cicale (Dkt. 3) is DENIED as moot;

- Petitioner's Motion for Evidentiary Hearing (Dkt. 19) is DENIED;

- Petitioner's Motion to Appoint Counsel (Dkt. 4) is DENIED;

- Petitioner's Motion to Compel (Dkt. 27) is DENIED; and

- Petitioner's Motion to Amend (Dkt. 26) is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
December _15_, 2014

NICHOLAS G. GARAUFIS
United States District Judge

52