UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

VINCENT JOHN BASCIANO,

                            Petitioner,

       -against-

UNITED STATES OF AMERICA,

                            Respondent.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CV-280 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Petitioner Vincent Basciano ("Petitioner" or "Basciano") brings a pro se Petition for a

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255.[1] (Pet. (Dkt. 1).) For the following

reasons, Basciano's Petition is DENIED.

## I.     PROCEDURAL HISTORY

The court assumes familiarity with the underlying facts of this case and discusses the

facts relevant to Petitioner's claims as needed below.

### A.     The 2006 Trial

On November 19, 2004, Basciano was arrested pursuant to an indictment charging him

with racketeering conspiracy in connection with his role as a member of the Bonanno crime

family of La Cosa Nostra ("Bonanno family"). (Superseding Indictment 1 ("S-1") (Trial Dkt.

165).)[2] On January 11, 2006, the grand jury returned Superseding Indictment S-5, on which

---

[1] The court addressed Petitioner's discovery motions by an accompanying Recusal and Discovery Order. (Dec. 15, 2014, Order ("Recusal and Discovery Order") (Dkt 39).)

[2] Citations which reference "Dkt." are documents from the instant case, Basciano v. United States, No. 12-CV-280 (NGG) (E.D.N.Y.). Citations referring to "Trial Dkt." are documents filed during the underlying criminal proceedings, United States v. Basciano, No. 03-CR-929 (NGG) (E.D.N.Y.), which the court will sometimes refer to

Petitioner was later tried. (Superseding Indictment 5 ("S-5") (Trial Dkt. 445).) On May 9, 2006, Basciano was convicted of racketeering conspiracy following a jury trial. (See Verdict Sheet (Trial Dkt. 749).) The jury found that the following predicate racketeering acts were proved by the Government: illegal gambling (policy operation), illegal gambling (joker poker machines), conspiracy to murder David Nunez, and the attempted murder of Nunez. Id. However, the jury found certain other racketeering acts not proved and failed to reach a verdict on the remaining acts, including the murder of Frank Santoro. See id.

On September 22, 2006, Basciano filed a motion for acquittal under Federal Rule of Criminal Procedure 29 or a new trial under Federal Rule of Criminal Procedure 33, which the court denied. See United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 3780542 (E.D.N.Y. Dec. 21, 2006). Basciano also filed a motion to recuse the court and Assistant U.S. Attorney Greg Andres, which the court also denied. See United States v. Basciano, Nos. 03-CR-929 (NGG), 05-CR-060 (NGG), 2006 WL 3483924 (E.D.N.Y. Nov. 30, 2006) (denying motion to recuse the court); United States v. Basciano, Nos. 03-CR-929 (NGG), 05-CR-060 (NGG), 2006 WL 3486774 (E.D.N.Y. Dec. 1, 2006) (denying motion to recuse the prosecutor).

## B. The 2007 Retrial

On June 14, 2007, Petitioner was charged, in Superseding Indictment S-8, with crimes as to which the first jury could not reach a verdict, as well as substantive racketeering and other offenses. (Superseding Indictment 8 ("S-8") (Trial Dkt. 840).) On July 31, 2007, the jury returned a verdict, finding Petitioner guilty on all counts. (See Verdict Sheet (Trial Dkt. 981).)

---

as the "03-CR-929 case." "T-I" refers to pages in the 2006 trial transcript and "T-II" refers to pages in the 2007 trial transcript, both corresponding to the 03-CR-929 docket. Citations referring to "Capital Trial Dkt." are documents filed during a later capital proceeding, United States v. Basciano, No. 05-CR-060 (NGG) (E.D.N.Y.), which the court will occasionally refer to as the "capital case" or the "05-CR-060 case." "T-III" refers to pages in the 2011 capital trial transcript, corresponding to the 05-CR-060 docket. All page references refer to the page numbering assigned by the court's electronic docketing system (ECF).

The jury found that the following predicate racketeering acts were proved by the Government: conspiracy to murder and the murder of Frank Santoro, solicitation to murder Dominick Martino, solicitation to murder Salvatore Vitale, conspiracy to distribute marijuana, illegal gambling (lottery), and illegal gambling (sports betting). See id.

On March 24, 2008, Petitioner filed a second motion for a new trial under Rule 33, which the court denied. United States v. Basciano, No. 03-CR-929 (NGG), 2008 WL 794945 (E.D.N.Y. Mar. 24, 2008). On March 31, 2008, Petitioner filed a motion for reconsideration, which the court also denied. United States v. Basciano, No. 03-CR-929 (NGG), 2008 WL 905867 (E.D.N.Y. Mar. 31, 2008). Thereafter, Petitioner was sentenced to life imprisonment, five years of supervised release, and forfeiture in the amount of $5,400,000. (See Am. J. (Trial Dkt. 1077).)

## C.    The Direct Appeal

On July 16, 2010, Petitioner filed a direct appeal to the Second Circuit, challenging the convictions obtained in both his 2006 and 2007 trials. See United States v. Basciano, 384 F. App'x 28 (2d Cir. 2010). Petitioner argued that he was denied a fair trial for the following reasons:

> (1) the prosecution withheld Brady/Giglio material, (2) the prosecution impermissibly bolstered the credibility of its witnesses and failed to correct false testimony, (3) the district judge failed to recuse himself after learning that [Petitioner] had included his name on a purported 'hit list,' [] (4) the trial evidence and jury charge constructively amended or varied the superseding indictment on which [Petitioner] was tried in 2007 . . . [and] (5) that a conflict of interest precluded his defense counsel from rendering effective representation.

Id. at 30. The Second Circuit affirmed Petitioner's conviction by summary order, finding that

Petitioner's arguments were without merit.[3] See id. Basciano then petitioned the United States

Supreme Court for a writ of certiorari, which the Court denied on January 18, 2011. See

Basciano v. United States, 131 S. Ct. 1025 (Jan. 18, 2011).

### D.    The Capital Trial

On January 26, 2005, Petitioner was charged, under docket number 05-CR-060, with

conspiracy to murder and murder in aid of racketeering of Randolph "Randy" Pizzolo, as well as

a related firearms offense.[4] (Indictment (Capital Trial Dkt. 1).) Petitioner again filed a motion to

recuse the court, which the court denied. See United States v. Basciano, No. 05-CR-060 (NGG),

2010 WL 4484366 (E.D.N.Y. Nov. 1, 2010). The court also denied Petitioner's pre-trial motion

to disqualify the entire United States Attorney's Office for the Eastern District of New York.

See United States v. Basciano, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011). The indictment was

frequently superseded, and Petitioner was ultimately tried on Superseding Indictment S-12 in a

capital trial in 2011. (Superseding Indictment 12 ("S-12") (Capital Trial Dkt. 1075).) On May

16, 2011, the jury found Petitioner guilty of conspiracy to murder, murder in aid of racketeering,

and using, carrying, or possessing a firearm in relation to the Pizzolo murder. (Verdict Sheet

(Capital Trial Dkt. 1232).) During the penalty phase of the capital trial, the jury did not impose a

death sentence and instead imposed life imprisonment without the possibility of release. (Special

---

[3] On August 19, 2010, Petitioner also filed a third motion for a new trial, which the court denied. See United States v. Basciano, No. 03-CR-929 (NGG), 2010 WL 3325409 (E.D.N.Y. Aug. 19, 2010). On February 16, 2012, the Second Circuit affirmed this court's refusal to grant Petitioner a new trial. See United States v. Basciano, 465 F. App'x 9 (2d Cir. 2012).

[4] Petitioner's instant Petition only challenges his conviction in the 03-CR-929 case following the 2006 and 2007 trails, at which the Pizzolo murder conspiracy was admitted as an uncharged crime. Petitioner's later capital trial, in the 05-CR-060 case, is only relevant because Petitioner argues that certain evidence that came to light during the capital trial constitutes Brady material that should have been produced to him in the earlier 03-CR-929 case. See infra Part III.

Verdict Sheet (Capital Trial Dkt. 1268).) Petitioner is currently appealing his capital trial conviction. (Not. of Appeal (Capital Trial Dkt. 1308).)

### E.    The Petition for a Writ of Habeas Corpus

On January 17, 2012, Petitioner filed the instant Petition, by which he seeks to vacate the 2006 and 2007 convictions. (Pet.) The Petition alleges eleven grounds of error, which the court groups into the following categories: (1) violations of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny (id. at 34-46) (Ground Three); (2) ineffective assistance of trial and appellate counsel (id. at 5-24, 26-32, 78-82, 83-84) (Grounds One, Two, Nine, and Ten); (3) improper admission of uncharged acts (id. at 69-71, 72-74, 75-77) (Grounds Six, Seven, and Eight); and (4) prosecutorial misconduct and bias (id. at 49-53, 55-68, 85-94) (Grounds Four, Five, and Eleven). Petitioner also filed numerous recusal and discovery-related motions, which the court addressed in the accompanying Recusal and Discovery Order. (Dec. 15, 2014, Order ("Recusal and Discovery Order") (Dkt 39).)

On July 18, 2013, the Government filed an opposition brief in response to Basciano's Petition. (See Gov't Opp'n (Dkt. 20).) Petitioner did not file a reply by his deadline. Instead, on November 27, 2013, before the court could rule on his pending Motion to Amend, Petitioner filed an Amended Petition, which added new claims that were not part of his original Petition. (See Am. Pet. (Dkt. 38).) The court granted Petitioner's Motion to Amend in part and denied it in part, largely striking the new claims as futile. (See Recusal and Discovery Order at 48-53.) However, in light of Petitioner's pro se status, insofar as Petitioner elaborates his original claims and responds narrowly to arguments raised in the Government's opposition brief, the court reads the Amended Petition together with his opening filing as a reply memorandum. (Id. at 50.)

## II.    STANDARD OF REVIEW

Section 2255, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), permits a prisoner who was sentenced in federal court to "move the court which imposed the sentence to vacate, set aside, or correct the sentence" when he claims "the right to be released upon the ground that the sentence was imposed," among other reasons, "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). "[B]ecause requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult to upset a conviction by collateral, as opposed to direct, attack." Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995) (citing United States v. Frady, 456 U.S. 152, 165 (1982)). Therefore, a habeas petitioner must show "both a violation of [his] Constitutional rights and 'substantial prejudice' or a 'fundamental miscarriage of justice.'" Ciafarano v. United States, 585 F. Supp. 2d 360, 368 (E.D.N.Y. 2008) (quoting Ciak, 59 F.3d at 301).[5]

Furthermore, in the case of a collateral challenge, two separate rules may preclude claims from being relitigated. See Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010). The first of these is the so-called mandate rule, which "bars re-litigation of issues already decided on direct appeal." Id. (citing Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006); United States v. Minicone, 994 F.2d 86, 89 (2d Cir. 1993)). The mandate rule precludes relitigation of issues either expressly or impliedly resolved by the mandate of the appellate court. See id. (citing United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001)); see also Basciano, 465 F. App'x at 13.

---

[5] Of course, "[a] pleading by a pro se litigant must be construed liberally." Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008) (emphasis omitted).

The second rule "prevents claims that could have been brought on direct appeal from being raised on collateral review, absent cause and prejudice."[6] Yick Man Mui, 614 F.3d at 54; see also United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011); United States v. Perez, 129 F.3d 255, 260-61 (2d Cir. 1997). However, a petitioner may raise such claims "where the issues were not raised at all on direct appeal due to ineffective assistance of counsel." Perez, 129 F.3d at 261 (internal quotation marks removed). Thus, when "a petitioner seeks to raise an ineffective assistance of counsel claim for the first time in the § 2255 context, the petitioner may bring his claim regardless of whether it could have been raised on direct appeal." Dong Cai v. United States, No. 13-CV-3617 (ARR), 2013 WL 5934314, at *3 n.5 (E.D.N.Y. Nov. 1, 2013) (citing Yick Man Mui, 614 F.3d at 54); see also United States v. Sessa, No. 92-CR-351 (ARR), 2011 WL 256330, at *17 (E.D.N.Y. Jan. 25, 2011), aff'd, 711 F.3d 316 (2d Cir. 2013).[7]

## III. VIOLATIONS OF BRADY

Petitioner's primary claim is that he was deprived of Due Process in violation of the Fifth Amendment, under Brady and its progeny, due to the Government's suppression of: (1) certain

---

[6] To benefit from application of the "cause and prejudice" exception, a petitioner must establish cause which was "external to the petitioner, something that cannot be fairly attributed to him." Viera v. United States, 832 F. Supp. 2d 222, 227 (E.D.N.Y. 2011) (emphasis omitted) (quoting Coleman v. Thompson, 501 U.S. 722, 752 (1991)). The petitioner must then establish "'actual prejudice' from the alleged violations." Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)). Alternatively, a petitioner is exempted from failure to raise a claim on direct appeal if he can establish "actual innocence," which requires petitioner to "prove that, in light of all admissible evidence, 'it is more likely than not that no reasonable juror would have convicted him.'" Viera, 832 F. Supp. 2d at 227 (quoting Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004)).

[7] Still, under the mandate rule, a petitioner may not relitigate specific ineffective assistance of counsel claims which were raised and considered on direct appeal. Yick Man Mui, 614 F.3d at 55. Additionally, ineffective assistance of counsel claims can be barred in a § 2255 proceeding "when the factual predicates of those claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate." Id. at 53 (citing United States v. Pitcher, 559 F.3d 120, 124 (2d Cir. 2009)).

proffer statements by Giuseppe "Joey" Gambina, and (2) information reflected in a telephonic note made by Assistant U.S. Attorney John Buretta. (Pet. at 34-45.)[8]

## A. Legal Standard

To be entitled to relief under Brady and its progeny, Petitioner must show that: (1) the evidence at issue is favorable to him, either because it is exculpatory, or because it is impeaching; (2) the evidence was suppressed by the Government; and (3) prejudice ensued. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999). To establish prejudice, also known as the "materiality" inquiry, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 280 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)); see also Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). A "reasonable probability" of a different result is shown when suppression of the evidence "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678). In making the determination as to whether suppressed evidence is material, the court looks to the "cumulative effect of suppression in light of the evidence as a whole." United States v. Jackson, 345 F.3d 59, 74 (2d Cir. 2003) (citing Kyles, 514 U.S.at 436-37) (internal quotation marks omitted).

## B. Gambina's Proffer Statements

### 1. Background

Gambina, a member of the Bonanno family, met with the Government at proffer sessions on August 31, 2005; September 9, 2005; September 16, 2005; and September 23, 2005. (Gov't Opp'n, Ex. 1 (Excerpts from 3500-GG ("Gambina Proffer Reports")) (Dkt. 20-1) at 47-50; Pet., Ex. 10 (Excerpts from 3500-GG ("Gambina Proffer Agreements")) (Dkt. 1-2) at 16-23.) At

---

[8] In his Amended Petition, Basciano adds two additional Brady claims. (Am. Pet. at 22-27.) Because the court previously concluded that those claims are futile, it declines to consider them here. (See Recusal and Discovery Order at 50-51.)

these sessions, Gambina provided information about the conspiracy to murder Randy Pizzolo, a crime that was later admitted as an uncharged act at Petitioner's 2006 and 2007 trials through the testimony of cooperating witness and Bonanno family captain Dominick Cicale.[9] At the proffer sessions, Gambina reported the involvement of Cicale and Bonanno family member Anthony "Ace" Aiello in the Pizzolo murder conspiracy. (Gambina Proffer Reports at 47.) Gambina explained that in late November 2004, Cicale and Aiello instructed him about a two-part murder plot: Pizzolo would first murder another victim, after which Gambina would drive Pizzolo to another location, where Aiello would then kill Pizzolo. (Id.) According to Gambina, this meeting with Cicale took place shortly *after* Basciano had been arrested and while he remained in custody. (Id.) After the meeting with Cicale, Gambina told Aiello that he would not participate in the murders and warned Aiello that Cicale and Basciano may be trying to set them up should Cicale or Basciano choose to cooperate with the Government. (Id. at 50.) Petitioner alleges that Gambina's proffer statements directly contradict Cicale's trial testimony about the Pizzolo murder conspiracy. (Pet. at 35-36; Am. Pet. at 17-20.) According to Petitioner, their suppression therefore constitutes a violation of Brady and its progeny.[10]

### 2. Relevant Trial Proceedings

Petitioner was not charged with the Pizzolo murder in the 03-CR-929 case at issue in these collateral proceedings. Rather, evidence of the Pizzolo murder conspiracy and Basciano's involvement was admitted for the purpose of telling a complete story behind the charged crimes (particularly the murder of Frank Santoro), to show the evolution of relationships of trust among

---

[9] Gambina did not testify at Petitioner's 2006 or 2007 trials, but did testify regarding the Pizzolo murder at Petitioner's 2011 capital trial. Petitioner was convicted of the Pizzolo murder and the related conspiracy at the capital trial. See supra Part I.D.

[10] The Government does not appear to contest Petitioner's claim that Gambina's proffer statements were withheld by the prosecution during his 2006 and 2007 trials, but disputes their exculpatory nature and their materiality. (See Am. Pet. at 17-19; Gov't Opp'n at 102-12.)

the participants, to shed light on the background of the enterprise, to corroborate the testimony of

cooperating witnesses, and to rebut Basciano's claim that he was incapable or unwilling to

violate the rules of organized crime. See United States v. Basciano, No. 03-CR-929, 2006 WL

385325, at *1, 10 (E.D.N.Y. Feb. 17, 2006); United States v. Basciano, No. 03-CR-929, 2007

WL 1791221, at *1 (E.D.N.Y. June 19, 2007). (See also T-I at 10085-86; T-II at 4752-53.)[11]

Evidence of the Pizzolo murder was admitted through the testimony of Cicale, who

testified that Petitioner was "furious" with Pizzolo because Pizzolo, a construction manager and

a Bonanno family associate, was mismanaging work on Basciano's house, "running his mouth a

lot," and "acting wild." Pizzolo had also refused a Bonanno family invitation to move to Florida

to manage property there. (T-II at 1219-24.) At the time, Basciano had been the acting boss of

the Bonanno family for "a little bit less than a year," and he wanted to make a point that he "will

not tolerate people acting out of line." (Id.) Cicale testified that Basciano had ordered the

Pizzolo murder *before* he was arrested, that Gambina had agreed to participate in the murder, and

that Gambina then backed out of the conspiracy after Petitioner's arrest. (T-II at 1225-27.)

Cicale also testified that after Petitioner's arrest Cicale informed Aiello and Gambina that the

murder was called off, but that the new acting boss of the Bonanno family, Michael Mancuso,

later ordered Cicale to proceed with the hit on Pizzolo. (Id.)[12]

3.    Discussion

Petitioner argues that Gambina's proffer statements constitute favorable information,

which the Government improperly suppressed in violation of Brady and its progeny. Principally,

---

[11] The court also charged the jury that it could consider evidence of uncharged crimes in deciding whether the Government had proved the "pattern" element of racketeering conspiracy and racketeering, respectively. (Final 2006 Jury Charge (Trial Dkt. 593) at 63; Final 2007 Jury Charge (Trial Dkt. 891) at 20, 56-57.)

[12] The Government also introduced testimony from other cooperating witnesses that at times contradicted Cicale's testimony, including testimony by Nicholas "PJ" Pisciotti that Cicale had taken credit for the Pizzolo murder, with no attribution that Basciano had been involved. (T-II at 3363-64.)

Petitioner alleges that Gambina's proffer statements and Cicale's testimony contradict each other regarding the timing of the Pizzolo murder conspiracy. (Pet. at 35-36; Am. Pet. at 18-19.) Petitioner argues that unlike Cicale, Gambina placed the conversation between Cicale, Gambina, and Aiello about the two-part murder plot *after* the date of Petitioner's arrest. Basciano reasons that Gambina's statements "would have completely destroyed Cicale's credibility" and would have supported "Petitioner's theory that Cicale had his own personal motive for wanting Pizzolo dead and that he implemented the plan from beginning to end, only after the Petitioner was in jail and no longer in a position to even know of it, much less stop it." (Pet. at 37; Am. Pet. at 19.) Petitioner notes that this contradiction is particularly important because Cicale was the principal witness through whom evidence of the Pizzolo murder was admitted at the 2006 and 2007 trials, in contrast to the capital trial where various forms of evidence were used to prove the Pizzolo murder, including jailhouse tapes recorded secretly by Joseph Massino. (Pet'r's Mem. of Law (Dkt. 1-3) at 41.) Basciano adds that Assistant U.S. Attorney Buretta interviewed Gambina during the proffer sessions, placing him on notice regarding the conflict between Gambina's version and Cicale's. (Id. at 4; Pet., Ex. 8 (Excerpts from 3500-GG ("Gambina Proffer Notes")) (Dkt. 1-2) at 14.)[13]

Petitioner's claim, however, is procedurally barred by prior decisions of the Second Circuit, which previously rejected Petitioner's Brady claims based on other materials that allegedly impeached Cicale's credibility and demonstrated that Cicale and others had their own independent motives to kill Pizzolo independent of Petitioner. First, on direct appeal, the Second Circuit expressly rejected Petitioner's theory that the suppression of additional evidence that

---

[13] Petitioner also claims that Gambina's out-of-court statements about the Pizzolo murder conspiracy were improperly admitted through Cicale at the 2006 and 2007 trials pursuant to an erroneous application of the co-conspirator hearsay exception in Federal Rule of Evidence 801(d)(2)(E). (Pet. at 37-40.) For a discussion of this contention, see infra Part IV.D.

Cicale had an independent motive to kill Pizzolo constituted a <u>Brady</u> violation. <u>See</u> <u>Basciano</u>, 384 F. App'x at 31. The Second Circuit observed that Cicale was thoroughly impeached at trial with his long record of criminal activity, deceit, and violence. <u>Id.</u> As the court found,

> [e]ven assuming that Basciano could have used this information—
> *or other allegedly suppressed information regarding Pizzolo*—to
> impeach Cicale's testimony that Basciano ordered the Pizzolo
> murder, because that murder was not a charged predicate in either
> the 2006 or 2007 trial, the impeachment is properly deemed
> cumulative of the many other attacks that were mounted against
> Cicale's credibility and, thus, immaterial.

<u>Id.</u> (emphasis added).

Then, on Petitioner's second trip to the Second Circuit, the court again noted that yet other allegedly suppressed information "suggests only that it would have been helpful to the defense to argue that others had a motive to murder Pizzolo and that Cicale's testimony was not credible." <u>See</u> <u>Basciano</u>, 465 F. App'x at 14. "The record reveals, however, that both arguments *were* put before the district court and the jury." <u>Id.</u> (emphasis in original). The Second Circuit observed that the jury heard testimony that Pizzolo had shot but not killed Darren D'Amico at "Café on the Green" in 2002 (T-I at 6133-34); that Cicale had told others, without referencing Petitioner, that he, Cicale, "took care of" the Pizzolo murder (T-II at 3363-64); and that acting boss Michael Mancuso had ordered the hit on Pizzolo (T-II at 1227-28). <u>See</u> <u>Basciano</u>, 465 F. App'x at 14-15. Most sweepingly, the Second Circuit concluded that

> even if we were to decide that the non-disclosed evidence [showing
> that others had their own independent motives to kill Pizzolo
> independent of Petitioner] should have been disclosed to the district
> court and that the district court thereafter would have excluded
> evidence of the Pizzolo murder, Basciano would still not be entitled
> to a new trial. There was a multitude of other evidence presented
> concerning the actual charges against Basciano that did not hinge
> on the testimony of Cicale, through whom evidence of the Pizzolo
> murder was admitted.

<u>Id.</u> at 15. This holding forecloses Petitioner's challenge to the admission of the Pizzolo murder.

Furthermore, even if they are not procedurally barred, Petitioner's arguments are meritless. Gambina's proffer reports are not materially inconsistent with Cicale's trial testimony. Gambina confirmed that there was a conspiracy to murder Pizzolo, as well as a second victim. (Gambina Proffer Reports at 47.) Consistent with Cicale's trial testimony, Gambina stated that Cicale had recruited him and Aiello to participate in the hit. (Id.) Gambina also corroborated Cicale's testimony that Gambina eventually refused to go forward with the plan, angering Cicale. (Id. at 50.) Furthermore, Gambina's concern that Basciano or Cicale might have been trying to set up Aiello and Gambina in case Basciano or Cicale later cooperated with the Government corroborates Cicale's testimony that the Pizzolo murder conspiracy included Basciano. (Id.) Although Cicale and Gambina differ as to whether Cicale approached Gambina regarding the Pizzolo murder just before or just after Basciano's arrest, it is clear that a developed plot to murder Pizzolo existed at the time of Basciano's arrest.[14]

While Gambina's proffer reports may be favorable to Petitioner, they are not material within the meaning of Brady and its progeny. Although Cicale was the principal witness through whom evidence of the Pizzolo murder conspiracy was introduced, Petitioner significantly overstates the centrality of Cicale's testimony about the Pizzolo murder in his case. See Basciano, 2008 WL 794945, at *4 ("Defendant mischaracterizes the centrality of Cicale's testimony in establishing the elements of the charges for which Basciano was convicted and gives short shrift to the multitude of other evidence offered against him.") The Pizzolo murder was an uncharged offense introduced through Cicale's testimony for a limited purpose as an

---

[14] Basciano also cites the Government's 2009 disclosure in John Gotti, Jr.'s criminal proceedings, United States v. John A. Gotti, No. 08-CR-1220 (PKC) (S.D.N.Y.), in which Assistant U.S. Attorney Buretta stated that Gambina's "account of criminal activity in regard to the murder of Randolph Pizzolo differs from Cicale's account." (Pet. at 88-89; Am. Pet. at 278-79; Pet'r's Mem. of Law at 5; Pet., Ex. 3 (Excerpts from 3500-DC (John Buretta's letter to Charles F. Carnesi, Esq.) (Dkt. 1-2) at 4.) Although the information may have been favorable, Buretta stated only that Gambina's account differed from Cicale's and he did not represent that Gambina's account was *materially different* than Cicale's under the standards of Brady and its progeny.

uncharged crime and referenced only four times during summations at the 2006 and 2007 trials. (T-I at 9440, 9980, 9994-95, 10038; T-II at 4408-09, 4410, 4465, 4688.)

Furthermore, while on the stand, Cicale was so thoroughly impeached by evidence of his life-long record of criminal activity, deceit, and violence, as well as possible motives of other persons to murder Pizzolo, that any further impeachment would be cumulative. See Basciano, 384 F. App'x at 31; Basciano, 465 F. App'x at 14.

By contrast, the charged offenses, including the Santoro murder, were proven through a multitude of other evidence that did not hinge on Cicale's testimony, as this court and the Second Circuit have both observed on multiple occasions. See, e.g., Basciano, 465 F. App'x at 15. See also infra Part III.C.3 (discussing the other evidence introduced at trial). In light of the other evidence concerning the charged conduct, there is, therefore, no reasonable probability that the disclosure of Gambina's proffer statements concerning the uncharged Pizzolo murder would have changed the result of the proceeding. See Strickler, 527 U.S. at 280; United States v. Gambino, 59 F.3d 353, 366 (2d Cir. 1995) ("Finding a lack of materiality, we need not decide whether the [evidence] was 'suppressed,' in other words, whether the knowledge of the tape's existence should be imputed to the prosecution, based on its having been available to the F.B.I.") This conclusion is unchanged even when Gambina's proffer reports are considered cumulatively in conjunction with other alleged Brady material that was the subject of Petitioner's prior Rule 33 motions, such as the Cicale false murder plot allegations and the Vasaturo proffer report. See Basciano, 2008 WL 794945, at *1-6; Basciano, 2010 WL 3325409, at *6-9.

### C.   Assistant U.S. Attorney Buretta's Telephonic Note

#### 1.   Background

Written by Assistant U.S. Attorney John Buretta on June 22, 2010, and produced to Petitioner prior to his 2011 capital trial, the telephonic note describes meetings between Cicale and Assistant U.S. Attorney Greg Andres, the lead prosecutor at Petitioner's 2006 trial, following Cicale's arrest in 2005. (Gov't Opp'n, Ex. 1 ("Buretta Note") (Dkt. 20-1) at 47-50.) The entirety of the Buretta Note states that during the first two of these meetings, the Government "did not tell [Cicale] about things he would be charged with." (Id.) Then, "after Andres had discussion[s] with [Cicale's] attorney," Cicale consulted with his attorney. (Id.) While the note is silent as to what took place in the interim, by the time that Cicale met with Petitioner at a subsequent co-defendant meeting, Cicale told Petitioner "that [Cicale] was going to be supposedly charged [with the] Santoro murder." (Id.) Although Petitioner concedes that the Buretta Note itself does not constitute Brady material, he reasons that the note demonstrates that during Petitioner's 2007 trial the Government knowingly suppressed information concerning Cicale's potential criminal charges that preceded his decision to cooperate. (Pet. at 43.)

#### 2.   Relevant Trial Proceedings

During the 2007 trial, the defense sought to cross-examine Cicale about the timing of his decision to cooperate, which the court precluded pursuant to Federal Rule of Evidence 403. (T-II at 1284-86.) Later, the defense attempted to cross-examine Cicale as to whether, prior to his cooperation, the Government had threatened to charge him with the murder of Santoro, a second death-eligible crime.[15] (T-II at 1397-1400.) Cicale testified that he did not recall if he learned that he was going to be charged with the Santoro murder while attending a co-defendant meeting

---

[15] Prior to his meetings with the Government, Cicale had already been charged with the murder of Randy Pizzolo, itself a death-eligible murder. (T-II at 1390.)

in November 2005, three months prior to when he decided to cooperate. (Id.) In summation, defense counsel argued that Cicale falsely implicated Petitioner in a variety of crimes, including the Santoro murder, in order to escape the death penalty for both the Santoro and the Pizzolo murders. (T-II at 4580-83, 4588.) The Government refuted this theory on rebuttal summation. (T-II at 4688-89.)

### 3. Discussion

According to Petitioner, the Buretta Note demonstrates that the Government threatened to charge Cicale with the Santoro murder, a fact which was improperly suppressed in violation of Brady and its progeny. Consistent with the defense theory at trial, Petitioner reads the Buretta Note to mean that after Cicale's attorney conferred with Assistant U.S. Attorney Andres, Cicale's discussion with his attorney *must have* pertained to Cicale's impending charge for the Santoro murder.[16] (Pet. at 20-21.) Petitioner argues that the Buretta Note supports the "defense theory that Cicale was motivated to frame the Petitioner with the Santoro murder only after Cicale became aware that the Government was about to charge him, Cicale, with [the Santoro murder]." (Id.) Petitioner reasons that the court would have allowed the defense to cross-examine Cicale regarding the motive and timing of his cooperation had the Government complied with its Brady obligations. (Pet'r's Mem. of Law at 50.) Although Basciano concedes that the Buretta Note itself is not Brady material because it did not exist at the time of trial, he argues that the Government had an obligation to disclose the underlying information even though it was not written down. (Id. at 65 (citing United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007) ("The obligation to disclose information covered by the Brady and Giglio rules exists without regard to whether that information has been recorded in tangible form.").)

---

[16] Petitioner invites the court to draw conclusions about the nature and content of meetings between an attorney, his client, and opposing counsel based on the content of the Buretta Note, despite the fact that the note contains no further information regarding the contents of these meetings.

Notably, Petitioner's claim is procedurally barred by the Second Circuit decisions previously discussed, which rejected Petitioner's <u>Brady</u> claims based on other materials that allegedly impeached Cicale and concluded that the jury's conviction on the Santoro murder charge would stand even if Cicale's testimony was entirely disregarded. <u>See supra</u> Part III.B.3. In particular, the Second Circuit found that "Cicale's life-long and murderous criminal history, coupled with his record of deceit and violence while cooperating with federal authorities and inconsistent statements in his own testimony, provided such fertile grounds for impeachment as to occupy nearly 300 pages of transcript spanning two days." <u>See Basciano</u>, 384 F. App'x at 31. Subjects of impeachment included his conviction for manslaughter in the homicide of George Kehoe, his commission of and guilty plea to the murders of Santoro and Pizzolo, his involvement in drug dealing, assaults, shootings, armed robbery while on bail, arson, violations of prison rules and supervised release, his attempts to cash fraudulent checks, and accusations of domestic violence, defrauding his grandmother, and lies at his first proffer session. (<u>See, e.g.</u>, T-II at 965, 968-69, 972-73, 974-76, 978-84, 991-92, 1007-09, 1010-11, 1298-1300, 1326, 1331-32, 1354, 1376-78, 1380, 1383-85, 1387-89, 1392-93, 1425-26, 1512-15.) The defense impeached Cicale further with his prior inconsistent statements on a variety of topics including his recollection of the Santoro murder (<u>see, e.g.</u>, T-II at 1439-44, 1458, 1472-74, 1478-80), and his motive to cooperate, including his indictment for a death-eligible Pizzolo murder and potential indictment for the death-eligible Santoro murder prior to his decision to cooperate (<u>see, e.g.</u>, T-II at 1390-92, 1400).[17] Thus even if the information in the Buretta note is helpful to Petitioner, Second Circuit's holdings foreclose Petitioner's claim, which is premised on further impeachment of Cicale. <u>See Yick Man Mui</u>, 614 F.3d at 53.

---

[17] Petitioner complains that many of the crimes with which Cicale was impeached also inculpated Petitioner. (Pet'r's Mem. of Law at 70-71.) However, he does not contest that defense counsel had an ample opportunity to impeach Cicale.

The Second Circuit also concluded that there was a "multitude of other evidence presented concerning the actual charges against [Petitioner] that did not hinge on the testimony of Cicale." Basciano, 465 F. App'x at 15. With respect to the charged Santoro murder, which Petitioner attacks here, "the jury considered Basciano's own recorded statements, the testimony of cooperating witnesses Salvatore Vitale, Nicholas Pisciotti, Richard Cantarella, and James Tartaglione, as well as the testimony of Kenneth Champlin and Carmine Naddeo, and physical evidence corroborating the details of the Santoro murder provided by the witnesses." Id.; see also Basciano, 2008 WL 794945, at *4-5 (holding that even if it was improperly suppressed, information that Cicale had solicited a fellow inmate to frame Petitioner in a bogus plot to murder Cicale was not material and therefore did not warrant a new trial). Accordingly, Petitioner's Brady arguments are procedurally barred by two prior decisions of the Second Circuit.

Furthermore, even if these decisions do not bar consideration of the Buretta Note, Petitioner's argument is without merit. The Buretta Note was written in 2010, approximately three years after his second trial in the 03-CR-929 case, and therefore does not itself constitute Brady material, as Petitioner concedes. Petitioner is correct that the obligation to disclose Brady information exists without regard to whether that information has been recorded in tangible form. See Rodriguez, 496 F.3d at 226. Accordingly, at issue are the underlying facts allegedly reflected in the Buretta Note: Cicale learning that he may be charged with the Santoro murder during his meetings with the Government shortly before he decided to cooperate against Petitioner.

However, that underlying information is unlikely to be suppressed within the meaning of Brady because Petitioner participated in the co-defendant meeting in which Cicale said that he

18

was going to be "supposedly" charged with the Santoro murder, placing Petitioner on notice of the very facts he now claims were withheld from him. See United States v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990) ("[T]here is no improper suppression within the meaning of Brady where the facts are already known by the defendant."); United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence.").

Even if information about Cicale's potential charge for the Santoro murder was suppressed, it does not appear that its disclosure would have reasonably resulted in a different outcome at trial. The Buretta Note simply does not offer significant support for Petitioner's speculative theory that the Government threatened Cicale with the Santoro murder, causing him to cooperate and falsely implicate Basciano in various crimes. Rather, the Buretta Note reflects a degree of skepticism by Cicale about whether he would be charged with the Santoro murder. This characterization is not materially inconsistent with Cicale's testimony at trial that he did not recall whether at the time of the co-defendant meeting he had learned that the Government intended to charge him with the Santoro murder. (T-II at 1397-1400.)

Besides, even without the information reflected in the Buretta Note, defense counsel impeached Cicale about his motive to cooperate, including his indictment for the death-eligible Pizzolo murder and the potential indictment for the death-eligible Santoro murder prior to Cicale's cooperation. (See, e.g., T-II at 1390-92, 1400.) Indeed, defense counsel argued in summation that Cicale falsely implicated Petitioner in order to escape the death penalty for both the Santoro and Pizzolo murders. (T-II at 4580-83, 4588.) In light of this, any additional impeachment based on information contained in the Buretta Note would have been cumulative.

Moreover, the information reflected in the Buretta Note does not undermine the testimony of five cooperating witnesses (Salvatore Vitale, Richard Cantarella, James Tartaglione, Nicholas Pisciotti, and Dominick Cicale); the corroborating testimony from civilian eyewitnesses Kenneth Champlin and Carmine Naddeo; law enforcement witnesses Michael Breslin, Luis Fontanez, and Rita Fitzpatrick; medical examiner Dr. James Gill; Basciano's own recorded statements captured on consensual recordings made by James Tartaglione; Anthony Indelicato's prison phone calls after Petitioner's arrest; Anthony Donato's and Cicale's telephone records upon Basciano's arrest; and physical evidence. (T-II at 307-09, 706-08, 819-22, 846, 1628-29, 1709-12, 1974-75, 2259, 3429-32, 4056.) Contrary to Petitioner's allegations, there is no reasonable probability that the disclosure of the information contained in the Buretta Note, in light of the overwhelming other evidence, would have resulted in a different outcome at trial. See Strickler, 527 U.S. at 280. The court concludes that, even examining the Buretta Note together with all other Brady claims that Petitioner has previously raised, its disclosure would not have led to a different result at trial.[18][19]

---

[18] Petitioner also seeks a hearing to determine what was said to Cicale during the November 2005 meetings. (Pet'r's Mem. of Law at 68-69.) However, not only are Petitioner's allegations speculative, but no hearing is necessary because the court concludes that no Brady or Giglio violation took place. See United States v. White, 972 F.2d 16, 22 (2d Cir. 1992) (district court did not abuse its discretion by not conducting an evidentiary hearing where it is unnecessary to resolve issues that would be hearing's focus).

[19] Petitioner also contends that the suppression of the information in the Buretta Note prevented the defense from securing the admission of statements of unavailable witness Joseph Fillipone. (Pet'r's Mem. of Law at 66-67.) Because Fillipone invoked his Fifth Amendment privilege against testifying, at the 2006 trial defense counsel sought to introduce Fillipone's grand jury testimony from December 29, 2005, in which Fillipone contradicted Cicale's trial testimony regarding the Santoro murder. (Id. (citing T-I at 8701).) The Government opposed the request, arguing that during grand jury proceedings the Government did not have a similar motive to cross-examine Fillipone regarding the Santoro murder because the Government had not yet spoken to Cicale. (Id. (citing T-I at 8709).) Petitioner argues that the suppression of the information contained in the Buretta Note (which shows that the Government met with Cicale at least twice prior to Fillipone's grand jury testimony) prevented defense counsel in countering the Government and securing the admission of Fillipone's grand jury testimony at trial. The Government, however, represents that Cicale's Jencks Act material from Petitioner's capital trial shows that Cicale did not begin proffering and, therefore, discussing criminal activity, such as the Santoro murder, until January 11, 2006. (Gov't Opp'n at 144.) Having reviewed the submitted materials, the court has no reason to doubt this

* * * * *

For the foregoing reasons, Petitioner's <u>Brady</u> claims are denied.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner next claims that he was deprived of his right to effective assistance of counsel in violation of the Sixth Amendment as a result of various errors by his trial and appellate counsel.

### A. Legal Standard

"Because the Sixth Amendment provides criminal defendants with the right to *effective* assistance of counsel, inadequate representation is a basis for relief under section 2255." <u>Morales v. United States</u>, 635 F.3d 39, 43 (2d Cir. 2011) (internal citations and quotation marks omitted). A two-part test must be satisfied in order to prove constitutional ineffective assistance of counsel: (1) deficient performance by counsel, and (2) prejudice to the defendant. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984). With regard to the first part of the test, "[a]n attorney's representation is deficient when it falls 'below an objective standard of reasonableness,' as determined by reference to 'prevailing professional norms.'" <u>Morales</u>, 635 F.3d at 43 (quoting <u>Strickland</u>, 466 U.S. at 688). <u>Strickland</u> requires that judicial scrutiny of counsel's performance be "highly deferential," and that "every effort be made to eliminate the distorting effects of hindsight." <u>Strickland</u>, 466 U.S. at 689. Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" <u>Id.</u> In order to meet this demanding standard, a court deciding a claim of ineffective assistance of counsel must "reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time [assistance was

---

representation. (<u>See also</u> Mar. 30, 2006, Mem. & Order (Trial Dkt. 546) (finding that the Government's delay in turning over Fillipone's grand jury testimony did not constitute a <u>Brady</u> violation).)

21

given]." Id. The second part of the test is satisfied when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A petitioner must satisfy both prongs of the test such that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

## B. Counsel's Failure as a Result of Stipulating to Elements of Racketeering

Petitioner asserts that his trial counsel was ineffective in unnecessarily conceding elements of charged crimes. Specifically, Petitioner contends that his trial counsel erroneously stipulated to the existence of the Bonanno enterprise "possibly in an attempt to exclude 404(b) other acts evidence, only to have the same evidence admitted in any event." (Pet. at 83; Am. Pet. at 268.) Petitioner claims that "by stipulating to everything but the [charged racketeering] predicates, defense counsel, for all intents and purposes, actually pled Petitioner guilty, because, under basic conspiracy law, the Petitioner's admitted membership in the Bonanno Family . . . was tantamount to a guilty plea to RICO conspiracy." (Am. Pet. at 269.)

The court concludes that trial counsel's decision to stipulate to the existence of the Bonanno crime family does not constitute ineffective assistance of counsel. Under the "highly deferential" inquiry with regard to evaluating trial counsel's strategic choices, see Strickland, 466 U.S. at 689, trial counsel's decision to stipulate to the existence of the Bonanno crime family was an effective one from the counsel's perspective at the time it was made. As described in greater detail below, see infra Part IV.C.1, counsel stipulated to the existence of the Bonanno enterprise prior to Basciano's first trial in order to limit the admission of many uncharged crimes.[20] See Basciano, 2006 WL 385325, at *1-2. In light of the voluminous evidence tying

---

[20] However, counsel's later actions at trial caused some of the previously excluded evidence to be admitted eventually under Rule 404(b). See infra Part IV.C.1.

Petitioner to the Bonanno family, this was a sensible strategic choice that was intended to narrow

the scope of what was contested and thus limit the admission of prejudicial crimes. (See Mar. 8,

2006, Order (Trial Dkt. 524) at 5 (noting that "the Defendants conceded the first through fourth

elements" of racketeering conspiracy, consistent with their intent "to focus the trial on the

specific racketeering acts charged and not the Bonanno crime family's existence").)[21]  The

Strickland test rejects the idea that such a strategic decision, even if misguided, could be the

basis for a finding of ineffective assistance of counsel. See Strickland, 466 U.S. at 690 (holding

that "strategic choices made after thorough investigation of law and facts relevant to plausible

options are virtually unchallengeable"). In light of the discretion that the law confers on trial

counsel concerning such strategic decisions, appellate counsel was similarly not ineffective in

failing to raise this argument on Petitioner's direct appeal. Jackson v. Leonardo, 162 F.3d 81, 85

(2d Cir. 1998) (appellate counsel can reasonably focus on stronger arguments and omit weaker

ones on appeal).

### C.      Counsel's Failure in Connection with the Admission of Uncharged Acts

Petitioner further claims that he was deprived of effective assistance of counsel in

connection with the court's admission of uncharged acts. Petitioner argues that: (1) the court

improperly instructed the jury regarding the admission of uncharged acts; (2) the court should

have required the Government to prove the uncharged acts beyond a reasonable doubt; and (3)

this court and the Second Circuit erred when considering new evidence challenging the Pizzolo

murder conviction as impeachment material under Giglio rather than exculpatory material under

Brady. (See Pet. at 10-22, 30-31; Am. Pet. at 195-99, 220-21.) Petitioner claims that he was

deprived of effective assistance of counsel to the extent that trial counsel failed to object to these

---

[21] Petitioner's argument that by stipulating to the existence of the enterprise, trial counsel "actually pled Petitioner guilty" is therefore a gross overstatement.

23

rulings and appellate counsel failed to raise corresponding objections on appeal. (See Pet. at 22; Am. Pet. at 215-16.)

1.    Background

In this case, the Government provided notice prior to the 2006 trial that it sought to admit various uncharged acts both pursuant to Federal Rule of Evidence 404(b) and as direct evidence of the "pattern" of racketeering. (See Mot. in Limine (Trial Dkt. 446) at 28, 36.) The particular uncharged acts that the court initially admitted pursuant to Rule 404(b) included: (1) gambling; (2) loansharking and extortion; and (3) murder, murder conspiracy, attempted murder, and solicitation to murder.[22] See Basciano, 2006 WL 385325, at *6-8. The latter category included (1) the murder of Randy Pizzolo; (2) the conspiracy to murder Joseph Bonnelli; (3) the conspiracy to murder Patrick DeFilippo; (4) the murder of Anthony Colangelo; (5) the conspiracy to murder Salvatore Caio; (6) the solicitation to murder the girlfriend of Dominick Cicale; (7) the conspiracy to murder Michael Mancuso; and (8) the assault of an unnamed Bonnano family member. Id. at *10.

These uncharged acts were admitted pursuant to Rule 404(b) to "complete the story of the charged crimes, demonstrate relationships of trust and corroborate the testimony of cooperating witnesses." Basciano, 2006 WL 385325, at *10; see Basciano, 2007 WL 1791221, at *1. Because Petitioner stipulated to the existence of the Bonnano enterprise prior to his 2006 trial, the court held that "evidence to show the [enterprise] element of this offense [was] outweighed by the unfair prejudice under Rule 403, and therefore inadmissible," provided that Petitioner did not subsequently open the door by contesting these facts. See Basciano, 2006 WL 385325, at *2.

---

[22] The court denied the Government's motion to admit a number of uncharged acts including arson, car theft, narcotics trafficking, fireworks purchase, and fraud. See Basciano, 2006 WL 385325, at *7. The court also denied the admission of several murders, murder conspiracies, attempted murders, and solicitations to murder. Id. at *8.

Accordingly, the court denied the Government's motion to admit the uncharged acts as direct evidence of the racketeering enterprise.

Counsel's later actions at trial caused some of the previously excluded evidence to be eventually admitted under Rule 404(b). Basciano's defense counsel opened the door when he raised the inference that Basciano was too afraid of Bonanno family boss Joseph Massino to have committed an unsanctioned murder (such as the Santoro or Pizzolo murder). (Mar. 6, 2006, Order (Trial Dkt. 517); see also Mot. for Recon. (Trial Dkt. 513).) Accordingly, the court admitted the murder of John Doe in a Queens social club to allow the Government to rebut this inference. (Mar. 6, 2006, Order.) After this evidence was admitted, the court gave a 404(b) limiting instruction, directing the jury not to consider the evidence for propensity purposes but only for the proper purpose of challenging Basciano's ability to have committed an unapproved murder. (See Mar. 8, 2006, Order (Trial Dkt. 522).) Upon the Government's request for reconsideration, the court reaffirmed its conclusion, including the decision not to admit uncharged evidence as direct evidence of the racketeering enterprise. (Mar. 8, 2006, Order (Trial Dkt. 524); see also Mot. for Recon. (Trial Dkt. 509).)[23]

After excluding the uncharged crimes as direct evidence of the racketeering enterprise at both trials, the court charged the jury that it could consider such evidence in deciding whether the Government had proved the "pattern" element of racketeering conspiracy and racketeering, respectively. (Final 2006 Jury Charge (Trial Dkt. 593) at 63 (stating that in determining whether the Government had proved the requisite threat of continued unlawful activity, the jury was "not limited to consideration of the specific racketeering acts charged against the defendant" and could consider "other unlawful activities of the enterprise and its members viewed in their

---

[23] Later, the court also admitted evidence of certain other uncharged crimes such as drug trafficking and home invasion robberies after the defense created a misleading impression during the cross-examination of Cicale that certain crimes never occurred and that Basciano had not ordered them. (T-I at 6181-82.)

entirety, including both charged and uncharged unlawful activities"); Final 2007 Jury Charge (Trial Dkt. 891) at 20, 56-57 (same); see also T-I at 10085-86; T-II at 4752-53.)

A number of these uncharged crimes were also charged as racketeering predicates in Count One (racketeering) in Superseding Indictment S-9 in the 05-CR-060 capital case. (See Superseding Indictment 9 ("S-9") (Capital Trial Dkt. 464).) Later, after Basciano challenged Count One of the S-9 indictment on double jeopardy grounds, the Second Circuit held that double jeopardy barred Basciano's successive prosecution for substantive racketeering. See United States v. Basciano, 599 F.3d 184, 189 (2d Cir. 2010) (the "Double Jeopardy Opinion").

### 2.   Failure to Object to Jury Instructions Regarding the Uncharged Acts

Petitioner challenges the court's evolving instructions concerning the admission of uncharged acts pursuant to Rule 404(b), arguing that the court's instructions were overly broad and confusing. (Pet. 12-15; Am. Pet. at 199-202.) Petitioner adds that over the course of trial the court improperly allowed the admission of uncharged acts in order to rebut Basciano's claim that he was incapable or unwilling to violate the rules of organized crime. (See Am. Pet. at 202-08.) Petitioner further argues that the court "hoodwinked" the defense when it ultimately allowed the jury to consider uncharged acts as direct evidence of the "pattern" element after having previously agreed to admit them only under Rule 404(b).[24] (Pet. at 17, Am. Pet. at 210.) Petitioner claims ineffective assistance of trial counsel in connection with his counsel's failure to object on these grounds and ineffective assistance of appellate counsel with regard to his counsel's failure to raise these objections on appeal. (Pet. at 23, Am. Pet. at 215-16.)

Petitioner's claims, however, are barred by prior decisions of the Second Circuit, and insofar as they are not precluded they are without merit. As the Second Circuit stated, the initial "[a]dmission of 404(b) evidence is entirely appropriate to explain, as it did here, the development

---

[24] Petitioner alleges that such evidentiary rulings compounded the Government's suppression of Brady material.

26

of criminal relationships and to illustrate that mutual trust existed between coconspirators." See Basciano, 465 F. App'x. at 14. As described above, any later admission of the uncharged acts evidence that was initially withheld from the jury was a result of counsel's actions at trial that opened the door to the admission of such evidence. Accordingly, insofar as the court's jury instructions evolved over the course of trial, they did so in direct response to evolving strategy by the defense.[25] However, such trial strategy can hardly constitute deficient performance by counsel under the deferential standard in Strickland.[26]

As the Second Circuit also observed, the court charged the jury "[c]onsistent with [Circuit] precedent" regarding the admission of uncharged acts as direct evidence of the racketeering pattern. Unlike the "enterprise" element, to which defense counsel stipulated, the "pattern" element remained contested at both trials. (See T-I at 2455-62 ("Court: So you've stipulated on the first four elements and the fifth element is the subject matter of the litigation in trial.").) Therefore, it was appropriate for the Government to rely on uncharged crimes to prove the contested "pattern" element. See, e.g, United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) (holding that the Government is permitted to introduce evidence of uncharged crimes—without relying on Rule 404(b)—in order to prove the crimes charged in the indictment). The court also instructed the jury that it needed to find all of the elements of

---

[25] With regard to the 2007 trial, the Government gave notice of its intention to introduce the uncharged Pizzolo, Bonelli, and DeFilippo evidence pursuant to the court's decision in February 2006, which remained the law of the case. (See Trial Dkt. 805.) The court granted the request for reasons explained in its prior order. See Basciano, 2007 WL 1791221, at *1.

[26] Although with the benefit of hindsight it is apparent that defense counsel opened the door to the admission to certain uncharged acts, it is evident that the line of cross-examination by defense counsel that opened the door was a matter of strategy. (See Mar. 6, 2006, Order at 4-5 (discussing the statements at issue).) By the line of questioning at issue, defense counsel sought to downplay Basciano's individual role in the Bonanno family, consistent with the defense theory that Basciano was but a low-level associate of the Bonanno family. Such a strategic line of questioning cannot be the basis for a finding of ineffective assistance of counsel, even if it opened the door to the admission of other acts. See also Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986) (holding that opening the door did not constitute ineffective assistance of counsel); United States v. Gonzalez, 407 F. Supp. 2d 375, 383 (D. Conn. 2005) (same).

racketeering conspiracy (at the 2006 trial) and racketeering (at the 2007 trial) beyond a reasonable doubt. (T-I at 10112, 10118; T-II at 4779-88.)

In light of the Second Circuit rulings, Petitioner is precluded from raising ineffective assistance of counsel claims on these grounds. See Yick Man Mui, 614 F.3d at 53 (observing that ineffective assistance of counsel claims are barred "when the factual predicates of those claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate.")

### 3. Failure to Object to Insufficient Proof of the Uncharged Acts

Citing the Second Circuit's Double Jeopardy Opinion in his capital case, Petitioner claims that those uncharged acts in the 03-CR-929 case that were also charged as racketeering predicates in the S-9 indictment in the 05-CR-060 case (namely, the conspiracies to murder Randy Pizzolo, Joseph Bonnelli, and Patrick DeFilippo) are more properly characterized as charged acts for the purpose of the 03-CR-929 case and should have been proven beyond a reasonable doubt in 2006 and 2007. (See Pet. at 8-12; Am. Pet. at 195-99.) According to Petitioner, he was deprived of his right to effective assistance of counsel to the degree that trial and appellate counsel failed to object on such a basis.

Petitioner, however, misconstrues the Second Circuit's Double Jeopardy Opinion. See Basciano, 599 F.3d at 184. The Double Jeopardy Opinion was an appeal in Petitioner's capital case in which he argued that the racketeering charge (Count One) in the 05-CR-060 (S-9) indictment was barred by the Double Jeopardy Clause because it was the substantially the same as the racketeering charge (Count One) in the 03-CR-929 (S-8) indictment, for which he stood convicted. See id. at 197. In comparing these two charges, the Second Circuit reviewed a variety of factors that contributed to Basciano's colorable showing of a duplicative racketeering

28

"pattern" element.[27] The Second Circuit observed that the two indictments relied on identical language to describe the criminal means and methods of the Bonanno crime family and certain common racketeering predicates. Id. at 201. In addition, the Second Circuit determined that the prior admission of several racketeering predicate acts charged in 05-CR-060 (S-9) as uncharged Rule 404(b) and direct evidence in the 03-CR-929 proceedings contributed to Basciano's showing. Id. After further analysis, the Second Circuit concluded that the racketeering charge (Count One) in the 05-CR-060 (S-9) indictment was barred from relitigation because the Petitioner had already been put in jeopardy for that charge in the 03-CR-929 proceedings. See id. at 188-90.

However, the Second Circuit's holding regarding a duplicative racketeering charge in the capital case cannot possibly retroactively convert uncharged acts admitted at the 03-CR-929 proceedings into de facto charged ones, requiring proof beyond a reasonable doubt. As stated above, these uncharged acts were admitted for a narrow purpose at both the 2006 and 2007 trials, consistent with the court's jury instructions. The jury was not required to find the uncharged acts, such as the Pizzolo murder, proved to find Petitioner guilty of the charged crimes, such as the Santoro murder. The Double Jeopardy opinion does not have anything to say in support of Petitioner's unorthodox argument. Accordingly, counsel could not have been ineffective in failing to raise such a frivolous claim. United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) (counsel's "failure to make a meritless argument does not amount to ineffective assistance"), abrogated in part on other grounds by Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, n.8 (2003).

---

[27] The Government had already conceded that the two racketeering charges involved the same enterprise—the Bonanno crime family—but argued that the offenses were distinguished by different patterns of racketeering. Basciano, 599 F.3d at 188.

4.    <u>Failure to Argue That the Pizzolo Evidence was Exculpatory Under Brady</u>

Petitioner further argues that because the uncharged Pizzolo murder was purportedly

"part of the very act charged," "any suppressed evidence which tended to cast doubt on

Basciano's participation [in the Pizzolo murder] or Cicale's version thereof, was material under

<u>Brady</u>" and not just impeachment evidence under <u>Giglio</u>. (Pet. at 30-31; Am. Pet. at 220-21.)

Petitioner maintains that this court's and the Second Circuit's prior rejection of his Pizzolo-

related <u>Brady</u> claims was an erroneous result of his counsel's failure to frame the Pizzolo murder

as a charged crime. (Am. Pet. at 219-20.) Accordingly, Petitioner contends that his trial

"counsel's deficient performance in failing to properly frame" this argument in his Rule 33

proceedings and his appellate counsel's failure to raise this issue on direct appeal constitutes

ineffective assistance of counsel. (<u>See</u> Pet. at 28; Am. Pet. 221.)

Petitioner's argument that the Pizzolo evidence was "inextricably linked" to the charged

crimes is without merit. As discussed above, <u>see</u> <u>supra</u> Part IV.C.3, the admission of the

uncharged Pizzolo murder under Rule 404(b) and as direct evidence of racketeering does not

convert it into a charged predicate. Accordingly, counsel did not err in failing to raise this claim.

Rather, Petitioner's counsel properly raised a number of <u>Brady</u> claims during Rule 33

proceedings, arguing that the Government had suppressed favorable information that would have

impeached Cicale's testimony with respect to the Pizzolo murder. <u>See</u> <u>Basciano</u>, 2008 WL

794945, at *1; <u>Basciano</u>, 2010 WL 3325409, at *7-9. Although this court twice denied counsel's

motions and the Second Circuit twice affirmed, these decisions ultimately have little to do with

whether the favorable information was characterized as <u>Brady</u> or <u>Giglio</u>. Rather, the Second

Circuit found that the information regarding the Pizzolo homicide simply did not undermine the

confidence in Petitioner's conviction in light of a multitude of evidence independent of the

testimony of Dominick Cicale. <u>Basciano</u>, 384 F. App'x at 31; <u>Basciano</u>, 465 F. App'x at 14-15.

Therefore, counsel's failure to argue Petitioner's unconventional theory does not constitute ineffective assistance of trial or appellate counsel. See United States v. Noble, 363 F. App'x 771, 773 (2d Cir. 2010) (stating that "[a]n attorney's 'failure to make a meritless argument does not amount to ineffective assistance'") (quoting Arena, 180 F.3d at 396).

### D. Counsel's Failure to Object to the Admission of Out-of-Court Statements

Petitioner also asserts that his trial counsel was ineffective in failing to object to "various instances of witnesses testifying to what others had said with regard to other acts not charged in the indictment" and that his appellate counsel was ineffective in failing to raise this issue on direct appeal. (See Pet. at 78; Am. Pet. at 263.) Petitioner identifies Cicale's testimony regarding statements that Gambina and Mancuso made to him about the Pizzolo murder as such inadmissible out-of-court statements. (Id.) Petitioner reasons that because the Pizzolo murder conspiracy was not a charged crime in this case, statements by Gambina and Mancuso were not admissible pursuant to the co-conspirator hearsay exception in Federal Rule of Evidence 801(d)(2)(E). (Pet. at 79-80; Am. Pet. at 264-65.)

#### 1. Legal Standard

Hearsay is a statement made by an out-of-court declarant that is offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). As a rule, hearsay is not admissible, unless specifically allowed by the Federal Rules of Evidence or by statute. Fed. R. Evid. 802. Federal Rule of Evidence 801(d)(2)(E) provides one such exception for out-of-court statements of a defendant's co-conspirator. Fed. R. Evid. 801(d)(2)(E). Before admitting a co-conspirator's out-of-court statement against a defendant under Rule 801(d)(2)(E), a court must determine that there was a conspiracy involving the declarant and the defendant, and that the statement was made "during the course and in furtherance of the conspiracy." Id. The court "in each instance must find the existence [between the defendant and the declarant] of a specific

31

criminal conspiracy [to do that criminal act.]" United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999). The statement itself must be considered but does not by itself establish the existence of the conspiracy. Fed. R. Evid. 801(d)(2)(E). In contrast to Petitioner's theory of admissibility, "the objective of the joint venture need not be the crime charged in the indictment (or the objective of the conspiracy charged in the indictment)." United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002) (citing Gigante, 166 F.3d at 82); see also United States v. Lyles, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment.")

### 2. Gambina's Out-of-Court Statements

Petitioner objects to Cicale's testimony that: (1) Gambina initially agreed to participate in the Pizzolo murder, and (2) Gambina backed out of the Pizzolo murder conspiracy after Petitioner's arrest. (T-II at 1225-27.) Contrary to Petitioner's theory, it is not certain Gambina's statements would constitute inadmissible hearsay, even without relying on Rule 801(d)(2)(E). Gambina's statements may have been admissible not for the truth of what Gambina said, but rather for their effect on the listener, Cicale, as he prepared to murder Pizzolo. Thus, any hearsay objection by defense counsel would have likely been overruled.

If the statements *were* offered for their truth pursuant to Rule 801(d)(2)(E), the court would have been required to decide if there existed a conspiracy between Cicale and Gambina to murder Pizzolo. See Gigante, 166 F.3d at 82. The record, however, does not provide definitive evidence of whether Gambina was, in fact, a co-conspirator in the Pizzolo murder plot.[28] It would be difficult in the current posture of this habeas proceeding to make a factual finding

---

[28] At Petitioner's 2011 capital trial, Gambina testified that in his meetings with Cicale he neither agreed to be part of the conspiracy nor declined to participate, although he allowed Cicale to believe that he would participate. (T-III at 6583-84, 6651.)

regarding Gambina's true status. In any event, such a determination is not necessary in order to reach a decision on Petitioner's ineffective assistance of counsel claim.

Even assuming arguendo that Cicale's testimony about Gambina's statements was improperly admitted at trial, Petitioner's counsel was not ineffective in failing to object because Petitioner cannot satisfy the prejudice prong of the Strickland standard. Specifically, the statements that Petitioner challenges are few and tangential to the charges. They merely explain Gambina's peripheral involvement in the Pizzolo murder conspiracy, Gambina's relationship with Cicale, and Cicale's role in the Pizzolo murder. Unlike Gambina's proffer statements, for example, which form the basis for Petitioner's Brady claims, see supra Part III.B, these out-of-court statements do not address the timing of the conspiracy or Basciano's involvement. They do not inculpate Petitioner, and their exclusion would not have been particularly useful to him.

It is also helpful to remember that Gambina's statements at issue only pertain to the uncharged Pizzolo murder conspiracy. The Second Circuit concluded, however, that even if the district court would have excluded evidence of the uncharged Pizzolo murder in its entirety, Basciano still would not be entitled to a new trial. Basciano, 465 F. App'x at 15. This holding altogether forecloses Petitioner's instant ineffective assistance of counsel claim as it pertains to the Pizzolo murder. See Yick Man Mui, 614 F.3d at 53 (an ineffective assistance of counsel claim can be barred in a § 2255 proceeding "when the factual predicates of those claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate"). Accordingly, there is no reasonable probability that the result of the proceeding would have been different but for counsel's error in objecting to Cicale's testimony about Gambina's out-of-court statements.[29] See Strickland, 466 U.S. at 694.

_____

[29] In passing, Petitioner also states that his inability to confront Gambina or to effectively cross-examine Cicale regarding Gambina's out-of-court statements "may have been" a violation of Confrontation Clause. (Pet'r's Mem.

### 3. Mancuso's Out-of-Court Statements

Petitioner also objects to Cicale's testimony that acting boss Michael Mancuso ordered Cicale to proceed with the Pizzolo murder after it was initially called off following Petitioner's arrest. (T-II at 1225-28.) Unlike Gambina, there is sufficient evidence in the record that Mancuso conspired with Petitioner to murder Pizzolo for this court to determine that the testimony was properly admitted under the co-conspirator hearsay exception in Rule 801(d)(2)(E). The statements at issue here pertain to the progress of the Pizzolo murder plot, reaffirm Basciano's initial order to kill Pizzolo, and confirm Mancuso's role in ensuring that Basciano's order was carried out. (Id.) The statements themselves, as well as Cicale's other testimony at trial, sufficiently established the existence of the conspiracy for the purpose of Rule 801(d)(2)(E).[30] (See T-II at 1199-1218, 1225-28.) Because the Mancuso statements were non-hearsay, Petitioner's counsel made no error in failing to object to their admission either at trial or on appeal, foreclosing Petitioner's ineffective assistance claim. Arena, 180 F.3d at 396. Additionally, for the reasons explained above, even if counsel erred, there is no reasonable probability that but for counsel's error in connection with the admission of the Pizzolo murder the result of the proceeding would have been different. See supra Part IV.C.

\* \* \* \* \*

In light of the foregoing, the court concludes that Petitioner's claims that he has been deprived of his right to effective assistance of trial and appellate counsel in violation of his Sixth Amendment are without merit.

---

of Law at 24-25.) Petitioner could have brought this claim on appeal, but he neither alleges cause and prejudice nor ineffective assistance of counsel in connection with his failure to raise this claim on appeal. Accordingly, Petitioner is procedurally barred from raising this claim now. Yick Man Mui, 614 F.3d at 54.

[30] As discussed above, the fact that the Pizzolo murder was not a charged crime does not affect admissibility of co-conspirator testimony. Russo, 302 F.3d at 45.

## V.    OTHER CLAIMS PERTAINING TO THE ADMISSION OF UNCHARGED ACTS

Consistent with his ineffective assistance of counsel claims, Petitioner raises other claims arising from the allegedly improper admission of uncharged acts, particularly the Pizzolo murder. (Pet. at 72; Am. Pet. at 251.) Specifically, Petitioner claims that the admission of this evidence rendered the Racketeer Influenced and Corrupt Organizations ("RICO") statute overbroad and void for vagueness as applied to him (Pet. at 73; Am. Pet. at 251), and constitutes a constructive amendment of the indictment (Pet. at 72; Am. Pet. at 260).

### A.    Overbreadth and Vagueness

Petitioner asserts that the "use of non-racketeering activity to prove" the pattern element of 18 U.S.C. §§ 1961 and 1962 is "contrary to the RICO statute, violated [his] due process" rights and rendered the statute (i) overbroad or (ii) void for vagueness. (Pet. at 72; Am. Pet. at 251.) Petitioner failed to raise this claim on appeal and is therefore precluded from arguing it now. Yick Man Mui, 614 F.3d at 54. Nor does Petitioner allege that cause and prejudice should excuse this requirement. See Thorn, 659 F.3d at 231; Perez, 129 F.3d at 260-61. Rather, Petitioner asserts that he is entitled to bring this claim due to unspecified ineffective assistance of counsel and because of the "novelty" of the claim. (Pet. at 74; Am. Pet. at 258.)

#### 1.    Overbreadth

"The 'overbreadth' doctrine . . . permits a defendant to make a facial challenge to an overly broad statute restricting speech." Alexander v. United States, 509 U.S. 544, 555 (1993). The Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." United States v. Salerno, 481 U.S. 739, 745 (1987) (citing Schall v. Martin, 467 U.S. 253, 268, n.18 (1984)). Because "the RICO statute does not criminalize constitutionally protected speech" it is "materially different from the statutes at issue in . . . overbreadth cases." See Alexander, 509 U.S. at 555. In light of such clear case law, an

35

attorney's failure to make a frivolous argument concerning the overbreadth of the RICO statute does not constitute ineffective assistance of counsel. See Noble, 363 F. App'x at 773. Because the court has considered and denied Petitioner's ineffective assistance of counsel claim and because "novelty" is not a proper ground to excuse Petitioner's failure to raise a claim on appeal, the court does not consider this overbreadth claim any further because it is procedurally defaulted.

    2.    Vagueness

A statute is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." United States v. Burden, 600 F.3d 204, 228 (2d Cir. 2010) (internal quotations omitted). Generally, demonstrating a RICO pattern requires proof of multiple racketeering predicates that are related and that amount to, or threaten the likelihood of, continued criminal activity. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229 (1989); Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 n.14 (1985); United States v. Indelicato, 865 F.2d 1370, 1381-84 (2d Cir. 1989) (en banc). It is well-established that the government may prove a charged pattern of racketeering activity with evidence beyond a defendant's own predicate acts. See Indelicato, 865 F.2d at 1384 (2d Cir. 1989); United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992). Although challenges to RICO on the basis of vagueness are viewed in light of the facts and circumstances of a particular case, Burden, 600 F.3d at 228, the Second Circuit has rejected claims that RICO is unconstitutionally vague in a variety of applications, including challenges to the "pattern" element. See, e.g., United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991) (collecting cases and holding that the RICO statute's pattern requirement was not void for vagueness as applied to defendant).

As for the facts and circumstances of this particular case, Petitioner stipulated to the existence of the Bonanno crime family of La Cosa Nostra and did not contest his membership in it.[31] Basciano, 2006 WL 385325, at *2. Because "RICO was plainly intended to encompass the illegal activities of organized crime," Petitioner had sufficient notice that his conduct fell within RICO's reach, and thus the statute is not unconstitutionally vague as applied to him. See Coiro, 922 F.2d at 1017. Petitioner's conviction "is not invalid simply because other marginal cases . . . might involve facts that create undue uncertainty as to the application of RICO's pattern requirement to a defendant's activities." Id. In light of clearly established Second Circuit case law, counsel's failure to make a meritless argument regarding the unconstitutional vagueness of the RICO statute as applied to an admitted member of La Cosa Nostra does not constitute ineffective assistance. Noble, 363 F. App'x at 773. Accordingly, since the court has considered and denied Petitioner's ineffective assistance of counsel claim, the court does not consider this vagueness claim any further because it is procedurally defaulted.

### B.  Constructive Amendment of the Indictment

Petitioner next claims that the admission of the uncharged Pizzolo murder as Rule 404(b) evidence amounted to a constructive amendment of Count One (racketeering) of the S-8 indictment.[32] (Pet. at 75; Am. Pet. at 260-62.) Petitioner argues that the uncharged Pizzolo murder was improperly used to prove a pattern of racketeering, which should have only been proven by reference to the charged racketeering acts. (Pet. at 75; Am. Pet. at 260-62.) It is apparent that this claim could have been brought on direct appeal but was not, making it

---

[31] Petitioner's counsel conceded at his 2006 trial that he was a member of the Bonanno crime family (T-I at 2011, 2457-61), which the district court noted in its jury instructions (T-I at 10118).

[32] As described in greater detail above, see supra Part IV.C.1, the Pizzolo murder was admitted pursuant to Rule 404(b) for a discrete purpose after Defense counsel opened the door, subject to a limiting instruction.

improper for the court to consider it on § 2255 collateral review.[33] Petitioner does not allege that

cause and prejudice should excuse this requirement. See Thorn, 659 F.3d at 231; Perez, 129

F.3d at 260-61. Rather, Petitioner again contends that this claim was not raised on direct appeal

due to unspecified ineffective assistance of counsel. (Pet. at 76; Am. Pet. at 261.)

"A constructive amendment occurs when the government's presentation of evidence and

the district court's jury instructions combine to 'modify essential elements of the offense charged

to the point that there is a substantial likelihood that the defendant may have been convicted of

an offense other than the one charged by the grand jury.'" United States v. Vebeliunas, 76 F.3d

1283, 1290 (2d Cir. 1996) (quoting United States v. Clemente, 22 F.3d 477, 482 (2d Cir. 1994)

(collecting cases)). Constructive amendments "are per se violations of the fifth amendment that

require reversal even without a showing of prejudice to the defendant." Clemente, 22 F.3d at

482 (citing United States v. Helmsley, 941 F.2d 71, 89 (2d Cir. 1991)). "In determining whether

an 'essential element' of the offense has been modified . . . [the Second Circuit has] 'consistently

permitted significant flexibility in proof, provided that the defendant was given notice of the core

of criminality to be proven at trial.'" Id. (quoting United States v. Patino, 962 F.2d 263, 266 (2d

Cir. 1992)). The question, therefore, is whether the admission of the uncharged Pizzolo murder

modified essential elements of Superseding Indictments S-8 such that there is a substantial

likelihood that Petitioner was convicted of an offense other than the ones charged. See

Vebeliunas, 76 F.3d at 1290.

As already discussed in considering Petitioner's claim of unconstitutional vagueness, see

supra Part V.A.2, it is well established that evidence beyond a defendant's own predicate acts is

admissible as direct evidence of racketeering. See Indelicato, 865 F.2d at 1384; DiNome, 954

---

[33] Indeed, Petitioner did bring an unrelated constructive amendment claim on direct appeal, which the Second
Circuit rejected. See Basciano, 384 F. App'x at 33-34.

F.2d at 843. Furthermore, in this case, Petitioner was provided with proper notice of the "core of criminality to be proven at trial." Clemente, 22 F.3d at 482 (internal quotation marks omitted). First, Basciano was indicted for racketeering in connection with his leadership of the Bonanno crime family, which required its members to "carry out, among other crimes, acts of violence, including murder and assault." (S-5 at 2, 4; S-8 at 5-6.) In this way, the uncharged Pizzolo murder was a part of this "core of criminality" of which Petitioner had notice. Second, Petitioner was on actual notice that evidence of the Pizzolo murder would be presented at trial. On January 13, 2006, the Government filed a motion in limine seeking the admission of such evidence, which the court granted on February 17, 2006. See Basciano, 2006 WL 385325, at *1, 10.[34] Finally, at the conclusion of the evidence, the court repeatedly warned the jury that Petitioner was only on trial for the crimes listed in the indictment and emphasized the elements that must be proved in order to render a guilty verdict. (Final 2007 Jury Charge at 4 (noting that "the defendant [was] on trial for the crimes charged in the indictment and not for anything else"); see id. at 19, 20, 34, 48, 55; see also T-I at 10070-71; T-II at 4779-80, 4786-88.) Although the court permitted the use of the Pizzolo murder conspiracy as direct evidence of a racketeering pattern (T-I at 10125; T-II at 4788), it was clear that the Defendant was on trial for the racketeering charge and not for the uncharged other acts. See Clemente, 22 F.3d at 483 (appropriate instructions "specifically instructed the jury that the defendants were not on trial for any crimes except for those that were charged in the indictment" and "warned that the evidence of uncharged acts was admitted solely" for specific allowable purposes).

Since the court concludes that the introduction of the uncharged crimes was proper, counsel's failure to make a frivolous constructive amendment claim does not constitute

---

[34] While the court admitted the Pizzolo murder, the court denied the Government's motion to admit a significant number of other uncharged acts because these acts were deemed to be overly prejudicial under the Rule 403 balancing test. Basciano, 2006 WL 385325 at *7-9.

ineffective assistance. Noble, 363 F. App'x at 773. Absent ineffective assistance of counsel, the court does not consider Petitioner's constructive amendment claim any further because it is procedurally defaulted. [35]

## VI. PROSECUTORIAL ELICITATION OF PERJURY, MISCONDUCT, AND BIAS

Petitioner next argues that, having improperly suppressed Brady material, the Government engaged in further prosecutorial misconduct by: (1) knowingly introducing Cicale's false testimony (Pet. at 49-53; Am. Pet. at 157-66), and (2) improperly bolstering and commenting on the credibility of witnesses (Pet. at 65, 67; Am. Pet. at 243, 245), depriving him of his ability to develop several defense theories. Petitioner also claims that the lead prosecutors of the 2006 and 2007 trials were biased against him. (Pet. at 85-94; Am. Pet. at 275-85.)

### A. Eliciting False Testimony

Reprising his Brady claims, which the court rejected above, Petitioner argues that Gambina's proffer reports and the information reflected in the Buretta Note reveal that the Government engaged in prosecutorial misconduct by knowingly introducing Cicale's false testimony regarding: (1) his involvement in the Pizzolo murder conspiracy, and (2) his later motive to cooperate (Pet. at 49; Am. Pet. at 157), as well as (3) the plot to kill Michael Mancuso (Am. Pet. at 170-71).[36] Petitioner concedes that he could have brought these false testimony

---

[35] In addition, Petitioner repeats his claim that by failing to disclose information contradicting Cicale's account of the Pizzolo murder conspiracy, prosecutors "despoiled" this court's calculus under Rule 403, causing the Pizzolo murder to be admitted erroneously. (Pet. at 69.) This claim was presented to the Second Circuit on his appeal from the denial of his third motion for a new trial and is precluded by the Second Circuit's prior decision rejecting this argument. See 465 F. App'x at 15 ("[E]ven if we were to decide that the non-disclosed evidence should have been disclosed to the district court and that the district court thereafter would have excluded evidence of the Pizzolo murder, Basciano would still not be entitled to a new trial.").

[36] In his Amended Petition, Basciano adds two new prosecutorial misconduct claims based on the Government's alleged introduction of false testimony by: (1) Detective Thomas Crowe regarding moving across the street from Petitioner's girlfriend (Am. Pet. at 172-90), and (2) Cicale concerning the Santoro murder (Am. Pet. at 166-69). Because the court concluded that these two claims are futile, it declines to consider it here. (See Recusal and Discovery Order at 51-52.)

claims on appeal and failed to bring them in their present form.[37] (Pet. at 48; Am. Pet. at 156.) However, Petitioner does not argue that cause and prejudice or ineffective assistance of counsel should excuse his failure to do so. See Thorn, 659 F.3d at 231; Perez, 129 F.3d at 260-61. Therefore, these false testimony claims are procedurally defaulted.

In any event, these claims would fail even if the court were to reach the merits. It is well established that the prosecution has an obligation to ensure that testimony elicited at trial is truthful and a conviction procured through the introduction of "testimony the prosecutor knows to be false is repugnant to the Constitution." Shih Wei Su v. Filion, 335 F.3d 119, 126 (2d Cir. 2003) (citing Mooney v. Holohan, 294 U.S. 103, 112 (1935)). If undisclosed evidence shows that the Government knew or should have known that its case includes perjured testimony, a conviction should be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). If the prosecutors did not know of the perjury, due process is violated only "if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003) (quoting United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991)). In other words, faced with an allegation that a conviction was procured through the introduction of false testimony, a court must determine: "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the

---

[37] Indeed, previously on direct appeal Petitioner argued—in a variation of some of his current claims—that that the Government improperly bolstered Cicale's credibility by eliciting false testimony that he could face the death penalty if he lied in violation of his cooperation agreement. Basciano, 384 F. App'x at 32. The Second Circuit rejected this claim because it found that no evidence belied either Cicale's proffered belief that he could face the death penalty if he testified falsely or indicated that the Government knew that his testimony was false or mistaken. Id.

testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in Agurs." Shih Wei Su, 335 F.3d at 127.

While the court does not take Petitioner's allegations lightly, his claims are without merit. Just as the Second Circuit previously found that no evidence belied either Cicale's proffered belief that he could face the death penalty if he testified falsely or indicated that the Government knew that his testimony to this effect was false or mistaken, Basciano, 384 F. App'x at 32, Petitioner's instant claims of perjury consist of unconfirmed allegations. Neither Gambina's proffer statements nor the Buretta Note establish that Cicale perjured himself at trial. As the court discussed above in considering Petitioner's Brady claims, see supra Parts III.B-C, although these new pieces of evidence might have been useful to Petitioner, they were not inconsistent with Cicale's testimony. Petitioner has not come forward with anything that persuasively demonstrates that the Cicale lied about the timing of the Pizzolo murder conspiracy or that the Government threatened to charge Cicale with the Santoro murder. Even if Cicale perjured himself at trial, there is no evidence that the Government was aware of such purported falsehoods.[38] [39]

---

[38] In a variation of his argument, Petitioner also argues that suppression of Gambina's proffer statements and the information contained in the Buretta Note deprived him of the ability to develop information crucial to the defense theory that after the Government threated to charge him with the death-eligible Santoro murder, Cicale falsely implicated Petitioner in a variety of crimes when he cooperated. (Pet. at 55-58.) However, even without the allegedly suppressed materials, Petitioner was able to argue this theory at trial and extensively impeach Cicale based on this theory. (See T-II at 4579-4615, 4622-27, 4633-39.) See also supra Part III.C.3.

[39] Petitioner also provides an affidavit by one Paul Villanueva, a one-time pretrial detainee at the Metropolitan Detention Center, who claims that at a meeting with two unidentified Assistant U.S. Attorneys, the prosecutors pressured Villanueva to falsely accuse Petitioner of asking Villanueva to kill a fellow inmate named Joseph Borelli but that Villanueva refused. (Pet., Ex. 7 (Affidavit of Paul Villanueva ("Villanueva Aff.") (Dkt. 1-2) at 11-13; Pet'r's Mem. of Law at 10; see also Am. Pet. at 282 n.81.) Petitioner argues that the statement by one of the Assistant U.S. Attorneys, "don't worry we got your back on this," means that the Assistant U.S. Attorneys were willing to suborn perjury regarding the fabricated murder plot, and that the Assistant U.S. Attorneys in his prosecution were also willing to suborn perjury from Cicale so that Cicale would not disclose "what was said during Cicale's secret meetings with the government." (Pet'r's Mem. of Law at 68.) Not only does Petitioner not identify the Assistant U.S. Attorneys who met with Villanueva, but the connection with the instant case is completely speculative. This claim is without merit.

In his Amended Petition, Basciano also argues that trial testimony by Nicholas "P.J." Pisciotti and Thomas Lee shows that the Government knowingly introduced Cicale's false testimony regarding the conspiracy to murder Michael Mancuso.[40] (Am. Pet. at 170-71) However, the inconsistencies between the testimony of Pisciotti, Lee, and Cicale have previously been raised in the litigation concerning Petitioner's conditions of confinement before Judge Levy and before this court, which found against Petitioner. See Basciano v. Lindsay, 530 F. Supp. 2d 435, 440, 444 (E.D.N.Y. 2008), aff'd, Basciano v. Martinez, 316 F. App'x 50 (2d Cir. 2009) (summary order). Calling attention to Cicale's testimony that he sought permission from Basciano to kill Mancuso while Basciano was in custody at the Metropolitan Detention Center, Judge Levy found that the evidence presented "convincingly portray[s] a troubling pattern of criminal activity conducted within the confines of federal detention facilities." Report and Recommendation ("R&R"), Basciano v. Lindsay, No. 07-CV-0421 (NGG) (E.D.N.Y. May 25, 2007), Dkt. 17. Objecting to Judge Levy's R&R, the defense highlighted trial testimony from Pisciotti and Lee that conflicted with Cicale's account of the Mancuso murder plot. Basciano, 530 F. Supp. 2d at 441 (citing T-II at 3570). Although this court noted that "it is cognizant of the fact that the defense has called into question the allegation that Basciano gave Cicale permission to murder Mancuso," the court affirmed Judge Levy's R&R on the basis of the totality of the circumstances showing Petitioner's dangerousness. Id. at 447. Although Petitioner again draws the court's attention to inconsistencies between the testimony of Pisciotti, Lee, and Cicale, he fails to establish that Cicale committed perjury, much less that that Government knowingly

---

[40] The Mancuso murder plot was introduced as other crimes evidence, along with the Pizzolo murder. Basciano, 2006 WL 385325, at *10.

elicited such false testimony. Because there is no evidence of introduction of false testimony, Petitioner's claim is without merit.[41]

### B. Improperly Bolstering and Commenting on Witness Credibility

Petitioner further argues that the suppression of Gambina's proffer statements and the information reflected in the Buretta Note was compounded when the Government improperly "bolstered Cicale's credibility" by: (1) eliciting testimony from Cicale that his own proffer statements had been vetted by the Government (Pet'r's Mem. of Law at 20-22, 37), and (2) eliciting testimony of FBI Special Agent Kim McCaffrey who "vouched for Cicale's truthfulness." (Id. at 23; Pet. at 64-67 (citing T-I at 9158-59); Am. Pet. at 243.) He also contends that the Government engaged in misconduct by improperly "vouch[ing] for Cicale's truthfulness" in rebuttal summation. (Pet. at 64-67; Am. Pet. at 243.)

Like Petitioner's false testimony claims, the improper argument claims could have been brought on appeal. Again, Petitioner does not allege cause and prejudice that would excuse this procedural requirement. See Thorn, 659 F.3d at 231; Perez, 129 F.3d at 260-61. Nor does he allege that the failure to raise these claims on direct appeal is a result of ineffective assistance of counsel. Accordingly, these claims are procedurally defaulted. Moreover, as with the false testimony claims, these bolstering and improper argument claims would be rejected even if the court reached the merits.

---

[41] It appears that Petitioner seeks to relitigate the conditions of his confinement. (Pet'r's Mem. of Law at 11-14.) He argues that the Government "flip flopped" in how it represented Petitioner's solicitation of the murder of Patrick DeFilippo in the 03-CR-929 case and the 05-CR-060 case. (Id. at 13.) He argues that the issue is not moot because the "removal of . . . [Special Administrative Measures] . . . do not remove the government misconduct." (Id.) He also argues that the Government improperly relied on the so-called "hit list" during the litigation concerning his conditions of confinement and invites the court to hold a hearing about the after-effects of the Special Administrative Measures that still "haunt[]" him. (Id. at 14.) The court declines Petitioner's invitation to re-open this issue in these collateral proceedings. Of course, Petitioner is free to pursue Bureau of Prisons administrative remedies or litigate his conditions of confinement by way of a § 2241 petition.

1.    Improper Bolstering

It is well-settled that, "absent an attack on the veracity of a witness, no evidence to

bolster his credibility is admissible." See United States v. Gaind, 31 F.3d 73, 78 (2d Cir. 1994)

(internal quotation marks omitted).  However, once such an attack has been launched, a district

court enjoys broad discretion in admitting rehabilitative evidence of credibility.  Id.; United

States v. Cosentino, 844 F.2d 30, 33 (2d Cir. 1988).  Moreover, claims of improper bolstering are

not cognizable under the Due Process Clause.  See Ochoa v. Breslin, 798 F. Supp. 2d 495, 506

(S.D.N.Y. 2011) (noting that an "improper bolstering claim does not implicate a federal

constitutional right" in a § 2254 state habeas case).

a.    *Cicale's testimony*

At the 2006 trial, Cicale was cross-examined by defense counsel on a variety of topics,

including by counsel for Petitioner's co-defendant regarding: (1) Cicale's lying at his first proffer

session despite being told that he had to be truthful, and (2) his ultimate acceptance as a

cooperating witness despite his deceit.  (T-I at 6274-83.)  On the Government's redirect, the

Government asked Cicale if prosecutors told him during the proffer process "that the government

would check your information," to which Cicale replied in the affirmative.  (Id.)  The

Government also asked Cicale whether Cicale had "an understanding of how the government

could check the information" that Cicale provided, and Cicale stated that it would be checked

"[t]hrough cooperating witnesses and whatever the information that the government had."  (Id.)

Petitioner claims the prosecutors improperly bolstered Cicale's credibility by eliciting such

testimony.[42]  (Pet'r's Mem. of Law at 20-22.)

---

[42] Petitioner also cites an analogous statement by Cicale on cross-examination at the 2007 trial.  (Id. at 37 (citing T-II at 1392 ("I was told that the government verified that I was telling them the truth.")).)

As an evidentiary matter, because the defense had challenged Cicale's credibility (T-I at 6274-83), the Government was properly permitted to explore on redirect the witness's belief as to whether the Government would be able to learn if he had lied. See United States v. Quinones, 511 F.3d 289, 313 (2d Cir. 2007) ("A cooperating witness's expectation as to how his testimony will be viewed by prosecutors . . . is relevant to demonstrating his motive to lie or to tell the truth and, thus may properly be explored by the government . . . once the witness's credibility has been put in issue."); see also Gaind, 31 F.3d at 78. Even if the redirect examination constituted improper bolstering, such a claim is not cognizable under the Due Process Clause. Ochoa, 798 F. Supp. 2d at 506. Accordingly, Petitioner's claim is without merit.

b.   *Agent McCaffrey's testimony*

Agent McCaffrey was called by the defense at the 2006 trial to testify about the proffer and debriefing sessions of cooperating witness Salvatore Vitale. (T-I at 9116-45.) On cross-examination, the Government sought to elicit the distinction between a proffer session and a debriefing session. (T-I at 9157-63.) Agent McCaffrey explained that the FBI accepts cooperating witnesses only after their information is corroborated and it is determined that the FBI "believe[s] the witness is being truthful." (T-I at 9158-59.) Petitioner claims that Agent McCaffrey improperly vouched for Cicale's truthfulness with this testimony. (Pet. at 64-67; Am. Pet. at 243; Pet'r's Mem. of Law at 23.)

The court cannot find that this brief exchange impermissibly bolstered Cicale's credibility. The Government's cross-examination followed the direct examination of Agent McCaffrey by the defense, during the course of which the defense asked Agent McCaffrey a series of questions that put Salvatore Vitale's character for truthfulness at issue. (T-I at 9116-68.) In response to the direct examination, the Government was permitted to rehabilitate Vitale's credibility on cross-examination. See Gaind, 31 F.3d at 78. The exchange, therefore related to

46

the testimony of Salvatore Vitale, and did not bolster the testimony of Dominick Cicale. Even if

the answer constituted improper bolstering of a cooperating witness, the court did not allow the

Government to pursue this line of questioning any further (T-I at 9158), and the exchange was

not referenced during summation. Thus even if Agent McCaffrey's response was improper, the

effect of the statement was minimal. Such a passing reference does not constitute a violation of

Due Process and in no way undermines the certainty of Petitioner's conviction.[43] Ochoa, 798 F.

Supp. 2d at 506.

>    2.    Improper Argument

Petitioner also argues in several sections of his Petition that the suppression of

Gambina's proffer statements and the information reflected in the Buretta Note was compounded

when Assistant U.S. Attorney Buretta improperly "vouched for Cicale's truthfulness" on rebuttal

summation at the 2007 trial. (Pet. at 59, 64-67; Am. Pet. at 243.)

>    a.    *Legal standard*

"A defendant asserting that a prosecutor's remarks warrant a new trial 'face[s] a heavy

burden, because the misconduct alleged must be so severe and significant as to result in the

denial of [his] right to a fair trial." United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2011)

(quoting United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993)). A defendant's conviction

may be vacated if prosecutorial misconduct caused "substantial prejudice" implicating the right

to due process. United States v. Elias, 285 F.3d 183, 190-92 (2d Cir. 2002); accord Banki, 685

F.3d at 120; United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999). To determine whether a

defendant has suffered "substantial prejudice," the court should consider "[1] the seriousness of

the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the

---

[43] Indeed, as the Government notes, the jury's own verdict following the 2006 trial nullifies Petitioner's claim.
United States v. Miller, 116 F.3d 641, 683 (2d Cir. 1997) ("An acquittal by the jury on some counts may be
evidence that the trial was not unfair.") (citing United States v. Myerson, 18 F.3d 153, 163 (2d Cir. 1994)).

certainty of conviction absent the improper statements." Banki, 685 F.3d at 120 (quoting United States v. Parker, 903 F.2d 91, 98 (2d Cir. 1990)); accord Locascio, 6 F.3d at 945-46.  In evaluating a claim of improper argument, a court "must consider the objectionable remarks within the context of the entire trial." United States v. Espinal, 981 F.2d 664, 666 (2d Cir. 1992) (citing United States v. Young, 470 U.S. 1, 11-12 (1985)).

Comments regarding witness credibility are one type of potentially improper prosecutor remarks.  Generally, prosecutors may not vouch for the truthfulness of their witnesses, United States v. Modica, 663 F.2d 1173, 1179 (2d Cir. 1981) or imply the existence of extraneous proof supporting the witness's credibility, United States v. Bagaric, 706 F.2d 42, 61 (2d Cir. 1983) abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994). However, prosecutors "have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility." United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) (citing United States v. Perry, 643 F.2d 38, 51 (2d Cir. 1981) ("[I]n light of the fact that the defense lawyers attacked the credibility and honesty of the Government's case in their closings, the Government's statements vouching for witnesses were understandable if not laudable.")).

b.    *Rebuttal summation*

Having earlier impeached Cicale regarding his motive to cooperate (including his indictment for the Pizzolo murder and possible charges for the Santoro murder), defense counsel James Kousouros argued in summation at the 2007 trial that Cicale had falsely implicated Basciano in a variety of crimes in order to escape the death penalty.  (T-II at 4580-83, 4588.)  In response to this argument, Assistant U.S. Attorney Buretta stated in rebuttal summation that there was no proof that Cicale was aware that he was going to be charged with the Santoro murder.  (T-II at 4688-89 ("Mr. Kousouros stands here and says, Well, Mr. Cicale was about to

48

be charged with the Santoro murder. Is that true? Was there any evidence of that at all?").)

Buretta also argued the Government could not have threatened Cicale with the Santoro murder because "[t]here's no evidence implicating Dominick Cicale [in the Santoro murder] before he walks in the door," agreeing to cooperate against Basciano. (T-II at 4689.)

Buretta's first argument to the jury—that the defense lacked proof to support its theory that that Cicale was aware he was going to be charged with the Santoro murder—does not constitute misconduct. Although it is improper for prosecutors to suggest that the defendant bears a burden to come forward with evidence in his defense, Shareef, 190 F.3d at 79, prosecutors are permitted to summarize evidence. United States v. Barnes, 604 F.2d 121, 148 (2d Cir. 1979) (A prosecutor may point out the defense's "failure . . . to support [its] own factual theories with witnesses."). In this case, Buretta was merely pointing out the defense's lack of support for its theory, without impermissibly suggesting that the burden was on the defense.

Buretta's second argument to the jury—that "[t]here's no evidence implicating Dominick Cicale [in the Santoro murder] before he walks in the door" (T-II at 4689)—is more problematic. Petitioner correctly notes that long-term reporting by confidential informant Joseph Barone to the FBI made it clear that Cicale was directly involved in the Santoro murder.[44] (Am. Pet. at 159-62.) For example, Barone reported as early as 2003 that the Santoro murder was ordered by Basciano and committed by Cicale. (See Gov't Opp'n, Ex. 1 (FD-302 Report Dated Jan. 28, 2003) (Dkt. 20-1) at 3.) Although the second statement may have been improper, it does not

---

[44] Barone was a confidential informant reporting to an FBI special agent who was investigating the Bonanno crime family. Between February 2001 and January 2003, Barone provided the FBI with information about several incidents at issue in Petitioner's trial. The Government turned over Barone's reports to the defense prior to Petitioner's capital trial in 2011. As the court concluded in the Recusal and Discovery Order, even if Barone's reports were improperly suppressed by the Government prior to Petitioner's 2006 and 2007 trials, they were not material to the outcome of these proceedings. (Recusal and Discovery Order at 28-38.) As a result, the court declined to hold an evidentiary hearing on the Government's alleged suppression of the Barone Materials. (Id. at 42.) Similarly, the court declines to make a factual determination as to whether Barone's reports concerning Cicale's involvement in the Santoro murder was known to Assistant U.S. Attorney Buretta when he made the argument in question.

constitute "egregious" conduct that warrants a new trial. First, the comment was made on summation-rebuttal, in response to defense counsel's arguments, where greater leeway is typically afforded to prosecutors to respond. See Young, 470 U.S. at 12 (holding that "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo"); United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) ("In particular, where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." (citation omitted)). Second, the improper statement was a passing argument in rebuttal-summation of a six-week trial. Viewed against the entire proceeding, the remark in question did not deprive Petitioner of his right to a fair trial. Espinal, 981 F.2d at 666; Elias, 285 F.3d at 191; Modica, 663 F.2d at 1181-82. Third, the court advised the jury at both trials that evidence of a witness's interest is properly considered in evaluating the credibility of witnesses. (Final 2006 Jury Charge at 24-26 ("[Testimony of cooperators] must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe."); Final 2007 Jury Charge at 24-26 (same).) Finally, the overwhelming evidence of the charged conduct and the extensive impeachment of Cicale, as discussed at length in connection with Petitioner's Brady claims, see supra Parts III.B-C, demonstrates that the conviction would have stood absent the improper statements concerning Cicale's credibility. Accordingly, Petitioner's claims are without merit.[45]

---

[45] Petitioner also references Assistant U.S. Attorney Buretta's statement in summation, "In his opening statement Mr. Kousouros said to you, promised that he would prove to you that Dominick Cicale was a liar. Hold him to it." (Pet. at 41 (citing (T-II 4461).) This statement, however, was in direct response to Basciano's opening statement, where the defense repeatedly attacked the credibility of the Government's cooperating witnesses, referring to them as "degenerate liars" and said in reference to Cicale, "By the end of this trial you're going to see this is a man with an ability to fabricate that is going to be beyond your ken. Hold me to that." (T-II at 115, 120.) Thus, the Government's comment in summation was a proper response to the defense's opening statement. See Young, 470 U.S. at 12; Tocco, 135 F.3d at 130.

## C.    Prosecutorial Bias

Finally, Petitioner argues that he is the victim of prosecutorial bias at the hands of Assistant U.S. Attorneys Andres and Buretta, the lead prosecutors of the 2006 and 2007 trials, respectively. (Pet. at 85-94; Am. Pet. at 275-85.) According to Petitioner, both prosecutors "concealed Brady material from the defense" because of their belief that Basciano solicited the murder of Assistant U.S. Attorney Andres.[46] (Pet. at 85, 92.) Petitioner again cites Gambina's proffer statements and the information contained in the Buretta Note for the proposition that the Government purposely withheld Brady materials throughout his Rule 33 proceedings, disclosing them only when the time for Basciano to make use of such allegedly exculpatory information had expired. (Pet. 81-86; Am. Pet. at 278.)

To prove a prima facie case of prosecutorial bias, Petitioner must show "(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith . . . ." United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974). Petitioner's claims clearly fail both prongs of the Berrios test. Petitioner does not claim, nor is there any evidence to suggest, that he was singled out on a discriminatory basis such as race. Rather, Petitioner was prosecuted for crimes committed in connection with his role as a member of the Bonanno crime family of La Cosa Nostra, a relationship that he acknowledged during opening statements. (T-I at 2011.) Petitioner's claim is more properly characterized as a claim that he was "deprived of

---

[46] The alleged solicitation to murder Assistant U.S. Attorney Andres occurred on or about November 23, 2004, following Petitioner's November 19, 2004 arrest. See Basciano, 763 F. Supp. 2d at 312. Later, just before or shortly after the conclusion of Petitioner's first trial in April or May of 2006, Basciano wrote a list containing the names of the court, the lead prosecutor (Andres), and three cooperating witnesses and provided this list to a fellow inmate. See Basciano, 2006 WL 3483924, at *1. The Government alleged that Basciano indicated to the inmate that he sought to have the listed individuals killed, but Petitioner contended that the list was created for use in a Santeria ritual that required it to be placed in his right shoe and stomped on five times per day during the course of trial. Id.

his entitlement to a 'disinterested' prosecutor." See Wright v. United States, 732 F.2d 1048, 1056 (2d Cir. 1984). In other words, Petitioner's claim can be understood as an argument that Andres and Buretta had "an axe to grind against the defendant," as distinguished from the appropriate interest of a prosecutor in bringing a charged defendant to justice. Id.

Similarly to his contention of prosecutorial elicitation of false testimony, Basciano fails to show sufficient evidence of any improper motive on the part of Assistant U.S. Attorneys Andres and Buretta. As the court previously stated in response to Petitioner's motion to recuse the United States Attorney's Office in his capital proceedings, "none of [the claims] assert any particular act of bad faith or unethical conduct." Basciano, 763 F. Supp. 2d at 314. Moreover, insofar as the outcome of the alleged bias resulted in the Government's suppression of Gambina's proffer statements and the information contained in the Buretta Note, the court has already concluded that no constitutional violation resulted. See supra Parts III.B-C. In other words, Petitioner's claim of bias is without merit, and accordingly his claim is denied.

\* \* \* \* \*

In sum, the court concludes that Petitioner's claims regarding prosecutorial elicitation of perjury, misconduct, and bias are without merit.

VII.    CONCLUSION

For the aforementioned reasons, Basciano's Petition is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       December 17, 2014

NICHOLAS G. GARAUFIS
United States District Judge

52